B1 (Official Form 1) (04/13)

| UNITED STATES BANKRUPTCY COURT<br>District of Delaware | VOLUNTARY PETITION |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>Seegrid Corporation | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all):<br>04-3741133 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>216 RIDC Park West Drive<br>Pittsburgh, PA<br>ZIP CODE 15275 | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>Allegheny | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>ZIP CODE | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☑ Other | ☐ Chapter 7<br>☐ Chapter 9<br>☑ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13    ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding<br>☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding |

| Chapter 15 Debtors | Tax-Exempt Entity<br>(Check box, if applicable.) | Nature of Debts<br>(Check one box.) |
|---|---|---|
| Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding by, regarding, or against debtor is pending: | ☐ Debtor is a tax-exempt organization under title 26 of the United States Code (the Internal Revenue Code). | ☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."   ☑ Debts are primarily business debts. |

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☑ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | **Check one box:**<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>**Check if:**<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,490,925 (*amount subject to adjustment on 4/01/16 and every three years thereafter.*)<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>**Check all applicable boxes:**<br>☑ A plan is being filed with this petition.<br>☑ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

Estimated Number of Creditors

| ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

B1 (Official Form 1) (04/13)                                                                                                          Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s): |  |
|---|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet.) | | |
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet.) | | |
|---|---|---|
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| **Exhibit A**<br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐  Exhibit A is attached and made a part of this petition. | **Exhibit B**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>    Signature of Attorney for Debtor(s)    (Date) |
|---|---|

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐   Yes, and Exhibit C is attached and made a part of this petition.

☑   No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐   Exhibit D, completed and signed by the debtor, is attached and made a part of this petition.

If this is a joint petition:

☐   Exhibit D, also completed and signed by the joint debtor, is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☑   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐   There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐   Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐   Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐   Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐   Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐   Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

B1 (Official Form 1) (04/13)                                                                                                    Page 3

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case.)* | |

| **Signatures** | |
|---|---|

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
   Signature of Debtor

X _____
   Signature of Joint Debtor

   _____
   Telephone Number (if not represented by attorney)

   _____
   Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only **one** box.)

☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
   (Signature of Foreign Representative)

   _____
   (Printed Name of Foreign Representative)

   _____
   Date

| **Signature of Attorney\*** | **Signature of Non-Attorney Bankruptcy Petition Preparer** |
|---|---|

**Signature of Attorney\***

X    /s/ Robert Dehney
   _____
   Signature of Attorney for Debtor(s)
   Robert Dehney
   _____
   Printed Name of Attorney for Debtor(s)
   Morris Nichols Arsht & Tunnell LLP
   _____
   Firm Name

   1201 N. Market Street
   Wilmington, DE 19801
   _____
   Address
   302-658-9200
   _____
   Telephone Number
   10/22/2014
   _____
   Date

\*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

   _____
   Printed Name and title, if any, of Bankruptcy Petition Preparer

   _____
   Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X    /s/ David Heilman
   _____
   Signature of Authorized Individual
   David Heilman
   _____
   Printed Name of Authorized Individual
   President
   _____
   Title of Authorized Individual
   10/22/2014
   _____
   Date

   _____
   Address

X _____
   Signature

   _____
   Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

SEEGRID CORPORATION,[1]

      Debtor.

Chapter 11

Case No. 14-_____ (    )

## LIST OF CREDITORS
## HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 case. The list (1) may include persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, and (2) does not include secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.[2]

| Name of Creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of Claim | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Giant Eagle, Inc.<br>101 Kappa Dr<br>RIDC Park<br>Pittsburgh, PA 15238 | Andrew S Drexler Sr VP and CFO<br>Telephone: (412) 963-2598<br>Facsimile: (412) 968-1615 | Unsecured Noteholder | N/A | $27,152,183.00 |
| Here Management Services, LLC<br>1301 Grandview Ave.<br>Ste 220<br>Pittsburgh, PA 15211-4204 | Anthony Horbal<br>Telephone: (412) 401-8540<br>Facsimile: (866) 757-4447 | Unsecured Noteholder | N/A | $7,373,276.00 |
| Rick Cohen<br>c/o C&S Wholesale Grocers<br>7 Corporate Dr<br>Keene, NH 03431 | Rick Cohen<br>Telephone: (603) 354-4601<br>Facsimile: (603)-354-4692 | Unsecured Noteholder | N/A | $2,340,222.00 |
| David Shapira<br>101 Kappa Drive<br>Pittsburgh, PA 15238 | David Shapira<br>Telephone: (412) 338-5225<br>Facsimile: (412) 963-2540 | Unsecured Noteholder | N/A | $698,237.00 |
| Raymond Corporation, The | Arthur Goodell, Esq. | Trade Payable | N/A | $490,000.00 |

---

[1]     The last four digits of the Debtor's tax payer identification number are: 1133. The Debtor's address is 216 Park West Drive, Pittsburgh, PA 15275.

[2]     Nothing contained in this list shall constitute an admission or a waiver of any of the Debtor's rights as to liability, amount, or any defenses or offset.

| Name of Creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of Claim | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| 20 South Canal St<br>Greene, NY 13778-0130 | Telephone: (607) 656-2302<br>Facsimile: (607) 656-2466 | | | |
| Bernard D Marcus<br>Karen Littman Trustee<br>One Oxford Centre, 35Th Fl<br>301 Grant St<br>Pittsburgh, PA 15219 | Karen Littman Trustee<br>Telephone: (412) 338-5200<br>Facsimile: (412) 391-8758 | Unsecured Noteholder | N/A | $434,400.00 |
| Daniel H Shapira<br>One Oxford Centre, 35Th Fl<br>301 Grant St<br>Pittsburgh, PA 15219 | Daniel H Shapira<br>Telephone: (412) 338-5225<br>Facsimile: (412) 391-8758 | Unsecured Noteholder | N/A | $433,667.00 |
| Linde Material Handling Gmbh<br>Kion Group<br>Monica Kind<br>Abraham Lincoln Strasse 21<br>Wiesbaden, 65189<br>Germany | Monica Kind<br>Telephone: (011)490611770238<br>Facsimile: (11)490611770230200 | Trade Payable | N/A | $322,399.84 |
| Buchanan Ingersoll & Rooney<br>One Oxford Centre, 20Th Floor<br>301 Grant Street<br>Pittsburgh, PA 15219 | Managing Partner<br>Telephone: (412) 562-8800<br>Facsimile: (412) 562-1041 | Trade Payable | N/A | $218,247.57 |
| RIDC<br>PO Box 3830<br>Pittsburgh, PA 15230 | Legal/CFO<br>Telephone: (412)-471-3939 Ext. 3912<br>Facsimile: (412)-471-1740 | Trade Payable | N/A | $192,271.10 |
| Onello & Mello LLP<br>Three Burlington Woods Dr<br>Ste 203<br>Burlington, MA 01803 | David M Mello<br>Telephone: (617) 994-4900<br>Facsimile: (617) 742-7774 | Trade Payable | N/A | $162,114.99 |
| Salem Metal Fabricators Inc<br>21 Lonergan Rd<br>Middleton, MA 01949-4597 | Jason M Vining Pres and Treasurer<br>Telephone: (978) 774-2100<br>Facsimile: (978) 762-6434 | Trade Payable | N/A | $150,630.10 |
| John Lucot<br>1783 Dominion Dr<br>Pittsburgh, PA 15241 | John Lucot<br>Telephone: (412) 963-2573<br>Facsimile: (412) 967-368matrix | Unsecured Noteholder | N/A | $125,022.00 |
| Shaun K. Donnellan<br>1250 W Southwinds Blvd, Apt 118<br>Vero Beach, FL 32963 | Shaun K. Donnellan<br>Telephone: 330-417-1771<br>Facsimile: Individual No Fax | Unsecured Noteholder | N/A | $122,213.00 |
| Galil Motion Control Inc<br>270 Technology Way<br>Rocklin, CA 95765 | Wayne Baron President<br>Telephone: (916) 626-0101<br>Facsimile: (916) 626-0102 | Trade Payable | N/A | $104,275.00 |

| Name of Creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of Claim | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Unicarriers Americas Corp<br>240 N Prospect St<br>Marengo, IL 60152 | Tom Prusinski CFO<br>Telephone: (815) 568-4385<br>Facsimile: (815) 568-0180 | Trade Payable | N/A | $88,898.58 |
| Larry Baldauf<br>4108 Kennedy Drive<br>Butler, PA 16001 | Larry Baldauf<br>Telephone: (412) 721-5217<br>Facsimile: Individual No Fax | Unsecured Noteholder | N/A | $73,671.00 |
| Sunburst Electronics Inc<br>PO Box 3428<br>420 E Bayfront Pkwy<br>Erie, PA 16508 | Dominic Dionisio Controller<br>Telephone: (814) 461-9120<br>Facsimile: (814) 480-8203 | Trade Payable | N/A | $69,297.90 |
| MacDiarmid Machine Corp<br>7 Perry Way<br>Newburyport, MA 01950 | Scott P MacDiarmid President<br>Telephone: (978) 465-3546<br>Facsimile: (978) 465-3636 | Trade Payable | N/A | $63,569.82 |
| Richard Nimtz<br>1233 N Gulfstream Ave #1401<br>Sarasota, FL 34236 | Richard Nimtz<br>Telephone: (941) 373-0004<br>Facsimile: Individual No Fax | Unsecured Noteholder | N/A | $62,511.00 |

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SEEGRID CORPORATION, | : | Case No. 14-_____ (___) |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION REGARDING LIST OF
## CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

I, David Heilman, the undersigned authorized signatory of Seegrid Corporation, named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list of creditors and that it is true and correct to the best of my information and belief.

Dated: October 21, 2014

/s/ David Heilman
David Heilman
Chief Executive Officer

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

- 4 -

## SECRETARY'S CERTIFICATE
## OF
## SEEGRID CORPORATION

The undersigned Secretary of Seegrid Corporation (the "Company"), a corporation duly organized and existing under the laws of the State of Delaware, does hereby certify that attached hereto as Exhibit A is a true and correct copy of resolutions adopted by unanimous vote of the members of the Board of Directors of the Company (the "Board") at a duly noticed and called special meeting of the Board held on October 20, 2014.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of this 21st day of October, 2014.

Thomas G. Buchanan, Secretary

## EXHIBIT A

### RESOLUTIONS OF THE BOARD OF DIRECTORS OF SEEGRID CORPORATION ADOPTED AT A SPECIAL MEETING OF THE BOARD OF DIRECTORS HELD ON OCTOBER 20, 2014

**WHEREAS**, on September 18, 2014, the Board of Directors approved a restructuring term sheet presented by Giant Eagle, Inc. ("Giant Eagle"), which outlined the terms and conditions of a prepackaged Chapter 11 reorganization; and

**WHEREAS**, the Board of Directors has considered the business and financial condition and results of operations of the Corporation and has determined that it is in the Corporation's best interest to file a prepackaged plan of reorganization of the Corporation (the "Plan") in the United States Bankruptcy Court for the District of Delaware pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

**WHEREAS**, pursuant to the Bankruptcy Code, the Plan must be approved by certain of the Corporation's creditors; and

**WHEREAS**, the Corporation submitted the Plan and a Disclosure Statement, which describes certain aspects of the Plan, including treatment of the creditors and certain aspects of the Corporation's operations, financial prospects and other related matters, to the Corporation's creditors, which is attached hereto as **Exhibit A** (the "Disclosure Statement")[1]; and

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to ratify, approve and confirm the distribution of the Disclosure Statement, including the Plan, to the Corporation's creditors; and

**WHEREAS**, upon the approval of the Plan by the Corporation's creditors, the Board of Directors believes it to be in the Corporation's best interest to file the Disclosure Statement and the Plan with the United States Bankruptcy Court for the District of Delaware; and

**WHEREAS**, as part of the Plan, the Corporation's operating assets are being transferred to a newly formed wholly owned subsidiary ("Seegrid Sub"), pursuant to the terms and conditions of a Contribution, Assignment and Assumption Agreement (the "Contribution Agreement"); and

**WHEREAS**, upon or following the approval of the Plan by the Corporation's creditors, the Board of Directors believes it to be in the Corporation's best interest to file the Certificate of Incorporation for Seegrid Sub, substantially in the form necessary to incorporate all of the terms and conditions of the Series A Preferred Shares (the "Shares") as set forth in the Offering (as defined below), with the Secretary of State of the State of Delaware (the "Certificate of Incorporation"); and

---

[1] Except as otherwise set forth herein, all of the documents approved by these resolutions are attached to the Disclosure Statement, including the Plan and all of its exhibits, which is attached to the Disclosure Statement as Exhibit A.

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to enter into the Contribution Agreement with Seegrid Sub upon confirmation of the Plan; and

**WHEREAS**, the Corporation expects to receive debtor-in-possession financing in the aggregate principal amount of up to $3 million from Giant Eagle under the DIP Credit Agreement (the "DIP Facility"), whereby the DIP Facility will act as a bridge for the Corporation to implement and consummate the restructuring transactions contemplated in the Plan and upon the Effective Date, the outstanding obligations under the DIP Facility will be converted into the Shares on the terms described in the DIP Credit Agreement; and

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to approve the DIP Facility; and

**WHEREAS**, in connection with the Plan, the Corporation's debt holders and direct and indirect stockholders are being offered the opportunity to participate in an offering of the Shares, pursuant to the terms and conditions set forth in the Offer Notice, attached hereto as **Exhibit B** (the "Offer Notice"); and

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to ratify, approve and confirm the distribution of the Offer Notice to the Corporation's debt holders and direct and indirect stockholders; and

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to take such necessary actions, obtain such government approvals and to execute such documents as are necessary to facilitate the sale of the Shares by Seegrid Sub pursuant to the terms and conditions of the Offer Notice; and

**WHEREAS**, following the Effective Date, Giant Eagle will provide additional post-reorganization financing to Seegrid Sub, whereby if the debt converted to the Shares under the Plan is less than $10 Million, Giant Eagle has agreed to purchase such additional Shares so that Giant Eagle shall own $10 million of such Shares; and

**WHEREAS**, Giant Eagle memorialized its intentions to provide additional post-reorganization financing in a Plan Support Agreement (the "Plan Support Agreement"); and

**WHEREAS**, the Board of Directors believes it to be in the Corporation's best interest to acknowledge and approve the terms and conditions of the Plan Support Agreement.

**NOW THEREFORE, BE IT**

**RESOLVED**, that the distribution of the Disclosure Statement and the Offering Notice is hereby ratified, approved and confirmed in all respects; and it is further

**RESOLVED**, that, upon the approval of the Plan by the Corporation's creditors, the filing by the Corporation of the Disclosure Statement and the Plan pursuant to the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, is authorized and approved; and it is further

**RESOLVED**, that, upon the approval of the Plan by the Corporation's creditors, James Rock, as the Chief Executive Officer of the Corporation, David Heilman, as the President of the Corporation and/or Phillip W. Oliveri, as the Chief Financial Officers and Treasurer of the Corporation (collectively, the "Authorized Officers"), are hereby authorized, empowered and directed on behalf of and in the name of the Corporation to take such actions as described in the following resolutions; and it is further

**RESOLVED**, that the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered, and directed on behalf of and in the name of the Corporation to execute, verify, and deliver all documents necessary to validly perfect the filing of the Plan; and it is further

**RESOLVED**, that the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered and directed on behalf of and in the name of the Corporation to appear in all bankruptcy proceedings on behalf of the Corporation, and to otherwise do and perform all acts and deeds, and to execute, verify, and deliver all necessary documents, in connection with such bankruptcy case, with a view to successful prosecution of such bankruptcy case; and it is further

**RESOLVED**, that the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered and directed to file the Certificate of Incorporation with the Secretary of State of the State of Delaware; and it is further

**RESOLVED**, that the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered and directed on behalf of and in the name of the Corporation to execute and deliver the Contribution Agreement, and such ancillary documents as may be deemed necessary or appropriate by the Authorized Officers, the execution thereof by such Authorized Officers to be conclusive evidence of such determination, and to consummate the transactions contemplated thereby; and it is further

**RESOLVED**, that the DIP Credit Facility is hereby approved and the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered and directed on behalf of and in the name of the Corporation to execute and deliver the DIP Credit Agreement and such documents, notes, guaranties, security agreements, pledge agreements, and all other documents, agreements or instruments (collectively, the "DIP Credit Documents") as may be deemed necessary or appropriate by the Authorized Officers in connection with the DIP Credit Facility, the execution thereof by such Authorized Officers to be conclusive evidence of such determination, and to consummate the transactions contemplated thereby; and it is further

**RESOLVED**, that the Corporation be, and it hereby is, authorized, to the extent applicable, to obtain the use of cash collateral, in such amounts and on such terms as may be agreed by any Authorized Officers, including the grant of replacement liens, as is reasonably necessary for the continuing conduct of the affairs of the Corporation; and it is further

**RESOLVED**, that the Authorized Officers, acting alone or with one or more other Authorized Officers, are hereby authorized, empowered and directed on behalf of and in the name of the Corporation to take such necessary actions, obtain such government approvals and to

execute and deliver such documents as are necessary to facilitate the sale of the Shares by Seegrid Sub pursuant to the terms and conditions of the Plan and the Offer Notice; and it is further

RESOLVED, that the terms and conditions of the Plan Support Agreement are hereby acknowledged and approved; and it is further

RESOLVED, that the engagement of the law firm of Morris, Nichols, Arsht & Tunnell LLP, as general bankruptcy counsel in the representation of the Corporation as debtor and debtor in possession, prior to and in any case commenced by the Corporation under the Bankruptcy Code, and in all matters arising in connection therewith, is hereby ratified and approved, and the Authorized Officers be, and hereby are, authorized and empowered to retain such other attorneys, advisors, accountants, consultants or other professionals on behalf of the Corporation as the Authorized Officers may determine to be necessary or appropriate; and it is further

RESOLVED, that the engagement of the law firm of Buchanan Ingersoll & Rooney PC as special corporate counsel under Section 327(e) of the Bankruptcy Code in any case commenced by the Corporation under the Bankruptcy Code, and in all matters arising in connection therewith, is hereby ratified and approved; and it is further

RESOLVED, that the engagement of SSG Advisors as the Corporation's financial advisors prior to and in any case commenced by the Corporation under the Bankruptcy Code, and in all matters arising in connection therewith, is hereby ratified and approved; and it is further

RESOLVED, that the Authorized Officers be, and each hereby is, authorized, empowered, and directed, with full power of delegation, on behalf of and in the name of the Corporation, to execute, verify and/or file, cause to be filed and/or executed or verified (or direct others to do so on their behalf as provided herein), and to amend, supplement, or otherwise modify from time to time, all necessary or appropriate documents, including, without limitation, petitions, affidavits, schedules, motions, lists, applications, pleadings, engagement agreements, and other documents, agreements, and papers, including all DIP Credit Documents, and to take any and all actions that the Authorized Officers deem necessary or appropriate; each in connection with the Plan, the DIP Credit Facility, the sale of the Shares by Seegrid Sub, or any other actions contemplated hereby; and it is further

RESOLVED, that the Authorized Officers, and any employees or agents (including counsel) designated by or directed by the Authorized Officers, shall be, and each hereby is, authorized, empowered, and directed to cause the Corporation and such of its affiliates as management deems appropriate to enter into, execute, deliver, certify, file, record, and perform such agreements, instruments, motions, affidavits, applications for approval, or rulings of governmental or regulatory authorities, certificates, or other documents, and to take such other actions, as in the judgment of such Authorized Officers shall be necessary, proper, and desirable to effectuate the Plan, to effectuate the restructuring of the Corporation's debt, other obligations, organizational form and structure, and ownership of the Corporation and its subsidiaries consistent with the foregoing resolutions, and the transactions contemplated by these resolutions, their authority thereunto to be evidence by the taking of such actions; and it is further

**RESOLVED**, that any specific resolutions that may be required to have been adopted by the Board of Directors of the Corporation to effectuate the matters and transactions contemplated by the foregoing resolutions be, and they hereby are, adopted, and the directors, officers, and authorized representatives of the Corporation be, and each of them acting alone hereby is, authorized in the name and on behalf of the Corporation to certify as to the adoption of any and all such resolutions; and it is further

**RESOLVED**, that the Authorized Officers shall be, and each hereby is, authorized, empowered, and directed on behalf of the Corporation and in its name to take or cause to be taken all actions and to execute and deliver all such instruments that such Authorized Officers determine are necessary or desirable in connection with the foregoing resolutions; and it is further

**RESOLVED**, that all of the acts and transactions heretofore taken by the officers and directors of the Corporation in connection with or otherwise in contemplation of the transactions contemplated by any of the foregoing resolutions be and they hereby are confirmed, approved and ratified.

**Exhibit A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEEGRID CORPORATION, | Case No. 14-_____-_____ |
| Debtor. | |

## DISCLOSURE STATEMENT FOR PREPACKAGED
## PLAN OF REORGANIZATION OF SEEGRID CORPORATION
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

### OCTOBER 3, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
James D. Newell (PA ID No. 51337)
Zakarij O. Thomas (PA ID No. 87385)
301 Grant Street, 20th Floor
One Oxford Centre
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562 1041

-and-

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway
Kathleen A. Murphy
919 N. Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

*Attorneys for Debtor Seegrid Corporation*

---

SEEGRID CORPORATION HAS NOT COMMENCED A CASE UNDER THE BANKRUPTCY CODE AT THIS TIME. THIS DISCLOSURE STATEMENT AND ACCOMPANYING PLAN OF REORGANIZATION SOLICITS ACCEPTANCES OF THE PLAN PRIOR TO THE FILING OF A VOLUNTARY REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.

# DISCLAIMER

Seegrid Corporation, as proposed chapter 11 debtor and debtor in possession ("Seegrid" or the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote on the Debtor's Prepackaged Chapter 11 Plan of Reorganization, as the same may be amended from time to time (the "Plan")[1].  To the extent you are entitled to vote on the Plan, the Debtor is commencing the solicitation of your vote to approve the Plan (the "Solicitation") before the Debtor files a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

If the required creditors vote to approve the Plan and if other pre-filing conditions are satisfied, the Debtor intends to file a voluntary reorganization case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code to implement the Plan.  In order to expedite the Debtor's reorganization, however, the Debtor may commence the Chapter 11 Case prior to the Voting Deadline (as defined herein).

Because the Chapter 11 Case has not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Bankruptcy Code section 1125(a).  Following the commencement of the Chapter 11 Case, the Debtor expects to seek an order of the Bankruptcy Court promptly to (a) approve this Disclosure Statement as having contained "adequate information," (b) approve the solicitation of votes as having been in compliance with Bankruptcy Code section 1126(b) and (c) confirm the Plan.  The Bankruptcy Court may order additional disclosures.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein.  Any representation to the contrary is a criminal offense.  Neither the Solicitation of the Plan nor this Disclosure Statement constitutes an offer to sell nor the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

---

The deadline to accept or reject the Plan is *5:00 p.m. (prevailing Eastern Time) on October 17, 2014* (the "Voting Deadline") unless the Debtor extends the Voting Deadline.  To be counted, a ballot ("Ballot") indicating acceptance or rejection of the Plan must be **actually received** by Logan & Company, Inc., the Debtor's notice, claims, and balloting agent (the "Balloting Agent"), no later than the Voting Deadline.

---

[1] Capitalized terms defined in this Disclosure Statement shall be used as defined herein whenever appearing in capitalized form, regardless of whether appearing in the singular, plural or possessive form(s).  All capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan; to the extent such terms are not defined in the Plan, they shall have the meanings ascribed under Section 101 of the Bankruptcy Code.

> The Debtor cannot assure you that the Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Case (a) will contain any of the terms described in this Disclosure Statement or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtor urges each holder of a Claim entitled to vote on the Plan (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under the "Risk Factors" section below) and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to vote to accept or reject the Plan. A creditor entitled to vote on the Plan should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

> If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtor (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan, to the extent applicable, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.

THE DEBTOR AND THE REORGANIZED DEBTOR, AS APPROPRIATE, RESERVE THE RIGHT TO OBJECT TO THE AMOUNT OR CLASSIFICATION OF ANY CLAIM OR INTEREST.

THE ESTIMATES SET FORTH IN THIS DISCLOSURE STATEMENT CANNOT BE RELIED ON BY ANY CREDITOR OR INTEREST HOLDER WHOSE CLAIM OR INTEREST IS SUBJECT TO AN OBJECTION. A CLAIM HOLDER WHOSE CLAIM IS SUBJECT TO AN OBJECTION MAY NOT RECEIVE THE SPECIFIED SHARE OF THE ESTIMATED DISTRIBUTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT.

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................................. 1

II.    IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT ............. 3

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
       AND THE PLAN ................................................................................................... 4
       A.  What is chapter 11? ...................................................................................... 4
       B.  What is a "prepackaged" plan of reorganization? .......................................... 5
       C.  Why is the Debtor sending me this Disclosure Statement? ........................... 5
       D.  Am I entitled to vote on the Plan? ................................................................. 5
       E.  How do I vote on the Plan and what is the Voting Deadline? ......................... 7
       F.  Why is the Bankruptcy Court holding a Confirmation Hearing and when is
           the Confirmation Hearing set to occur? ........................................................ 7
       G.  What is the purpose of the Confirmation Hearing? ....................................... 8
       H.  What is the effect of the Plan on the Debtor's ongoing business? ................. 8
       I.  Who do I contact if I have additional questions with respect to this Disclosure
           Statement or the Plan? ................................................................................. 8
       J.  Does the Debtor recommend voting in favor of the Plan? ............................. 8

IV.    GENERAL INFORMATION CONCERNING THE DEBTOR ................................. 9
       A.  Overview of the Debtor and its Business ....................................................... 9
           1.  General ................................................................................................. 9
           2.  The Debtor's Capital Structure ........................................................... 10
       B.  Events Leading up to the Chapter 11 Filing ................................................ 11
           1.  Seegrid Fails to Attract Sufficient Outside Financing .......................... 11
           2.  Seegrid Exhausts Willingness of Investors other than Giant Eagle to Fund
               Operating Loans ................................................................................. 12
           3.  Anthony Horbal Blocks Debtor's Ability to Obtain Financing from Willing
               Sources ............................................................................................... 14

V.     ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE ............................. 15
       A.  Commencement of Chapter 11 Case and First Day Orders ......................... 15
       B.  Financing Facilities .................................................................................... 16
           1.  Debtor in Possession Financing .......................................................... 16
           2.  Post-Confirmation Financing of Seegrid Sub ...................................... 16
       C.  Stay of Pending Litigation Proceedings and Potential Removal of Pending Litigation
           Proceedings to the Bankruptcy Court ......................................................... 16
       D.  Expected Timetable of the Chapter 11 Case ............................................... 17

VI.    SUMMARY OF THE PLAN OF REORGANIZATION ......................................... 17
       A.  Summary of Treatment of Claims and Interests under the Plan ................... 17
       B.  General Basis for the Prepackaged Plan ..................................................... 19
       C.  Plan Objectives .......................................................................................... 20
       D.  Classification and Allowance of Claims and Interests Generally .................. 20

E.   Classification and Treatment of Unclassified Claims under the Plan.................................21
    1.   Administrative Expense Claims...................................................................... 21
    2.   Fees and Expenses of Professionals ............................................................. 21
    3.   Priority Tax Claims ....................................................................................... 22
    4.   Non-Tax Priority Claims ............................................................................... 22
F.   Treatment of Classified Claims and Interests under the Plan ...........................................22
    1.   Class 1 – Secured Claims .............................................................................. 23
    2.   Class 2 - Unsecured Claims .......................................................................... 24
    3.   Class 3 – Preferred Share Interests................................................................ 25
    4.   Class 4 – Common Stock Interests ............................................................... 26
G.   Description of the Restructuring Transaction and Creation of New Seegrid Sub ............26
    1.   Formation of Seegrid Sub ............................................................................. 26
    2.   Issuance of Seegrid Sub Equity .................................................................... 26
    3.   Seegrid Sub's Officers and Board of Directors............................................. 27
H.   Distributions On Account of Allowed Claims ..................................................................27
    1.   Distributions.................................................................................................. 27
    2.   Date of Distributions .................................................................................... 28
    3.   Postpetition interest on Claims..................................................................... 28
    4.   Means of Cash Payment ............................................................................... 28
    5.   Delivery of Distributions .............................................................................. 28
    6.   Time Bar to Cash Payments ......................................................................... 28
    7.   Record Date for Holders of Claims .............................................................. 29
    8.   Distributions after Effective Date ................................................................ 29
    9.   Fractional Cents ............................................................................................ 29
    10. Setoff............................................................................................................. 29
    11. No Distributions Pending Allowance............................................................ 29
I.    Executory Contracts and Unexpired Leases .....................................................................30
    1.   General Treatment......................................................................................... 30
    2.   Cure of Defaults ........................................................................................... 30
    3.   Rejection Damages Claims ........................................................................... 31
J.    Provisions for Resolving and Treating Disputed Claims..................................................31
    1.   Disputed Claims ........................................................................................... 31
    2.   Objection to Claims....................................................................................... 31
    3.   Payments and Distributions with Respect to Disputed Claims .................... 31
    4.   Estimation of Claims .................................................................................... 31
    5.   Preservation of Rights to Settle Claims ....................................................... 32
K.   Means of Implementing the Plan .....................................................................................32
    1.   Generally ....................................................................................................... 32
    2.   Seegrid Sub ................................................................................................... 32
    3.   Amendment of Certificate............................................................................. 33
    4.   Effectuating Documents; Further Transactions ............................................ 33

VII.   EFFECTS OF CONFIRMATION OF THE PLAN............................................................ 33
A.   Vesting of Seegrid's Assets ..............................................................................................33
B.   Terms of Injunction and Automatic Stay..........................................................................33
C.   No Liability for Certain Released Claims..........................................................................34

VIII.  Discharges, Releases and Injunctions ................................................................ 34
    A.  Discharge of Seegrid ..............................................................................34
    B.  Discharge Injunction ..............................................................................34
    C.  Exculpation ............................................................................................35
    D.  Indemnification and Reimbursement Obligations .................................35
    E.  Release of Avoidance Actions ................................................................35

IX.  CONDITIONS PRECEDENT to CONFIRMATION AND CONSUMMATION OF THE
    PLAN ................................................................................................... 35
    A.  Conditions Precedent to Confirmation of the Plan ...............................35
    B.  Effective Date of the Plan ......................................................................36
    C.  Waiver of Conditions Precedent to the Confirmation Order .................37
    D.  Waiver of Conditions Precedent to the Effective Date .........................37
    E.  Effect of Failure of the Effective Date of the Plan ...............................37

X.  JURISDICTION OF BANKRUPTCY COURT ............................................. 37
    A.  Retention of Jurisdiction ........................................................................37
    B.  Modification of Plan ..............................................................................39
    C.  Compromises of Controversies ..............................................................39
    D.  Revocation or Withdrawal of the Plan ...................................................39

XI.  MISCELLANEOUS PROVISIONS ............................................................. 40
    A.  Governing Law .......................................................................................40
    B.  Plan Supplement .....................................................................................40
    C.  Inconsistencies .......................................................................................40
    D.  Reservation of Rights .............................................................................40
    E.  Officer and Board of Directors ...............................................................40
    F.  Preservation of Causes of Action ...........................................................41
    G.  Severability of Plan Provisions ..............................................................41
    H.  Tax Reporting and Compliance ..............................................................41
    I.  Exemption from Transfer Taxes .............................................................42
    J.  Binding Effect ........................................................................................42
    K.  Further Authorizations ...........................................................................42
    L.  Payment of Statutory Fees .....................................................................42
    M.  Prepayment ............................................................................................42
    N.  Effective Date Actions Simultaneous ....................................................42
    O.  General Statements .................................................................................43

XII.  GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE.. 43
    A.  Voting On the Plan .................................................................................43
    B.  Voting Record Date ................................................................................43
        1.  Who May Vote .............................................................................. 44
        2.  Eligibility ...................................................................................... 44
        3.  Binding Effect .............................................................................. 44
    C.  Procedure/Voting Deadlines ..................................................................44
    D.  Plan Confirmation Process .....................................................................45
        1.  Requirements ................................................................................ 45

2.  Confirmation Hearing ............................................................................... 48

XIII.  RISK FACTORS ............................................................................................. 48
  A.  Bankruptcy Factors ......................................................................................48
      1.  Classifications of Claims and Interests ................................................. 48
      2.  Non-Occurrence of the Effective Date ................................................... 48
      3.  Failure to Receive Requisite Accepting Votes........................................ 48
      4.  Nonconsensual Confirmation .................................................................. 49
      5.  Failure to Confirm the Plan ................................................................... 49
      6.  Risk of Additional or Larger Claims ...................................................... 50
      7.  Alternative Chapter 11 Plan .................................................................. 50
      8.  Variances from Projections .................................................................... 50
      9.  Certain tax implications of the Chapter 11 Case .................................... 51
      10. The Debtor's emergence from chapter 11 is not assured .......................... 51
      11. The Debtor may fail to satisfy solicitation requirements ........................ 51
      12. Confirmation and consummation may be delayed if the Debtor has to
          resolicit .................................................................................................. 52

XIV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES............................. 52
  A.  Certain U.S. Federal Income Tax Consequences to the Debtor and Reorganized
      Debtor ..........................................................................................................53
  B.  Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims or
      Interests .......................................................................................................53
      1.  Class 2-B .............................................................................................. 54
      2.  Holders of the First and Third Priority Secured Bridge Noteholder Claims.............. 54
      3.  Holders of the Second Priority Secured Noteholder Claims ..................... 55
  C.  Importance of Obtaining Professional Tax Assistance ....................................55

XV.  ALTERNATIVES TO THE PLAN .................................................................. 55
  A.  Liquidation under Chapter 7 .........................................................................55
  B.  Dismissal......................................................................................................56

XVI.  RECOMMENDATIONS ................................................................................ 56

XVII. CONCLUSION................................................................................................ 56

## I.    INTRODUCTION

Seegrid submits this Disclosure Statement dated October 3, 2014 to certain Holders of Claims and Interests in connection with the solicitation of acceptances with respect to the Plan. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. This Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Interests, and also describes certain aspects of the Debtor's operations, financial projections, and other related matters.

The purpose of this Disclosure Statement is to set forth information (a) regarding the Debtor's history, its business and the proposed Chapter 11 Case, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims against and Interests in the Debtor of their rights under the Plan, (d) assisting the Holders of Claims against and Interests in the Debtor in making an informed judgment regarding whether they should vote to accept or reject the Plan and (e) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

As of September 24, 2014, the Debtor had outstanding debt in the aggregate principal amount of approximately $48.37 million, consisting of approximately (a) $1.43 million of principal indebtedness owing to its first-lien priority lenders; (b) $10.7 million of principal indebtedness owing to its second-lien priority lenders; (c) $1.22 million of principal indebtedness owing to its third-lien priority lender; (d) $31.9 million of principal indebtedness owing to its unsecured lenders; and (e) $3.12 million of accounts payable.

Giant Eagle, Inc. ("**Giant Eagle**") and related entity Giant Eagle of Delaware, Inc. ("**Giant Eagle Delaware**") are collectively the largest shareholders and lenders to Seegrid. Giant Eagle and Giant Eagle Delaware own approximately 31.8% of Seegrid's outstanding shares and Giant Eagle has loaned Seegrid in excess of $33 million. Anthony Horbal ("**Horbal**") and related entity HERC Management Services, LLC ("**HERC**" and, collectively with Horbal, the "**Horbal Group**") constitute the second largest shareholder and lender to Seegrid. The Horbal Group owns approximately 21.3% of Seegrid's outstanding shares and has loaned Seegrid in excess of $7 million.

Until late 2013, Giant Eagle and the Horbal Group loaned funds to Seegrid as needed in amounts that loosely correlated to the ratio of their respective Giant Eagle and Giant Eagle Delaware/Horbal Group ownership interests. With the exception of a $100,000 loan in June of 2014 (compared to over $6 million loaned by Giant Eagle in 2014), the Horbal Group ceased lending to Seegrid alongside Giant Eagle in late 2013.

Approximately $45,258,253 in principal amount of Seegrid's debt matured on September 30, 2014. Seegrid does not have available cash to satisfy the obligations that matured and came due on September 30. Seegrid believes that the majority of its lenders would be willing to extend the maturity dates to allow Seegrid to continue its normal operations. The consent of the Horbal Group is required, however, to extend the maturity date of all notes. The Horbal Group has refused to extend the maturity date despite knowing that Seegrid does not have the means to pay the obligations at maturity and that, by refusing to extend the maturity, the Horbal Group will leave Seegrid no choice but to file for bankruptcy protection. As more fully described

below, Seegrid has received a number of non-bankruptcy restructuring alternatives from Giant Eagle. Each time, the Horbal Group has blocked Seegrid's ability to close the transaction.

Most recently, on August 20, 2014, Giant Eagle made a proposal that would have avoided a restructuring of Seegrid under the Bankruptcy Code. Specifically, Giant Eagle proposed to provide $8 million in financing to Seegrid on substantially the same terms as had been agreed by the Seegrid Board of Directors and the Horbal Group in the past. Under this proposal, Giant Eagle would have provided $4 million in immediate funds pursuant to senior secured convertible promissory notes, with related warrant coverage, and up to an additional $4 million of funding on the same terms conditioned on certain performance criteria. The August 20, 2014 proposal contained the same basic terms as were agreed in a January 2014 financing, except that the August proposal required that all noteholders, including the Horbal Group, extend the maturity of their Seegrid Notes from September 30, 2014 to September 30, 2019 to provide Seegrid time to achieve its economic goals. Giant Eagle also agreed to allow a full marketing process to seek outside investors and/or purchasers, with the active involvement of the Horbal Group, a provision that the Horbal Group had previously requested. All stockholders and convertible noteholders of Seegrid would have been given the opportunity to participate in the financing.

Despite these efforts, the Horbal Group's refusal to consent to Seegrid's proposals has forced Seegrid to reorganize under the protections of the Bankruptcy Code. Giant Eagle has funded recent operations on a subordinated basis to give Seegrid sufficient breathing room to formulate a plan to address its financial crisis while preserving Seegrid's going concern value. Without this interim financial assistance, and with the looming maturity date of September 30, 2014, Seegrid would have been forced to shut down operations and liquidate several months ago.

Seegrid is pleased to report that after extensive, good-faith and arm's-length negotiations, Giant Eagle is willing to extend (i) post-petition financing to the Debtor, conditioned upon acceptance of the Plan, and (ii) post-confirmation financing to the newly created subsidiary ("**Seegrid Sub**"), conditioned upon acceptance and confirmation of the Plan, all as set forth more fully herein and in the Plan.

After giving effect to the transactions contemplated by the Plan, the Debtor will emerge from chapter 11 as a holding company and Seegrid Sub will be appropriately capitalized with access to financing to support its emergence and go-forward business needs.

As provided by Article IX of the Plan, the Debtor may also undertake certain other restructuring transactions to implement the Plan.

**SEEGRID BELIEVES THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE ESTATE AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, THE DEBTOR BELIEVES THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTOR STRONGLY RECOMMENDS THAT CREDITORS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## II.    IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtor believes that the Plan is in the best interests of all creditors and urges all Holders of Claims entitled to vote on the Plan to accept the Plan.

Unless the context requires otherwise, any references to *"we," "our" and "us"* are to the Debtor.

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Effective Date to occur will be satisfied (or waived).

***If you are a creditor entitled to vote on the Plan, you are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, and the section entitled "Risk Factors," before submitting your Ballot to vote on the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement, and the Plan Supplement, and any exhibits, schedules or amendments thereto, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtor believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.

The Debtor has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtor's independent auditors unless explicitly stated herein.

The Debtor is relying on section 4(a)(2) of the Securities Act, and similar state securities law provisions, to exempt from registration under the Securities Act and state securities laws the offer to certain Holders of First Priority Secured Bridge Noteholder Claims, Third Priority Secured Bridge Noteholder Claims, direct and indirect stockholders and convertible debt holders to obtain Seegrid Sub Series A Preferred Shares prior to the Commencement Date, including, without limitation, in connection with the solicitation of votes to accept or reject the Plan. After the Commencement Date, the Debtor will also rely on Bankruptcy Code section 1145(a) to exempt from registration under the Securities Act and state securities laws the offer, issuance, and distribution of such securities under the Plan. Upon confirmation of the Plan, the securities

described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in Bankruptcy Code section 1145. To the extent exemptions from registration other than Bankruptcy Code section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act, including, without limitation, section 4(a)(2) of the Securities Act.

The Debtor may make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtor's future performance. Such forward-looking statements represent the Debtor's estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtor's restructuring plans or cause the actual results of the Debtor to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward- looking. There can be no assurance that the restructuring transactions described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of Reorganized Seegrid (also referred to herein as the "**Reorganized Debtor**").

## III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or Entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

**B.      What is a "prepackaged" plan of reorganization?**

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.  Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

**C.      Why is the Debtor sending me this Disclosure Statement?**

The Debtor will be seeking to obtain Bankruptcy Court approval of the Plan.  In connection with soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires the Debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement has been prepared in accordance with these requirements.

**D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to Bankruptcy Code section 1122(a), is referred to as a "Class."

Pursuant to the provisions of the Bankruptcy Code, only Classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, Classes of Claims or Interests that are "unimpaired" are deemed to have accepted the Plan and do not cast votes on the Plan.

Under the Plan, unclassified Claims and Holders of Claims in Classes 3-A, 3-B, 3-C, 3-D, 3-E and 4 are Unimpaired and therefore deemed to accept the Plan.  Holders of Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B are Impaired and are entitled to vote on the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1-A, 1-B, 1-C, 1-D, 2-A and 2-B.**

The respective voting status for unclassified Claims and each Class of Claims is set forth below.

The tables below designate the Classes of Claims against and Interests in the Debtor and specify which of those Classes are Impaired or Unimpaired by the Plan.  FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, SEE ARTICLES III and IV OF THE PLAN.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Expense Claims | Unimpaired | No (conclusively presumed to accept) |
| N/A | Priority Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| N/A | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 1 | Secured Claims | | |
| Class 1-A | First Priority Secured June 11 Noteholder Claims | Impaired | Yes |
| Class 1-B | First Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 1-C | Second Priority Secured Noteholder Claims | Impaired | Yes |
| Class 1-D | Third Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 2 | | | |
| Class 2-A | Unsecured Claims | | |
| Class 2-B | Noteholder General Unsecured Claims | Impaired | Yes |
| Class 3 | Other General Unsecured Claims | Impaired | Yes |
| Class 3 | | | |
| Class 3-A | Series A Preferred Share Interests | Unimpaired | No (conclusively presumed to accept) |
| Class 3-B | Series A-1 Preferred Share Interests | Unimpaired | No (conclusively presumed to accept) |
| Class 3-C | Series B Preferred Share Interests | Unimpaired | No (conclusively presumed to accept) |

| Class 3-D | Series C Preferred Share Interests | Unimpaired | No (conclusively presumed to accept) |
| Class 3-E | Series C-1 Preferred Share Interests | Unimpaired | No (conclusively presumed to accept) |
| Class 4 | Common Stock Interests | Unimpaired | No (conclusively presumed to accept) |

**E.    How do I vote on the Plan and what is the Voting Deadline?**

If you are entitled to vote to accept or reject the Plan, a Ballot for the acceptance or rejection of the Plan is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class. Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed, signed and submitted so that it is **actually received** by the Balloting Agent by 5:00 p.m. on the Voting Deadline (unless extended by the Debtor); _provided_ that Holders of Claims who cast a Ballot prior to the time for filing any of the Debtor's chapter 11 petition shall not be entitled to change their vote or cast a new Ballot after the Chapter 11 Case is commenced. See "**Solicitation and Voting Procedures**" Section XII of this Disclosure Statement for additional information.

If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the Balloting Agent as set forth herein.

**F.    Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

Following commencement of the Chapter 11 Case, the Debtor will request that the Bankruptcy Court schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned or continued from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtor and certain other parties prior to the Confirmation Hearing in accordance with the notice of the Confirmation Hearing.

### G.    What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### H.    What is the effect of the Plan on the Debtor's ongoing business?

Seegrid is reorganizing under chapter 11 of the Bankruptcy Code. As a result, subject to the occurrence of the Effective Date, Confirmation means that Seegrid will not be liquidated or forced to go out of business. Rather, Seegrid will transfer its operating assets to Seegrid Sub and will become a holding company. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by Seegrid that is a Business Day on or after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in Article XII of the Plan have been satisfied, or if capable of being waived, waived.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtor may continue in business and, except as otherwise provided by the Plan, may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan are deemed authorized and approved.

### I.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, you may contact the Debtor's counsel at the addresses and phone numbers listed on the cover page of this Disclosure Statement. Copies of the Plan and this Disclosure Statement may be obtained by contacting the Balloting Agent by calling 973-509-3190 or by emailing seegrid@loganandco.com.

### J.    Does the Debtor recommend voting in favor of the Plan?

Yes. The Debtor believes the Plan provides for a larger distribution to the Debtor's creditors than would otherwise result from any other available alternative. The Debtor believes the Plan, which preserves the operations of Seegrid's business through a holding company structure, is in the best interest of all creditors, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## IV.    GENERAL INFORMATION CONCERNING THE DEBTOR

### A.    Overview of the Debtor and its Business

#### 1.    *General*

Seegrid Corporation was founded in 2003 by Dr. Hans Morevic and Dr. Scott Friedman to bring automation to high-volume commercial vehicles. Today, Seegrid remains the pioneer and leading provider of automation solutions for high-volume commercial vehicles, including pallet trucks and tow trucks.

Seegrid's corporate headquarters is located in Pittsburgh, Pennsylvania where Seegrid leases 40,200 square feet. Seegrid's headquarters houses Seegrid's research and development, engineering, technical support, global sales and marketing, and corporate functions. Seegrid also maintains an engineering facility in Lowell, Massachusetts. As of the date of this Disclosure Statement, Seegrid has 53 full-time employees and 1 part-time employee.

Over the past ten years, Seegrid has developed the first automation system focused on seamlessly converting commercial industrial vehicles (pallet trucks and tow tractors) into low cost robotic industrial vehicles that do not require additional infrastructure. Robotic industrial vehicles dramatically improve the economics and operations of an existing industry through reduced labor costs and improved efficiency and safety. Unlike previous attempts at vehicle automation, Seegrid's robotic industrial vehicles completely leverage the existing manufacturing, sales and field service operations of original equipment manufacturers.

Seegrid's automation system integrates a proprietary and patented software technology to "see" its environment, map it in a virtual "grid" and guide the vehicle. The technology is state-of-the-art yet simple to use, as it does not require additional infrastructure or a specialized team of engineers to install, support, or operate the robotic industrial vehicles. Seegrid's software technology was designed by its team of engineers, including holders of five PhDs, and features sophisticated, state-of-the-art "evidence grid" software technology, stereo camera technology, user interface/sliding autonomy interaction architecture, motion control technology and enterprise and fleet information software technology. Seegrid currently has 31 issued or allowed patents and over 40 patents in process on over 20 matters. These patents and patent applications generally cover the automation of materials handling processes and the underlying robot perception technology. Seegrid has invested in over $15.1 million of research and development costs since its inception in 2003. These expenses served to develop the technology, commercialize the product and refine the core software and probabilistic volumetric sensing approaches.

For the first commercial application of this technology, Seegrid is using its automation systems to fundamentally change the materials handling industry by automating pallet trucks, tow tractors, and other industrial vehicles. The materials handling industry, specifically manufacturing and warehousing applications, provides an attractive initial target market for Seegrid's automation solutions because labor costs are high and rising, the market is large and qualified labor is becoming scarce. Indeed, the biggest challenge facing the material handling

industry has historically been managing labor and controlling the associated labor costs. Accordingly, the market is ripe for Seegrid's automated, labor cost reducing solutions.

### 2.    *The Debtor's Capital Structure*

Since its inception, Seegrid has raised approximately $61.4 million in funding from investors including its founders, strategic partners and financial investors.

Seegrid currently has two classes of shares authorized, consisting of Common Stock and Preferred Stock. There are six series of Preferred Stock authorized, consisting of: Series A Preferred Share Interests, Series A-1 Preferred Share Interests, Series B Preferred Share Interests, Series C Preferred Share Interests, Series C-1 Preferred Share Interests, and Series D Preferred Share Interests. Seegrid's latest equity financing was completed in 2009 and raised $7.0 million in proceeds from the sale of Series C-1 Preferred Share Interests. No shares of Series D Preferred have been issued and are being reserved for issuance upon optional conversion of the loans described below.

Seegrid has approximately $45 million in loans outstanding as of September 24, 2014, primarily borrowed from Giant Eagle and the Horbal Group.

As discussed more fully in Section IV(B)(2) below, Seegrid's convoluted secured debt structure has developed over the last several years out of necessity, rather than design. During that time, Seegrid has been in a nearly constant state of believing it was on the verge of launching with original equipment manufacturers ("**OEMs**") and starting to see traction in the sales of its own branded trucks, which would put Seegrid on the path to profitability. In addition, as more fully described below, Seegrid sought on numerous occasions to attract outside investors or purchasers. Many of these loans were intended to be short-term advances against a longer term financing alternative or sale that never materialized.

Historically, Seegrid was able to raise funds through convertible, unsecured loans from its investors. In October of 2012, however, it became clear that Seegrid would likely need to offer enhanced terms to attract financing in the future. At the time, Seegrid was pursuing up to $4 million in unsecured financing to close in November and December of 2012 (the "**December 2012 Round**"), with Giant Eagle committed to funding $2.18 million. Given that Seegrid would be seeking additional financing a few months later, Seegrid determined that it needed to assure lenders in the December 2012 Round that they would receive the benefit of any future enhancements. Accordingly, the loan documents related to the December 2012 Round provided that participants would receive any enhancements provided to lenders in the next round of financing once the next round reached a threshold of $1 million in funded loans.

In January of 2013, Giant Eagle and HERC presented Seegrid with a term sheet proposing a $3 million secured debt offering (the "**First Secured Debt Offering**"). The First Secured Debt Offering provided that the lenders thereunder would receive a security interest in substantially all of Seegrid's assets[2] Pursuant to the First Secured Debt Offering, the Debtor

---

[2]    Throughout each of the offerings of debt subscribed to by Giant Eagle and HERC and other investors, the opportunity to participate was extended to Seegrid's existing stakeholders who were accredited investors.

assigned, pledged and granted to the lenders under the December 2012 Round and First Secured Debt Offering a security interest in substantially all of the Debtor's personal property and the proceeds thereof.

In December of 2013, Giant Eagle presented Seegrid with a term sheet for additional secured funding at the same priority level as the First Secured Debt Offering (the "**Second Secured Debt Offering**") and, after substantial negotiations led by a special committee of disinterested members of Seegrid's board, Seegrid and Giant Eagle agreed to terms on the Second Secured Debt Offering.

The loan documents for the Second Secured Debt Offering implemented the loan in two increments of $2 million each, with the first being funded on January 21, 2014 and the second to be funded on March 15, 2014, provided that Seegrid remained reasonably on track with its 2014 business plan. Giant Eagle funded all $4 million contemplated under the Second Secured Debt Offering notwithstanding Seegrid's failure to make the sales targets outlined in the 2014 business plan. For the two months ended February 28, 2014, prior to the funding of the second increment of $2,000,000, Seegrid's revenue was $301,615 against projected revenues of $1,498,360. Through May 2014 shortfalls continued, with actual revenue of $1,845,255 versus a budgeted revenue of $5,388,815. Giant Eagle provided additional funding under the Second Secured Debt Offering terms in the amount of $600,000 on May 23, 2014 to fund continuing operations.

Giant Eagle and HERC subsequently funded operational losses on a senior basis through a funding on June 11, 2014, whereby Giant Eagle funded $400,000 and HERC funded $100,000. Giant Eagle subsequently funded $928,000 on a senior basis in July of 2014.

From August 5, 2014 through October 1, 2014, after the Horbal Group thwarted Seegrid's efforts to obtain a longer term financing solution (as more fully discussed below), Giant Eagle funded an additional $1,644,000 in subordinated debt to prevent Seegrid from shutting down and to fund Seegrid's operations and efforts to resolve its debt crisis.

**B.    Events Leading up to the Chapter 11 Filing**

**1.    *Seegrid Fails to Attract Sufficient Outside Financing***

For the past several years, Seegrid has sought an outside investor or purchaser to enable it to further exploit the technology that forms the basis of its vision guided systems.

On February 9, 2010, Seegrid engaged Merrill Lynch to advise Seegrid and seek out a potential sale of greater than $5 million in voting securities. Merrill Lynch was not successful, but Seegrid continued to seek out investors.

In September of 2011, Seegrid engaged Needham & Company ("**Needham**") to locate and secure new investors or potential buyers under a nine month engagement. During the Needham engagement, Seegrid along with Needham actively marketed the Debtor for a capital raise. In connection with this marketing effort, Needham contacted at least 76 potential investors. Of those investors, at least 26 potential investors actively reviewed the investment opportunity, at least 5 parties expressed further interest and at least 3 reviewed Seegrid's Confidential Information Memorandum.

With respect to Needham's efforts to sell Seegrid, Needham contacted at least 62 potential purchasers. At least 39 parties actively reviewed the opportunity, and 4 expressed further interest. Despite much effort by Needham and Seegrid, Needham was not successful in raising new investments or locating a buyer.

Concurrently with the efforts of Needham, in November of 2011, Seegrid engaged Gulf Capital Group, Inc. ("**Gulf Capital**") to provide consulting and financing services seeking investors from the countries belonging to the Gulf Cooperation Council, the greater Middle East and North Africa.

Gulf Capital contacted at least 22 potential investors under its arrangement with Seegrid. In support of Gulf Capital's efforts, Seegrid's senior management participated in a series of trips to Qatar to meet with interested parties. Ultimately, Gulf Capital was unsuccessful in landing investors.

During these engagements, and in between active engagements, Seegrid's shareholders and senior management undertook efforts of their own to attract investors and strategic buyers through their respective networks and contact lists. In addition, several investors and companies reached out to Seegrid directly to explore opportunities; these inquiries resulted in a number of meetings and visits both to Seegrid and to potential investors and acquirers, but none of these opportunities matured into an investment or acquisition offer.

In April of 2013, Seegrid engaged OEM Capital as financial advisor to explore potential new sources of financing and potential acquisitions of Seegrid. OEM Capital was selected after a search process which included consideration of several other investment banking advisors.

OEM Capital raised interest from potential investors and purchasers, but no potential transaction progressed beyond an initial stage. In March of 2014, Seegrid terminated the agreement with OEM Capital due to lack of results. Prior to termination of the engagement, OEM Capital considered and/or contacted over 115 parties, certain of which spent significant resources and efforts evaluating Seegrid before declining the opportunity.

Subsequent to March of 2014, Seegrid's management, Board members and investors continued to seek outside investors and/or a strategic acquirer and were in active discussions and due diligence with three potential investors, the last of which ended in mid-June with no viable offers.

2.    *Seegrid Exhausts Willingness of Investors other than Giant Eagle to Fund Operating Loans*

In the years leading up to 2012, Seegrid's early R&D and operating shortfalls were funded by equity investments and, later, by unsecured loans from existing shareholders. Until late 2012, equity investments and unsecured notes were sufficient enticements to keep financing flowing into Seegrid as needed.

In early 2013, when the First Secured Debt Offering was implemented, Giant Eagle and HERC had invested at a level above which they were comfortable with the Debtor, and the First

Secured Offering was intended to fund Seegrid's operating losses while Seegrid engaged OEM Capital as investment banker to attempt to sell Seegrid.

Aside from its efforts to seek long-term outside investments and its continued efforts to seek short-term funding from its current investors as a last resort, Seegrid took a series of steps in late 2012 and early 2013 to reduce its expenses through workforce reductions, wage reductions, reduced healthcare benefits, renegotiation of its headquarters lease and other changes. These steps by Seegrid management reduced the monthly operating expense by approximately 25%, or $300,000 (from a monthly burn rate of approximately $1.15 million down to $850,000).

Notwithstanding these efforts, and an increase in Seegrid brand product sales, commencing in 2013 the Debtor relied almost exclusively on loans and advances from Giant Eagle and HERC to enable it to continue operations.

In September of 2013, Giant Eagle requested a presentation from Seegrid's management regarding long-term cash needs and a forecast for 2014. This presentation was made in November 2013 and resulted in the Second Secured Debt Offering.

The tenor of Seegrid's relationship with Giant Eagle and HERC was temporarily buoyed when Seegrid passed reliability testing with the largest OEM and Seegrid moved closer to a launch which had experienced many delays. In late 2013, it was expected that the launch would occur in April of 2014. Ultimately, due to further delays, this launch did not occur until June of 2014.

Seegrid's prospects were also temporarily supported by the increased levels of Seegrid brand product sales and the success Seegrid experienced with its largest customer in 2013, supporting the model that customers would prove the utility of the product in their operations and use them throughout their facilities in many different applications. Sales to this customer, which exceeded $3.4 million, proved Seegrid's business model could work.

Nonetheless, by 2014, only Giant Eagle was willing to lend to Seegrid (with the exception of HERC's funding of $100,000 as compared to over $6.2 million in funding by Giant Eagle in 2014). Giant Eagle professed to be growing weary by that point, and the funding provided by Giant Eagle in 2014 became milestone-based and/or tied to specific sales progress based on the budget presented in November 2013.

Despite Giant Eagle's professed growing reluctance to fund Seegrid's operating losses, Giant Eagle (along with HERC and other lenders from time to time) made its convertible loans to the Company based on valuations of Seegrid (assuming conversion of the loans into Series D Preferred and taking into consideration warrant coverage) well in excess of $40 million from April of 2012 through June of 2014.

By late June of 2014, Giant Eagle was not willing to make further loans based on what Giant Eagle perceived to be an inflated valuation of Seegrid. Accordingly, when Giant Eagle proposed a new financing structure by way of a term sheet dated July 2, 2014 for $10 million in long term financing, Giant Eagle's proposal valued Seegrid at $12.5 million on a pre-funding basis (the "**July 2, 2014 Term Sheet**"). Unlike prior debt financing transactions, the July 2, 2014

Term Sheet contemplated the creation of an operating subsidiary with new equity funding to flow into the subsidiary.

### 3. *Anthony Horbal Blocks Debtor's Ability to Obtain Financing from Willing Sources*

The July 2, 2014 Term Sheet was intended to allow Seegrid to become current on its obligations through the end of 2014 and provide sufficient funding to carry Seegrid through to cash flow positive operations unlike prior debt financing transactions. As with prior offerings, the opportunity would be offered to the other accredited shareholders to participate. Absent such participation, the existing shareholders interests would have been diluted, but the offering would have preserved 10% of the post-closing value of Seegrid for employees, which amount was subsequently negotiated to 15% by Seegrid. The employee component was important because employee options were substantially diluted over time to the point that they were out of the money, and the proposal would have restored material value to the employees, which was a critical component for continuing value enhancement for Seegrid's stakeholders.

Due to the dilutive nature of the July 2, 2014 Term Sheet, Giant Eagle conditioned the proposal upon the unanimous approval of Seegrid's Board of Directors and majority approval of the disinterested stockholders.

Anthony Horbal, a member of Seegrid's Board of Directors at the time of the vote on July 11, 2014, voted against the July 2, 2014 Term Sheet as amended and reissued on July 10th. The Horbal Group also refused to extend the September 30, 2014 maturity date of the debt held by the Horbal Group.

On July 21, 2014, Seegrid's Board directed management and counsel to discuss three different financing alternatives with Giant Eagle and the Horbal Group: (i) providing 4 to 5 months of interim financing to allow Seegrid to engage in a thorough marketing process for a sale of Seegrid, (ii) provide ongoing funding for Seegrid to continue executing on its business plan, including a proposal to Giant Eagle that the July 2, 2014 Term Sheet (as modified on July 10) be put back on the table, or (iii) provide sufficient funding to allow Seegrid to wind up its operations in an orderly liquidation.

On July 22, 2014, Giant Eagle presented a Term Sheet to Seegrid (the "**July 22, 2014 Term Sheet**") which was very similar to the July 2, 2014 Term Sheet (as modified on July 10), with the addition of warrant coverage. The July 22, 2014 Term Sheet was conditioned on the approval of the Horbal Group, along with certain waivers from the Horbal Group. Seegrid's Board met on July 22, 2014 and July 23, 2014 to discuss the July 22, 2014 Term Sheet, and Giant Eagle's request to Seegrid that Seegrid respond with a specific counter-proposal if the terms of the July 22, 2014 Term Sheet were not acceptable.

At the July 23, 2014 Board meeting, Seegrid's Board directed management and counsel to counter the terms of the July 22, 2014 Term Sheet with specific revisions, including a pre-funded 60 day marketing period for a sale of Seegrid, an increased valuation and a reduced warrant exercise period. In subsequent discussions, Giant Eagle expressed a willingness to be

flexible on terms, provided that Seegrid would be able to obtain the required consent and waivers from the Horbal Group.

The Seegrid Board met again on July 24, 2014 to discuss the July 22, 2014 Term Sheet and Giant Eagle's response to Seegrid's counter-proposal. At the end of this lengthy Board meeting, it was clear that the Horbal Group would not provide the necessary consent and waivers. Counsel for Seegrid was directed to advise Giant Eagle that the July 22, 2014 Term Sheet was not approved.

Failing to have a feasible alternative source of capital acceptable to the Horbal Group, Seegrid's Board considered all options available to Seegrid, including a new proposal by Giant Eagle to fund Seegrid's operations in chapter 11 pending a thorough but prompt section 363 sale process, with Giant Eagle serving as a stalking horse. Giant Eagle subsequently withdrew its proposal for a sale process and, instead, proposed a loan that would have avoided the risk, expense and negative impact of a bankruptcy filing. On August 20, 2014, Giant Eagle proposed funding up to an additional $8 million under a convertible note and warrant transaction on the same terms and at the same valuation as the January 2014 note purchase transaction, with the sole exception that the maturity date for all existing and new notes be extended from September 30, 2014 to September 30, 2019. Given the urgency of Seegrid's financial condition, the August 20, 2014 proposal required a preliminary (nonbinding) approval from both Seegrid and the Horbal Group on or before August 26, 2014.

Seegrid immediately communicated the terms of the August 20, 2014 proposal to the Horbal Group, and offered to provide any information required in order to allow the Horbal Group to consider the request for the Horbal Groups' preliminary approval of the proposal. Seegrid explained to the Horbal Group that the August 20, 2014 proposal was the only alternative to bankruptcy available to Seegrid, and that the funding proposal was on the same terms as previously approved by the Seegrid Board and by the Horal Group, except for the 5 year extension of the notes. The Horbal Group requested extensive information to allow it to review the proposal, which Seegrid promptly provided. To date, however, the Horbal Group has not responded to the August 20, 2014 proposal.

As a result of Seegrid's inability to obtain from the Horbal Group approval for the August 20, 2014 proposal or consent to the extension of the September 30, 2014 maturity date for Seegrid's over $45 million of debt, Seegrid's only alternative would have been an immediate shut-down of operations and liquidation. To avoid this alternative, Giant Eagle presented the proposed DIP Financing and restructuring proposal as set forth in the Plan.

## V.    ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE

### A.    Commencement of Chapter 11 Case and First Day Orders

To implement the restructuring transactions contemplated in the Plan, the Debtor intends to commence a case under chapter 11 of the Bankruptcy Code by filing a voluntary petition for relief in the Bankruptcy Court. On the Commencement Date, the Debtor will request a series of orders from the Bankruptcy Court to minimize any disruption to the Debtor's operations and to facilitate the Debtor's reorganization. These requests will include, but are not limited to, orders

permitting the Debtor to: (i) obtain senior secured postpetition financing and use cash collateral, (ii) pay certain employee obligations, (iii) retain counsel, and (iv) approve the continued operation of the Debtor's cash management system. Additionally, to expedite the Chapter 11 Case, the Debtor intends to seek an immediate order setting dates for a combined hearing to (i) approve the adequacy of the Disclosure Statement; (ii) approve the procedures for the Solicitation; and (iii) confirm the Plan. The Debtor will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

## B.    Financing Facilities

### 1.    *Debtor in Possession Financing*

The Debtor expects to receive debtor in possession financing in the aggregate principal amount of up to $3 million from Giant Eagle under the DIP Credit Agreement (the "**DIP Facility**"). This DIP Facility will act as a bridge for the Debtor to implement and consummate the restructuring transactions contemplated in the Plan.

On the Commencement Date, the Debtor will seek interim authority to make immediate borrowings under the DIP Facility and, as soon as practicable thereafter, will seek final Bankruptcy Court approval of the DIP Facility. The Debtor believes that the commitment amount of the DIP Facility will satisfy the Debtor's financing needs during the expected duration of the Chapter 11 Case. Upon the Effective Date, the outstanding obligations under the DIP Facility will be converted into Seegrid Sub Series A Preferred Shares on the terms described in the DIP Credit Agreement.

### 2.    *Post-Confirmation Financing of Seegrid Sub*

Following the Effective Date, Giant Eagle will provide additional post-reorganization financing to Seegrid Sub. To the extent that the debt converted to Seegrid Sub Series A Preferred Shares under the Plan is less than $10 Million, Giant Eagle has agreed to purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such shares. Giant Eagle and Seegrid have memorialized this agreement pursuant to a Plan Support Agreement, a copy of which is attached to the Plan as Exhibit B.

## C.    Stay of Pending Litigation Proceedings and Potential Removal of Pending Litigation Proceedings to the Bankruptcy Court

With certain exceptions, the filing of the Chapter 11 Case will operate as a stay with respect to the commencement or continuation of litigation against the Debtor that was or could have been commenced before the commencement of the Chapter 11 Case. In addition, the Debtor's liability with respect to litigation that would be stayed by the commencement of the Chapter 11 Case will be subject to discharge, settlement, and release upon Confirmation of the Plan, with certain exceptions. Therefore, litigation claims against the Debtor may be subject to discharge in connection with the Chapter 11 Case. This may reduce the Debtor's exposure to losses in connection with the adverse determination of such litigation. Further, the Debtor may exercise its right pursuant to 28 U.S.C. § 1452 to remove any pending litigation proceedings to the Bankruptcy Court.

D.    **Expected Timetable of the Chapter 11 Case**

The Debtor expects the Chapter 11 Case to proceed quickly. As described above, the Debtor has been in extensive negotiations with Giant Eagle to restructure the Debtor's obligations and to obtain commitments for financing the Debtor's post-petition and post-confirmation operations.

The Debtor cannot assure, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtor. On the Commencement Date, the Debtor will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order, and the other conditions to consummation of the Plan set forth in Article XII of the Plan are satisfied or waived (to the extent permitted under the Plan and applicable law).

## VI.    SUMMARY OF THE PLAN OF REORGANIZATION

The following sections summarize the salient provisions of the Plan. This summary refers to, and is qualified in its entirety by, reference to the Plan, a copy of which is attached hereto as Exhibit A. Parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and its impact on Creditors and Interest Holders.

A.    **Summary of Treatment of Claims and Interests under the Plan**. The table below summarizes the classification and treatment of Claims and Interests under the Plan, as well as the estimated recovery for each Class. Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on the books and records of Seegrid, as of the date hereof.

The estimated recovery percentages set forth below have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims or Allowed Interests in each Class.

THE EXPECTED RECOVERIES SET FORTH BELOW ARE FOR ILLUSTRATIVE PURPOSES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.[3]

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| N/A | Administrative Expense Claims of Professionals | Payment in full (or as otherwise agreed). | 100% |
| N/A | Priority Tax Claims | Payment in full on the Effective Date, or regular installment payments over five years from the | 100% |

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to Seegrid Sub's business operations and general economic conditions.

| Class | Description | Treatment | Estimated Recovery |
|---|---|---|---|
| | | Effective Date or payment as otherwise agreed. | |
| N/A | Non-Tax Priority Claims | Payment in full on the Effective Date (or as otherwise agreed). | 100% |
| Class 1 | Secured Claims | | |
| Class 1-A | First Priority Secured June 11 Noteholder Claims | The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the First Priority Secured June 11 Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed First Priority Secured June 11 Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed First Priority Secured June 11 Noteholder Claims shall receive a first priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan. | 100% |
| Class 1-B | First Priority Secured Bridge Noteholder Claims | On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares. | 100% |
| Class 1-C | Second Priority Secured Noteholder Claims | The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the Second Priority Secured Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed Second Priority Secured Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed Second Priority Secured Noteholder Claims shall receive a second priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid. | 100% |
| Class 1-D | Third Priority Secured Bridge Noteholder Claims | On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares. | |
| Class 2 | Unsecured Claims | | |
| Class 2-A | Noteholder General | The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual | 100% |

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
|  | Unsecured Claims | rights to which such Claim entitles such holder except that the maturity date of the Unsecured Notes held by holders shall be extended to the fifth anniversary of the Effective Date. |  |
| Class 2-B | Other General Unsecured Claims | Each holder of an Allowed Other General Unsecured Claim shall receive a Cash Distribution on the Effective Date equal to 50% of its Allowed Other General Unsecured Claim and a non-interest bearing promissory note issued by Seegrid Sub in the principal amount of the remaining balance of its Allowed Other General Unsecured Claim. The promissory note shall be payable on the first anniversary of the Effective Date. In lieu thereof, each holder of Other General Unsecured Claims may elect to receive 75% of such Allowed Other General Unsecured Claim on the Effective Date. | 100% |
| Class 3 | Series A, A-1, B, C and C-1 Preferred Share Interests | Unimpaired. | 100% |
| Class 4 | Common Stock Interests | Unimpaired. | 100% |

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

**NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF THE DEBTOR, OR THE REORGANIZED DEBTOR, AS APPLICABLE, TO OBJECT TO ANY PROOF OF CLAIM OR PROOF OF INTEREST ON ANY GROUND OR FOR ANY PURPOSE, INCLUDING IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.**

**B.    General Basis for the Prepackaged Plan**

The Debtor has determined that a prolonged Chapter 11 Case would damage severely its ongoing business operations and threaten its viability as a going concern. The prepackaged nature of the Plan (as set forth in the Plan and described herein) allows the Debtor to exit chapter 11 quickly, while the provisions of the Plan allow the Debtor to reduce its debt service obligations, extend the maturity of its debt, and position the Debtor for the realization of the value of the Seegrid Sub Common Stock.

**C.    Plan Objectives**

The primary objectives of the Plan are to:  (i) maximize the value of the ultimate recovery to all Creditors and holders of Interests on a fair and equitable basis, compared to the value they would receive if the assets of the Debtor were liquidated under chapter 7 of the Bankruptcy Code; and (ii) settle, compromise or otherwise dispose of certain Claims and Interests on terms believed to be fair and reasonable in the best interests of the Debtor, the Debtor's Creditors and Interest Holders.  The Debtor believes that through the Plan, Holders of Allowed Claims and Allowed Interests will obtain a recovery substantially better than any recovery they would receive if the assets of the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

**D.    Classification and Allowance of Claims and Interests Generally**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a plan proponent significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates several "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtor. Administrative Expense Claims and Priority Tax and Non-Tax Priority Claims are not classified for purposes of voting or receiving Distributions under the Plan, but are treated separately as unclassified Claims.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The Plan provides specific treatment for each Class of Claims or Interests.  Only Holders of Allowed Claims or Allowed Interests are entitled to vote on and receive Distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

The categories of Claims and Interests and their treatment listed below classify Claims and Interests for all purposes, including voting, confirmation and Distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### E.    Classification and Treatment of Unclassified Claims under the Plan

Unclassified Claims are Unimpaired by the Plan.  The following are the unclassified Claims: Administrative Expense Claims, Priority Tax Claims and Non-Tax Priority Claims.

#### 1.    *Administrative Expense Claims*

In order to confirm the Plan, Allowed Administrative Expense Claims must be paid in full on the Effective Date or in a manner otherwise agreeable to the holders of those Administrative Expense Claims.  Administrative expenses are the actual and necessary costs and expenses of Seegrid's Chapter 11 Case, including postpetition salaries and other benefits earned by employees, officers and directors, amounts owed to vendors providing goods and services during the Chapter 11 Case, any indebtedness or obligations incurred or assumed by Seegrid as Debtor-in-Possession during the Chapter 11 Case, and all other debts incurred by Seegrid after the Commencement Date in the ordinary course of its business.  The Allowed Administrative Expense Claims shall be paid from the Debtor's ongoing business operations and the proceeds of the Debtor's DIP Credit Agreement.

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expense Claims to be paid in full by the later of (i) the Effective Date (or as soon thereafter as is reasonably practicable), and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed, except with regard to Administrative Expense Claims incurred in the ordinary course of business, which may be paid by Seegrid in accordance with its past practice and the terms of the agreements governing such obligations.

Reorganized Seegrid, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. Seegrid or Reorganized Seegrid will have the right to object to any Administrative Expense Claim on the later of (i) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court, and (ii) 30 days after the date such Administrative Expense Claim is filed.  Unless Seegrid or Reorganized Seegrid objects to an Administrative Expense Claim, the Administrative Expense Claim will be deemed allowed in the amount requested.  In the event that Seegrid or Reorganized Seegrid timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

#### 2.    *Fees and Expenses of Professionals*

All Professionals seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall (i) file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (A) upon the later of (1) the Effective Date and (2) the first Business Day after the date that is thirty (30) calendar days after the date

such Administrative Expense Claim of Professionals becomes an Allowed Administrative Expense Claim, or (B) upon such other terms as may be mutually agreed upon by such holder and Reorganized Seegrid.

### 3.    *Priority Tax Claims*

Priority Tax Claims are the unsecured Claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes. These unsecured Claims are given a statutory priority in right of payment. Seegrid estimates that, on the Effective Date, the Allowed amount of such Claims will be *de minimus*.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by Seegrid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized Seegrid: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable; (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; and (ii) over a period ending not later than five (5) years after the Effective Date.

### 4.    *Non-Tax Priority Claims*

Non-Tax Priority Claims are Priority Claims other than an Administrative Expense Claim or a Priority Tax Claim granted priority in payment under section 507(a) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of Seegrid (up to a statutory cap of $12,475 per employee). Seegrid estimates that on the Effective Date, the Allowed amount of such Claims will be *de minimus*.

Except to the extent a holder of an Allowed Non-Tax Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Non-Tax Priority Claim shall receive in full satisfaction, settlement and discharge of and in exchange for such Non-Tax Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Non-Tax Priority Claim on or before the later of: (a) the Effective Date; and (b) the date the Claim becomes an Allowed Non-Tax Priority Claim, or as soon thereafter as practicable. Any Allowed Non-Tax Priority Claim not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### F.    **Treatment of Classified Claims and Interests under the Plan**

The treatment of Claims against and Interests in the Debtor is set forth in detail in Article IV of the Plan. A summary of that treatment is provided below.

Unless the Holder of an Allowed Claim or Allowed Interest and the Debtor or the Reorganized Debtor, as applicable, agree to a different treatment, each Holder of an Allowed Claim or Allowed Interest will receive the following Distributions in accordance with Article IV of the Plan:

### 1.    *Class 1 – Secured Claims*

Class 1 consists of all Allowed Secured Claims against Seegrid.  This class is divided into four subclasses based on the relative rights and priorities of each Class vis-a-vis Seegrid.

#### (a)    *Class 1-A – First Priority Secured June 11 Noteholder Claims*

Class 1-A consists of Allowed First Priority Secured June 11 Noteholder Claims. Holders of Class 1-A Allowed Claims have Liens on substantially all of Seegrid's assets.  Seegrid estimates that the First Priority Secured June 11 Noteholder Claims will be $521,556 on the Effective Date.

On the Effective Date, the holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the First Priority Secured June 11 Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed First Priority Secured June 11 Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed First Priority Secured June 11 Noteholder Claims shall receive a first priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

Class 1-A is Impaired under the Plan.  Each holder of an Allowed First Priority Secured June 11 Noteholder Claim is entitled to vote to accept or reject the Plan.

#### (b)    *Class 1-B – First Priority Secured Bridge Noteholder Claims*

Class 1-B consists of Allowed First Priority Secured Bridge Noteholder Claims. Holders of Class 1-B Allowed Claims have Liens on substantially all of Seegrid's assets.  Seegrid estimates that the First Priority Secured Bridge Noteholder Claims will be $962,425 on the Effective Date.

On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares.

Class 1-B is Impaired under the Plan.  Each holder of an Allowed First Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

#### (c)    *Class 1-C – Second Priority Secured Noteholder Claims*

Class 1-C consists of all Allowed Second Priority Secured Noteholder Claims.  Holders of Class 1-C Allowed Claims have Liens on substantially all of Seegrid's assets.  Seegrid estimates that the Second Priority Secured Noteholder Claims will be $11,750,301 on the Effective Date.

The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the Second Priority Secured Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed Second Priority Secured Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed Second Priority Secured Noteholder Claims shall receive a second priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid.

Class 1-C is Impaired under the Plan. Each holder of an Allowed Second Priority Secured Noteholder Claim is entitled to vote to accept or reject the Plan.

(d)      <em>Class 1-D – Third Priority Secured Bridge Noteholder Claims</em>

Class 1-D consists of all Allowed Third Priority Secured Bridge Noteholder Claims. Holders of Class 1-D Allowed Claims have Liens on substantially all of Seegrid's assets on account of such Claim. Seegrid estimates that the Third Priority Secured Bridge Noteholder Claims will be $1,866,417 on the Effective Date.

On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares.

Class 1-D is Impaired under the Plan. Each holder of an Allowed Third Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

**2.      _Class 2 - Unsecured Claims_**

(a)      <em>Class 2-A –Noteholder General Unsecured Claims</em>

Class 2-A consists of Allowed Noteholder General Unsecured Claims. Holders of Noteholder General Unsecured Claims hold promissory notes given by Seegrid for loans made by such Holders. Such loans are not secured by any assets or interests of Seegrid. Seegrid estimates that the aggregate amount of such Claims will be $39,042,047 on the Effective Date.

The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder except that the maturity date of the Unsecured Notes held by holders shall be extended to the fifth anniversary of the Effective Date. Class 2-A Noteholder General Unsecured Claims are Impaired by the Plan. Each holder of an Allowed Noteholder General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)      <em>Class 2-B – Other General Unsecured Claims</em>

Class 2-B consists of all general unsecured non-priority Claims, other than the Noteholder General Unsecured Claims. This Class consists principally of the Claims of trade and other business creditors for goods and services provided to Seegrid prior to the Commencement Date, and damage Claims if any, arising from Seegrid's rejection (if any) of executory contracts and unexpired leases. Seegrid estimates that on the Effective Date, the Allowed Amount of Other General Unsecured Claims will be approximately $2,600,000.

Each holder of an Allowed Other General Unsecured Claim shall receive a Cash Distribution on the Effective Date equal to 50% of its Allowed Other General Unsecured Claim and a non-interest bearing promissory note issued by the Seegrid Sub in the principal amount of the remaining balance of its Allowed Other General Unsecured Claim, which shall be the automatic treatment for such Claims if the holder does not elect the alternative treatment set forth below. The promissory note shall be payable on the first anniversary of the Effective Date. In lieu thereof, each holder of Other General Unsecured Claims may elect to receive 75% of such Allowed Other General Unsecured Claim on the Effective Date.

Class 2-B Other General Unsecured Claims are Impaired by the Plan. Each holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

3.    ***Class 3– Preferred Share Interests***

(a)    *Class 3-A – Series A Preferred Share Interests*

Class 3-A consists of all Series A Preferred Share Interests of Seegrid. The holders of Class 3-A Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 3-A is Unimpaired by the Plan. Each holder of Class 3-A Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(b)    *Class 3-B – Series A-1 Preferred Share Interests*

Class 3-B consists of all Series A-1 Preferred Share Interests of Seegrid. The holders of Class 3-B Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 3-B is Unimpaired by the Plan. Each holder of Class 3-B Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(c)    *Class 3-C – Series B Preferred Share Interests*

Class 3-C consists of all Series B Preferred Share Interests of Seegrid. The holders of Class 3-C Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 3-C is Unimpaired by the Plan. Each holder of Class 3-C Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(d)    *Class 3-D – Series C Preferred Share Interests*

Class 3-D consists of all Series C Preferred Share Interests of Seegrid. The holders of Class 3-D Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 3-D is Unimpaired by the Plan. Each holder of Class 3-D Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(e)    <em>Class 3-E – Series C-1 Preferred Share Interests</em>

Class 3-E consists of all Series C-1 Preferred Share Interests of Seegrid. The holders of Class 3-E Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 3-E is Unimpaired by the Plan. Each holder of Class 3-E Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**4.    _Class 4 – Common Stock Interests_**

Class 4 consists of all Common Stock Interests of Seegrid. The holders of Class 4 Common Stock Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

Class 4 is Unimpaired under the Plan. Each holder of Class 4 Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**G.    Description of the Restructuring Transaction and Creation of New Seegrid Sub**

The primary component of Seegrid's Plan is a restructuring transaction in which substantially all of Seegrid's assets will be contributed to a newly created subsidiary, Seegrid Sub, free and clear of all Claims and Encumbrances. In addition to the assets transferred by Seegrid, Seegrid Sub will be further capitalized with the proceeds of the issuance of Seegrid Sub Series A Preferred Shares. Seegrid Sub shall continue Seegrid's pre-Commencement Date operations and shall assume responsibility for employee contracts as well as Seegrid's post-Commencement Date operational liabilities and payment of any notes issued to Holders of Allowed Other General Unsecured Claims.

**1.    _Formation of Seegrid Sub_**

On or before the Effective Date, Seegrid will form Seegrid Sub, a wholly owned Delaware "C" corporation. On the Effective Date, Seegrid shall convey to Seegrid Sub (i) all of its operating assets, including without limitation, its intellectual property and the name "Seegrid"; (ii) its post-Commencement Date operating liabilities; and (iii) its employees. In exchange for its contribution to Seegrid Sub, Seegrid shall receive 11.25 million shares of Seegrid Sub Common Stock.

**2.    _Issuance of Seegrid Sub Equity_**

On the Effective Date, all indebtedness of Seegrid to Giant Eagle for borrowed money arising on or after June 11, 2014, including the indebtedness under the DIP Credit Agreement, shall be converted dollar for dollar into Seegrid Sub Series A Preferred Shares. To the extent that the debt converted under the Plan is less than $10 million, for a period of one year after the Effective Date, Giant Eagle shall have the right to purchase such additional Seegrid Sub Series A

26

Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares. To the extent that Seegrid Sub meets its projections during the Chapter 11 Case, Giant Eagle has agreed to purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such Shares.

Seegrid Sub shall reserve for issuance to management and employees and directors of Seegrid Sub 3,750,000 shares of Seegrid Sub Common Stock to be issued in accordance with a plan adopted by the Board of Directors of Seegrid Sub.

Assuming Giant Eagle purchases all $10 million shares of Seegrid Sub Series A Preferred Shares available to it, and no other parties purchase or elect to receive Seegrid Sub Series A Preferred Shares, the economic interests in Seegrid Sub would be:  40% - Giant Eagle in the form of Seegrid Sub Series A Preferred Shares; 45% - Reorganized Seegrid in the form of Seegrid Sub Common Stock; and 15% - management and employees of Seegrid Sub in the form of Seegrid Sub Common Stock.

Additional Seegrid Sub Series A Shares beyond the $10 million of Seegrid Sub Series A Preferred Shares available to Giant Eagle will be offered to Seegrid's other direct and indirect stockholders and convertible debt holders.

Giant Eagle and each Investor who purchases Seegrid Sub Series A Preferred Shares shall receive a warrant to purchase additional Seegrid Sub Series A Preferred Shares in Seegrid Sub at $1.00 per share in an amount equal to the amount invested in Seegrid Sub Series A Preferred Shares.  Such warrant shall be exercisable up to and including the second anniversary of the Effective Date of the Plan.

### 3.    *Seegrid Sub's Officers and Board of Directors*

Seegrid Sub shall initially have a four member Board of Directors, consisting of Daniel Shapira, Philip Oliveri, Dr. Hans Moravec and James Rock.  Seegrib Sub's board shall be subject to change and increase over time.

Seegrid Sub's officers shall be James Rock, CEO, David Heilman, President, Philip Oliveri, Treasurer and Thomas Buchanan, Secretary.

## H.    **Distributions On Account of Allowed Claims**

One of the key concepts under the Bankruptcy Code is that only Claims that are "allowed" may receive distributions under a Chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" Claim simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the debtor.  For an explanation of how Disputed Claims will be determined, see subsection J, below.

### 1.    *Distributions*

Reorganized Seegrid and Seegrid Sub, as applicable, will make all Distributions required to be made under the Plan as provided under Article VI of the Plan.

### 2.    *Date of Distributions*

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Claims or Equity Interests shall be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 3.    *Postpetition interest on Claims*

Unless expressly provided for in the Plan and the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or unless required by applicable bankruptcy law (including the fair and equitable rule), interest shall not accrue on or after the Commencement Date on account of any Claim, except with respect to interest on account of Class 1-A, 1-B, 1-C and 1-D Claims which interest shall continue to accrue during the Chapter 11 Case.

### 4.    *Means of Cash Payment*

At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

### 5.    *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Equity Interest shall be made at the address of such holder as set forth on the Schedules filed, as may be required, with the Bankruptcy Court, or on the books and records of Seegrid or its agents, or in a letter of transmittal, unless Seegrid has been notified in writing of a change of address.

If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder shall be made unless and until Reorganized Seegrid or Seegrid Sub is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder without interest. A Cash Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in Reorganized Seegrid, and the Claim of any holder to such Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require Seegrid, Reorganized Seegrid, or Seegrid Sub to attempt to locate any holder of an Allowed Claim.

### 6.    *Time Bar to Cash Payments*

Checks issued by Reorganized Seegrid or Seegrid Sub in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to Reorganized Seegrid or Seegrid Sub by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the sixty (60) day

period following the date of issuance of such check. After expiration of the thirty (30) day period, all funds held on account of such void check shall, in the discretion of Reorganized Seegrid or Seegrid Sub, be used to satisfy the costs of administering and fully consummating the Plan or become property of Reorganized Seegrid or Seegrid Sub, and the Claim of any holder to such Distributions shall be discharged and forever barred

### 7.    *Record Date for Holders of Claims*

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### 8.    *Distributions after Effective Date*

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date. No interest shall accrue or be payable on such Distributions.

### 9.    *Fractional Cents*

Notwithstanding any other provision in the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half a penny or less being rounded down.

### 10.    *Setoff*

Seegrid or Reorganized Seegrid may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed Amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that Seegrid or Reorganized Seegrid may have against the holder of such Claim, and the failure to do so shall not constitute a waiver or release by Seegrid or Reorganized Seegrid of any such Claim that Seegrid or Reorganized Seegrid may have against the holder of such Claim.

### 11.    *No Distributions Pending Allowance*

Notwithstanding any other provision of the Plan, no payments or Distributions by shall be made with respect to all or any portion of a Disputed Claim or unless and until all objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim or, or some portion thereof, has become an Allowed Claim.

## I.    Executory Contracts and Unexpired Leases

### 1.    *General Treatment*

Subject to approval of the Bankruptcy Court, section 365 of the Bankruptcy Code allows a debtor to assume or reject its executory contracts and unexpired leases.

Seegrid shall assume, as of the Effective Date, all Executory Contracts to which Seegrid is a party and shall assign such Executory Contracts to Seegrid Sub, except for: (a) the Executory Contracts specifically listed in certain Schedules to the Plan Supplement, which contracts shall either be rejected or assumed and assigned, respectively, as described therein; and (b) the Executory Contracts specifically addressed herein or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date. Seegrid may, at any time on or before the Effective Date and with the written consent of Giant Eagle, amend the Schedules to the Plan Supplement to delete therefrom, or add thereto, any Executory Contract. Seegrid shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case. The fact that any contract or lease is listed in the Schedules to the Plan Supplement shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that Seegrid or any successor in interest to Seegrid (including Reorganized Seegrid) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such: (a) rejections; (b) assumptions; or (c) assumptions and assignments, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 2.    *Cure of Defaults*

Generally, if there has been a default under an executory contract or unexpired lease (other than a default specified in section 365(b)(2) of the Bankruptcy Code), the debtor can assume the contract or lease only if the debtor cures the default.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Article 7.1 of the Plan, Reorganized Seegrid shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract. The non-Debtor party or parties to each such Executory Contract shall have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract. Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, Seegrid shall: (a) resolve such objection, which resolution shall not require approval of the Bankruptcy Court; (b) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract; or (c) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties.

### 3.    *Rejection Damages Claims*

In the event that the rejection of an Executory Contract by Seegrid, pursuant to the Plan or otherwise, results in damages to the non-Debtor party or parties to such Executory Contract, a Claim for such damages shall be forever barred and shall not be enforceable against Seegrid, Reorganized Seegrid, or their respective properties or interests in property as agents, successors or assigns unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for Seegrid on or before (i) if such Executory Contract is rejected pursuant to Articles 7.1 and 7.2 of the Plan, the later of:  (a) thirty (30) days after entry of the Confirmation Order or (b) thirty (30) days after the non-Debtor party receives notice of the rejection of such Executory Contract pursuant to Article 7.2 of the Plan; or (ii) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by Seegrid to reject that Executory Contract, thirty (30) days after entry of such order.

## J.    **Provisions for Resolving and Treating Disputed Claims**

### 1.    *Disputed Claims*

All Disputed Claims against Seegrid shall be subject to the provisions of Article VIII of the Plan.

### 2.    *Objection to Claims*

Seegrid or Reorganized Seegrid, as the case may be, shall be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court, on or before the first (1st) anniversary of the Effective Date or, if such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Claim is brought (in each case unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

### 3.    *Payments and Distributions with Respect to Disputed Claims*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided for herein shall be made on account of such Claim, unless and until such Claim becomes an Allowed Claim

### 4.    *Estimation of Claims*

Seegrid or Reorganized Seegrid, as the case may be, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether Seegrid previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court

**5.**   *Preservation of Rights to Settle Claims*

In accordance with section 1123(b) of the Bankruptcy Code, Seegrid and Reorganized Seegrid shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that Seegrid or its Estate may hold against any Entity, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019.

**K.   Means of Implementing the Plan**

**1.**   *Generally*

On the Confirmation Date, Seegrid shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement the provisions of the Plan, including, without limitation, the creation of Seegrid Sub.

**2.**   *Seegrid Sub*

*(a)*   *Formation*

On or before the Effective Date, Seegrid shall form a wholly-owned Delaware "C" corporation subsidiary ("**Seegrid Sub**"). On the Effective Date, Seegrid shall convey to Seegrid Sub: (i) all of its operating assets, including without limitation, its intellectual property and the name "Seegrid"; (ii) its post Commencement Date operating liabilities; and (iii) its employees. In exchange for its contribution to Seegrid Sub, Seegrid shall receive 11.25 million shares of Seegrid Sub common stock.

*(b)*   *Giant Eagle*

On the Effective Date, all indebtedness of Seegrid to Giant Eagle for borrowed money arising after June 11, 2014, including Giant Eagle's First and Third Priority Secured Bridge Noteholder Claims and any indebtedness under the DIP Credit Agreement, shall be converted dollar for dollar into Seegrid Sub Series A Preferred Shares. Such Seegrid Sub Series A Preferred Shares shall have the right and preferences reflected on Exhibit A to the Plan. To the extent that the debt converted hereunder is less than $10 million, and subject to the terms of the Plan Support Agreement, within one year after the Effective Date, Giant Eagle shall have the rights to purchase such additional Seegrid Sub Series A Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares. To the extent that Seegrid Sub meets its projections during the Chapter 11 Case, Giant Eagle shall purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such Shares.

*(c)*   *Management and Employees*

Seegrid Sub shall reserve for issuance to management, employees and directors of Seegrid Sub 3,750,000 shares of Seegrid Sub common stock to be issued in accordance with a plan adopted by the Board of Directors of Seegrid Sub.

(d)    *Other Investors*

Additional Seegrid Sub Series A Shares beyond the $10 million of Seegrid Sub Series A Shares available to Giant Eagle will be offered to Seegrid's other direct and indirect stockholders and convertible debt holders.

(e)    *Warrant*

Giant Eagle, any other holder of a First Priority Secured Noteholder Claim that elects to convert its debt into Seegrid Sub Series A Preferred Shares, and each Investor who purchases Seegrid Sub Series A Preferred Shares shall receive a warrant to purchase additional Seegrid Sub Series A Preferred Shares at $1.00 per share in an amount equal to the amount invested in or converted into Seegrid Sub Series A Preferred Shares. Such warrant shall be exercisable up to and including the second anniversary of the Effective Date of the Plan.

### 3.    *Amendment of Certificate*

Seegrid shall amend its Certificate of Incorporation to prohibit the issuance of non-voting equity securities.

### 4.    *Effectuating Documents; Further Transactions*

Any officer, or director of Seegrid, Reorganized Seegrid, or Seegrid Sub, as the case may be, shall be, and hereby is, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary of Seegrid is hereby authorized to certify or attest to any of the foregoing, if necessary.

## VII.    EFFECTS OF CONFIRMATION OF THE PLAN

### A.    Vesting of Seegrid's Assets

Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, the property of the Estate of Seegrid shall vest in Seegrid and Seegrid Sub, as the case may be, on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity except as provided herein. From and after the Effective Date, Reorganized Seegrid and Seegrid Sub may each operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Without limiting the generality of the foregoing, Reorganized Seegrid may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized Seegrid incurs after the Effective Date.

### B.    Terms of Injunction and Automatic Stay

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105,

362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, shall remain in full force and effect until the injunctions set forth in the Plan become effective, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, Reorganized Seegrid may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. All actions of the type or nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

## C.   No Liability for Certain Released Claims

Neither Seegrid, Reorganized Seegrid, nor Seegrid Sub, does, or shall be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of Seegrid relating to or arising out of the operations of, or assets of, Seegrid whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date, except that Reorganized Seegrid and Seegrid Sub shall assume their respective obligations specified in the Plan and Confirmation Order.

## VIII.   DISCHARGES, RELEASES AND INJUNCTIONS

## A.   Discharge of Seegrid

Except as specifically provided in Article IV or XI of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge Seegrid and Reorganized Seegrid from any and all Claims of any nature whatsoever, including, without limitation, all Claims, demands, and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not: (a) a Proof of Claim based on such Claim or demand was filed under section 501 of the Bankruptcy Code, or such Claim was listed on any Schedules of Seegrid; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided for in Article IV of the Plan, as of the Effective Date the rights provided in the Plan shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims against Seegrid or Reorganized Seegrid or any of their respective assets and properties.

## B.   Discharge Injunction

*Except as specifically provided in Article IV or XI of the Plan, all persons or Entities who have held, hold or may hold Claims are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against Reorganized Seegrid with respect to such Claim; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against Reorganized Seegrid or Seegrid Sub with respect to such Claim; (c) creating,*

*perfecting, or enforcing any Encumbrance of any kind against Reorganized Seegrid or against the property or interests in property of Reorganized Seegrid with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized Seegrid or against the property or interests in property of Reorganized Seegrid with respect to such Claim; and (e) pursuing any Claim released pursuant to Article XI of the Plan.*

## C.    Exculpation

Neither Seegrid nor Giant Eagle or their respective representatives or shareholders shall have or incur any liability to any holder of a Claim or Equity Interest, for any act or omission in connection with, related to, or arising out of:    (a) the Chapter 11 Case; (b) pursuit of confirmation of the Plan; (c) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan; (d) the Plan; (e) the negotiation, formulation and preparation of the Plan and related documents; or (f) any of the terms and/or settlements and compromises reflected in the Plan and related documents; except for willful misconduct or gross negligence as determined by a Final Order.

## D.    Indemnification and Reimbursement Obligations

For purposes of the Plan, the obligations of Seegrid to indemnify and reimburse persons who are or were directors, officers, or employees of Seegrid on the Commencement Date or at any time thereafter against and for any obligations as provided in Seegrid's certificate of incorporation, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.

## E.    Release of Avoidance Actions

Upon the Effective Date, Seegrid shall release all Avoidance Actions.

## IX.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A.    Conditions Precedent to Confirmation of the Plan

The following are conditions precedent to confirmation of the Plan that must be satisfied, unless waived in accordance with Article 12.3 of the Plan:

(a)    At least two-thirds (2/3) in amount and fifty-percent (50%) in number of those holders of Class 2-B Other General Unsecured Claims actually voting on the Plan shall have voted to accept/vote in favor of the Plan.

(b)    The Confirmation Order shall, among other things:

(i)    order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(ii)    provide that, except with respect to obligations specifically preserved in the Plan, Seegrid is discharged effective on the Effective Date (in accordance with the Plan) from any Claims, and Seegrid's liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of Seegrid entered into or obligation of Seegrid incurred before the Effective Date, or from any conduct of Seegrid prior to the Effective Date, or whether such interest accrued before or after the Commencement Date, is extinguished completely;

(iii)    provide for the Discharge Injunction set forth in Article 11.2 of the Plan;

(iv)    provide that the transfer by Seegrid of its assets to Seegrid Sub is free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity;

(v)    authorize the implementation of the Plan in accordance with its terms and provide that, on the Effective Date, all of the transactions listed in Article IX shall occur, as set forth therein;

(vi)    provide that any transfers effected or entered into, or to be effected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(vii)    approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan; and

(viii)    provide that all Executory Contracts assumed or assumed and assigned by Seegrid during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of Reorganized Seegrid, Seegrid Sub, or the assignee thereof notwithstanding any provision in such contract or lease (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease.

**B.    Effective Date of the Plan**

The Plan shall become effective on the Effective Date.

**C.      Waiver of Conditions Precedent to the Confirmation Order**

To the fullest extent permitted by law, any of the conditions precedent set forth in Article 12.1 of the Plan may be waived or modified, in whole or in part, by Seegrid, after consultation with and the consent of Giant Eagle. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court, and without any other formal action.

**D.      Waiver of Conditions Precedent to the Effective Date**

The Debtor, may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in Article 12.1 of the Plan, whereupon the Effective Date shall occur without further action by any Person, provided, however, that the condition specified in Article 12.1(a) of the Plan may not be waived. The Debtor reserves the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

**E.      Effect of Failure of the Effective Date of the Plan**

In the event that Seegrid determines it is appropriate, after consultation with Giant Eagle prior to the Effective Date, upon notification submitted by Seegrid to the Bankruptcy Court: (A) the Confirmation Order shall be vacated; (B) no Distributions under the Plan shall be made; and (C) Seegrid and all holders of Claims against and Equity Interests in Seegrid shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred. If the Confirmation Order is vacated pursuant to Article 12.4 of the Plan, nothing contained in the Plan shall: (A) constitute or be deemed a waiver or release of any Claims or Equity Interests by, against, or in Seegrid or any other Entity; or (B) prejudice in any manner the rights of Seegrid or any other Entity in the Chapter 11 Case or any other or further proceedings involving Seegrid.

## X.      JURISDICTION OF BANKRUPTCY COURT

**A.      Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court or the corresponding United States District Court, as applicable, shall, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

(a)      hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims or Equity Interests that have been or properly should have been brought in the Bankruptcy Court;

(b)      hear and determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan or otherwise to recover assets for the benefit of the Estate;

(c)      hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, or any injunctions issued pursuant thereto;

(d)     enter such orders as are necessary to implement and enforce the injunctions described herein;

(e)     hear and determine any and all applications pursuant to section 330 or 503 of the Bankruptcy Code for allowance of any compensation for Professional services rendered and reimbursement of expenses incurred in connection therewith any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(f)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts to which Seegrid is a party, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(g)     hear and determine any and all applications, Claims, causes of action, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or commenced by Reorganized Seegrid or any other party in interest subsequent to the Effective Date;

(h)     consider any technical modifications of the Plan, and remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

(i)     issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code, including but not limited to compelling the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(j)     hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against Seegrid that has been or properly should have been brought in the Bankruptcy Court;

(k)     hear and determine any timely objections to Administrative Expense Claims or Administrative Expense Claims of Professionals asserted, or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to determine whether any Disputed Claim shall be Allowed or Disallowed, in whole or in part;

(l)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(n)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's

obligations hereunder, including, but not limited to, performance of Seegrid's duties under the Plan;

(o)    enforce remedies upon any default under the Plan;

(p)    hear and determine any other matter not inconsistent with the Bankruptcy Code;

(q)    hear and determine any claim that in any way challenges or is related to any provision in the Confirmation Order; and

(r)    enter a final decree closing the Chapter 11 Case.

**B.    Modification of Plan**

Except as limited by prior orders of the Bankruptcy Court, Seegrid, with the consent of Giant Eagle, may alter, amend, or modify the Plan or any Schedules or Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended Schedules or Exhibits in the Plan or the Plan Supplement, provided, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and Seegrid shall have complied with section 1125 of the Bankruptcy Code, to the extent necessary. Further, Seegrid, with the consent of Giant Eagle, may alter, amend, or modify the Plan or any Schedules or Exhibits thereto at any time after entry of the Confirmation Order and before the Plan's substantial consummation; provided, that: (a) the Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such holder changes its previous acceptance or rejection.

**C.    Compromises of Controversies**

From and after the Effective Date, Reorganized Seegrid shall be authorized to compromise controversies on such terms as Reorganized Seegrid may determine, in its sole discretion, to be appropriate.

**D.    Revocation or Withdrawal of the Plan**

Seegrid, with the consent of Giant Eagle, reserves the right to revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If Seegrid revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be null and void in all respects; any settlement or compromise embodied in the Plan including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests, any assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall: (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, Seegrid or

any other Entity; (b) prejudice in any manner the rights of Seegrid or any Entity in any further proceedings involving Seegrid; or (c) constitute an admission of any sort by Seegrid or any other Entity.

## XI.    MISCELLANEOUS PROVISIONS

### A.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or a schedule or exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

### B.    Plan Supplement

Any and all Exhibits, lists, or Schedules referred to herein or in the Plan but not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the deadline established by the Bankruptcy Court for the filing and service of objections to the Plan. Thereafter, the Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours. Claimants also may obtain a copy of the Plan Supplement, once filed, from Seegrid by written request to counsel for the Debtor.

### C.    Inconsistencies

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling. To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

### D.    Reservation of Rights

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concession or settlement. Moreover, if the Plan does not become effective no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

### E.    Officer and Board of Directors

No Changes will be made to the Board of Directors of the Reorganized Debtor, as Daniel Shapira, Philip Oliveri and Dr. Hans Moravec shall remain on the Board of Directors on the Effective Date. Seegrid Sub shall initially have a four member Board of Directors, consisting of

Daniel Shapira, Philip Oliveri, Dr. Hans Moravec and James Rock. Seegrib Sub's board shall be subject to change and increase over time.

Reorganized Seegrid's officers on the Effective Date shall be James Rock, CEO, David Heilman, President, Philip Oliveri, Treasurer and Thomas Buchanan, Secretary.

**F.      Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement. Unless any Causes of Action are expressly waived, relinquished, compromised or released in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtor will reserve all Causes of Action, including unknown Causes of Action, for later adjudication. All Causes of Action of the Debtor against any party shall vest in the Reorganized Debtor on the Effective Date. The Reorganized Debtor will have the exclusive right to determine and to initiate, file, prosecute, enforce, withdraw, settle, release, compromise or litigate to judgment any such Causes of Action.

**G.      Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**H.      Tax Reporting and Compliance**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, Seegrid and Reorganized Seegrid, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. No holder of an Allowed Claim against Seegrid shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under the Plan. Reorganized Seegrid is hereby authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of Seegrid ending after the Commencement Date through, and including, the Effective Date of the Plan.

I.     **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in such section 1146(a).

J.     **Binding Effect**

The rights, benefits and obligations of any Entity named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for Seegrid under chapters 7 or 11 of the Bankruptcy Code). The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

K.     **Further Authorizations**

Seegrid and Reorganized Seegrid, as applicable, after the Effective Date, may seek such orders, judgments, injunctions, and rulings as each deems necessary to carry out the intentions and purposes of, and to give full effect to the provisions of, the Plan.

L.     **Payment of Statutory Fees**

All fees and United States Trustee Fees, due and owing under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, as pro-rated to the Effective Date, shall be paid on or before the Effective Date. After the Effective Date but before the closing of the Chapter 11 Case, such fees shall be pro-rated to the closing of the Chapter 11 Case. The United States Trustee Fees shall be paid from Seegrid or Reorganized Seegrid's general funds.

M.     **Prepayment**

Except as otherwise provided in the Plan or the Confirmation Order, Reorganized Seegrid shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; provided, that any such prepayment shall not violate or otherwise prejudice the relative priorities and parities among the Classes of Claims.

N.     **Effective Date Actions Simultaneous**

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Actions required to be taken after the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date.

**O.    General Statements**

Statements of a general nature set forth in the Disclosure Statement shall not be construed to limit or restrict the specific provisions herein.

## XII.    GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE

**A.    Voting On the Plan**

The following is a summary of the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims. If you are entitled to vote and did not receive a Ballot, or you received a damaged Ballot, or you lost your Ballot, please contact the Balloting Agent at 973-509-3190.

Votes cannot be transmitted orally. Votes may be transmitted by facsimile or by electronic mail (e-mail) pursuant to the instructions enclosed with your Ballot. Accordingly, you are urged to return your signed and completed Ballot promptly. Any executed Ballot that does not indicate either an acceptance or a rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, will not be counted as a vote to either accept or reject the Plan.

SEEGRID RESERVES THE RIGHT TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE IN THE EVENT ANY OF CLASSES 1-A, 1-B, 1-C, 1-D, 2-A or 2-B VOTE TO REJECT THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN, SEEGRID RESERVES THE RIGHT TO AMEND THE PLAN EITHER BEFORE OR AFTER THE CONFIRMATION DATE.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF CLAIMS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING WITHOUT THE NECESSITY OF RESOLICITING VOTES.

**B.    Voting Record Date**

Seegrid has fixed September 24, 2014 at 5:00 p.m. (prevailing Eastern Time) as the "**Voting Record Date**" for the determination of the Holders of Claims entitled to vote to accept or reject the Plan and the amount of such Claims.

1.    *Who May Vote*

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims or Interests in Classes that are Impaired by, and are receiving Distributions under, the Plan may vote on the Plan. Holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. Administrative Expense Claims, Priority Tax Claims and Non-Tax Priority Claims are not generally classified for purposes of voting or receiving Distributions under the Plan.

**In this case, Holders of Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B are entitled to vote to accept or reject the Plan.** If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed for the purpose of voting.

2.    *Eligibility*

In order for a Holder of a Claim to be entitled to vote to accept or reject the Plan, the Holder's Claim must listed on the Debtor's books and records. Creditors having an Allowed Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

3.    *Binding Effect*

Whether a Holder of an Allowed Claim votes on the Plan or not, such Holder shall be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.

C.    **Procedure/Voting Deadlines**

In order for your vote to be counted, you must complete, date, sign and properly mail or deliver the enclosed Ballot to the Balloting Agent, by one of the methods set forth below:

By Mail:          Logan & Company, Inc.
                  Attn: Balloting Department
                  546 Valley Road, 2nd Floor
                  Upper Montclair, NJ 07043

By Electronic Mail:    seegrid@loganandco.com (with original to follow by mail).

By Facsimile:          973-509-1131 (with original to follow by mail).

Once you have delivered your Ballot to the Balloting Agent, you may change your vote by submitting to counsel to the Debtor a valid subsequent Ballot to be received by the Voting Deadline.

You are urged to timely complete, date, sign and promptly return the original enclosed Ballot by mail, courier service or hand delivery or by electronic mail or facsimile, with original to follow by mail, courier service or hand delivery.

Please be sure to complete the Ballot properly and legibly, identifying the exact amount of your Claim, the Class or Classes in which the Claim(s) is/are classified under the Plan and the name of the Creditor.

## D.    Plan Confirmation Process

### 1.    *Requirements*

The requirements for confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

### (a)    *Acceptance by All Impaired Classes*

Except as noted below, each Impaired Class of Claims must vote to either accept the Plan or be deemed to accept the Plan. "Impaired" is defined in section 1124 of the Bankruptcy Code. A Claim or Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the Holder. Under the Plan, Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B are Impaired and are entitled to vote, separately, to accept or reject the Plan.

As a voting Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, Creditors holding a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of Creditors, excluding the votes of Insiders (if any), must actually vote to accept the Plan.

### (b)    *Feasibility*

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. In addition, section 1129(a)(12) requires that all fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the Effective Date of the Plan. These conditions are often referred to as the "feasibility" of the Plan. The Plan is a reorganization plan and is predicated upon the continuation of business by the Reorganized Debtor as a holding company.

The projections prepared by the Debtor are included in the feasibility analysis (the "**Feasibility Analysis**") attached hereto as <u>Exhibit B</u>. The Debtor believes the projections are reasonable and achievable. As demonstrated by the Feasibility Analysis, the post-Effective Date financing committed to by Giant Eagle is sufficient to fund Seegrid Sub's operating losses until the cost cutting measures, refined business plan and increase in sales result in a net profit to sustain Seegrid Sub. Moreover, the Contribution Agreement included in the Feasibility Analysis will allow the Reorganized Debtor to pay its day-to-day administrative expenses until such time as the Reorganized Debtor realizes on the Seegrid Sub Common Stock.

As a result of the above, the Plan satisfies the feasibility test. Moreover, the Plan provides for payment of all statutory fees due and owing to the United States Trustee.

Accordingly, the Debtor believes that the Plan satisfies the requirements of feasibility under section 1129(a) of the Bankruptcy Code.

    (c)    ***"Best Interests" Test***

Pursuant to section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find that the Plan is in the best interests of Creditors and Interest Holders (commonly referred to as the "**Best Interests Test**"). To satisfy the "Best Interests" test, the Bankruptcy Court must determine that each Holder of an Impaired Claim or Impaired Interest either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code on that date.

The first step in meeting the "Best Interests" test is to determine the proceeds that would be generated from the hypothetical liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation. The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtor's assets and the Cash held by the Debtor at the time of the commencement of its chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of a liquidation.

    i.    Costs and Expenses of Liquidation

In a chapter 7 liquidation, a trustee in bankruptcy would be appointed. The net amount generated from the liquidation of the Debtor's assets would be reduced by the administrative expenses of both the chapter 7 case and the Chapter 11 case, including the fees and commissions of the chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the chapter 7 trustee, in addition to unpaid expenses incurred by the Debtor during the Chapter 11 case. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims or Allowed Interests.

Any remaining net Cash would be allocated to creditors and stockholders in strict accordance with the priorities set forth in section 726 of the Bankruptcy Code. The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed Distributions under the Plan to each of the Classes of Claims and Interests to determine if the Plan is in the best interests of each Creditor or Holder of an Interest.

If the present value of the Distributions available to unsecured creditors under the hypothetical liquidation is less than or equal to the present value of the Distributions available to unsecured creditors under the Plan, then the Plan is in the best interests of creditors and can be considered in the "best interests of creditors" by the Bankruptcy Court.

    ii.    The Plan Meets the Best Interests Test

The Debtor believes that the Plan will produce a recovery for Holders of Claims and Interests that would be equal to or better than would be achieved in a chapter 7 liquidation. If

the Chapter 11 Case were converted to a case under chapter 7, the Debtor's business operations would cease and there would be no on-going revenue stream to pay Claims over time.

Importantly, a chapter 7 liquidation would likely result in an increase in Administrative Expense Claims, because there would be an additional tier of Administrative Expense Claims by the chapter 7 trustee and his or her professionals. The chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtor. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for professionals), which would continue to be allowed in the chapter 7 case as well. In addition, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Additionally, with respect to Class 2-B, the Distributions will be funded by Giant Eagle and, absent Giant Eagle's commitment, Class 2-B's recovery is uncertain as to amount and timing. Finally, it is likely that distributions from a chapter 7 estate would be significantly deferred. As a result, the present value of such distributions is likely to be lower than if made under the Plan.

For the reasons set forth above, the Debtor believes that the Plan provides a recovery at least equal to, if not better than, the recovery in a chapter 7 case for Holders of Claims, and the Plan meets the requirements of the Best Interests Test. A Liquidation Analysis to the same effect is attached to this Disclosure Statement as Exhibit C.

(d)     *"Cramdown" Provisions*

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even though a class of claims or equity interests has not voted to accept the plan, as long as one impaired class of claims has accepted the plan (excluding the votes of Insiders, if any) and the plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting classes.

The Plan impairs certain Classes of secured and unsecured Claims. The Debtor may, if applicable, pursue confirmation through a "cramdown" provision under section 1129(b)(2)(B), which states, in pertinent part, that a plan must be "fair and equitable" to such dissenting class and does not discriminate unfairly against such dissenting class. A plan is "fair and equitable" to an secured creditor class if, among other possible treatment, the plan provides the secured creditor with the "indubitable equivalent" of its claim. A plan is "fair and equitable" to an unsecured creditor class if, among other things, the plan provides, with respect to unsecured claims and equity interests, that the holder of any such claim or equity interest that is junior to the claims or equity interests of such class, will not receive or retain, on account of such junior claim or equity interest, any property unless the senior unsecured class is paid in full.

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its

claim or interest. The Debtor will invoke the "cramdown" provisions of section 1129(b)(2) of the Bankruptcy Code should any voting Class fail to accept the Plan.

### 2.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. To confirm the Plan, the Bankruptcy Court must determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "**Confirmation Hearing**"). On the Commencement Date, Seegrid will request that the Bankruptcy Court promptly set a Confirmation Hearing.

## XIII.  RISK FACTORS

ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### A.    **Bankruptcy Factors**

#### 1.    *Classifications of Claims and Interests*

Parties in interest may object to the Debtor' classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    *Non-Occurrence of the Effective Date*

If the conditions precedent to the Effective Date, which are set forth in Article XII of the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED. In the event that the conditions precedent to the Effective Date have not been timely satisfied or waived, the Plan would be deemed null and void and (i) the Debtor or another party-in-interest may propose or solicit votes on an alternative plan that may not be as favorable to parties-in-interest as the current Plan, (ii) the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code; or (iii) the Chapter 11 Case could be dismissed.

#### 3.    *Failure to Receive Requisite Accepting Votes*

There can be no assurance that the requisite acceptances to confirm the Plan will be received. In order for the Plan to be accepted, of those Holders of Claims who cast Ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting Class is required.

If the requisite votes are not received, the Chapter 11 Case could be converted into a case under chapter 7 of the Bankruptcy Code or dismissed. There can be no assurance that the distributions under a chapter 7 liquidation or dismissal would be similar to or as favorable to Holders of Claims as those proposed in the Plan. Seegrid believes that Distributions to Creditors would be significantly reduced and delayed under a chapter 7 liquidation, as discussed hereinabove.

### 4.   *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired classes. If any impaired class does not vote to accept the Plan, the Debtor intends to seek Confirmation over the rejection of the Plan. Although the Debtor believes that the Plan satisfies the nonconsensual Confirmation requirements of Bankruptcy Code section 1129(b), there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, the pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, delay and increased expenses relating to Administrative Expense Claims of Professionals.

### 5.   *Failure to Confirm the Plan*

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity holder of the Debtor might challenge the confirmation of the Plan or the balloting procedures and/or voting results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes and that the value of Distributions to non-accepting Holders of Claims or Interests within a particular Class under the Plan will not be less than the value of Distributions such Holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtor believes that non-accepting Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims and Interests. If an alternative Plan could not be agreed to, it is possible that the Debtor would convert the Chapter 11 Case to a

chapter 7 case or dismiss the Chapter 11 Case, in which case it is likely that Holders of Claims or Interests would receive substantially less favorable treatment than they would receive under the Plan.

In addition, in the event that the Plan is not confirmed, the Debtor could incur substantial expenses related to the development and confirmation of a new plan and possibly the approval of a new disclosure statement. This would only unnecessarily prolong the administration of the Debtor's assets and negatively affect Creditors' recoveries on their Claims.

Similarly, as described above, in the event the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the Debtor will incur substantial expenses related to hiring additional professionals and paying the fees of the chapter 7 trustee. The additional cost will only serve to reduce Distributions to Creditors.

### 6.    *Risk of Additional or Larger Claims*

The Disclosure Statement necessarily includes estimates, including estimates of future events and unliquidated Claims. These estimates include, but are not limited to, estimates as to the total amount of Claims that will be asserted against the Debtor and the outcome of Disputed Claims. The Debtor believes that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are that: (i) additional prepetition or Administrative Expense Claims may be asserted; (ii) Disputed Claims may be resolved at higher amounts than expected; or (iii) the resolution of Claims may require the expenditure of unanticipated professional fees.

### 7.    *Alternative Chapter 11 Plan*

If the Plan is not confirmed, any other party-in-interest may attempt to formulate an alternative chapter 11 plan. However, the Debtor believes that such an alternative chapter 11 plan will necessarily be significantly inferior to the Plan proposed herewith. The prosecution of an alternative chapter 11 plan would unnecessarily delay Creditors' receipt of Distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller Distributions to Holders of Allowed Claims and Interests than are currently provided for in the Plan. Accordingly, the Debtor believes that the Plan will enable all Holders of Claims and Interests to realize the greatest possible recovery on their respective Claims and with the least delay.

### 8.    *Variances from Projections*

As noted in this Disclosure Statement, the Debtor has estimated Distributions to Holders of Allowed Claims and Allowed Interests based upon certain financial projections. The projections reflect assumptions concerning, among other things, Seegrid's operations prior to the Effective Date and Seegrid Sub's on-going business operations following the Effective Date. The Debtor believes that the assumptions underlying the projections are reasonable; however, unanticipated events occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtor, the Reorganized Debtor or Seegrid Sub. The projections have not been compiled, audited, or examined by independent accountants and the Debtor makes

no representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

### 9.    *Certain tax implications of the Chapter 11 Case*

Holders of Claims should carefully review Section XIII hereof, "Certain Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Case may adversely affect the Reorganized Debtor and certain Holders of Claims

### 10.    *The Debtor's emergence from chapter 11 is not assured*

While the Debtor expects to emerge from chapter 11, there can be no assurance that the Debtor will successfully reorganize or when this reorganization will occur, irrespective of the Debtor's obtaining Confirmation of the Plan.

### 11.    *The Debtor may fail to satisfy solicitation requirements*

Bankruptcy Code section 1126(b) provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in Bankruptcy Code section 1125.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with Bankruptcy Code section 1126(b).

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtor is attempting to deliver this Disclosure Statement to all Holders of Claims entitled to vote as of the Voting Record Date. In that regard, the Debtor believes that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements then the Debtor may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. The Debtor cannot provide any assurances that such a resolicitation would be successful.

12.     *Confirmation and consummation may be delayed if the Debtor has to resolicit*

If the Debtor resolicits acceptances of the Plan from parties entitled to vote thereon, or if the Debtor is required to solicit the votes of the Holders of Claims that have been deemed to reject the Plan, Confirmation of the Plan could be delayed and possibly jeopardized. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Debtor could experience significant deterioration in its relationships with trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that the DIP Credit Agreement or the Plan Support Agreement may expire or be terminated in accordance with its terms.

## XIV.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), proposed Treasury Regulations promulgated thereunder, and administrative rulings and court decisions, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan. To the extent that the following discussion relates to the consequences to Holders of Allowed Claims or Interests, it is limited to Holders that are United States persons within in the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein. No representations or

assurances are being made to the Holders of Claims or Interests with respect to the United States federal income tax consequences described herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as banks, mutual funds, insurance companies, tax-exempt organizations, investors in pass-through entities and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class.

Any discussion of United States federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan. A Holder of a Claim or Interest should seek advice based on their particular circumstances from an independent tax advisor.

## A.    Certain U.S. Federal Income Tax Consequences to the Debtor and Reorganized Debtor

The Debtor will report net operating loss ("**NOL**") carryforwards for U.S. federal income tax purposes as of the Commencement Date in the amount of approximately $58,000,000. The amount of the NOL carryforward will be adjusted downward as a result of cancellation of indebtedness income ("**COD Income**") and the elimination of the First and Third Priority Secured Bridge Noteholder Claims resulting from the Holder exchanging such Claims for Seegrid Sub Series A Preferred Stock pursuant to the Plan. The NOL carryforwards, as adjusted, will remain with the Reorganized Debtor following consummation of the Plan and will not be available for use by Seegrid Sub. Seegrid Sub will not file a consolidated return with the Reorganized Debtor.

The Debtor does not anticipate undergoing an "ownership change", under Section 382 of the IRC. Consequently, the Debtor does not anticipate that the use of its NOL carryforwards will be subject to limitation following consummation of the Plan.

## B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims or Interests

A Holder of an Allowed Claim or Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim or Interest but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim or Interest. Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest with respect to a Claim or Interest may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Subject to the discussion below, a Holder of an Allowed Claim or Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim or Interest and the amount realized by the Holder upon consummation of the Plan that is not

attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the Creditor or Interest Holder, the nature of the Claim or Interest in the Creditor's or Interest Holder's hands, whether the Claim or Interest was purchased at a discount, whether and to what extent the Creditor or Interest Holder has previously claimed a bad debt deduction with respect to the Claim or Interest, and the Creditor's or Interest Holder's holding period of the Claim or Interest. If the Claim or Interest in the Creditor's or Interest Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Creditor or Interest Holder held such Claim or Interest for longer than one year, or short-term capital gain or loss if the Creditor or Interest Holder held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Interest who receives, in respect of its Claim or Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Interest.

1. **Class 2-B**

The Holders of Other General Unsecured Claims will receive $0.75 cash for each $1.00 claim as of the Effective Date of the Plan, or 50% of any such Holder's Claim in cash and an interest free promissory note from Seegrid Sub payable in one year. Depending on which option is selected by any such Holders of Class 2-B Claims, the Holder may have its Claim paid in full or may suffer a loss, depending on its method of accounting. The Debtor may experience COD Income or gain as a result Seegrid Sub issuing promissory notes to satisfy some, or potentially all, of these outstanding claims.

2. **Holders of the First and Third Priority Secured Bridge Noteholder Claims**

Holders of First and Third Priority Secured Bridge Noteholder Claims may experience gain or loss under the Plan. Holders of such Claims will have gain or loss in an amount equal to the value of the Seegrid Sub Series A Preferred Stock received less the tax basis in the indebtedness surrendered in exchange therefor. Holders of such Claims should seek their own tax advice with regard to whether any such Holder would experience a gain or loss as a result of the implementation of the Plan. The Debtor will experience gain or loss as result of the Seegrid Sub Series A Preferred Stock being exchanged for the release of First and Third Priority Secured Bridge Noteholder Claims.

### 3.    *Holders of the Second Priority Secured Noteholder Claims*

The Holders of the Second Priority Secured Noteholder Claims will likely experience a taxable exchange as a result of consummation of the Plan and the adjustments made to their Claims under the Plan. The maturity date of such debt will be extended, and the security interest of those claims will be adjusted. Pursuant to regulations promulgated under Section 1001 of the IRC, it is likely that Holders of such Claims will experience a "deemed" exchange for U.S. federal income tax purposes. Notwithstanding the foregoing, however, the Debtor expects that the issue price for the "new" debt instrument deemed to be issued to Holders of Second Priority Secured Noteholder Claims will be equal to the stated principal amount of the obligation. Consequently, a Holder should be considered to have received an instrument with a fair market value equal to the tax basis in the "old" debt instrument deemed surrendered in the exchange. Consequently, unless a Holder in this Class had previously taken a deduction related to the debt instrument, the Debtor does not anticipate that a taxable gain or loss would arise as a result of the deemed exchange of debt instruments under U.S. federal income tax law arising as a result of the modification of these debt instruments under the Plan. Holders of such Claims should seek their own tax advice with regard to whether any such holder would experience a gain or loss as a result of the implementation of the Plan.

### C.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOREGOING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE UNCERTAIN IN MANY CASES AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XV.    **ALTERNATIVES TO THE PLAN**

The Debtor has determined that the Plan is the most practical means of providing for maximum recoveries to the Holders of Allowed Claims and Allowed Interests. Alternatives to the Plan that have been considered and evaluated by the Debtor include (i) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code and (ii) dismissal of the Chapter 11 Case. Through consideration of these alternatives to the Plan, the Debtor has concluded that the Plan, in comparison, will likely provide a greater recovery to Holders of Allowed Claims and Allowed Interests on a more expeditious timetable, and in a manner that minimizes certain risks inherent in any other course of action available to the Debtor.

### A.    **Liquidation under Chapter 7**

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under sections 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case may be converted to a

case under chapter 7 of the Bankruptcy Code, and a trustee would be elected or appointed to liquidate any remaining assets of the Debtor for Distribution to Holders of Allowed Claims and Interests pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, all Creditors and Interest Holders under the Plan may receive Distributions of a lesser value on account of their Allowed Claims and Allowed Interests and may have to wait a longer period of time to receive such Distributions than they would under the Plan.

**B.    Dismissal**

If the Chapter 11 Case is dismissed outside the context of the Plan, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Debtor and the Holders of Claims and Interests. Therefore, the Debtor believes that dismissal of the Chapter 11 Case (except as provided in the Plan) is not a viable alternative to Confirmation of the Plan.

## XVI.   RECOMMENDATIONS

The Debtor believes that the Plan is substantially preferable to any other plan, preferable to liquidation under chapter 7 of the Bankruptcy Code, and preferable to a dismissal of the Chapter 11 Case. Conversion of the Chapter 11 Case to a case under chapter 7 would result in substantial delays in the distribution of proceeds available and would significantly increase administrative costs, and, therefore, would materially reduce Creditor and Interest Holder recoveries. Therefore, the Debtor strongly recommends that you vote in favor of the Plan.

## XVII.   CONCLUSION

It is important that you exercise your right to vote on the Plan. The Debtor believes that the Plan fairly and equitably provides for the treatment of all Claims against, and Interests in, the Debtor and recommends that you cast your Ballot in favor of the Plan.

Dated: October 3, 2014
      Pittsburgh, Pennsylvania

**BUCHANAN INGERSOLL & ROONEY PC**

James D. Newell (PA ID No. 51337)
Zakarij O. Thomas (PA ID No. 87385)
301 Grant Street, 20th Floor
One Oxford Centre
Pittsburgh, PA 15219
Telephone:  (412) 562-8800
Facsimile:  (412) 562 1041

      -and-

Mary F. Caloway
Kathleen A. Murphy
919 N. Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 552-4200
Facsimile:  (302) 552-4295

*Attorneys for Seegrid Corporation*

# EXHIBITS

**Exhibit A**      Prepackaged Plan of Reorganization

**Exhibit B**      Feasibility Analysis

**Exhibit C**      Liquidation Analysis

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------  x
In re:                                                        :
                                                              :   Chapter 11
SEEGRID CORPORATION,                                          :
                                                              :   Case No. 14-_____
                                    Debtor.                   :
------------------------------------------------------------  x
```

## PREPACKAGED PLAN OF REORGANIZATION OF SEEGRID CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### OCTOBER 3, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
James D. Newell
Zakarij O. Thomas
301 Grant Street, 20th Floor
One Oxford Centre
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562 1041

-and-

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway (DE Bar No. 3059)
Kathleen A. Murphy (DE Bar No. 5215)
919 N. Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

*Attorneys for Debtor Seegrid Corporation*

# Table of Contents

Page

ARTICLE I DEFINITIONS AND INTERPRETATIONS..................................................................1

| | | |
|---|---|---|
| 1.1 | Administrative Expense Claim ..................................................................1 |
| 1.2 | Administrative Expense Claims of Professionals ......................................1 |
| 1.3 | Allowed.....................................................................................................1 |
| 1.4 | Allowed Amount.......................................................................................2 |
| 1.5 | Amended Certificate of Incorporation .....................................................2 |
| 1.6 | Avoidance Action(s) .................................................................................2 |
| 1.7 | Ballot .......................................................................................................2 |
| 1.8 | Bankruptcy Code ......................................................................................2 |
| 1.9 | Bankruptcy Court......................................................................................2 |
| 1.10 | Bankruptcy Rules ....................................................................................2 |
| 1.11 | Business Day............................................................................................2 |
| 1.12 | Cash.........................................................................................................2 |
| 1.13 | Cause of Action.......................................................................................2 |
| 1.14 | Chapter 11 Case ......................................................................................3 |
| 1.15 | Claim.......................................................................................................3 |
| 1.16 | Class........................................................................................................3 |
| 1.17 | Commencement Date................................................................................3 |
| 1.18 | Common Stock.........................................................................................3 |
| 1.19 | Confirmation Date ...................................................................................3 |
| 1.20 | Confirmation Hearing ..............................................................................3 |
| 1.21 | Confirmation Order..................................................................................3 |
| 1.22 | Cure.........................................................................................................3 |
| 1.23 | Cure Notice .............................................................................................3 |
| 1.24 | Debtor .....................................................................................................3 |
| 1.25 | Debtor in Possession ...............................................................................3 |
| 1.26 | DIP Credit Agreement .............................................................................4 |
| 1.27 | Disallowed ..............................................................................................4 |
| 1.28 | Discharge Injunction ...............................................................................4 |
| 1.29 | Disputed Claim ........................................................................................4 |
| 1.30 | Distribution .............................................................................................4 |
| 1.31 | Distribution Record Date .........................................................................4 |
| 1.32 | Effective Date ..........................................................................................4 |
| 1.33 | Encumbrance............................................................................................4 |
| 1.34 | Entity.......................................................................................................4 |
| 1.35 | Equity Interest..........................................................................................4 |
| 1.36 | Estate.......................................................................................................4 |
| 1.37 | Executory Contract ..................................................................................4 |
| 1.38 | Final Judgment or Final Order .................................................................4 |
| 1.39 | First Priority Secured June 11 Noteholder Claim .....................................5 |
| 1.40 | First Priority Secured Bridge Noteholder Claim ......................................5 |
| 1.41 | First Priority Secured June 11 Notes ........................................................5 |

1.42     Giant Eagle..................................................................................................5
1.43     Impaired......................................................................................................5
1.44     Interest........................................................................................................5
1.45     Investor.......................................................................................................5
1.46     Lien.............................................................................................................6
1.47     Non-Tax Priority Claim..............................................................................6
1.48     Noteholder Claim........................................................................................6
1.49     Noteholder General Unsecured Claim.........................................................6
1.50     Other General Unsecured Claim..................................................................6
1.51     Plan.............................................................................................................6
1.52     Plan Supplement.........................................................................................6
1.53     Priority Claim.............................................................................................6
1.54     Priority Tax Claim......................................................................................6
1.55     Professional................................................................................................6
1.56     Proof of Claim............................................................................................6
1.57     Rejection Claim..........................................................................................6
1.58     Reorganized Seegrid...................................................................................6
1.59     Representative.............................................................................................6
1.60     Schedules....................................................................................................7
1.61     Second Priority Secured Noteholder Claim.................................................7
1.62     Second Priority Secured Notes....................................................................7
1.63     Secured Claim.............................................................................................7
1.64     Secured Noteholder Claim...........................................................................7
1.65     Seegrid Sub.................................................................................................7
1.66     Seegrid Sub Common Stock.........................................................................7
1.67     Seegrid Sub Series A Preferred Shares........................................................7
1.68     Series A Preferred Share Interests..............................................................7
1.69     Series A-1 Preferred Share Interests...........................................................7
1.70     Series B Preferred Share Interests...............................................................7
1.71     Series C Preferred Share Interests...............................................................7
1.72     Series C-1 Preferred Share Interests............................................................7
1.73     Shareholder.................................................................................................8
1.74     Third Priority Secured Bridge Noteholder Claim.........................................8
1.75     Third Priority Secured Bridge Notes...........................................................8
1.76     Unimpaired.................................................................................................8
1.77     United States Trustee...................................................................................8
1.78     United States Trustee Fees...........................................................................8
1.79     Unsecured Note............................................................................................8

ARTICLE II ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.........................8

2.1     Allowed Administrative Expense Claims.......................................................8
2.2     Allowed Administrative Expense Claims of Professionals.............................9
2.3     Priority Tax Claims.......................................................................................9
2.4     Non-Tax Priority Claims...............................................................................9

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS...................9

3.1     Classification................................................................................................9

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS..........10

    4.1     Class 1-A – First Priority Secured June 11 Noteholder Claims............................10
    4.2     Class 1-B – First Priority Secured Bridge Noteholder Claims ............................11
    4.3     Class 1-C – Second Priority Secured Noteholder Claims....................................11
    4.4     Class 1-D – Third Priority Secured Bridge Noteholder Claims ...........................11
    4.5     Class 2-A – Noteholder General Unsecured Claims............................................12
    4.6     Class 2-B – Other General Unsecured Claims....................................................12
    4.7     Class 3-A – Series A Preferred Share Interests .................................................12
    4.8     Class 3-B – Series A-1 Preferred Share Interests .............................................12
    4.9     Class 3-C – Series B Preferred Share Interests .................................................13
    4.10    Class 3-D – Series C Preferred Share Interests.................................................13
    4.11    Class 3-E – Series C-1 Preferred Share Interests..............................................13
    4.12    Class 4 – Common Stock Interests ...................................................................13

ARTICLE V ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION
    BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS...................14

    5.1     Classes Entitled to Vote ..................................................................................14
    5.2     Class Acceptance Requirement........................................................................14

ARTICLE VI DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS............14

    6.1     Distributions...................................................................................................14
    6.2     Date of Distributions ......................................................................................14
    6.3     Postpetition Interest on Claims .......................................................................14
    6.4     Means of Cash Payment..................................................................................14
    6.5     Delivery of Distributions ................................................................................14
    6.6     Time Bar to Cash Payments............................................................................15
    6.7     Record Date for Holders of Claims .................................................................15
    6.8     Distributions after Effective Date ...................................................................15
    6.9     Fractional Cents .............................................................................................15
    6.10    Setoff.............................................................................................................15
    6.11    No Distributions Pending Allowance ..............................................................16

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES .,.......................................................................................................16

    7.1     General Treatment .........................................................................................16
    7.2     Cure of Defaults.............................................................................................16
    7.3     Bar to Rejection Damages ..............................................................................16

ARTICLE VIII PROCEDURES FOR RESOLVING AND TREATING DISPUTED
    CLAIMS .......................................................................................................17

    8.1     Disputed Claims.............................................................................................17
    8.2     Objection to Claims .......................................................................................17
    8.3     Payments and Distributions with Respect to Disputed Claims...........................17
    8.4     Estimation of Claims......................................................................................17
    8.5     Preservation of Rights to Settle Claims ...........................................................17

ARTICLE IX MEANS FOR IMPLEMENTATION OF THE PLAN.........................................18

9.1     Generally................................................................................................18
9.2     Seegrid Sub...........................................................................................18
9.3     Amendment of Certificate...................................................................19
9.4     Effectuating Documents; Further Transactions ..................................19

ARTICLE X EFFECT OF CONFIRMATION.........................................................19

10.1    Vesting of Seegrid Assets ....................................................................19
10.2    Terms of Injunction and Automatic Stay.............................................19
10.3    No Liability for Seegrid Claims............................................................19

ARTICLE XI DISCHARGES, RELEASES AND INJUNCTIONS ...........................20

11.1    Discharge ..............................................................................................20
11.2    Discharge Injunction ............................................................................20
11.3    Exculpation ...........................................................................................20
11.4    Indemnification and Reimbursement Obligations ...............................20
11.5    Release of Avoidance Actions ..............................................................21

ARTICLE XII CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ......................................................................21

12.1    Conditions Precedent to Confirmation of the Plan .............................21
12.2    Effective Date of the Plan.....................................................................22
12.3    Waiver of Conditions Precedent to the Confirmation Order ...............22
12.4    Effect of Failure of the Effective Date of the Plan .............................22

ARTICLE XIII JURISDICTION OF BANKRUPTCY COURT ...............................22

13.1    Retention of Jurisdiction ......................................................................22
13.2    Modification of Plan .............................................................................24
13.3    Compromises of Controversies.............................................................24
13.4    Revocation or Withdrawal of the Plan .................................................24

ARTICLE XIV MISCELLANEOUS PROVISIONS.................................................25

14.1    Governing Law .....................................................................................25
14.2    Notices ..................................................................................................25
14.3    Plan Supplement ...................................................................................25
14.4    Inconsistencies .....................................................................................26
14.5    Reservation of Rights............................................................................26
14.6    Tax Reporting and Compliance ...........................................................26
14.7    Exemption from Transfer Taxes ...........................................................26
14.8    Binding Effect.......................................................................................26
14.9    Further Authorizations..........................................................................27
14.10   Payment of Statutory Fees ...................................................................27
14.11   Prepayment ...........................................................................................27
14.12   Effective Date Actions Simultaneous ..................................................27
14.13   General Statements...............................................................................27
14.14   Preservation of Causes of Action.........................................................27
14.15   Severability of Plan Provisions ............................................................27

ARTICLE XV CRAMDOWN...................................................................................29

iv

15.1 Cramdown............................................................................................................29

## EXHIBITS TO PLAN

A. Seegrid Sub Series A Preferred Shares
B. Plan Support Agreement

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                             :

                                :    Chapter 11

SEEGRID CORPORATION,           :

                                :    Case No. 14-_____

                     Debtor.       :

---------------------------------------------------------------- x

## PREPACKAGED PLAN OF REORGANIZATION OF SEEGRID CORPORATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

        Seegrid Corporation ("Seegrid" or "Debtor") propose the following plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

        The definitions provided in this Article I apply to the Plan. Unless otherwise specified, all Article, schedule or exhibit references in the Plan are to the respective Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Article, subsection or clause. With respect to a distribution under the Plan, "on" a date means on or as soon as reasonably practical thereafter. A term used but not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

        **1.1**     **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 503(b), 507(a)(1), and 507(b) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses of preserving Seegrid's Estate; (b) any actual and necessary costs and expenses of operating Seegrid's business; and (c) any indebtedness or obligations incurred or assumed by Seegrid as Debtor in Possession during the Chapter 11 Case.

        **1.2**     **Administrative Expense Claims of Professionals** means any compensation for Professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

        **1.3**     **Allowed** means, when used with respect to any Claim against or Interest in Seegrid (a) as to which no objection or request for estimation has been filed, no litigation has commenced, or Seegrid otherwise has assented to the validity thereof; (b) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order; or (c) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the holder(s) of such Claim or

1

Interest and Seegrid (or Reorganized Seegrid, as the case may be), or (iii) under the terms of the Plan.

**1.4    Allowed Amount** means, with respect to any Claim, the lesser of: (a) the dollar amount of such Claim as Allowed; (b) the estimated amount of such Claim; and (c) the dollar amount agreed to by Seegrid. Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the Allowed Amount of an Allowed Claim shall not include interest or penalties accruing on such Allowed Claim from and after the Commencement Date. In addition, unless a Final Order of the Bankruptcy Court provides otherwise, the Allowed Amount of an Allowed Claim shall not, for any purpose under the Plan, include interest at any default rate of interest.

**1.5    Amended Certificate of Incorporation** means the amended and restated certificate of incorporation of Reorganized Seegrid.

**1.6    Avoidance Action(s)** means any avoidance or recovery action under any of sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, whether or not litigation has been commenced with respect to such cause of action as of the Effective Date.

**1.7    Ballot** means each of the ballots and/or master ballots distributed with the Disclosure Statement to holders of Impaired Claims on which ballot such holder of a Claim may, among other things, vote to accept/vote in favor of or reject/vote against the Plan.

**1.8    Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Commencement Date, together with all amendments, modifications and replacements of the foregoing, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

**1.9    Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Case.

**1.10    Bankruptcy Rules** means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Case.

**1.11    Business Day** means any day except: (a) Saturday; (b) Sunday; (c) any other day on which banking institutions in New York, New York, are required or authorized to be closed by law or executive order; and (d) the Friday immediately after Thanksgiving.

**1.12    Cash** means legal tender of the United States of America.

**1.13    Cause of Action** means any action, including any cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, or Claim whatsoever, whether known or unknown, now or in the future, reduced to judgment, not reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, whether asserted or assertable directly or derivatively, in law, equity or otherwise, which may be brought by or on behalf of Seegrid and/or the Estate, arising under any provision of the Bankruptcy Code or other applicable law or regulation or similar governmental pronouncement.

**1.14    Chapter 11 Case** means Seegrid's case under chapter 11 of the Bankruptcy Code, captioned *In re Seegrid Corporation*, Case No. (Pending Filing), to be commenced in the Bankruptcy Court.

**1.15    Claim** means:  (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such right gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.16    Class** means a category of holders of Claims or Equity Interests described in Article III below.

**1.17    Commencement Date** means the date on which a petition is filed by Seegrid pursuant to section 301 of the Bankruptcy Code to commence the Chapter 11 Case.

**1.18    Common Stock** means the shares of common stock of Seegrid.

**1.19    Confirmation Date** means the date on which the Confirmation Order is entered by the Bankruptcy Court with respect to the Chapter 11 Case.

**1.20    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.21    Confirmation Order** means the order or orders of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

**1.22    Cure** means the payment of Cash by Seegrid, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to:  (a) cure a default by Seegrid under an Executory Contract; and (b) permit Seegrid to assume such Executory Contract under section 365 of the Bankruptcy Code.

**1.23    Cure Notice** means the pleading that the Reorganized Debtor shall file and serve within thirty (30) days after the Effective Date listing the amount of the proposed Cure for each assumed, or assumed and assigned, Executory Contract.

**1.24    Debtor** means Seegrid Corporation in the Chapter 11 Case.

**1.25    Debtor in Possession** means Seegrid Corporation, as debtor in possession in the Chapter 11 Case pursuant to section 1101(1) of the Bankruptcy Code.

3

**1.26    DIP Credit Agreement** means the Debtor in Possession Credit Agreement extended by Giant Eagle to the Debtor, as approved by the Bankruptcy Court, and all other documents evidencing the obligations of the Debtor arising thereunder.

**1.27    Disallowed** means, when used with respect to a Claim against or Interest in Seegrid, a Claim or Interest that:  (a) is disallowed in whole or in part (but solely to the extent of such disallowance) by an order of the Bankruptcy Court or other court of competent jurisdiction; or (b) has been withdrawn, in whole or in part, by the holder thereof.

**1.28    Discharge Injunction** means the injunction set forth in Section 11.2 of this Plan.

**1.29    Disputed Claim** means a Claim against Seegrid, or any portion thereof, that is neither Allowed nor Disallowed or is contingent, disputed or unliquidated.

**1.30    Distribution** means any:  (a) Cash; (b) property; or (c) interest in property to be paid or distributed hereunder to the holders of Allowed Claims or Equity Interests.

**1.31    Distribution Record Date** means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Claims, which shall be the Effective Date.

**1.32    Effective Date** means the date that the Confirmation Order has been entered by the Bankruptcy Court and has become a Final Order.

**1.33    Encumbrance** means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

**1.34    Entity** means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.35    Equity Interest** means any right, title and ownership interest in Seegrid.

**1.36    Estate** means the estate created under section 541 of the Bankruptcy Code in the Chapter 11 Case.

**1.37    Executory Contract** means any unexpired lease or executory contract of Seegrid that is subject to treatment under section 365 of the Bankruptcy Code.

**1.38    Final Judgment or Final Order** means a judgment or an order, as the case may be, as to which the time to appeal, petition for certiorari, or move for reargument or

rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, that if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought: (a)(i) such judgment or order shall have been affirmed by the highest court to which such judgment or order was appealed; or (ii) certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; or (b) such appeal, writ of certiorari, or request for reargument or rehearing shall have been dismissed with prejudice by the filing or seeking party.

        **1.39**    **First Priority Secured June 11 Noteholder Claim** means a Secured Noteholder Claim pursuant to that certain Second Amendment to Note and Warrant Purchase Agreement and funded on June 11, 2014 and secured by a valid and perfected first priority Lien upon the assets of Seegrid.

        **1.40**    **First Priority Secured Bridge Noteholder Claim** means a Secured Noteholder Claim secured by a valid and perfected first priority Lien upon the assets of Seegrid pursuant to bridge loans funded on or around July 1, 2013, July 9, 2014 and July 23, 2014.

        **1.41**    **First Priority Secured June 11 Notes** shall mean the promissory notes issued by Seegrid pursuant to that certain Second Amendment to Note and Warrant Purchase Agreement and funded on or around June 11, 2014 and secured by a first priority Lien on Seegrid's assets.

        **1.42**    **Giant Eagle** means Giant Eagle, Inc., a Pennsylvania corporation.

        **1.43**    **Impaired** means, when used with respect to a Claim or an Equity Interest, a Claim or Equity Interest as to which the Plan: (a) alters the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) does not cure any such default that occurred before or after the Commencement Date, (ii) does not reinstate the maturity of such claim or interest as such maturity existed before such default; (iii) does not compensate the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), does not compensate the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; or (v) otherwise alters the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

        **1.44**    **Interest** means an Equity Interest in Seegrid.

        **1.45**    **Investor** means any of Seegrid's direct and indirect stockholders and convertible debt holders electing to purchase Seegrid Sub Series A Shares.

**1.46    Lien** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.47    Non-Tax Priority Claim** means a Priority Claim other than an Administrative Expense Claim or a Priority Tax Claim.

**1.48    Noteholder Claim** means a claim against Seegrid evidenced by a promissory note issued by Seegrid.

**1.49    Noteholder General Unsecured Claim** means a Noteholder Claim that is not secured by a Lien.

**1.50    Other General Unsecured Claim** means a Claim against Seegrid that is not a Secured Noteholder Claim, an Administrative Expense Claim, a Priority Tax Claim, a Non-Tax Priority Claim or a Noteholder General Unsecured Claim.

**1.51    Plan** means this plan of reorganization of Seegrid under chapter 11 of the Bankruptcy Code, including any supplements, schedules and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

**1.52    Plan Supplement** means the plan supplement filed by the Debtor at least five business days prior to the date set by the Bankruptcy Court for objections to the Plan.

**1.53    Priority Claim** means a Claim entitled to a priority pursuant to Section 507 of the Bankruptcy Code.

**1.54    Priority Tax Claim** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.55    Professional** means any person retained or to be compensated pursuant to section 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code.

**1.56    Proof of Claim** means any proof of claim or interest filed with the Bankruptcy Court or the Balloting Agent pursuant to Bankruptcy Code section 501 and Rule 3001 or 3002 of the Bankruptcy Rules that asserts a Claim against or Equity Interest in Seegrid.

**1.57    Rejection Claim** means any Claim for damages under section 502(g) of the Bankruptcy Code resulting from the rejection of an executory contract or unexpired lease by Seegrid or Reorganized Seegrid.

**1.58    Reorganized Seegrid** means Seegrid, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**1.59    Representative** means, with respect to any specified Entity, any current or former officer, director, employee, agent, attorney, accountant, financial advisor, expert, consultant, other representative or any person who controls any of these.

6

**1.60    Schedules** means the schedules of assets and liabilities and the statements of financial affairs of Seegrid as filed with the Bankruptcy Court by Seegrid after commencement of the Chapter 11 Case in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

**1.61    Second Priority Secured Noteholder Claim** means a Noteholder Claim secured by a valid and perfected second priority Lien on the assets of Seegrid.

**1.62    Second Priority Secured Notes** shall mean the promissory notes issued by Seegrid secured by a second priority Lien on Seegrid's assets.

**1.63    Secured Claim** means a Claim that is:  (a) secured by a valid, duly perfected, non-avoidable security interest in the interest of Seegrid in property, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such claimholder's interest in Seegrid's interest in such property, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed in writing by Seegrid and the claimholder; or (b) secured by the amount of any valid, non-avoidable rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.64    Secured Noteholder Claim** means a Noteholder Claim secured by a Lien on the asset of Seegrid.

**1.65    Seegrid Sub** means a newly formed entity organized by Seegrid as described in Article IX of the Plan, or any successor thereto by merger, consolidation, or otherwise.

**1.66    Seegrid Sub Common Stock** means the shares of common stock of Seegrid Sub to be issued on the Effective Date as described in Article IX of the Plan.

**1.67    Seegrid Sub Series A Preferred Shares** means the Series A Preferred Shares to be issued by Seegrid Sub on the Effective Date as described in Article IX of the Plan.

**1.68    Series A Preferred Share Interests** means the Series A Preferred Shares of Seegrid.

**1.69    Series A-1 Preferred Share Interests** means the Series A-1 Preferred Shares of Seegrid.

**1.70    Series B Preferred Share Interests** means the Series B Preferred Shares of Seegrid.

**1.71    Series C Preferred Share Interests** means the Series C Preferred Shares of Seegrid.

**1.72    Series C-1 Preferred Share Interests** means the Series C-1 Preferred Shares of Seegrid.

**1.73**    **Shareholder** means an owner of an equity interest in an Entity.

**1.74**    **Third Priority Secured Bridge Noteholder Claim** means a Noteholder Claim secured by a valid and perfected third priority Lien on the assets of Seegrid.

**1.75**    **Third Priority Secured Bridge Notes** shall mean the promissory notes issued by Seegrid secured by a third priority Lien on Seegrid's assets.

**1.76**    **Unimpaired** means a Claim or Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is not Impaired under the Plan.

**1.77**    **United States Trustee** means the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the District of Delaware.

**1.78**    **United States Trustee Fees** means the fees payable to the United States Trustee in accordance with 28 U.S.C. § 1930.

**1.79**    **Unsecured Note** shall mean a promissory note issued by Seegrid which is not secured by a Lien.

## ARTICLE II
## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

**2.1**    **Allowed Administrative Expense Claims.** Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise provided for in the Plan, in full satisfaction, settlement and discharge of and in exchange for such Claims, Seegrid or Reorganized Seegrid shall pay each Allowed Administrative Expense Claim in full and in Cash on, or as soon thereafter as is reasonably practicable, the latest of:  (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; and (c) the date the Allowed Administrative Expense Claim becomes due and payable according to its terms; provided, however, that the Allowed Administrative Expense Claim representing liabilities incurred by the Debtor in Possession in the ordinary course of business or liabilities under loans or advances to or other obligations incurred by the Debtor in Possession may be paid by Seegrid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Reorganized Seegrid, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. Seegrid or Reorganized Seegrid shall have the right to object to any Administrative Expense Claim by the later of:  (a) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court; and (b) 30 days after the date such Administrative Expense Claim is filed. Unless Seegrid or Reorganized Seegrid objects to an Administrative Expense Claim, such Claim shall be deemed allowed in the amount requested. In the event that Seegrid or Reorganized Seegrid timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court

shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

       **2.2**    **Allowed Administrative Expense Claims of Professionals.**   All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred.  The Allowed Claims of Professionals shall be paid from Cash of the Debtor or Reorganized Seegrid, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; or (ii) upon such other terms as may be mutually agreed upon by such holder and Reorganized Seegrid.

       **2.3**    **Priority Tax Claims.** Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by Seegrid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized Seegrid: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of:  (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; and (ii) over a period ending not later than five (5) years after the Effective Date.

       **2.4**    **Non-Tax Priority Claims.** Non-Tax Priority Claims shall be paid in full on the Effective Date.

### ARTICLE III
### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

       Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in Seegrid.

       **3.1**    **Classification.** The categories of Claims and Equity Interests listed below, other than Administrative Expense Claims and Priority Claim, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class No. | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | | |
| Class 1-A | First Priority Secured June 11 Noteholder Claims | Impaired | Yes |
| Class 1-B | First Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 1-C | Second Priority Secured Noteholder Claims | Impaired | Yes |
| Class 1-D | Third Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 2 | Unsecured Claims | | |
| Class 2-A | Noteholder General Unsecured Claims | Impaired | Yes |
| Class 2-B | Other General Unsecured Claims | Impaired | Yes |
| Class 3 | Preferred Share Interests | | |
| Class 3-A | Series A Preferred Share Interests | Unimpaired | No |
| Class 3-B | Series A-1 Preferred Share Interests | Unimpaired | No |
| Class 3-C | Series B Preferred Share Interests | Unimpaired | No |
| Class 3-D | Series C Preferred Share Interests | Unimpaired | No |
| Class 3-E | Series C-1 Preferred Share Interests | Unimpaired | No |
| Class 4 | Common Stock Interests | Unimpaired | No |

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 4.1    Class 1-A – First Priority Secured June 11 Noteholder Claims.

(a)    Classification.  Class 1-A consists of all Allowed First Priority June 11 Secured Noteholder Claims.

(b)    Treatment.  The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the First Priority Secured June 11 Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed First Priority Secured June 11 Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed First Priority Secured June 11 Noteholder Claims shall receive a first priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

(c)  Impairment and Voting.  Class 1-A First Priority Secured June 11 Noteholder Claims are Impaired by the Plan. Each holder of a First Priority Secured June 11 Noteholder Claim is entitled to vote to accept or reject the Plan.

### 4.2    Class 1-B – First Priority Secured Bridge Noteholder Claims.

(a)  Classification.  Class 1-B consists of all Allowed First Priority Secured Bridge Noteholder Claims.

(b)  Treatment.  On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares as provided in Article 9.2.

(c)  Impairment and Voting.   Class 1-B First Priority Secured Bridge Noteholder Claims are Impaired by the Plan.  Each holder of a First Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

### 4.3    Class 1-C – Second Priority Secured Noteholder Claims.

(a)  Classification.  Class 1-C consists of all Allowed Second Priority Secured Noteholder Claims.

(b)  Treatment.  The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the Second Priority Secured Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed Second Priority Secured Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed Second Priority Secured Noteholder Claims shall receive a second priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

(c)  Impairment and Voting.  Class 1-C Second Priority Secured Noteholder Claims are Impaired by the Plan.  Each holder of an Allowed Second Security Secured Noteholder Claim is entitled to vote to accept or reject the Plan.

### 4.4    Class 1-D – Third Priority Secured Bridge Noteholder Claims.

(a)  Classification.  Class 1-D consists of all Allowed Third Priority Secured Bridge Noteholder Claims.

(b)  Treatment.  On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares as provided in Article 9.2.

(c)  Impairment and Voting.  Class 1-C Third Priority Secured Bridge Noteholder Claims are Impaired by the Plan. Each holder of an Allowed Third Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

**4.5**        **Class 2-A – Noteholder General Unsecured Claims**.

(a)    <u>Classification</u>.  Class 2-A shall consist of Allowed Noteholder General Unsecured Claims.

(b)    <u>Treatment.</u>  The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder except that the maturity date of the Unsecured Notes held by holders shall be extended to the fifth anniversary of the Effective Date.

(c)    <u>Impairment and Voting</u>.  Class 2-A Noteholder General Unsecured Claims are Impaired by the Plan.  Each holder of an Allowed Noteholder General Unsecured Claim is entitled to vote to accept or reject the Plan.

**4.6**        **Class 2-B – Other General Unsecured Claims**.

(a)    <u>Classification</u>.   Class 2-B consists of all Allowed Other General Unsecured Claims.

(b)    <u>Treatment.</u>  Each holder of an Allowed Other General Unsecured Claim shall receive a Cash Distribution on the Effective Date equal to 50% of its Allowed Other General Unsecured Claim and a non-interest bearing promissory note issued by the Seegrid Sub in the principal amount of the remaining balance of its Allowed Other General Unsecured Claim, which shall be the automatic treatment for such holder if the holder does not elect the alternative treatment below.  The promissory note shall be payable on the first anniversary of the Effective Date.  In lieu thereof, each holder of Other General Unsecured Claims may elect to receive 75% of such Allowed Other General Unsecured Claim on the Effective Date.

(c)    <u>Impairment and Voting</u>.  Class 2-B Other General Unsecured Claims are Impaired by the Plan.  Each holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

**4.7**        **Class 3-A – Series A Preferred Share Interests**.

(a)    <u>Classification</u>.  Class 3-A consists of all Series A Preferred Share Interests of Seegrid.

(b)    <u>Treatment</u>.  The holders of Class 3-A Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)    <u>Impairment and Voting</u>.  Class 3-A is Unimpaired under the Plan.  Each holder of Class 3-A Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**4.8**        **Class 3-B – Series A-1 Preferred Share Interests**.

(a)    <u>Classification</u>.   Class 3-B consists of all Series A-1 Preferred Share Interests of Seegrid.

(b)   <u>Treatment</u>.  The holders of Class 3-B Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)   <u>Impairment and Voting</u>.  Class 3-B is Unimpaired under the Plan.  Each holder of Class 3-B Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.9   Class 3-C – Series B Preferred Share Interests.

(a)   <u>Classification</u>.  Class 3-C consists of all Series B Preferred Share Interests of Seegrid.

(b)   <u>Treatment</u>.  The holders of Class 3-C Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)   <u>Impairment and Voting</u>.  Class 3-C is Unimpaired under the Plan.  Each holder of Class 3-C Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.10   Class 3-D – Series C Preferred Share Interests.

(a)   <u>Classification</u>.  Class 3-D consists of all Series C Preferred Share Interests of Seegrid.

(b)   <u>Treatment</u>.  The holders of Class 3-D Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)   <u>Impairment and Voting</u>.  Class 3-D is Unimpaired under the Plan.  Each holder of Class 3-D Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.11   Class 3-E – Series C-1 Preferred Share Interests.

(a)   <u>Classification</u>.   Class 3-E consists of all Series C-1 Preferred Share Interests of Seegrid.

(b)   <u>Treatment</u>.  The holders of Class 3-E Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)   <u>Impairment and Voting</u>.  Class 3-E is Unimpaired under the Plan.  Each holder of Class 3-E Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.12   Class 4 – Common Stock Interests.

(a)   <u>Classification</u>.  Class 4 consists of all Common Stock Interests of Seegrid.

(b)   <u>Treatment</u>.  The holders of Class 4 Common Stock Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

13

(c)    Impairment and Voting.  Class 4 is Unimpaired under the Plan.  Each holder of Class 4 Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

5.1    **Classes Entitled to Vote**.  Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B are Impaired and are entitled to vote to accept or reject the Plan.  Holders of Claims and Equity Interests in all other Classes are Unimpaired and, as such, are deemed to have accepted the Plan and are not entitled to vote.

5.2    **Class Acceptance Requirement**.  Acceptance of the Plan by any Impaired Class of Claims or Equity Interests shall be determined in accordance with section 1126 of the Bankruptcy Code.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS

6.1    **Distributions**.  Reorganized Seegrid or Seegrid Sub shall make all Distributions required to be made under the Plan as provided under this Article VI.

6.2    **Date of Distributions**.  Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Claims or Equity Interests shall be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.3    **Postpetition Interest on Claims**.  Unless expressly provided for in the Plan, the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or unless required by applicable bankruptcy law (including the fair and equitable rule), interest shall not accrue on or after the Commencement Date on account of any Claim, except with respect to interest on account of Class 1-A, 1-B, 1-C and 1-D Claims which interest shall continue to accrue during the Chapter 11 Case.

6.4    **Means of Cash Payment**.  At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

6.5    **Delivery of Distributions**.  Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Equity Interest shall be made at the address of such holder as set forth on the Schedules filed, as may be required, with the Bankruptcy Court, or on the books and records of Seegrid or its agents, or in a letter of transmittal, unless Seegrid has been notified in writing of a change of address.