## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEEGRID CORPORATION,[1] | Case No. 14-_12391_ (        ) |
| Debtor. | |

## DECLARATION OF DAVID HEILMAN IN SUPPORT OF
## DEBTOR'S VOLUNTARY CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, David Heilman, do hereby declare as follows:

1.        I am the President of Seegrid Corporation, a Delaware corporation ("Seegrid" or the "Debtor").  I have served as President of Seegrid since May 12, 2014.  Prior to my service as President, I served as Chief Administrative Officer of Seegrid since January of 2011.

2.        As President, I am responsible for overseeing the day to day operations, business, and financial affairs of the Debtor, including overseeing the Debtor's overall financial condition, monitoring the Debtor's receipts and disbursements of cash, monitoring the Debtor's books and records, participating in the preparation of financial projections (in consultation with the Debtor's senior management team), and communicating with, among other parties, the Debtor's professionals, and the Debtor's shareholders and secured and unsecured lenders.

3.        On the date hereof (the "Commencement Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections

---

[1]        The last four digits of the Debtor's tax payer identification number are: 1133.  The Debtor's address is 216 Park West Drive, Pittsburgh, PA 15275.

1107(a) and 1108 of the Bankruptcy Code (the "Bankruptcy Code").  I am authorized by the Debtor to submit this Declaration on its behalf in support of the Debtor's first day motions.

4.  As a result of my first-hand experience as current President and former Chief Administrative Officer, my review of public and non-public documents, and my discussions with the Debtor's management team, I have formed opinions regarding the necessity for the relief sought in the Debtor's first-day motions and applications, especially to the extent that such relief will enable the Debtor to continue to operate as it pursues confirmation of a prepackaged plan of reorganization.

5.  I therefore submit this Declaration in support of the first-day motions and applications described below, as well as other motions and applications of the Debtor in the above-captioned chapter 11 case.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of relevant records and documents, information from the Debtor's employees or advisors, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

6.  Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Debtor in the first-day motions and applications is necessary to enable its chapter 11 bankruptcy estate to be administered effectively.  Failure to grant such relief would have a serious, negative effect on the Debtor's efforts to continue operating during its chapter 11 case and pursue and consummate its plan of reorganization.  Part I of this Declaration describes the business of the Debtor, its debt structure, and key events leading to the filing of the Debtor's voluntary chapter 11 petition.  Part II of this Declaration sets forth relevant

facts in support of the various first-day motions and applications filed by the Debtor concurrently with this Declaration.

## EXECUTIVE SUMMARY

7.      The Debtor is virtually, if not totally, out of cash.  Further, no individual or entity is willing to provide financing to the Debtor outside of the chapter 11 process.  The Debtor has not yet reached operational profitability and, after over four years of seeking investors or strategic purchasers with the assistance of multiple financial advisors and investment bankers, the Debtor is unable to find financing to fund further operating losses outside of bankruptcy.  The only option available to the Debtor is DIP financing to be provided by the Debtor's largest secured creditor, Giant Eagle, Inc. ("Giant Eagle"), for the limited purposes of preserving the going-concern value of the Debtor while an expedient confirmation process occurs.

8.      As of September 24, 2014, the Debtor had outstanding debt in the aggregate principal amount in excess of $48.7 million, consisting of approximately (a) $1.43 million of principal indebtedness owing to its first-lien priority lenders; (b) 10.7 million of principal indebtedness owing to its second-lien priority lenders; (c) $ 1.6 million of principal indebtedness owing to its third-lien priority lender; (d) $31.9 million of principal indebtedness owing to its unsecured lenders; and (e) $3 million of accounts payable.

9.      Giant Eagle and related entity Giant Eagle of Delaware, Inc. ("Giant Eagle Delaware") are collectively the largest shareholders and lenders to Seegrid.  Giant Eagle and Giant Eagle Delaware own approximately 31.8% of Seegrid's outstanding shares and Giant Eagle has loaned Seegrid in excess of $34 million.  Anthony Horbal ("Horbal") and related entity HERC Management Services, LLC ("HERC" and, collectively with Horbal, the "Horbal Group")

constitute the second largest shareholder and lender to Seegrid.  The Horbal Group owns

approximately 21.3% of Seegrid's outstanding shares and has loaned Seegrid in excess of $7

million.

10.     Until late 2013, Giant Eagle and the Horbal Group loaned funds to Seegrid

as needed in amounts that loosely correlated to the ratio of their respective Giant Eagle and Giant

Eagle Delaware/Horbal Group ownership interests.  With the exception of a $100,000 loan in

June of 2014 (compared to over $7.5 million loaned by Giant Eagle in 2014), the Horbal Group

ceased lending to Seegrid alongside Giant Eagle in late 2013.

11.     Approximately $45,258,253 in principal amount of Seegrid's debt matured

on September 30, 2014.  Seegrid does not have available cash to satisfy the obligations that

matured and came due on September 30 and for which a demand was made by the Horbal Group

on October 3, 2014.  Seegrid believes that the majority of its lenders would be willing to extend

the maturity dates to allow Seegrid to continue its normal operations.  The consent of the Horbal

Group is required, however, to extend the maturity date of all notes.  The Horbal Group has

refused to extend the maturity date despite knowing that Seegrid does not have the means to pay

the obligations at maturity and that, by refusing to extend the maturity, the Horbal Group left

Seegrid no choice but to file for bankruptcy protection.  As more fully described below, Seegrid

has received a number of non-bankruptcy restructuring alternatives from Giant Eagle.  Each

time, the Horbal Group has blocked Seegrid's ability to close the transaction.

12.     Most recently, on August 20, 2014, Giant Eagle made a proposal that

would have avoided a restructuring of Seegrid under the Bankruptcy Code.  Specifically, Giant

Eagle proposed to provide $8 million in financing to Seegrid on substantially the same terms as

had been agreed by the Seegrid Board of Directors and the Horbal Group in the past.  Under this

proposal, Giant Eagle would have provided $4 million in immediate funds pursuant to senior secured convertible promissory notes, with related warrant coverage, and up to an additional $4 million of funding on the same terms conditioned on certain performance criteria.

13.     The August 20, 2014 proposal contained the same basic terms as were agreed in a January 2014 financing, except that the August proposal required that all noteholders, including the Horbal Group, extend the maturity of their Seegrid Notes from September 30, 2014 to September 30, 2019 to provide Seegrid time to achieve its economic goals.  Giant Eagle also agreed to allow a full marketing process to seek outside investors and/or purchasers, with the active involvement of the Horbal Group, a provision that the Horbal Group had previously requested.  All stockholders and convertible noteholders of Seegrid would have been given the opportunity to participate in the financing.

14.     Despite these efforts, the Horbal Group's refusal to consent to Seegrid's proposals has forced Seegrid to reorganize under the protections of the Bankruptcy Code.  Giant Eagle has funded recent operations on a subordinated basis to give Seegrid sufficient breathing room to formulate a plan to address its financial crisis while preserving Seegrid's going concern value.  Without this interim financial assistance, and with the looming maturity date of September 30, 2014, Seegrid would have been forced to shut down operations and liquidate several months ago.

15.     After extensive, good-faith and arm's-length negotiations, Giant Eagle agreed to extend (i) post-petition financing to the Debtor, conditioned upon acceptance of the Plan, and (ii) post-confirmation financing to the newly created subsidiary ("Seegrid Sub"), conditioned upon acceptance and confirmation of that certain Prepackaged Plan of

Reorganization of Seegrid Corporation (the "Plan"), all as set forth more fully herein and in the Plan.

16.     The primary component of Seegrid's Plan is a restructuring transaction in which substantially all of Seegrid's assets will be contributed to a newly created subsidiary, Seegrid Sub, free and clear of all claims and encumbrances.  In addition to the assets transferred by Seegrid, Seegrid Sub will be further capitalized with the proceeds of the issuance of Seegrid Sub Series A Preferred Shares (as defined in the Plan).  Seegrid Sub shall continue Seegrid's pre-Commencement Date operations and shall assume responsibility for employee contracts as well as Seegrid's post-Commencement Date operational liabilities and payment of certain distributions under the Plan.

17.     On the Effective Date, all indebtedness of Seegrid to Giant Eagle for borrowed money arising on or after June 11, 2014, including the indebtedness under the DIP Credit Agreement, shall be converted dollar for dollar into Seegrid Sub Series A Preferred Shares.  To the extent that the debt converted under the Plan is less than $10 million, for a period of one year after the Effective Date, Giant Eagle shall have the right to purchase such additional Seegrid Sub Series A Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares.  To the extent that Seegrid Sub meets its projections during the Chapter 11 Case, Giant Eagle has agreed to purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such Shares.

18.     After giving effect to the transactions contemplated by the Plan, the Debtor will emerge from chapter 11 as a holding company and Seegrid Sub will be appropriately capitalized with access to financing to support its emergence and go-forward business needs.

19.     To that end, on October 3, 2014, the Debtor (with the assistance of Logan & Company, Inc. ("Logan" or the "Solicitation Agent")) commenced solicitation of acceptances of the Plan from holders of claims entitled to vote on the Plan (collectively, the "Voting Parties") by distributing a solicitation package that included that certain Disclosure Statement for Prepackaged Plan of Reorganization of Seegrid Corporation dated October 3, 2014 (the "Disclosure Statement"), a ballot with instructions, a cover letter from the Debtor's President, a return envelope, and the Plan to the Voting Parties (collectively, the "Solicitation Package").

20.     The solicitation package established September 24, 2014 as the record date for purposes of establishing the Holders of Claims entitled to vote to accept or reject the Plan and the amount of such Claims and established October 17, 2014 at 5:00 p.m. (prevailing Eastern time) as the voting deadline for purposes of accepting or rejecting the Plan (the "Voting Deadline").

21.     As set forth more fully in the Declaration of Kathleen M. Logan Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting Prepackaged Plan of Reorganization for Seegrid Corporation, the Debtor's Balloting Agent caused Solicitation Packages to be served by Federal Express overnight mail on October 3, 2014.

22.     Voting Parties were entitled to vote via the return envelope or via facsimile or email in order to provide Voting Parties with as much time as possible under the circumstances to consider and return their vote.

23.     Seegrid's other direct and indirect stockholders and convertible debt holders were offered the opportunity to purchase additional Seegrid Sub Series A Shares beyond the $10 million of Seegrid Sub Series A Preferred Shares available to Giant Eagle during the solicitation period of October 3, 2014 and October 17, 2014.  Specifically, the Debtor's Balloting

Agent sent packages including the Plan, Disclosure Statement and an election form detailing the investment opportunity to Seegrid's direct and indirect stockholders and convertible debt holders.

24.     Expediency though the bankruptcy process is paramount to the success of the Debtor's reorganization.  Aside from its technology, the Debtor's most valuable assets are its employees and customers.  The purchase of one of the Debtor's products is a large capital investment, and the Debtor's customers are not in the market for a "one-off" purchase.  Rather, the Debtor's customers are investing in a concept and a long-term relationship with the Debtor. Thus, it is vital that a confirmation process occurs on the timelines requested by the Debtor and its proposed DIP lender because:  (i) the Debtor cannot obtain any other financing, or longer term financing, to operate beyond the proposed timeframe, (ii) the Debtor cannot afford to lose its valuable employees during an extended bankruptcy process, (iii) customers may be hesitant to commit to purchases during the bankruptcy process, and critical opportunities may be lost altogether if customers pursue alternative solutions and (iv) the Debtor's vendors may not continue to work with the Debtor if the distributions contemplated by the Plan are not made promptly.

25.     In light of Seegrid's deteriorating cash situation, continued delays in sales and failure to attract outside investment after exhaustive efforts, Seegrid does not believe there is a viable alternative to the Plan, and believes that the Plan is in the best interests of Seegrid's creditors, employees and other parties-in-interest.

## I.      BACKGROUND

### A.      The Debtors' Capital Structure

26.     Seegrid Corporation was founded in 2003 by Dr. Hans Morevic and Dr. Scott Friedman to bring automation to high-volume commercial vehicles.  Today, Seegrid

remains the pioneer and leading provider of automation solutions for high-volume commercial vehicles, including pallet trucks and tow trucks.

27.    Since its inception, Seegrid has raised approximately $61.4 million in funding from investors including its founders and financial investors.

28.    Seegrid currently has two classes of shares authorized, consisting of Common Stock and Preferred Stock.  There are six series of Preferred Stock authorized, consisting of:  Series A Preferred Share Interests, Series A-1 Preferred Share Interests, Series B Preferred Share Interests, Series C Preferred Share Interests, Series C-1 Preferred Share Interests, and Series D Preferred Share Interests.  Seegrid's latest equity financing was completed in 2009 and raised $7.0 million in proceeds from the sale of Series C-1 Preferred Share Interests.  No shares of Series D Preferred have been issued and are being reserved for issuance upon optional conversion of the loans described below.

29.    Seegrid has approximately $45 million in loans outstanding as of September 24, 2014, primarily borrowed from Giant Eagle and the Horbal Group.

30.    As discussed more fully below, Seegrid's convoluted secured debt structure has developed over the last several years out of necessity, rather than design.  During that time, Seegrid has been in a nearly constant state of believing it was on the verge of launching with original equipment manufacturers ("OEMs") and starting to see traction in the sales of its own branded trucks, which would put Seegrid on the path to profitability. In addition, as more fully described below, Seegrid sought on numerous occasions to attract outside investors or purchasers.  Many of these loans were intended to be short-term advances against a longer term financing alternative or sale that never materialized.

31.     Historically, Seegrid was able to raise funds through convertible, unsecured loans from its investors.  In October of 2012, however, it became clear that Seegrid would likely need to offer enhanced terms to attract financing in the future.  At the time, Seegrid was pursuing up to $4 million in unsecured financing to close in November and December of 2012 (the "December 2012 Round"), with Giant Eagle committed to funding $2.18 million. Given that Seegrid would be seeking additional financing a few months later, Seegrid determined that it needed to assure lenders in the December 2012 Round that they would receive the benefit of any future enhancements.  Accordingly, the loan documents related to the December 2012 Round provided that participants would receive any enhancements provided to lenders in the next round of financing once the next round reached a threshold of $1 million in funded loans.

32.     In January of 2013, Giant Eagle and HERC presented Seegrid with a term sheet proposing a $3 million secured debt offering (the "First Secured Debt Offering"). The First Secured Debt Offering provided that the lenders thereunder would receive a security interest in substantially all of Seegrid's assets.[2]  Pursuant to the First Secured Debt Offering, the Debtor assigned, pledged and granted to the lenders under the December 2012 Round and First Secured Debt Offering a security interest in substantially all of the Debtor's personal property and the proceeds thereof.

33.     In June of 2013, Seegrid increased the maximum amount of financing under the First Secured Debt Offering from $3 million to $6 million.

34.     In December of 2013, Giant Eagle presented Seegrid with a term sheet for additional secured funding at the same priority level as the First Secured Debt Offering (the

---

[2]     Throughout each of the offerings of debt subscribed to by Giant Eagle and HERC and other investors, the opportunity to participate was extended to Seegrid's existing stakeholders who were accredited investors.

"Second Secured Debt Offering") and, after substantial negotiations led by a special committee of disinterested members of Seegrid's board, Seegrid and Giant Eagle agreed to terms on the Second Secured Debt Offering.

35. The loan documents for the Second Secured Debt Offering implemented the loan in two increments of $2 million each, with the first being funded on January 21, 2014 and the second to be funded on March 15, 2014, provided that Seegrid remained reasonably on track with its 2014 business plan. Giant Eagle funded all $4 million contemplated under the Second Secured Debt Offering notwithstanding Seegrid's failure to make the sales targets outlined in the 2014 business plan. For the two months ended February 28, 2014, prior to the funding of the second increment of $2,000,000, Seegrid's revenue was $301,615 against projected revenues of $1,498,360. Through May 2014 shortfalls continued, with actual revenue of $1,845,255 versus a budgeted revenue of $5,388,815. Giant Eagle provided additional funding under the Second Secured Debt Offering terms in the amount of $600,000 on May 23, 2014 to fund continuing operations.

36. Giant Eagle and HERC subsequently funded operational losses on a senior basis through a funding on June 11, 2014, whereby Giant Eagle funded $400,000 and HERC funded $100,000. Giant Eagle subsequently funded $928,000 on a senior basis in July of 2014.

37. From August 5, 2014 through October 1, 2014, after the Horbal Group thwarted Seegrid's efforts to obtain a longer term financing solution (as more fully discussed below), Giant Eagle funded an additional $1,644,000 in subordinated debt to prevent Seegrid from shutting down and to fund Seegrid's operations and efforts to resolve its debt crisis.

**B.    *The Debtor's Historical Operations and Recent Developments***

38. Seegrid's corporate headquarters is located in Pittsburgh, Pennsylvania where Seegrid leases 40,200 square feet. Seegrid's headquarters houses Seegrid's research and

development, engineering, technical support, global sales and marketing, and corporate

functions. Seegrid also maintains an engineering facility in Lowell, Massachusetts.  As of the

date of this Declaration, Seegrid has 41 full-time employees, 2 interns and 1 part-time employee.

39.     Over the past ten years, Seegrid has developed the first automation system

focused on seamlessly converting commercial industrial vehicles (pallet trucks and tow tractors)

into low cost robotic industrial vehicles that do not require additional infrastructure. Robotic

industrial vehicles dramatically improve the economics and operations of an existing industry

through reduced labor costs and improved efficiency and safety. Unlike previous attempts at

vehicle automation, Seegrid's robotic industrial vehicles completely leverage the existing

manufacturing, sales and field service operations of original equipment manufacturers.

40.     Seegrid's automation system integrates a proprietary and patented

software technology to "see" its environment, map it in a virtual "grid" and guide the vehicle.

The technology is state-of-the-art yet simple to use, as it does not require additional

infrastructure or a specialized team of engineers to install, support, or operate the robotic

industrial vehicles.  Seegrid's software technology was designed by its team of engineers,

including holders of five PhDs, and features sophisticated, state-of-the-art "evidence grid"

software technology, stereo camera technology, user interface/sliding autonomy interaction

architecture, motion control technology and enterprise and fleet information software

technology.  Seegrid currently has 31 issued or allowed patents and over 40 patents in process on

over 20 matters.  These patents and patent applications generally cover the automation of

materials handling processes and the underlying robot perception technology. Seegrid has

invested in over $15.1 million of research and development costs since its inception in 2003.

These expenses served to develop the technology, commercialize the product and refine the core software and probabilistic volumetric sensing approaches.

41.     For the first commercial application of this technology, Seegrid is using its automation systems to fundamentally change the materials handling industry by automating pallet trucks, tow tractors, and other industrial vehicles.

42.     The materials handling industry, specifically manufacturing and warehousing applications, provides an attractive initial target market for Seegrid's automation solutions because labor costs are high and rising, the market is large and qualified labor is becoming scarce.  Indeed, the biggest challenge facing the material handling industry has historically been managing labor and controlling the associated labor costs.  Accordingly, the market is ripe for Seegrid's automated, labor cost reducing solutions.

43.     Seegrid's founders understood early on that no single company would have the reach and resources to ship robotic vehicles worldwide and developed a two-phase market strategy to address the scale of the opportunity.

44.     The first phase of this strategy required Seegrid to develop its own line of Seegrid-branded robotic industrial vehicles, which it markets directly to end users.  This strategy allowed Seegrid to understand the needs of the industry, establish product functionality and a price point in the range of approximately $75,000 to $95,000 in the United States.

45.     The second phase of Seegrid's market strategy was to partner with the top OEM.  These OEMs, as a group, have the end user relationships, the installed base and the sales, distribution and service capabilities to ship and support robotic industrial vehicles worldwide. OEMs have been receptive as they are looking to capitalize on end user demand for automation

solutions and to deploy higher margin and higher value products into their sales, distribution and service channels, also allowing them to generate larger maintenance streams.

46.     Seegrid currently has agreements of different types with three of the top four OEMs.  Combined, these three OEMs account for 52% of the $31.45 billion market for industrial trucks represented by the top twenty OEMs.

47.     Seegrid has developed core Intellectual Property in a number of additional areas that may be used in markets other than automated material handling.   These core technologies include stereo camera design and manufacturing processes, stereo image processing algorithms and 3 Dimensional modeling algorithms.

### C.    *Revenues*

48.     Seegrid generates revenue from the sale of Seegrid-branded robotic industrial vehicles to dealers and end users, the sale of "Guided by Seegrid®" automation systems (sometimes referred to by Seegrid as "S-Kits") used by OEMs to convert their product into robotic industrial vehicles, and the sale of parts and services.  Prior to 2010, Seegrid generated significant revenue from development agreements with third parties.

49.     Seegrid's total revenue for 2011 was $2.4 million, with 57% of revenue derived from the sale of automation systems to OEMs, 34% of revenue from the sale of Seegrid-branded robotic industrial vehicles and the remainder from other services.

50.     Seegrid's total revenue for 2012 was $1.6 million from the sale of Seegrid-branded robotic industrial vehicles (16 units) and services and the sale of 11 S-Kits to OEMs.

51.     Seegrid's total revenue for the year ending December 31, 2013 was $6.2 million from the sale of 73 Seegrid brand trucks and services.  Approximately 56% of those sales were to a single end-user and Seegrid's largest customer.

52.     As of August 31, 2014, Seegrid's year to date sales were approximately $3.3 million as compared to a sales figure forecasted to be $11.3 million as of August 31 by Seegrid's 2014 budget.

### D.     *Events Leading to the Commencement of This Chapter 11 Case*

#### i)    Seegrid Fails to Attract Outside Financing

53.     For the past several years, Seegrid has sought an outside investor or purchaser to enable it to further exploit the technology that forms the basis of its vision guided systems.

54.     On February 9, 2010, Seegrid engaged Merrill Lynch to advise Seegrid and seek out a potential sale of greater than $5 million in voting securities.  Merrill Lynch was not successful, but Seegrid continued to seek out investors.

55.     In September of 2011, Seegrid engaged Needham & Company ("Needham") to locate and secure new investors or potential buyers under a nine month engagement.

56.     During the Needham engagement, Seegrid along with Needham actively marketed the Debtor for a capital raise.  In connection with this marketing effort, Needham contacted at least 76 potential investors.  Of those investors, at least 26 potential investors actively reviewed the investment opportunity, at least 5 parties expressed further interest and at least 3 reviewed Seegrid's Confidential Information Memorandum.

57.    With respect to Needham's efforts to sell Seegrid, Needham contacted at least 62 potential purchasers.  At least 39 parties actively reviewed the opportunity, and 4 expressed further interest.

58.    Despite much effort by Needham and Seegrid, Needham was not successful in raising new investments or locating a buyer.

59.    Concurrently with the efforts of Needham, in November of 2011, Seegrid engaged Gulf Capital Group, Inc. ("Gulf Capital") to provide consulting and financing services seeking investors from the countries belonging to the Gulf Cooperation Council, the greater Middle East and North Africa.

60.    Gulf Capital contacted at least 22 potential investors under its arrangement with Seegrid.  In support of Gulf Capital's efforts, Seegrid's senior management participated in a series of trips to Qatar to meet with interested parties.  Ultimately, Gulf Capital was unsuccessful in landing investors.

61.    During these engagements, and in between active engagements, Seegrid's shareholders and senior management undertook efforts of their own to attract investors and strategic buyers through their respective networks and contact lists.  In addition, several investors and companies reached out to Seegrid directly to explore opportunities; these inquiries resulted in a number of meetings and visits both to Seegrid and to potential investors and acquirers, but none of these opportunities matured into an investment or acquisition offer.

62.    In April of 2013, Seegrid engaged OEM Capital as financial advisor to explore potential new sources of financing and potential acquisitions of Seegrid. OEM Capital was selected after a search process which included consideration of several other investment banking advisors.

63.    OEM Capital raised interest from potential investors and purchasers, but no potential transaction progressed beyond an initial stage.  In March of 2014, Seegrid terminated the agreement with OEM Capital due to lack of results.  Prior to termination of the engagement, OEM Capital considered and/or contacted over 115 parties, certain of which spent significant resources and efforts evaluating Seegrid before declining the opportunity.

64.    Subsequent to March of 2014, Seegrid's management, Board members and investors continued to seek outside investors and/or a strategic acquirer and were in active discussions and due diligence with three potential investors, the last of which ended in mid-June with no viable offers.

ii)    Seegrid Exhaust Willingness of Investors other than Giant Eagle to Fund Operating Loans

65.    In the years leading up to 2012, Seegrid's early R&D and operating shortfalls were funded by equity investments and, later, by unsecured loans from existing shareholders.  Until late 2012, equity investments and unsecured notes were sufficient enticements to keep financing flowing into Seegrid as needed.

66.    In early 2013, when the First Secured Debt Offering was implemented, Giant Eagle and HERC had invested at a level above which they were comfortable with the Debtor, and the First Secured Offering was intended to fund Seegrid's operating losses while Seegrid engaged OEM Capital as investment banker to attempt to sell Seegrid.

67.    Aside from its efforts to seek long-term outside investments and its continued efforts to seek short-term funding from its current investors as a last resort, Seegrid took a series of steps in late 2012 and early 2013 to reduce its expenses through workforce reductions, wage reductions, reduced healthcare benefits, renegotiation of its headquarters lease and other changes.  These steps by Seegrid management reduced the monthly operating expense

by approximately 25%, or $300,000 (from a monthly burn rate of approximately $1.15 million down to $850,000).

68.    Notwithstanding these efforts, and an increase in Seegrid brand product sales, commencing in 2013 the Debtor relied almost exclusively on loans and advances from Giant Eagle and HERC to enable it to continue operations.

69.    In September of 2013, Giant Eagle requested a presentation from Seegrid's management regarding long-term cash needs and a forecast for 2014. This presentation was made in November 2013 and resulted in the Second Secured Debt Offering.

70.    The tenor of Seegrid's relationship with Giant Eagle and HERC was temporarily buoyed when Seegrid passed reliability testing with the largest OEM and Seegrid moved closer to a launch which had experienced many delays. In late 2013, it was expected that the launch would occur in April of 2014. Ultimately, due to further delays, this launch did not occur until June of 2014.

71.    Seegrid's prospects were also temporarily supported by the increased levels of Seegrid brand product sales and the success Seegrid experienced with its largest customer in 2013, supporting the model that customers would prove the utility of the product in their operations and use them throughout their facilities in many different applications. Sales to this customer, which exceeded $3.4 million, proved Seegrid's business model could work.

72.    Nonetheless, by 2014, only Giant Eagle was willing to lend to Seegrid (with the exception of HERC's funding of $100,000 as compared to over $6.2 million in funding by Giant Eagle in 2014). Giant Eagle professed to be growing weary by that point, and the funding provided by Giant Eagle in 2014 became milestone-based and/or tied to specific sales progress based on the budget presented in November 2013.

73.     Despite Giant Eagle's professed growing reluctance to fund Seegrid's operating losses, Giant Eagle (along with HERC and other lenders from time to time) made its convertible loans to Seegrid based on valuations of Seegrid (assuming conversion of the loans into Series D Preferred and taking into consideration warrant coverage) well in excess of $40 million from April of 2012 through June of 2014.

74.     By late June of 2014, Giant Eagle was not willing to make further loans based on what Giant Eagle perceived to be an inflated valuation of Seegrid.  Accordingly, when Giant Eagle  proposed a new financing structure by way of a term sheet dated July 2, 2014 for $10 million in long term financing, Giant Eagle's proposal valued Seegrid at $12.5 million on a pre-funding basis (the "July 2, 2014 Term Sheet"). Unlike prior debt financing transactions, the July 2, 2014 Term Sheet contemplated the creation of an operating subsidiary with new equity funding to flow into the subsidiary.

iii)     Anthony Horbal Block's Seegrid's Ability to Obtain Financing from Willing Sources

75.     The July 2, 2014 Term Sheet was intended to allow Seegrid to become current on its obligations through the end of 2014 and provide sufficient funding to carry Seegrid through to cash flow positive operations unlike prior debt financing transactions.  As with prior offerings, the opportunity would be offered to the other accredited shareholders to participate. Absent such participation, the existing shareholders interests would have been diluted, but the offering would have preserved 10% of the post-closing value of Seegrid for employees, which amount was subsequently negotiated to 15% by Seegrid.  The employee component was important because employee options were substantially diluted over time to the point that they were out of the money, and the proposal would have restored material value to the employees, which was a critical component for continuing value enhancement for Seegrid's stakeholders.

76.     Due to the dilutive nature of the July 2, 2014 Term Sheet, Giant Eagle conditioned the proposal upon the unanimous approval of Seegrid's Board of Directors and majority approval of the disinterested stockholders.

77.     Anthony Horbal, a member of Seegrid's Board of Directors at the time of the vote on July 11, 2014, voted against the July 2, 2014 Term Sheet as amended and reissued on July 10th.  The Horbal Group also refused to extend the September 30, 2014 maturity date of the debt held by the Horbal Group.

78.     On July 21, 2014, Seegrid's Board directed management and counsel to discuss three different financing alternatives with Giant Eagle and the Horbal Group:  (i) providing 4 to 5 months of interim financing to allow Seegrid to engage in a thorough marketing process for a sale of Seegrid, (ii) provide ongoing funding for Seegrid to continue executing on its business plan, including a proposal to Giant Eagle that the July 2, 2014 Term Sheet (as modified on July 10) be put back on the table, or (iii) provide sufficient funding to allow Seegrid to wind up its operations in an orderly liquidation.

79.     On July 22, 2014, Giant Eagle presented a Term Sheet to Seegrid (the "July 22, 2014 Term Sheet") which was very similar to the July 2, 2014 Term Sheet (as modified on July 10), with the addition of warrant coverage.  The July 22, 2014 Term Sheet was conditioned on the approval of the Horbal Group, along with certain waivers from the Horbal Group.  Seegrid's Board met on July 22, 2014 and July 23, 2014 to discuss the July 22, 2014 Term Sheet, and Giant Eagle's request to Seegrid that Seegrid respond with a specific counter-proposal if the terms of the July 22, 2014 Term Sheet were not acceptable.

80.     At the July 23, 2014 Board meeting, Seegrid's Board directed management and counsel to counter the terms of the July 22, 2014 Term Sheet with specific

revisions, including a pre-funded 60 day marketing period for a sale of Seegrid, an increased

valuation and a reduced warrant exercise period.  In subsequent discussions, Giant Eagle

expressed a willingness to be flexible on terms, provided that Seegrid would be able to obtain the

required consent and waivers from the Horbal Group.

81.    The Seegrid Board met again on July 24, 2014 to discuss the July 22, 2014

Term Sheet and Giant Eagle's response to Seegrid's counter-proposal.  At the end of this lengthy

Board meeting, it was clear that the Horbal Group would not provide the necessary consent and

waivers.  Counsel for Seegrid was directed to advise Giant Eagle that the July 22, 2014 Term

Sheet was not approved.

82.    Failing to have a feasible alternative source of capital acceptable to the

Horbal Group, Seegrid's Board considered all options available to Seegrid, including a new

proposal by Giant Eagle to fund Seegrid's operations in chapter 11 pending a thorough but

prompt section 363 sale process, with Giant Eagle serving as a stalking horse.  Giant Eagle

subsequently withdrew its proposal for a sale process and, instead, proposed a loan that would

have avoided the risk, expense and negative impact of a bankruptcy filing.  On August 20, 2014,

Giant Eagle proposed funding up to an additional $8 million under a convertible note and

warrant transaction on the same terms and at the same valuation as the January 2014 note

purchase transaction, including a provision to market the company, with the sole exception that

the maturity date for all existing and new notes be extended from September 30, 2014 to

September 30, 2019.  Given the urgency of Seegrid's financial condition, the August 20, 2014

proposal required a preliminary (nonbinding) approval from both Seegrid and the Horbal Group

on or before August 26, 2014.

83.     Seegrid immediately communicated the terms of the August 20, 2014 proposal to the Horbal Group, and offered to provide any information required in order to allow the Horbal Group to consider the request for the Horbal Groups' preliminary approval of the proposal.  Seegrid explained to the Horbal Group that the August 20, 2014 proposal was the only alternative to bankruptcy available to Seegrid, and that the funding proposal was on the same terms as previously approved by the Seegrid Board and by the Horal Group, except for the 5 year extension of the notes.  The Horbal Group requested extensive information to allow it to review the proposal, which Seegrid promptly provided.  To date, however, the Horbal Group has not responded to the August 20, 2014 proposal.

84.     As a result of Seegrid's inability to obtain from the Horbal Group approval for the August 20, 2014 proposal or consent to the extension of the September 30, 2014 maturity date for Seegrid's over $45 million of debt, Seegrid's only alternative would have been an immediate shut-down of operations and liquidation.  To avoid this alternative, Giant Eagle presented the proposed DIP Financing and restructuring proposal as set forth in the Plan.

### E.     Purposes of this Chapter 11 Case

85.     Although as described above Seegrid has continued to consider financing alternatives, Seegrid has been unsuccessful in its attempts to raise additional debt or equity other than through Giant Eagle's proposal.

86.     The DIP Financing will enable the Debtor to continue its operations pending confirmation of the Plan.

87.     On the Effective Date, Seegrid shall convey to Seegrid Sub (i) all of its operating assets, including without limitation, its intellectual property and the name "Seegrid"; (ii) its post-Commencement Date operating liabilities; and (iii) its employees.  In exchange for

its contribution to Seegrid Sub, Seegrid shall receive 11.25 million shares of Seegrid Sub Common Stock.

88.     As consideration for this transaction, all indebtedness of Seegrid to Giant Eagle for borrowed money arising on or after June 11, 2014, including the indebtedness under the DIP Credit Agreement, shall be converted dollar for dollar into Seegrid Sub Series A Preferred Shares.  To the extent that the debt converted under the Plan is less than $10 million, for a period of one year after the Effective Date, Giant Eagle shall have the right to purchase such additional Seegrid Sub Series A Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares.  To the extent that Seegrid meets its projections during the Chapter 11 Case, Giant Eagle has agreed to purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such Shares.

89.     Seegrid Sub shall reserve for issuance to management and employees and directors of Seegrid Sub 3,750,000 shares of Seegrid Sub Common Stock to be issued in accordance with a plan adopted by the Board of Directors of Seegrid Sub.

90.     Assuming Giant Eagle purchases all $10 million shares of Seegrid Sub Series A Preferred Shares available to it, and no other parties purchase or elect to receive Seegrid Sub Series A Preferred Shares, the economic interests in Seegrid Sub would be:  40% - Giant Eagle in the form of Seegrid Sub Series A Preferred Shares; 45% - Reorganized Seegrid in the form of Seegrid Sub Common Stock; and 15% - reserved for management and employees of Seegrid Sub in the form of Seegrid Sub Common Stock.

91.     Additional Seegrid Sub Series A Shares beyond the $10 million of Seegrid Sub Series A Preferred Shares available to Giant Eagle have been offered to Seegrid's other direct and indirect stockholders and convertible debt holders.

92.     A prompt confirmation process is necessary for a number of reasons. First, the requested time frame will be fast enough to limit the uncertainty during the bankruptcy case that may cause employees to consider alternative employment opportunities, especially since their upside opportunity in the company's value will be lost unless and until Seegrid Sub implements a new incentive plan.

93.     Equally important is the fact that many of Seegrid's current and potential customers are interested in Seegrid's product as an enterprise solution.  As noted, a purchase by a new customer of a single Seegrid vehicle is not a one-off transaction:  it is more likely made on a large capital investment which, if successful, is expected to be the beginning of a long-term relationship.  Finally, Seegrid sells an advanced technology that relies on the existence of a company to stand behind its warranty and provide technological support.  All of these reasons call into doubt whether Seegrid can hope for anything better than a pause on new orders pending the confirmation process.

94.     Even if customer and employee concerns would allow for a longer process, Seegrid has no ability to fund its operating losses pending a longer confirmation process.  Giant Eagle is the only willing lender in this case.

95.     Finally, this is the conclusion of a marketing process that has gone on for over 4 years with the competent assistance of a number of financial advisors and investment bankers.  Seegrid has been thoroughly exposed to the market and, with the proposed DIP Facility, Contribution Agreement and Plan Support Agreement, Seegrid has one last opportunity to spin off its operating assets and reorganize as a holding company, preserving substantial value for its creditors and shareholders and preserving the operations of the company for the employees, vendors and customers.

## II.      FACTS IN SUPPORT OF FIRST DAY MOTIONS

96.     The Debtor has respectfully requested that the motions described below (the "First Day Motions") be granted as critical elements in successfully administering its bankruptcy estate.  I offer the following factual background in support of the First Day Pleadings:[3]

### A.      DIP Financing and Cash Collateral Motion

97.     The Debtor believes that the best means to maximize the value of the Debtor's assets is to promptly seek confirmation of the Plan.  The Debtor, however, lacks sufficient funds to operate its business and meet its post-petition obligations during the Plan process.

98.     Following arms-length negotiations, the DIP Lender is providing post-petition financing and all of the Investors other than HERC have consented to the priming of their liens and the use of their cash collateral in connection therewith to enable the Debtor to operate during the Plan process.  The Investors including HERC are adequately protected with respect to both the priming liens and the use of its portion of the cash collateral (i) through the Plan process which will maximize value of the Debtor's assets and provide the greatest recovery to all creditors including HERC, (ii) the continued operation of the Debtor's business through the use of receivables under the DIP Facility, and (iii) the adequate protection liens and adequate protection claims being granted to HERC hereunder.  In addition, as set forth above, the DIP Lender has agreed, as part of the Carve-Out, to exclude any Pre-Petition Liens from the priming by the DIP Liens, to the extent of any diminution in the value of one or more Investor's interest in the Pre-Petition Encumbered Assets from and after the Petition Date.

---

[3]      Capitalized terms used in each of the following sections shall have the meanings ascribed to them in the relevant motion.

99.     The Debtor has virtually no unencumbered funds or credit available to fund its business operations.  Without funding under the debtor-in-possession financing facility from the DIP Lender and the use of cash collateral, as proposed herein, the Debtor's operations will have to immediately cease, the value of its assets will be severely diminished, and many jobs will be lost.  Further, due to severe operating and financial difficulties and its existing capital structure, the Debtor has been unsuccessful in its attempts to secure funding outside of a Chapter 11 context nor could the Debtor secure funding inside of a Chapter 11 bankruptcy on an unsecured or subordinated basis.  In short, without the use of cash collateral and funding under the proposed debtor-in-possession financing facility, the Debtor's prospects for maximizing value of its assets through confirmation of the Plan will be substantially undermined and the value of the Debtor's assets will be placed in serious jeopardy.  Therefore, it is imperative that the Debtor be authorized to use cash collateral and obtain debtor-in-possession financing in order to preserve its assets pending confirmation of the Plan.

100.     To protect and preserve the Debtor's assets during the confirmation process, the DIP Lender is prepared to proceed with its commitment under the DIP Facility.  The DIP Facility contemplates that the Debtor will first use available cash collateral to satisfy obligations, and then use proceeds from the DIP Facility.

101.     The Debtor believes that advances under the DIP Facility coupled with use of cash collateral will be sufficient to enable the Debtor to continue to operate on a going concern basis and allow the Debtor to seek confirmation of the Plan, implement the Plan (if confirmed by this Court) and close this Case.

102.     The DIP Facility was negotiated at arms' length and in good faith, and its terms and conditions are reasonable under the circumstances.

103.    Based on the above, the Debtor decided, in the exercise of its sound business judgment, that the DIP Facility (together with the use of cash collateral) was the most favorable under the circumstances and addressed the Debtor's working capital needs.  It, along with the use of cash collateral, will afford the Debtor valuable additional time to pursue confirmation of the Plan while maintaining the going concern value of the Debtor's business.

104.    The Debtor requires immediate access to funds in order to pay essential expense items.  The Debtor also requires certain funds to pay any unforeseen costs and expenses pending a final hearing.

105.    The Debtor requires the ability to obtain immediate credit under the DIP Facility on an interim basis pending the Final Hearing in an amount of up to $430,000.

106.    Such credit is needed to satisfy the Debtor's obligations in connection with the operation of its business, including, but not limited to, the payment of employee wages, salaries and benefits, as well as the Debtor's rent obligations.  The immediate and irreparable harm that could result in the absence of approval of interim financing is detrimental to the interests of all concerned.

**B.    Motion to Approve Solicitation Procedures and Schedule Confirmation Hearing**

107.    The Plan will achieve the Debtor's restructuring goals by (a) reducing the Debtor's total principal amount of general unsecured debt and (b) position the Debtor for ongoing growth.

108.    Specifically, the Plan contemplates that:

a.    On or before the Effective Date, the Debtor shall form a wholly-owned Delaware "C" corporation subsidiary ("Seegrid Sub").  On the Effective Date, the Debtor shall convey to Seegrid Sub:  (i) all of its operating assets, including without limitation, its intellectual property and the name "Seegrid"; (ii) its post Commencement Date operating liabilities; and (iii) its employees.  In exchange

- 27 -

for its contribution to Seegrid Sub, the Debtor shall receive 11.25 million shares of Seegrid Sub common stock.

b.   On the Effective Date, all indebtedness of the Debtor to Giant Eagle for borrowed money arising after June 11, 2014, including Giant Eagle's First and Third Priority Secured Bridge Noteholder Claims and any indebtedness under the DIP Credit Agreement shall be converted dollar for dollar into Seegrid Sub Series A Preferred Shares. Such Seegrid Sub Series A Preferred Shares shall have the right and preferences reflected on Exhibit A to the Plan. To the extent that the debt converted hereunder is less than $10 million, and subject to the terms of the Plan Support Agreement, within one year after the Effective Date, Giant Eagle shall have the rights to purchase such additional Seegrid Sub Series A Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares. To the extent that Seegrid Sub meets its projections during the Chapter 11 Case, Giant Eagle shall purchase such additional Seegrid Sub Series A Preferred Shares as causes Giant Eagle to reach $10 million of such Shares.

c.   Seegrid Sub shall reserve for issuance to management, employees and directors of Seegrid Sub 3,750,000 shares of Seegrid Sub common stock to be issued in accordance with a plan adopted by the Board of Directors of Seegrid Sub.

d.   Additional Seegrid Sub Series A Shares beyond the $10 million of Seegrid Sub Series A Shares available to Giant Eagle will be offered to the Debtor's other direct and indirect stockholders (the "Investors") and convertible debt holders in an amount that allows the Investors to maintain their direct and indirect pro rata share of the Seegrid Sub on a fully diluted, as converted basis, or such larger amount as the board of the Debtor may determine.

e.   Giant Eagle, any other holder of a First Priority Secured Noteholder Claim that elects to convert its debt into Seegrid Sub Series A Preferred Shares, and each Investor who purchases Seegrid Sub Series A Preferred Shares shall receive a warrant to purchase additional Seegrid Sub Series A Preferred Shares at $1.00 per share in an amount equal to the amount invested in or converted into Seegrid Sub Series A Preferred Shares. Such warrant shall be exercisable up to and including the second anniversary of the Effective Date of the Plan.

109.   To effectuate the terms of the proposed consensual restructuring, on October 3, 2014, the Debtor caused the Balloting Agent to distribute packages (the "Solicitation Packages") containing (a) the Disclosure Statement and the Plan, (b) the Ballot (each, a "Ballot" and collectively, the "Ballots") for each holder of a Class 1 claim and Class 2 claim, the only impaired classes of creditors entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"), and (c) directions for voting on the Plan. The Balloting Agent transmitted the

Solicitation Packages to the Voting Classes by overnight mail. Holders of Class 3 and Class 4 claims (the "Non-Voting Classes") were not provided a Solicitation Package.

110. The Debtor established October 17, 2014 at 5:00 p.m. (prevailing Eastern Time) as the deadline for the Voting Classes to vote to accept or reject the Plan (the "Voting Deadline"). Each Voting Class was explicitly informed in the applicable Ballot that such Holder needed to submit its Ballot such that it is actually received by the Balloting Agent on or before the Voting Deadline to be counted. Pursuant to the instructions contained in the Ballot, claimants in the Voting Classes were required to return the completed ballots by either electronic mail, first class mail, or overnight mail.

111. As soon a reasonably practicable, the Balloting Agent will file a voting report (the "Voting Report"), which will certify the results and methodologies for tabulation of Ballots accepting or rejecting the Plan with respect to the Voting Classes.

112. Additionally, the Debtor requests that the Court schedule the Combined Hearing to consider approval of the Disclosure Statement and confirmation of the Plan on or about December 5, 2014 at a time convenient for the Court. The Debtor submits that cause exists to approve this date and hold the Combined Hearing. First, the Debtor has requested the Court to schedule the Combined Hearing thirty-five (35) after the date of the Combined Hearing Notice. Second, as described herein, the Debtor commenced solicitation on October 3, 2014, which solicitation was in accordance with Bankruptcy Code Sections 1125(g) and 1126(b). The Solicitation Package was distributed to each claimant in the Voting Classes. Third, a combined hearing will reduce the time the Debtor remains in bankruptcy, thereby cutting the costs of administering the funding this chapter 11 case.

113.    Also, the Debtor believes that the proposed timing and procedures for filing and service of objections comply with the applicable rules and will afford the Court, the Debtor and other parties in interest sufficient time to consider the relevant objections prior to the Combined Hearing.

114.    The restructuring transactions proposed in the Plan are the product of months of negotiations among the Debtor and Giant Eagle.  Prior to the commencement of solicitation, the Plan and the related Disclosure Statement were subject to review and comment by counsel and other advisors for Giant Eagle during the course of arm's length negotiations with the Debtor.  The Debtor, in turn, engaged in discussions with Giant Eagle regarding the terms of the restructuring transactions contemplated in the Plan prior to launching solicitation of the Plan.  Moreover, the voting period is reasonable in light of the risks inherent to the Debtor in announcing the prepetition solicitation of the Plan, including deterioration of trade terms, customers withholding payment, and other actions that would disrupt the Debtor's operations.

115.    The Debtor requests that the Court approve the vote tabulation methodology utilized by the Debtor.  The Ballots and Solicitation Packages were transmitted to claimants in the Voting Classes by electronic mail and, where unavailable, overnight mail.  Claimants in the Voting Classes were required to return their Ballots to the Balloting Agent by electronic mail, first claim mail or overnight mail.  The Debtor will not count or consider for any purpose in determining whether the Plan has been accepted or rejected the following Ballots, as applicable:  (i) are received after the Voting Deadline unless the Debtor (in consultation with Giant Eagle) have granted an extension of the Voting Deadline with respect to such Ballot; (ii) are (in whole or in material part) illegible or unidentifiable; (iii) lack signatures; (iv) lack necessary information; (v) are damaged; (vi) are cast by a person or entity that does not hold a

Claim in a Voting Class as of the Voting Record Date; (vii) does not indicate an acceptance or a rejection or that indicates both an acceptance and a rejection; (viii) are sent to the Bankruptcy Court, the Debtor, the Debtor's agents, advisors or representatives (other than the Balloting Agent); or (ix) partially accept and partially reject the Plan (each, a "Defective Ballot"). Additionally, if multiple Ballots are received from an individual claimant with respect to the same Claim prior to the claimants Voting Deadline, the last Ballot timely received will supersede and revoke any previously received Ballot.

116.   The Debtor will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Balloting Agent, which shall, among other things, delineate every Defective Ballot.

117.   The Debtor will request that, at the Combined Hearing, the Court find that the Disclosure Statement contains adequate information as defined in Bankruptcy Code section 1125. The Debtor submits that the Disclosure Statement contains adequate information because it is extensive and comprehensive. What constitutes "adequate information" is based on the facts and circumstances of each case, but the focus is on whether sufficient information is provided to enable the parties to vote in an informed way, and that standard is easily met here. For example, the Disclosure Statement contains descriptions and summaries of, among other things:  (a) both the Plan and the Debtor's related reorganization efforts; (b) certain events and relevant negotiations preceding the commencement of this chapter 11 case; (c) the key terms of the restructuring transactions contained in the Plan; (d) the risk factors affecting consummation of the Plan; (e) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case; (f) financial information that would be relevant to creditors' determinations of whether to accept or reject the Plan; and (g) securities law and

federal tax law consequences of the Plan.  In addition, the Disclosure Statement and the Plan were the subject of review and comment by, among others, the key stakeholders in the Debtor's restructuring.

118.    The Debtor submits that cause exists to waive the section 341 meeting as set forth herein because the Disclosure Statement contains much of the type of information typically discussed during a meeting of creditors pursuant to section 341 of the Bankruptcy Code, including information on the corporate structure of the Debtor, an overview of the Debtor's business operations, the Debtor's capital structure, events leading up to the cases and a summary of the Plan and treatment of classes of claims and interests thereunder.

119.    In addition, the Debtor intends to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible.  A section 341 meeting may force the Debtor to delay the Combined Hearing, which would result in additional administrative expenses and professional fees to the detriment of the Debtor's estate.  Accordingly, pursuant to Bankruptcy Code section 341(e), the Debtor requests that the Court enter an order waiving the requirement that the U.S. Trustee convene the Creditors' Meeting if the Plan is confirmed within 80 days from the Petition Date.

C.    **Employee Wages and Benefits Motion**

120.    The Debtor maintains a workforce of approximately 44 employees (collectively, the "Employees"), of which 29 are salaried and 15 are paid on an hourly basis.  In addition to their wages and salaries, the Employees also receive certain medical, retirement, or other benefits that are furnished by the Debtor.

121.    The Debtor pays its Employees biweekly, with payroll being issued six (6) days in arrears and each pay period ends on a Saturday.  By way of example, the most recent

payroll on October 17, 2014 covered all work performed from September 28, 2014 through October 11, 2014.  Payroll is handled by the Debtor's third-party administrator.

122.    Given the timing of its bankruptcy filing, the Debtor is obligated to honor a variety of prepetition expenses of the Employees which will not come due until after the Petition Date.    These obligations (the "Prepetition Employee Obligations") include the following: (a) accrued salary and wages; (b) payment of certain amounts withheld from Employee compensation for taxes, benefit plan premiums, wage garnishments, or child support obligations; (c) contributions to certain medical insurance, health plans, 401(k) funds, and other employee benefits; and (d) reimbursement of business expenses incurred prepetition.

123.    The Prepetition Employee Obligations were not paid prior to the Petition Date because of the timing of the Debtor's bankruptcy filing.    Specifically, the Debtor's bankruptcy petition was filed before payroll checks were issued to Employees for earnings accrued during the week ending October 18, 2014, through the Petition Date.  In other instances, payments were likely not made because they had not been fully processed, or the checks had not cleared before the Petition Date.

124.    During weeks when payroll is due (a "Pay Week"), the Debtor typically sends its payroll administrator, Paychex, Inc. ("Paychex"), that Pay Week's payroll information on Wednesday.  Paychex processes the payroll by transferring the necessary funds from Debtor's operating account, maintained at PNC (the "Operating Account") on Thursday and Friday of Pay Week, and then drafting checks and/or depositing payroll in the bank accounts of the Debtor's employees.  Paychex also administers the necessary withdrawals from the Employees' paychecks pursuant to any court orders, state and federal taxes, and any voluntary 401(k) contributions.  Paychex charges a service fee (the "Service Fee") to the Debtor for its payroll services based

upon each Pay Week's payroll.  Paychex withdrawals its Service Fee directly from the Debtor's Operating Account.

125.    Although the Debtor was current on its payroll as of the Petition Date, it owed its Employees compensation in the form of accrued but unpaid wages and salaries in an approximate aggregate amount not exceeding $112,000 without taxes; $121,000 if you include employer taxes for the week ending October 18, 2014, through the Petition Date.  The Debtor's next payroll is due October 31, 2014, for the pay periods ending October 25, 2014.

126.    The Debtor seeks authority to pay accrued compensation as it becomes due and owing in the ordinary course and to pay any payroll checks that have been issued but have not yet cleared. The gross amount of wages or salaries owed to any Employee is less than the $12,475 priority amount established by §507(a)(4) of the Bankruptcy Code.

127.    In connection with this request, the Debtor also seeks authority to pay Employees their accrued but unpaid vacation pay, holiday pay, or sick leave in the ordinary course of business.  Employees may qualify for up to five (5) weeks of paid time off ("PTO") per year, depending on the Employee's length of service.  If an Employee leaves the Debtor, the Employee is entitled to be paid for unused PTO on a prorated basis.

128.    Through the ordinary course of business, the Debtor withholds certain mandatory deductions (including federal, state, and local taxes, alimony, child support, and wage garnishments) as well as other voluntary deductions (such as contributions for medical, dental, and vision plan premiums, and the 401(k) plan) from the Employees' wages and salaries.  Such withholdings are then forwarded by the Debtor to the applicable providers.

129.     In connection with this Motion, the Debtor seeks authority to distribute all amounts withheld from prepetition Employee compensation to the appropriate third parties, including, *inter alia*, the following:

A.     local, state, and federal withholding and payroll-related taxes associated with the Prepetition Employee Obligations, including but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes associated therewith; and

B.     amounts withheld from wages and salaries for the Employee-funded portion of the Employee Benefit Plans and Programs, as well as any court-ordered garnishments, support payments, higher education assistance payments, or other related amounts.

130.     Aside from the current payroll period, the Debtor believes it has distributed all employee withholdings as required.  Consequently, the Debtor estimates that approximately $60,000 will be withheld from Employee wages during the current pay period for various federal, state, local withholding taxes, garnishments, or other related payroll expenses.

131.     The Debtor likewise requests authority to continue post-petition its practice of withholding a portion of the Employees' compensation to satisfy the Employees' respective liabilities, and to forward such payments to the appropriate third parties, all in the ordinary course of business.

132.     It is the Debtor's policy to reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, meals, supplies, and other miscellaneous expenses.  These Employees include the Debtor's executives, customer service representatives, and managers, among others.

133.     Based on expense reimbursement requests submitted by Employees for the last six months, the Debtor has been paying approximately $12,000 per month for employee expense reimbursements.  Consequently, the Debtor estimates that it owes approximately $5000 on account of outstanding reimbursable business expenses incurred prepetition.  The Debtor

requests authority to pay such accrued prepetition reimbursement amounts.  If the Debtor is unable to reimburse these Employees for legitimate business expenses incurred on behalf of, and at the request of, the Debtor, such Employees may suffer severe personal hardship and may be unwilling to continue to provide services critical to the Debtor's continued operations.

134.    The Debtor requests authority to (a) pay any outstanding prepetition amounts with respect to the Employee Benefit Plans and Programs in place on the Petition Date, and (b) continue, on a post-petition basis, the Employee Benefit Plans and Programs currently in place in the ordinary course of its business.

135.    Along with employee wages, the Debtor believes that the Employee Benefit Plans and Programs are an integral part of each Employee's compensation package.  If the Debtor is unable to provide the Employee Benefit Plans and Programs, its ability to continue operations will be jeopardized as these Employees may lose their commitment to the Debtor and seek employment elsewhere.

136.    The Debtor offers its Employees many standard employee benefits either directly or through certain third parties.

137.    Among the Employee Benefit Plans and Programs provided by the Debtor, Employees are offered a medical insurance health plan, dental, vision, and a 401(k) program.

138.    The Debtor's medical insurance health plan, dental plan, and vision plan offers options to its Employees through Aetna, Inc. (the "Medical Plan"), Principal Life Insurance Company (the "Dental Plan"), and Highmark Blue Cross Blue Shield (the "Vision Plan"), respectively.

        a.    The Medical Plan:  For Employees that select the basic plan offered by Aetna, the Debtor covers the entire cost of the premium.  For Employees that opt into anything above the basic plan, the Employee covers the cost of the difference.

      b.    <u>The Dental Plan and the Vision Plan</u>:  The Debtor covers the cost of the Dental Plan and the Vision Plan on behalf of the Employees on an individual basis.  If the Employee adds their family to the Dental Plan or Vision Plan, the Employee pays the cost of the family.

139.    The Employees may also participate in, on a voluntary basis, short and long term disability and life insurance plans that the Debtor facilitates by withholding the requested amounts from the Employees' paychecks and transferring those funds to the necessary third parties, but does not provide any funding towards those plans.

140.    The average cost of the Debtor's portion of the health plan premium is approximately $43,500 per month.  The Debtor believes that it is current with respect to all health insurance premiums owed.  Through this Motion, the Debtor seeks authority to continue payment of medical insurance premiums to ensure uninterrupted medical coverage to the Employees.

141.    To assist with the cost of health care, the Debtor offers its employees the option to voluntarily contribute to a Health Saving Account (the "<u>HSA</u>").  If the employee opts to participate in a HSA, employee contributions to a HSA are withheld from the employee's paychecks after tax on a biweekly basis.  The Debtor contributes $25.00 a month to each employee that participates in a HSA.  Currently, the Debtor contributes $1000 per month for the 40 Employees that currently participate in a HSA.

142.    The Debtor proposes to continue the HSA in the same form as it existed prior to the Petition Date.  Specifically, the Debtor seeks to pay the $25.00 per employee for the benefit of Employees as part of its base compensation package.

143.    The Debtor also maintains a 401(k) retirement program in which its Employees may participate.  The program is administered by NRP Financial, Inc. ("<u>NRP</u>") in

exchange for a monthly fee of approximately $400.00. The Debtor withholds voluntary Employee contributions to the 401(k) plan on a per-pay period basis (the "Employee Contributions") and transfers the funds to NRP. The Debtor does not contribute any funds to the 401(k) plan.

144. The Debtor believes that it was current with respect to all prepetition premiums or payments owed under the Employee Benefit Plans and Programs. To the extent a prepetition contribution for an Employee Benefit Plan and Program was inadvertently unpaid, the Debtor requests authority to make payment in satisfaction of such obligation.

145. The Debtor's Employees rely on their regular paychecks being paid in the usual and normal course of business to meet their personal obligations on a timely basis. They could not reasonably be expected to continue in the Debtor's employ absent the continuity of payroll and related compensation payments. Because the continued employment of the Employees is vital to the success of this chapter 11 case, any delay in paying the Prepetition Employee Obligations will severely disrupt the Debtor's relationship with its employees and irreparably impair the motivation of Employees at a time when their dedication, confidence, and cooperation are needed most.

146. The Debtor further submits that the amounts to be paid to the Employees pursuant to this Motion are reasonable compared with the importance of preserving Employee loyalty and avoiding the losses the Debtor likely will suffer if those amounts are not paid. Assuming that its motion to incur postpetition financing and to use cash collateral is granted, the Debtor will also have sufficient cash on hand to pay all Prepetition Employee Obligations as they come due. Accordingly, the Debtor seeks authorization to pay the Prepetition Employee

Obligations (or to maintain accrued levels of benefits where payment is not yet due) all in accordance with the policies, plans, and programs in place prior to the Petition Date.

147.    Pursuant to this Motion, the Debtor seeks to pay to, or for the benefit of, its Employees, certain Prepetition Employee Obligations and to continue its Employee Benefit Plans and Programs in effect immediately prior to the filing of this case.  If the Debtor fails to pay or honor the Employees' prepetition compensation, reimbursement procedures, or maintain employee benefits, the Employees will suffer extreme personal hardship and in many cases will be unable to pay their basic living expenses.  This would undermine Employee morale and result in unmanageable Employee turnover during the critical early stages of the Debtor's chapter 11 case.  The Debtor submits that any significant deterioration in morale at this time would substantially and adversely impact the Debtor and its ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

### D.    Customer Practices Motion

148.    Prior to the Petition Date and in the ordinary course of its business, the Debtor engaged in many practices to facilitate sales and to develop and sustain positive reputations in the marketplace for its products and services.   Among these practices are warranties, parts and service support, and customer deposit programs (collectively, the "Customer Practices").  As illustrations, several of the Customer Practices are described with greater detail below.  The common goals of the Customer Practices have been to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtor— thereby retaining current customers, attracting new ones, and ultimately increasing sales.

149.    The great majority of the Customer Practices constitute services that are provided to customers under existing contracts.  The Debtor believes that it is the most prudent

and cost-efficient course of action to ensure that the Debtor continues to perform under such contracts, in order to maintain goodwill and reputation in the marketplace. Moreover, many of the Customer Practices will not arise until after the Petition Date, and therefore arguably constitute ordinary course expenditures of the Debtor. Out of an abundance of caution and to give its customers assurances that the Customer Practices will continue to be performed and honored by the Debtor; however, the Debtor files this Motion to the extent that the Customer Practices, as they relate to prepetition agreements, orders, and sales regarding the Debtor's products and services, may represent unperformed prepetition obligations of the Debtor that could be viewed as claims against the Debtor.

150.    Not surprisingly, when customers make purchasing decisions between the Debtor's products and services and those of the Debtor's competitors, they closely evaluate the quality and reliability of the products and the respective manufacturers' willingness and ability to stand behind what they sell and service. A manufacturer which fails to support its product will not only lose the opportunity to sell its products, but will also incur damage to its reputation and ability to sell products in the future. As a result, retail customers and wholesale buyers will only consider purchasing product from manufacturers with a proven record of customer support.

151.    The Debtor wants to continue the Customer Practices because they have been successful business strategies in the past and have generated valuable goodwill, repeat business and sales increases. The Debtor believes that maintaining these programs throughout this bankruptcy case is essential to the continued vitality of its business—and ultimately to its prospects for a successful reorganization. Given the Debtor's customers' reliance on the Customer Practices, even a short delay or gap by the Debtor in honoring its prepetition obligations in regard to the Customer Practices could cause serious and irreparable harm to the

value of the Debtor's goodwill and opportunities for future repeat business.   Therefore, the

Debtor believes that the relief requested by this Motion must be available at the earliest possible

moment in its bankruptcy case.

      152.   The following are general descriptions and examples of some (but not all)

of the Customer Practices engaged in by the Debtor:

      a.      The basic warranty offered by the Debtor (the "<u>Product Warranty</u>") generally provides that its product, excluding software and replacement parts, will be free from defective factory installed material for (a) 365 days after shipment to a buyer or (b) if the customer is a reseller, the earlier to occur of 450 days after shipment to the customer or 365 days after the customer's delivery to a third party end user, subject to certain conditions. Additionally, the Debtor offers a warranty (the "<u>Replacement Warranty</u>") on replacement parts not installed pursuant to the Product Warranty for a period of 180 days from date of delivery, subject to certain conditions. Finally, the Debtor also provides a warranty for its services (the "<u>Service Warranty</u>," and with the Product Warranty and Replacement Warranty, the "<u>Basic Warranties</u>").   If a customer notifies the Debtor of any nonconforming services within 30 days after the services are completed, the Service Warranty provides that the Debtor will again perform, if able to be cured, those services directly affected by such failure, at its sole expense, subject to certain conditions.

      b.      Related to the Basic Warranties are the Debtor's service contracts (the "<u>Service Contracts</u>").   With the Service Contracts, customers have the ability to prepay for what are essentially extended Basic Warranties of up to five years in length.

      c.      As part of its ongoing business, the Debtor occasionally receives funds from customers for the purchase of the Debtor's products and services (the "<u>Customer Deposits</u>").   Currently the Debtor estimates that it has Customer Deposits in an amount of $490,000.00.  The Debtor seeks the authority to refund or apply the deposit to a future purchase, in its discretion, consistent with its customary business practices.

      153.   The Debtor's ability to honor the Customer Practices is critical to

maintaining customer satisfaction and confidence in the Debtor and its products and services.

Failure to honor the Basic Warranties, Service Contracts and Customer Deposits, among other

Customer Practices ,will most likely result in loss of customers to the detriment of all parties in interest.

154.    Moreover, the total amount potentially owing to customers under the Customer Practices is minimal compared with the losses that the Debtor could suffer if the patronage of its customers erodes at the outset of these cases.  In sum, maintenance of the ability to honor the Customer Practices is essential to the continuation of the Debtor's business pending confirmation of a plan of reorganization and, ultimately, to the prospects for a successful chapter 11 case.  The Debtor's request to honor the prepetition Customer Practices surpasses this standard because the failure to satisfy such obligations could have a material adverse impact on the Debtor's operations and the value of the Debtor's business and estate.  In the Debtor's business judgment, the uninterrupted ability to honor the Customer Practices is essential to maintaining customer satisfaction and the value of the Debtor's business and assets.  By contrast, the inability to honor the Customer Practices would thus disrupt operations and undermine the Debtor's relationships with its customers to the detriment of all parties in interest.

**E.    Account Maintenance, Existing Business Forms and Cash Management Motion**

155.    The Debtor utilizes a cash management system in the day-to-day operation of its business (the "Cash Management System").  In connection with the Cash Management System, the Debtor maintains a bank and a money market account (collectively, the "Accounts").  A list of the Accounts is provided on Exhibit A to the motion seeking authority to continue the Cash Management System.

156.    All funds received by the Debtor are deposited into a commercial checking account (the "Operating Account") held at PNC Bank, N.A. ("PNC").  Funds in the

Operating Account are used by the Debtor to make payments as needed, including payroll and payments to vendors and suppliers.

157. On the weeks when payroll is due ("Pay Week"), the Debtor's third-party payroll administrator, Paychex, Inc. ("Paychex"), initiates a series of withdrawals from the Operating Account to cover payroll.

158. In addition to the Operating Account, the Debtor also maintains a Business Premium Money Market Account (the "Money Market Account") with PNC. The Money Market Account serves as collateral for the Debtor's company credit card.

159. As of October 17, 2014, the cash balance in the Operating Account was approximately $280,000.00, and the cash balance of the Money Market Account was $101,414.69, subject to $100,000.00 collateral arrangement supporting the Debtor's corporate credit card. The Debtor keeps records of all deposits and withdrawals made into the Accounts, and performs a monthly reconciliation of the transactions occurring in each account.

160. The Debtor submits that the relief requested herein will assist the Debtor's administration of the chapter 11 case. It will avoid possible disruptions and distractions that not only could divert the Debtor's attention from more pressing matters during the initial days of this chapter 11 case, but also disrupt the Debtor's continued operations. It will also reduce the administrative costs for these estates.

161. If the Debtor is forced to abandon its existing Cash Management System and to set up new and separate accounts, the Debtor's estate would be unnecessarily burdened with additional costs and expense. The implementation of a new cash management system at this time could also result in confusion and unnecessary delays in collecting receivables and paying

administrative expenses, thereby leading to the possible deterioration of assets to the detriment of the bankruptcy estate.

162.     Here, the requested relief is appropriate because, given the Debtor's business operations, the preservation and enhancement of the Debtor's respective values as going concerns will be hampered if the Debtor's cash management procedures are disrupted. Therefore, it is essential that the Debtor be permitted to continue to participate in the Cash Management System, and to continue the operation of their businesses pursuant to their existing cash management procedures.  In addition, vendors and contractors of the Debtor are familiar with and accustomed to the Debtor's current payment system, and any change in the method used by the Debtor for these payments would be disruptive to the Debtor's operations and threaten the continued provision of essential materials and services.

163.     Because of the Debtor's banking arrangements, it is imperative that the Debtor be permitted to continue using the Accounts in order to avoid wholesale disruption of the normal operation of its business.  The Debtor believes that the transition to chapter 11 will be smoother, and operational interference will be minimized, if the Accounts are continued with the same account numbers.

164.     The Debtor represents that, if the relief requested is granted, it will instruct PNC not to pay any debts incurred by the Debtor prior to the Petition Date, other than those expenses authorized by the Bankruptcy Court.

165.     The Debtor will continue to work closely with PNC to insure that adequate controls are in place to prevent the payment of any prepetition debts unless expressly authorized by the Bankruptcy Court.

166. The Debtor will ensure that a substantial gap in check number sequence is created so that prepetition checks can be clearly distinguished from post-petition checks. By preserving business continuity and avoiding the operational and administrative paralysis that closing the Accounts and opening new ones necessarily would create, all parties in interest, including, but not limited to employees, vendors, and customers, will be best served and the benefit to the estate generally will be considerable.

167. It would be difficult, unduly burdensome and disruptive to operations for the Debtor to establish an entirely new system of bank accounts and a new cash management and disbursement system. Moreover, because the Debtor has the capability to draw the precise distinctions between pre- and post-petition obligations and payments within the existing cash management system, the Debtor's creditors will not be prejudiced.

**F.      Utilities Motion**

168. In connection with its business operations, the Debtor obtains electricity, natural gas, water, sewer, sanitation, telephone and telecommunication services through approximately twenty (20) different accounts that it has with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers"). A list of the names, addresses and average monthly bill for each respective Utility Provider is attached to the motion seeking protection under section 366 of the Bankruptcy Code as Exhibit A. The Debtor generally pays each of the Utility Providers following receipt of a monthly invoice for services provided during the immediately preceding month.

169. If utility services to the Debtor's headquarters facility and other locations were interrupted, the Debtor would no longer be able to operate its business, and could suffer

irreparable harm.   Such an interruption would undoubtedly impede the Debtor's efforts to maximize the value of its business.

170.     The Debtor believes it is current with all payment obligations to its Utility Providers that have come due and owing as of the Petition Date.  The Debtor fully intends to pay all post-Petition Date obligations owed to the Utility Providers in a timely manner, and expects that it will have sufficient funds to do so.

171.     In order to provide adequate assurance of payment for future services to its Utility Providers, the Debtor proposes to make a deposit equal to 50% of the Debtor's average monthly utility charges over the twelve month period of August, 2013 – July, 2014, for each Utility Provider at each location, which amount totals approximately $7,970.00 in the aggregate (the "Utility Deposits").  The Debtor proposes to make Utility Deposits to each of the Utility Providers within twenty (20) days after the entry of the Interim Order granting this Motion for the purpose of providing each Utility Provider with adequate assurance of payment of its post-Petition Date services to the Debtor.

### G.     Logan Retention Applications

172.          Prior to the Petition Date, the Debtor and Logan entered into an Agreement for Services dated September 25, 2014 (the "Logan Agreement").  Pursuant to the Logan Agreement, the Debtor retained Logan to serve as its noticing and balloting agent with respect to the solicitation of the Prepackaged Plan.   In this capacity, Logan circulated the solicitation package for the Prepackaged Plan and ballots to approximately 450 different addresses for parties in-interest.

173.     The proposed terms of retention are set forth in the Logan Agreement attached to the Logan Declaration; provided, however, that the Debtor is seeking approval solely

with respect to services, terms, and provisions that are consistent with the Section 156(c) Application and the Retention Order.

174.    The Debtor anticipates that approximately 450 addressees will be eligible to receive notices in the bankruptcy case.

175.    In connection with the Logan Agreement, Logan was paid a retainer of $8,000.00 from the Debtor.  Logan applied the retainer to all pre-petition invoices, and thereafter, the Debtor replenished the retainer to the original retainer amount, to be held under the Logan Agreement during the Chapter 11 Case as security for the payment of fees and expenses incurred in rendering the Logan Services hereunder, with any remainder to be held as security for the payment of other approved fees and expenses incurred in rendering other services under the Logan Agreement.

176.    The Debtor's selection of Logan to act as the claims and noticing agent satisfies the Protocol in that the Debtor has obtained and reviewed engagement proposals from at least three (3) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtor submits, based on all engagement proposals obtained and reviewed, that Logan's rates are competitive and reasonable given Logan's quality of services and expertise.  Because Logan already has substantial experience with the Debtor's creditor matrix, having developed its database, source code, and other related information through its work as the balloting agent for the Prepackaged Plan, the Debtor believes Logan will be the most cost-effective party to serve as the Claims and Noticing Agent.

## CONCLUSION

177.    Accordingly, for the reasons stated herein and in each of the motions and applications set forth above, the Debtor requests that the Court approve the corresponding orders submitted with each First Day Pleading.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on October 21, 2014
               Pittsburgh, Pennsylvania

                           Seegrid Corporation,


                           By: */s/ David Heilman*
                                David Heilman
                                Chief Executive Officer