## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                          :
                                                :    Chapter 11
SEEGRID CORPORATION,                            :
                                                :    Case No. 14- 12391 _____
                                Debtor.         :
---------------------------------------------------------------- x

## PREPACKAGED PLAN OF REORGANIZATION OF SEEGRID CORPORATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Seegrid Corporation ("Seegrid" or "Debtor") propose the following plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

The definitions provided in this Article I apply to the Plan. Unless otherwise specified, all Article, schedule or exhibit references in the Plan are to the respective Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Article, subsection or clause. With respect to a distribution under the Plan, "on" a date means on or as soon as reasonably practical thereafter. A term used but not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**1.1    Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 503(b), 507(a)(1), and 507(b) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses of preserving Seegrid's Estate; (b) any actual and necessary costs and expenses of operating Seegrid's business; and (c) any indebtedness or obligations incurred or assumed by Seegrid as Debtor in Possession during the Chapter 11 Case.

**1.2    Administrative Expense Claims of Professionals** means any compensation for Professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.3    Allowed** means, when used with respect to any Claim against or Interest in Seegrid (a) as to which no objection or request for estimation has been filed, no litigation has commenced, or Seegrid otherwise has assented to the validity thereof; (b) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order; or (c) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the holder(s) of such Claim or

Interest and Seegrid (or Reorganized Seegrid, as the case may be), or (iii) under the terms of the Plan.

        **1.4**     **Allowed Amount** means, with respect to any Claim, the lesser of: (a) the dollar amount of such Claim as Allowed; (b) the estimated amount of such Claim; and (c) the dollar amount agreed to by Seegrid. Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the Allowed Amount of an Allowed Claim shall not include interest or penalties accruing on such Allowed Claim from and after the Commencement Date. In addition, unless a Final Order of the Bankruptcy Court provides otherwise, the Allowed Amount of an Allowed Claim shall not, for any purpose under the Plan, include interest at any default rate of interest.

        **1.5**     **Amended Certificate of Incorporation** means the amended and restated certificate of incorporation of Reorganized Seegrid.

        **1.6**     **Avoidance Action(s)** means any avoidance or recovery action under any of sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, whether or not litigation has been commenced with respect to such cause of action as of the Effective Date.

        **1.7**     **Ballot** means each of the ballots and/or master ballots distributed with the Disclosure Statement to holders of Impaired Claims on which ballot such holder of a Claim may, among other things, vote to accept/vote in favor of or reject/vote against the Plan.

        **1.8**     **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Commencement Date, together with all amendments, modifications and replacements of the foregoing, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

        **1.9**     **Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Case.

        **1.10**     **Bankruptcy Rules** means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Case.

        **1.11**     **Business Day** means any day except: (a) Saturday; (b) Sunday; (c) any other day on which banking institutions in New York, New York, are required or authorized to be closed by law or executive order; and (d) the Friday immediately after Thanksgiving.

        **1.12**     **Cash** means legal tender of the United States of America.

        **1.13**     **Cause of Action** means any action, including any cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, or Claim whatsoever, whether known or unknown, now or in the future, reduced to judgment, not reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, whether asserted or assertable directly or derivatively, in law, equity or otherwise, which may be brought by or on behalf of Seegrid and/or the Estate, arising under any provision of the Bankruptcy Code or other applicable law or regulation or similar governmental pronouncement.

        **1.14**    **Chapter 11 Case** means Seegrid's case under chapter 11 of the Bankruptcy Code, captioned *In re Seegrid Corporation*, Case No. (Pending Filing), to be commenced in the Bankruptcy Court.

        **1.15**    **Claim** means:  (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such right gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

        **1.16**    **Class** means a category of holders of Claims or Equity Interests described in Article III below.

        **1.17**    **Commencement Date** means the date on which a petition is filed by Seegrid pursuant to section 301 of the Bankruptcy Code to commence the Chapter 11 Case.

        **1.18**    **Common Stock** means the shares of common stock of Seegrid.

        **1.19**    **Confirmation Date** means the date on which the Confirmation Order is entered by the Bankruptcy Court with respect to the Chapter 11 Case.

        **1.20**    **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

        **1.21**    **Confirmation Order** means the order or orders of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

        **1.22**    **Cure** means the payment of Cash by Seegrid, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to: (a) cure a default by Seegrid under an Executory Contract; and (b) permit Seegrid to assume such Executory Contract under section 365 of the Bankruptcy Code.

        **1.23**    **Cure Notice** means the pleading that the Reorganized Debtor shall file and serve within thirty (30) days after the Effective Date listing the amount of the proposed Cure for each assumed, or assumed and assigned, Executory Contract.

        **1.24**    **Debtor** means Seegrid Corporation in the Chapter 11 Case.

        **1.25**    **Debtor in Possession** means Seegrid Corporation, as debtor in possession in the Chapter 11 Case pursuant to section 1101(1) of the Bankruptcy Code.

**1.26   DIP Credit Agreement**   means the Debtor in Possession Credit Agreement extended by Giant Eagle to the Debtor, as approved by the Bankruptcy Court, and all other documents evidencing the obligations of the Debtor arising thereunder.

**1.27   Disallowed** means, when used with respect to a Claim against or Interest in Seegrid, a Claim or Interest that:  (a) is disallowed in whole or in part (but solely to the extent of such disallowance) by an order of the Bankruptcy Court or other court of competent jurisdiction; or (b) has been withdrawn, in whole or in part, by the holder thereof.

**1.28   Discharge Injunction** means the injunction set forth in Section 11.2 of this Plan.

**1.29   Disputed Claim** means a Claim against Seegrid, or any portion thereof, that is neither Allowed nor Disallowed or is contingent, disputed or unliquidated.

**1.30   Distribution** means any:  (a) Cash; (b) property; or (c) interest in property to be paid or distributed hereunder to the holders of Allowed Claims or Equity Interests.

**1.31   Distribution Record Date** means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Claims, which shall be the Effective Date.

**1.32   Effective Date** means the date that the Confirmation Order has been entered by the Bankruptcy Court and has become a Final Order.

**1.33   Encumbrance** means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

**1.34   Entity** means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.35   Equity Interest** means any right, title and ownership interest in Seegrid.

**1.36   Estate** means the estate created under section 541 of the Bankruptcy Code in the Chapter 11 Case.

**1.37   Executory Contract** means any unexpired lease or executory contract of Seegrid that is subject to treatment under section 365 of the Bankruptcy Code.

**1.38   Final Judgment or Final Order** means a judgment or an order, as the case may be, as to which the time to appeal, petition for certiorari, or move for reargument or

rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, that if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought: (a)(i) such judgment or order shall have been affirmed by the highest court to which such judgment or order was appealed; or (ii) certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; or (b) such appeal, writ of certiorari, or request for reargument or rehearing shall have been dismissed with prejudice by the filing or seeking party.

      **1.39    First Priority Secured June 11 Noteholder Claim** means a Secured Noteholder Claim pursuant to that certain Second Amendment to Note and Warrant Purchase Agreement and funded on June 11, 2014 and secured by a valid and perfected first priority Lien upon the assets of Seegrid.

      **1.40    First Priority Secured Bridge Noteholder Claim** means a Secured Noteholder Claim secured by a valid and perfected first priority Lien upon the assets of Seegrid pursuant to bridge loans funded on or around July 1, 2013, July 9, 2014 and July 23, 2014.

      **1.41    First Priority Secured June 11 Notes** shall mean the promissory notes issued by Seegrid pursuant to that certain Second Amendment to Note and Warrant Purchase Agreement and funded on or around June 11, 2014 and secured by a first priority Lien on Seegrid's assets.

      **1.42    Giant Eagle** means Giant Eagle, Inc., a Pennsylvania corporation.

      **1.43    Impaired** means, when used with respect to a Claim or an Equity Interest, a Claim or Equity Interest as to which the Plan: (a) alters the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) does not cure any such default that occurred before or after the Commencement Date, (ii) does not reinstate the maturity of such claim or interest as such maturity existed before such default; (iii) does not compensate the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), does not compensate the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; or (v) otherwise alters the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

      **1.44    Interest** means an Equity Interest in Seegrid.

      **1.45    Investor** means any of Seegrid's direct and indirect stockholders and convertible debt holders electing to purchase Seegrid Sub Series A Shares.

**1.46    Lien** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.47    Non-Tax Priority Claim** means a Priority Claim other than an Administrative Expense Claim or a Priority Tax Claim.

**1.48    Noteholder Claim** means a claim against Seegrid evidenced by a promissory note issued by Seegrid.

**1.49    Noteholder General Unsecured Claim** means a Noteholder Claim that is not secured by a Lien.

**1.50    Other General Unsecured Claim** means a Claim against Seegrid that is not a Secured Noteholder Claim, an Administrative Expense Claim, a Priority Tax Claim, a Non-Tax Priority Claim or a Noteholder General Unsecured Claim.

**1.51    Plan** means this plan of reorganization of Seegrid under chapter 11 of the Bankruptcy Code, including any supplements, schedules and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

**1.52    Plan Supplement** means the plan supplement filed by the Debtor at least five business days prior to the date set by the Bankruptcy Court for objections to the Plan.

**1.53    Priority Claim** means a Claim entitled to a priority pursuant to Section 507 of the Bankruptcy Code.

**1.54    Priority Tax Claim** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.55    Professional** means any person retained or to be compensated pursuant to section 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code.

**1.56    Proof of Claim** means any proof of claim or interest filed with the Bankruptcy Court or the Balloting Agent pursuant to Bankruptcy Code section 501 and Rule 3001 or 3002 of the Bankruptcy Rules that asserts a Claim against or Equity Interest in Seegrid.

**1.57    Rejection Claim** means any Claim for damages under section 502(g) of the Bankruptcy Code resulting from the rejection of an executory contract or unexpired lease by Seegrid or Reorganized Seegrid.

**1.58    Reorganized Seegrid** means Seegrid, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**1.59    Representative** means, with respect to any specified Entity, any current or former officer, director, employee, agent, attorney, accountant, financial advisor, expert, consultant, other representative or any person who controls any of these.

**1.60    Schedules** means the schedules of assets and liabilities and the statements of financial affairs of Seegrid as filed with the Bankruptcy Court by Seegrid after commencement of the Chapter 11 Case in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

**1.61    Second Priority Secured Noteholder Claim** means a Noteholder Claim secured by a valid and perfected second priority Lien on the assets of Seegrid.

**1.62    Second Priority Secured Notes** shall mean the promissory notes issued by Seegrid secured by a second priority Lien on Seegrid's assets.

**1.63    Secured Claim** means a Claim that is:  (a) secured by a valid, duly perfected, non-avoidable security interest in the interest of Seegrid in property, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such claimholder's interest in Seegrid's interest in such property, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed in writing by Seegrid and the claimholder; or (b) secured by the amount of any valid, non-avoidable rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.64    Secured Noteholder Claim** means a Noteholder Claim secured by a Lien on the asset of Seegrid.

**1.65    Seegrid Sub** means a newly formed entity organized by Seegrid as described in Article IX of the Plan, or any successor thereto by merger, consolidation, or otherwise.

**1.66    Seegrid Sub Common Stock** means the shares of common stock of Seegrid Sub to be issued on the Effective Date as described in Article IX of the Plan.

**1.67    Seegrid Sub Series A Preferred Shares** means the Series A Preferred Shares to be issued by Seegrid Sub on the Effective Date as described in Article IX of the Plan.

**1.68    Series A Preferred Share Interests** means the Series A Preferred Shares of Seegrid.

**1.69    Series A-1 Preferred Share Interests** means the Series A-1 Preferred Shares of Seegrid.

**1.70    Series B Preferred Share Interests** means the Series B Preferred Shares of Seegrid.

**1.71    Series C Preferred Share Interests** means the Series C Preferred Shares of Seegrid.

**1.72    Series C-1 Preferred Share Interests** means the Series C-1 Preferred Shares of Seegrid.

      **1.73**    **Shareholder** means an owner of an equity interest in an Entity.

      **1.74**    **Third Priority Secured Bridge Noteholder Claim** means a Noteholder Claim secured by a valid and perfected third priority Lien on the assets of Seegrid.

      **1.75**    **Third Priority Secured Bridge Notes** shall mean the promissory notes issued by Seegrid secured by a third priority Lien on Seegrid's assets.

      **1.76**    **Unimpaired** means a Claim or Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is not Impaired under the Plan.

      **1.77**    **United States Trustee** means the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the District of Delaware.

      **1.78**    **United States Trustee Fees** means the fees payable to the United States Trustee in accordance with 28 U.S.C. § 1930.

      **1.79**    **Unsecured Note** shall mean a promissory note issued by Seegrid which is not secured by a Lien.

## ARTICLE II
## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

      **2.1**    **Allowed Administrative Expense Claims.** Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise provided for in the Plan, in full satisfaction, settlement and discharge of and in exchange for such Claims, Seegrid or Reorganized Seegrid shall pay each Allowed Administrative Expense Claim in full and in Cash on, or as soon thereafter as is reasonably practicable, the latest of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; and (c) the date the Allowed Administrative Expense Claim becomes due and payable according to its terms; provided, however, that the Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in Possession in the ordinary course of business or liabilities under loans or advances to or other obligations incurred by the Debtor in Possession may be paid by Seegrid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

      Reorganized Seegrid, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. Seegrid or Reorganized Seegrid shall have the right to object to any Administrative Expense Claim by the later of: (a) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court; and (b) 30 days after the date such Administrative Expense Claim is filed. Unless Seegrid or Reorganized Seegrid objects to an Administrative Expense Claim, such Claim shall be deemed allowed in the amount requested. In the event that Seegrid or Reorganized Seegrid timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court

shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

        **2.2    Allowed Administrative Expense Claims of Professionals**. All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code shall file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred.  The Allowed Claims of Professionals shall be paid from Cash of the Debtor or Reorganized Seegrid, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; or (ii) upon such other terms as may be mutually agreed upon by such holder and Reorganized Seegrid.

        **2.3    Priority Tax Claims**. Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by Seegrid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized Seegrid: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of:  (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; and (ii) over a period ending not later than five (5) years after the Effective Date.

        **2.4    Non-Tax Priority Claims**. Non-Tax Priority Claims shall be paid in full on the Effective Date.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

        Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in Seegrid.

        **3.1    Classification**. The categories of Claims and Equity Interests listed below, other than Administrative Expense Claims and Priority Claim, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class No. | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | | |
| Class 1-A | First Priority Secured June 11 Noteholder Claims | Impaired | Yes |
| Class 1-B | First Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 1-C | Second Priority Secured Noteholder Claims | Impaired | Yes |
| Class 1-D | Third Priority Secured Bridge Noteholder Claims | Impaired | Yes |
| Class 2 | Unsecured Claims | | |
| Class 2-A | Noteholder General Unsecured Claims | Impaired | Yes |
| Class 2-B | Other General Unsecured Claims | Impaired | Yes |
| Class 3 | Preferred Share Interests | | |
| Class 3-A | Series A Preferred Share Interests | Unimpaired | No |
| Class 3-B | Series A-1 Preferred Share Interests | Unimpaired | No |
| Class 3-C | Series B Preferred Share Interests | Unimpaired | No |
| Class 3-D | Series C Preferred Share Interests | Unimpaired | No |
| Class 3-E | Series C-1 Preferred Share Interests | Unimpaired | No |
| Class 4 | Common Stock Interests | Unimpaired | No |

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 4.1     Class 1-A – First Priority Secured June 11 Noteholder Claims.

(a)    Classification.  Class 1-A consists of all Allowed First Priority June 11 Secured Noteholder Claims.

(b)    Treatment.  The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the First Priority Secured June 11 Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed First Priority Secured June 11 Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed First Priority Secured June 11 Noteholder Claims shall receive a first priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

(c)    Impairment and Voting.    Class 1-A First Priority Secured June 11 Noteholder Claims are Impaired by the Plan. Each holder of a First Priority Secured June 11 Noteholder Claim is entitled to vote to accept or reject the Plan.

**4.2    Class 1-B – First Priority Secured Bridge Noteholder Claims.**

(a)    Classification.    Class 1-B consists of all Allowed First Priority Secured Bridge Noteholder Claims.

(b)    Treatment.    On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares as provided in Article 9.2.

(c)    Impairment and Voting.    Class 1-B First Priority Secured Bridge Noteholder Claims are Impaired by the Plan. Each holder of a First Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

**4.3    Class 1-C – Second Priority Secured Noteholder Claims.**

(a)    Classification.    Class 1-C consists of all Allowed Second Priority Secured Noteholder Claims.

(b)    Treatment.    The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder, except that (i) the maturity date for the Second Priority Secured Notes shall be extended to the fifth anniversary of the Effective Date and (ii) the Liens securing such Allowed Second Priority Secured Noteholder Claims shall be released on the Effective Date, and the holders of such Allowed Second Priority Secured Noteholder Claims shall receive a second priority replacement Lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

(c)    Impairment and Voting.    Class 1-C Second Priority Secured Noteholder Claims are Impaired by the Plan. Each holder of an Allowed Second Security Secured Noteholder Claim is entitled to vote to accept or reject the Plan.

**4.4    Class 1-D – Third Priority Secured Bridge Noteholder Claims.**

(a)    Classification.    Class 1-D consists of all Allowed Third Priority Secured Bridge Noteholder Claims.

(b)    Treatment.    On the Effective Date, the Allowed Claims in this Class will be converted into Seegrid Sub Series A Preferred Shares as provided in Article 9.2.

(c)    Impairment and Voting.    Class 1-C Third Priority Secured Bridge Noteholder Claims are Impaired by the Plan. Each holder of an Allowed Third Priority Secured Bridge Noteholder Claim is entitled to vote to accept or reject the Plan.

4.5       **Class 2-A – Noteholder General Unsecured Claims**.

(a)    Classification.  Class 2-A shall consist of Allowed Noteholder General Unsecured Claims.

(b)    Treatment.  The holder of an Allowed Claim in this Class shall retain all legal, equitable, and contractual rights to which such Claim entitles such holder except that the maturity date of the Unsecured Notes held by holders shall be extended to the fifth anniversary of the Effective Date.

(c)    Impairment and Voting.  Class 2-A Noteholder General Unsecured Claims are Impaired by the Plan.  Each holder of an Allowed Noteholder General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.6       **Class 2-B – Other General Unsecured Claims**.

(a)    Classification.   Class 2-B consists of all Allowed Other General Unsecured Claims.

(b)    Treatment.  Each holder of an Allowed Other General Unsecured Claim shall receive a Cash Distribution on the Effective Date equal to 50% of its Allowed Other General Unsecured Claim and a non-interest bearing promissory note issued by the Seegrid Sub in the principal amount of the remaining balance of its Allowed Other General Unsecured Claim, which shall be the automatic treatment for such holder if the holder does not elect the alternative treatment below.  The promissory note shall be payable on the first anniversary of the Effective Date.  In lieu thereof, each holder of Other General Unsecured Claims may elect to receive 75% of such Allowed Other General Unsecured Claim on the Effective Date.

(c)    Impairment and Voting.  Class 2-B Other General Unsecured Claims are Impaired by the Plan.  Each holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.7       **Class 3-A – Series A Preferred Share Interests**.

(a)    Classification.  Class 3-A consists of all Series A Preferred Share Interests of Seegrid.

(b)    Treatment.  The holders of Class 3-A Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)    Impairment and Voting.  Class 3-A is Unimpaired under the Plan.  Each holder of Class 3-A Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

4.8       **Class 3-B – Series A-1 Preferred Share Interests**.

(a)    Classification.   Class 3-B consists of all Series A-1 Preferred Share Interests of Seegrid.

(b)  <u>Treatment</u>.  The holders of Class 3-B Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)  <u>Impairment and Voting</u>.  Class 3-B is Unimpaired under the Plan.  Each holder of Class 3-B Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.9    Class 3-C – Series B Preferred Share Interests.

(a)  <u>Classification</u>.  Class 3-C consists of all Series B Preferred Share Interests of Seegrid.

(b)  <u>Treatment</u>.  The holders of Class 3-C Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)  <u>Impairment and Voting</u>.  Class 3-C is Unimpaired under the Plan.  Each holder of Class 3-C Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.10    Class 3-D – Series C Preferred Share Interests.

(a)  <u>Classification</u>.  Class 3-D consists of all Series C Preferred Share Interests of Seegrid.

(b)  <u>Treatment</u>.  The holders of Class 3-D Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)  <u>Impairment and Voting</u>.  Class 3-D is Unimpaired under the Plan.  Each holder of Class 3-D Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.11    Class 3-E – Series C-1 Preferred Share Interests.

(a)  <u>Classification</u>.   Class 3-E consists of all Series C-1 Preferred Share Interests of Seegrid.

(b)  <u>Treatment</u>.  The holders of Class 3-E Preferred Share Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c)  <u>Impairment and Voting</u>.  Class 3-E is Unimpaired under the Plan.  Each holder of Class 3-E Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### 4.12    Class 4 – Common Stock Interests.

(a)  <u>Classification</u>.  Class 4 consists of all Common Stock Interests of Seegrid.

(b)  <u>Treatment</u>.  The holders of Class 4 Common Stock Interests shall retain all legal, equitable and contractual rights to which holders of such Allowed Interests are entitled.

(c) <u>Impairment and Voting</u>. Class 4 is Unimpaired under the Plan. Each holder of Class 4 Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

**5.1    Classes Entitled to Vote**. Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B are Impaired and are entitled to vote to accept or reject the Plan. Holders of Claims and Equity Interests in all other Classes are Unimpaired and, as such, are deemed to have accepted the Plan and are not entitled to vote.

**5.2    Class Acceptance Requirement**. Acceptance of the Plan by any Impaired Class of Claims or Equity Interests shall be determined in accordance with section 1126 of the Bankruptcy Code.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS

**6.1    Distributions**. Reorganized Seegrid or Seegrid Sub shall make all Distributions required to be made under the Plan as provided under this Article VI.

**6.2    Date of Distributions**. Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Claims or Equity Interests shall be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**6.3    Postpetition Interest on Claims**. Unless expressly provided for in the Plan, the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or unless required by applicable bankruptcy law (including the fair and equitable rule), interest shall not accrue on or after the Commencement Date on account of any Claim, except with respect to interest on account of Class 1-A, 1-B, 1-C and 1-D Claims which interest shall continue to accrue during the Chapter 11 Case.

**6.4    Means of Cash Payment**. At the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

**6.5    Delivery of Distributions**. Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Equity Interest shall be made at the address of such holder as set forth on the Schedules filed, as may be required, with the Bankruptcy Court, or on the books and records of Seegrid or its agents, or in a letter of transmittal, unless Seegrid has been notified in writing of a change of address.

If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder shall be made unless and until Reorganized Seegrid or Seegrid Sub is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder without interest. A Cash Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in Reorganized Seegrid, and the Claim of any holder to such Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require Seegrid, Reorganized Seegrid, or Seegrid Sub to attempt to locate any holder of an Allowed Claim.

**6.6    Time Bar to Cash Payments**. Checks issued by Reorganized Seegrid or Seegrid Sub in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to Reorganized Seegrid or Seegrid Sub by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such check. After expiration of the thirty (30) day period, all funds held on account of such void check shall, in the discretion of Reorganized Seegrid or Seegrid Sub, be used to satisfy the costs of administering and fully consummating the Plan or become property of Reorganized Seegrid or Seegrid Sub, and the Claim of any holder to such Distributions shall be discharged and forever barred.

**6.7    Record Date for Holders of Claims**. Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**6.8    Distributions after Effective Date**. Distributions made after the Effective Date shall be deemed to have been made on the Effective Date. No interest shall accrue or be payable on such Distributions.

**6.9    Fractional Cents**. Notwithstanding any other provision in the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half a penny or less being rounded down.

**6.10    Setoff**. Seegrid or Reorganized Seegrid may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed Amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that Seegrid or Reorganized Seegrid may have against the holder of such Claim, and the failure to do so shall not constitute a waiver or release by Seegrid or Reorganized Seegrid of any such Claim that Seegrid or Reorganized Seegrid may have against the holder of such Claim.

**6.11    No Distributions Pending Allowance.**  Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim or unless and until all objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim or, some portion thereof, has become an Allowed Claim.

**ARTICLE VII**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**7.1    General Treatment.**  Seegrid shall assume, as of the Effective Date, all Executory Contracts to which Seegrid is a party and shall assign such Executory Contracts to Seegrid Sub, except for:  (a) the Executory Contracts specifically listed in certain Schedules to the Plan Supplement, which shall either be rejected or assumed and assigned, respectively, as described therein; and (b) the Executory Contracts specifically addressed herein or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date.  Seegrid may, at any time on or before the Effective Date and with the written consent of Giant Eagle, amend the Schedules to the Plan Supplement to delete therefrom, or add thereto, any Executory Contract. Seegrid shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby. The fact that any contract or lease is listed in the Schedules to the Plan Supplement shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that Seegrid or any successor in interest to Seegrid (including Reorganized Seegrid) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such: (a) rejections; (b) assumptions; or (c) assumptions and assignments, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**7.2    Cure of Defaults.**  Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Article 7.1 above, Reorganized Seegrid shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract. The non-Debtor party or parties to each such Executory Contract shall have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract. Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, Seegrid shall:  (a) resolve such objection, which resolution shall not require approval of the Bankruptcy Court; (b) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract; or (c) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties.

**7.3    Bar to Rejection Damages.**  In the event that the rejection of an Executory Contract by Seegrid pursuant to the Plan results in damages to the non-Debtor party or parties to such Executory Contract, a claim for such damages shall be forever barred and shall not be enforceable against Seegrid, Reorganized Seegrid, or their respective properties or

16

interests in property, unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for Seegrid on or before (a) if such Executory Contract is rejected pursuant to Articles 7.1 and 7.2 above, the later of: (i) thirty (30) days after entry of the Confirmation Order; and (ii) thirty (30) days after the non-Debtor party receives notice of the rejection of such Executory Contract pursuant to Article 7.2 above; and (b) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by Seegrid to reject that Executory Contract, thirty (30) days after entry of such order.

## ARTICLE VIII
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

**8.1    Disputed Claims.** All Disputed Claims against Seegrid shall be subject to the provisions of this Article VIII.

**8.2    Objection to Claims.** Seegrid or Reorganized Seegrid, as the case may be, shall be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court, on or before the first (1st) anniversary of the Effective Date or, if such Claim is brought after the Effective Date but prior to the closing of this Chapter 11 Case, ninety (90) days after such Claim is brought (in each case unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

**8.3    Payments and Distributions with Respect to Disputed Claims.** Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided for herein shall be made on account of such Claim, unless and until such Claim becomes an Allowed Claim.

**8.4    Estimation of Claims.** Seegrid or Reorganized Seegrid, as the case may be, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether Seegrid previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**8.5    Preservation of Rights to Settle Claims.** In accordance with section 1123(b) of the Bankruptcy Code, Seegrid and Reorganized Seegrid shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that Seegrid or its Estate may hold against any Entity, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019.

# ARTICLE IX
# MEANS FOR IMPLEMENTATION OF THE PLAN

**9.1     Generally**. On the Confirmation Date, Seegrid shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement the provisions of the Plan, including, without limitation, the creation of Seegrid Sub.

**9.2     Seegrid Sub.**

(a)     Formation. On or prior to the Effective Date, Seegrid shall form ("Seegrid Sub") a wholly-owned Delaware "C" corporation subsidiary to which it shall convey:  (i) all of its operating assets, including without limitation, its intellectual property and the name "Seegrid"; (ii) its post Commencement Date operating liabilities; and (iii) its employees.  In exchange for its contribution to Seegrid Sub, Seegrid shall receive 11.25 million shares of Seegrid Sub Common Stock.

(b)     Giant Eagle. On the Effective Date, all indebtedness of Seegrid to Giant Eagle for borrowed money arising after June 11, 2014, including Giant Eagle's First and Third Priority Secured Bridge Noteholder Claims and any indebtedness under the DIP Credit Agreement, shall be converted dollar for dollar into Series A Preferred Shares of Seegrid Sub. Such Series A Preferred Shares shall have the right and preferences reflected on Exhibit A hereto. To the extent that the debt converted hereunder is less than $10 million, for a period of one year after the Effective Date Giant Eagle shall have the right to purchase such additional Series A Preferred Shares in Seegrid Sub to enable it to have a total of $10 million in Series A Preferred Shares of Seegrid Sub. To the extent that Seegrid Sub meets its projections during the Chapter 11 Case, Giant Eagle has agreed to purchase such additional Series A Preferred Shares in Seegrid Sub as causes Giant Eagle to reach $10 million of such Shares pursuant to the Plan Support Agreement attached hereto as Exhibit B.

(c)     Management and Employees. Seegrid Sub shall reserve for issuance to management and employees of Seegrid Sub 3,750,000 shares of Seegrid Sub Common Stock to be issued in accordance with a plan adopted by the Board of Directors of Seegrid Sub.

(d)     Other Investors. Additional Series A Shares in Seegrid Sub beyond the $10 million of Seegrid Sub Series A Shares available to Giant Eagle will be offered to Seegrid's other direct and indirect stockholders and convertible debt holders.

(e)     Ownership of Seegrid Sub. Assuming Giant Eagle purchases all $10 million shares of Series A Preferred Shares of Seegrid Sub available to it and no other direct or indirect stockholders or convertible debt holders exercise their right to purchase Seegrid Sub Series A Preferred Shares, the economic interests in Seegrid Sub would be: 40% - Giant Eagle in the form of Seegrid Sub Series A Preferred Shares; 45% - Reorganized Seegrid in the form of Seegrid Sub Common Stock; and 15% - management and employees of Seegrid Sub in the form of Seegrid Sub Common Stock.

(f)     Warrant. Giant Eagle and each Investor who purchases Seegrid Sub Series A Preferred Shares shall receive a warrant to purchase additional Seegrid Sub Series A

Preferred Shares at $1.00 per share in an amount equal to the amount invested in or converted into Seegrid Sub Series A Preferred Shares. Such warrant shall be exercisable up to and including the second anniversary of the Effective Date of the Plan.

**9.3    Amendment of Certificate**. Seegrid shall amend its Certificate of Incorporation to prohibit the issuance of non-voting equity securities.

**9.4    Effectuating Documents; Further Transactions**. Any officer, or director of Seegrid, Reorganized Seegrid, or Seegrid Sub, as the case may be, shall be, and hereby is, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary of Seegrid is hereby authorized to certify or attest to any of the foregoing, if necessary.

## ARTICLE X
## EFFECT OF CONFIRMATION

**10.1    Vesting of Seegrid Assets**. Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, the property of the Estate of Seegrid shall vest in Seegrid and Seegrid Sub, as the case may be, on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity except as provided herein. From and after the Effective Date, Reorganized Seegrid and Seegrid Sub may each operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Without limiting the generality of the foregoing, Reorganized Seegrid may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized Seegrid incurs after the Effective Date.

**10.2    Terms of Injunction and Automatic Stay**. All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, shall remain in full force and effect until the injunctions set forth in the Plan become effective, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, Reorganized Seegrid may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. All actions of the type or nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

**10.3    No Liability for Seegrid Claims**. Neither Seegrid, Reorganized Seegrid, nor Seegrid Sub, does, or shall be deemed to, assume, agree to perform, pay, or

indemnify creditors for any liabilities or obligations of Seegrid relating to or arising out of the operations of, or assets of, Seegrid whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date, except that Reorganized Seegrid and the Seegrid Sub shall assume their respective obligations specified in the Plan and Confirmation Order.

## ARTICLE XI
## DISCHARGES, RELEASES AND INJUNCTIONS

**11.1    Discharge.** Except as specifically provided in Article IV or XI of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge Seegrid and Reorganized Seegrid from any and all Claims of any nature whatsoever, including, without limitation, all Claims, demands, and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not:  (a) a Proof of Claim based on such Claim or demand was filed under section 501 of the Bankruptcy Code, or such Claim was listed on any Schedules of Seegrid; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided for in Article IV of the Plan, as of the Effective Date the rights provided in the Plan shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims against Seegrid or Reorganized Seegrid or any of their respective assets and properties.

**11.2    Discharge Injunction.** *Except as specifically provided in Article IV or XI of the Plan, all persons or Entities who have held, hold or may hold Claims are permanently enjoined, from and after the Effective Date, from:  (a) commencing or continuing in any manner any action or other proceeding of any kind against Reorganized Seegrid with respect to such Claim; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against Reorganized Seegrid or Seegrid Sub with respect to such Claim; (c) creating, perfecting, or enforcing any Encumbrance of any kind against Reorganized Seegrid or against the property or interests in property of Reorganized Seegrid with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized Seegrid or against the property or interests in property of Reorganized Seegrid with respect to such Claim; and (e) pursuing any Claim released pursuant to this Article XI of the Plan.*

**11.3    Exculpation.** Neither Seegrid nor Giant Eagle or their respective representatives or shareholders shall have or incur any liability to any holder of a Claim or Equity Interest, for any act or omission in connection with, related to, or arising out of:  (a) the Chapter 11 Case; (b) pursuit of confirmation of the Plan; (c) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan; (d) the Plan; (e) the negotiation, formulation and preparation of the Plan and related documents; or (f) any of the terms and/or settlements and compromises reflected in the Plan and related documents; except for willful misconduct or gross negligence as determined by a Final Order.

**11.4    Indemnification and Reimbursement Obligations.** For purposes of the Plan, the obligations of Seegrid to indemnify and reimburse persons who are or were directors, officers, or employees of Seegrid on the Commencement Date or at any time thereafter

against and for any obligations as provided in Seegrid's certificate of incorporation, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.

        **11.5   Release of Avoidance Actions**.    Seegrid hereby releases all Avoidance Actions.

**ARTICLE XII**
**CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

        **12.1   Conditions Precedent to Confirmation of the Plan**. The following are conditions precedent to confirmation of the Plan that must be satisfied, unless waived in accordance with Article 12.3 below:

        (a)    At least two-thirds (2/3) in amount and fifty-percent (50%) in number of those holders of Class 2-B Other General Unsecured Claims actually voting on the Plan shall have voted to accept/vote in favor of the Plan.

        (b)    The Confirmation Order shall, among other things:

        (i)    order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

        (ii)    provide that, except with respect to obligations specifically preserved in the Plan, Seegrid is discharged effective on the Effective Date (in accordance with the Plan) from any Claims, and Seegrid's liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of Seegrid entered into or obligation of Seegrid incurred before the Effective Date, or from any conduct of Seegrid prior to the Effective Date, or whether such interest accrued before or after the Commencement Date, is extinguished completely;

        (iii)    provide for the Discharge Injunction set forth in Article 11.2 of the Plan;

        (iv)    provide that the transfer by Seegrid of its assets to Seegrid Sub is free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity;

        (v)    authorize the implementation of the Plan in accordance with its terms and provide that, on the Effective Date, all of the transactions listed in Article IX shall occur, as set forth therein;

21

(vi)    provide that any transfers effected or entered into, or to be effected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(vii)    approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan; and

(viii)    provide that all Executory Contracts assumed or assumed and assigned by Seegrid during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of Reorganized Seegrid, Seegrid Sub, or the assignee thereof notwithstanding any provision in such contract or lease (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

**12.2    Effective Date of the Plan**. The Plan shall become effective on the Effective Date.

**12.3    Waiver of Conditions Precedent to the Confirmation Order**. To the fullest extent permitted by law, any of the conditions precedent set forth in Article 12.1 above may be waived or modified, in whole or in part, by Seegrid, after consultation with and consent of Giant Eagle. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court, and without any other formal action.

**12.4    Effect of Failure of the Effective Date of the Plan**. In the event that Seegrid determines it is appropriate, after consultation with Giant Eagle prior to the Effective Date, upon notification submitted by Seegrid to the Bankruptcy Court: (A) the Confirmation Order shall be vacated; (B) no Distributions under the Plan shall be made; and (C) Seegrid and all holders of Claims against and Equity Interests in Seegrid shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred. If the Confirmation Order is vacated pursuant to this Article 12.4, nothing contained in the Plan shall: (A) constitute or be deemed a waiver or release of any Claims or Equity Interests by, against, or in Seegrid or any other Entity; or (B) prejudice in any manner the rights of Seegrid or any other Entity in the Chapter 11 Case or any other or further proceedings involving Seegrid.

## ARTICLE XIII
## JURISDICTION OF BANKRUPTCY COURT

**13.1    Retention of Jurisdiction**. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court or the United States District Court for the District of Delaware, as applicable, shall, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

(a)      hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims or Equity Interests that have been or properly should have been brought in the Bankruptcy Court;

(b)      hear and determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan or otherwise to recover assets for the benefit of the Estate;

(c)      hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, or any injunctions issued pursuant thereto;

(d)      enter such orders as are necessary to implement and enforce the injunctions described herein;

(e)      hear and determine any and all applications pursuant to section 330 or 503 of the Bankruptcy Code for allowance of any compensation for Professional services rendered and reimbursement of expenses incurred in connection therewith any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(f)      hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts to which Seegrid is a party, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(g)      hear and determine any and all applications, Claims, causes of action, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or commenced by Reorganized Seegrid or any other party in interest subsequent to the Effective Date;

(h)      consider any technical modifications of the Plan, and remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

(i)      issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code, including but not limited to compelling the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(j)      hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against Seegrid that has been or properly should have been brought in the Bankruptcy Court;

(k)      hear and determine any timely objections to Administrative Expense Claims or Administrative Expense Claims of Professionals asserted, or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to determine whether any Disputed Claim shall be Allowed or Disallowed, in whole or in part;

(l)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)    hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(n)    hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's obligations hereunder, including, but not limited to, performance of Seegrid's duties under the Plan;

(o)    enforce remedies upon any default under the Plan;

(p)    hear and determine any other matter not inconsistent with the Bankruptcy Code;

(q)    hear and determine any claim that in any way challenges or is related to any provision in the Confirmation Order; and

(r)    enter a final decree closing the Chapter 11 Case.

**13.2    Modification of Plan.** Except as limited by prior orders of the Bankruptcy Court, Seegrid, with the consent of Giant Eagle, may alter, amend, or modify the Plan or any Schedules or Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended Schedules or Exhibits in the Plan or the Plan Supplement, provided, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and Seegrid shall have complied with section 1125 of the Bankruptcy Code, to the extent necessary. Further, Seegrid, with the consent of Giant Eagle, may alter, amend, or modify the Plan or any Schedules or Exhibits thereto at any time after entry of the Confirmation Order and before the Plan's substantial consummation; provided, that: (a) the Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such holder changes its previous acceptance or rejection.

**13.3    Compromises of Controversies.** From and after the Effective Date, Reorganized Seegrid shall be authorized to compromise controversies on such terms as Reorganized Seegrid may determine, in its sole discretion, to be appropriate.

**13.4    Revocation or Withdrawal of the Plan.** Seegrid, with the consent of Giant Eagle, reserves the right to revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Seegrid revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be null and void in all respects; any settlement or compromise

24

embodied in the Plan including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests, any assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall: (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, Seegrid or any other Entity; (b) prejudice in any manner the rights of Seegrid or any Entity in any further proceedings involving Seegrid; or (c) constitute an admission of any sort by Seegrid or any other Entity.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**14.1    Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or a schedule or exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

**14.2    Notices.** To be effective, all notices, requests and demands to or upon Seegrid shall be deemed to have been duly given or made when actually delivered and addressed as follows:

If to Seegrid:

> Mr. David Heilman
> President
> c/o Seegrid Corporation
> 216 Parkwest Drive
> Pittsburgh, PA  15275
> email: dheilman@seegrid.com

with a copy (which alone will not constitute notice) to:

> James Newell, Esq.
> Zakarij Thomas, Esq.
> BUCHANAN INGERSOLL & ROONEY
> One Oxford Centre
> 310 Grant Street, 20th Floor
> Pittsburgh, PA 15219
> email:  james.newell@bipc.com
>             zakarij.thomas@bipc.com

**14.3    Plan Supplement.** Any and all Exhibits, lists, or Schedules referred to herein or in the Disclosure Statement but not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least five (5) Business Days

prior to the deadline established by the Bankruptcy Court for the filing and service of objections to the Plan. Thereafter, the Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours. Claimants also may obtain a copy of the Plan Supplement, once filed, from Seegrid by written request to counsel for the Debtor.

**14.4    Inconsistencies**. To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling. To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**14.5    Reservation of Rights**. If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concession or settlement. Moreover, if the Plan does not become effective no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

**14.6    Tax Reporting and Compliance**. In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, Seegrid, and Reorganized Seegrid, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. No holder of an Allowed Claim against Seegrid shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under the Plan. Reorganized Seegrid is hereby authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of Seegrid ending after the Commencement Date through, and including, the Effective Date of the Plan.

**14.7    Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in such section 1146(a).

**14.8    Binding Effect**. The rights, benefits and obligations of any Entity named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for Seegrid under chapters 7 or 11 of the Bankruptcy Code). The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

**14.9    Further Authorizations.** Seegrid and Reorganized Seegrid, as applicable, and, after the Effective Date, may seek such orders, judgments, injunctions, and rulings as each deems necessary to carry out the intentions and purposes of, and to give full effect to the provisions of, the Plan.

**14.10    Payment of Statutory Fees.** All fees and United States Trustee Fees, due and owing under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, as pro-rated to the Effective Date, shall be paid on or before the Effective Date. After the Effective Date but before the closing of the Chapter 11 Case, such fees shall be pro-rated to the closing of the Chapter 11 Case. The United States Trustee Fees shall be paid from Seegrid or Reorganized Seegrid's general funds.

**14.11    Prepayment.** Except as otherwise provided in the Plan or the Confirmation Order, Reorganized Seegrid shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; provided, that any such prepayment shall not violate or otherwise prejudice the relative priorities and parities among the Classes of Claims.

**14.12    Effective Date Actions Simultaneous.** Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. Actions required to be taken after the Effective Date or as soon as thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date.

**14.13    General Statements.** Statements of a general nature set forth in this Plan shall not be construed to limit or restrict the specific provisions herein.

**14.14    Preservation of Causes of Action.** In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement. Unless any Causes of Action are expressly waived, relinquished, compromised or released in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtor will reserve all Causes of Action, including unknown Causes of Action, for later adjudication. All Causes of Action of the Debtor against any party shall vest in the Reorganized Debtor on the Effective Date. The Reorganized Debtor will have the exclusive right to determine and to initiate, file, prosecute, enforce, withdraw, settle, release, compromise or litigate to judgment any such Causes of Action.

**14.15    Severability of Plan Provisions.** If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by

such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*[Remainder of Page Intentionally Left Blank.]*

## ARTICLE XV
## CRAMDOWN

**15.1 Cramdown.** Seegrid may request confirmation of the Plan under section 1129(b) of the Bankruptcy Code if any impaired Class does not accept this Plan pursuant to section 1126 of the Bankruptcy Code.  Further, Seegrid reserves the right to alter the treatment of any Class in order to effectuate a cramdown under Section 1129(b) of the Bankruptcy Code.

**IN WITNESS WHEREOF,** the undersigned has duly executed the Plan as of the date first above written.

Respectfully submitted,

Dated:  October 3, 2014

**Seegrid Corporation**

By: /s/ _____
   Name:  David R. Heilman
   Title:   President

EXHIBIT A TO
SEEGRID PLAN OF REORGANIZATION

**SEEGRID SUB SERIES A PREFERRED SHARES**

## ANNEX A

## Summary of the Series A Convertible Preferred Stock Rights and Preferences
of
## New Seegrid Corporation

### October 2, 2014

| | |
|---|---|
| *Company:* | [New Seegrid Corporation], a to-be-formed Delaware corporation (the "<u>Company</u>"). It is anticipated that New Seegrid Corporation will be renamed "Seegrid Corporation" following consummation of the Plan. |
| *Price Per Share:* | $1.00 per share. The price per share represents a Company pre-investment valuation of $15 million, on Fully-Diluted Basis (as defined below). |
| *Type of Security:* | Series A Preferred Stock, par value $0.001 per share ("<u>Series A Preferred</u>"), ranking senior to the common stock, par value $0.001 per share, of the Company ("<u>Common Stock</u>"). |
| *Initial Capitalization of New Seegrid Corporation (Common Stock, Equity Incentive Plan, and Giant Eagle Series A Preferred):* | Upon the consummation of the Plan: |

- 11.25 million shares of Common Stock will be issued to existing Seegrid Corporation (for purposes of this summary, "<u>Seegrid Holdings</u>") representing 45% of the Company's Common Stock outstanding on a "<u>Fully-Diluted Basis</u>" (calculated as all shares of Common Stock outstanding, all shares of Common Stock issuable upon conversion of outstanding Series A Preferred Stock, and all outstanding options and warrants, on an as-exercised basis);

- 3.75 million shares of Common Stock will be reserved for issuance under an equity incentive plan to be adopted by the Company's Board of Directors (the "<u>Equity Incentive Plan</u>") representing 15% of the Company on a Fully-Diluted Basis; and

- 10 million shares of Series A Preferred will be made available to Giant Eagle, Inc. ("<u>GE</u>") representing 40% of the Company on a Fully-Diluted Basis when fully subscribed.

| | |
|---|---|
| *Additional Shares of Series A Preferred; Warrants* | Additional shares of Series A Preferred Stock beyond the $10 million of Series A Preferred Stock made available to GE will be offered to Seegrid Holdings' other direct and indirect stockholders and debt holders ("<u>Investors</u>") in an amount that allows the Investors to maintain their direct and indirect pro rata share of the Company on a Fully-Diluted Basis or such larger amount as the Board of Seegrid Holdings may determine. Any issuance of such additional shares of Series A Preferred Stock will dilute proportionally the percentage of capital stock held by Seegrid Holdings and GE and reserved for issuance under the Equity Incentive Plan. |

GE and each Investor will receive a warrant to purchase additional shares of Series A Preferred Stock at an exercise price of $1.00 per share in an amount equal to the amount invested by GE or such Investor in Series A Preferred Stock. Such warrant shall be

exercisable up to and including the second anniversary of the consummation of the Plan. Any exercise of such warrants will dilute proportionally the percentage of capital stock held by Seegrid Holdings, GE and the Investors and reserved for issuance under the Equity Incentive Plan.

**Certificate of Incorporation:** The Company's Certificate of Incorporation (the "<u>Certificate</u>") will include the following provisions:

**Dividends:** Holders of Series A Preferred Stock will be entitled to receive cumulative dividends at the rate of 8% of the Original Issue Price <u>per annum</u>, payable (a) prior to and in preference to any declaration or payment of dividends to holders of Common Stock, or (b) in the event of a liquidation, dissolution, or winding up of the Company, or a Mandatory Redemption Event (as defined below). In addition, prior to the consummation of a Qualified Public Offering (as defined below), holders of Series A Preferred Stock have a right to participate with the holders of the Common Stock on an as-converted basis as to any such dividends declared or paid to the holders of the Common Stock.

"<u>Qualified Pubic Offering</u>" means an underwritten public offering of shares of Common Stock, by a nationally recognized investment banking firm, where the shares are listed on a nationally recognized securities exchange, at a price per share of at least equal to three times the Original Purchase Price of Series A Preferred Stock, (as adjusted for stock splits, stock dividends, combinations, or recapitalizations) with gross proceeds to the Company of not less than $50 million.

**Liquidation Preference:** Upon any liquidation, dissolution or winding up of the Company, each holder of Series A Preferred Stock will be entitled to receive prior and in preference to, any distribution with respect to the Common Stock, an amount in cash equal to the Original Issue Price (as adjusted for stock splits, stock dividends, combinations, or recapitalizations) <u>plus</u> all accrued and unpaid dividends (the "<u>Liquidation Preference</u>"). After payment of the Liquidation Preference to the holders of Series A Preferred Stock the remaining assets of the Company, if any, will be distributed ratably to the holders of Common Stock.

Unless the holders of a 66⅔% of the Series A Preferred Stock then outstanding, elect otherwise, a merger, consolidation, sale of assets or other transaction in which control of the Company is transferred will be deemed to be a liquidation, dissolution, or winding up for purposes of the Liquidation Preference.

**Voluntary Conversion:** A holder of Series A Preferred Stock will have the right at any time after the date of issuance to convert the holder's Shares into shares of Common Stock (the "<u>Conversion Shares</u>"). Shares of Series A Preferred Stock initially are convertible into shares of Common Stock on a 1:1 basis, and thereafter are convertible at the then applicable conversion price (see **Antidilution Protection**" below). Upon any voluntary conversion, any accrued and unpaid dividends will be canceled.

**Automatic Conversion:** The Series A Preferred Stock will be automatically converted into Common Stock, at the then applicable conversion price (see "**Antidilution Protection**" below), (a) in the event of a Qualified

Public Offering, or (b) in the event that the holders of a majority of the outstanding Series A Preferred Stock consent to such conversion. Upon any automatic conversion, any accrued and unpaid dividends will be canceled.

**Antidilution Protection:**    The conversion price of the Series A Preferred Stock will be subject to adjustment (a) for stock splits, stock dividends, combinations, recapitalizations, or similar events, and (b) on a broad-based weighted average basis to reduce dilution in the event that the Company issues additional equity securities (subject to certain customary exceptions) at a purchase price per share less than the applicable conversion price of Series A Preferred Price immediately prior to such issuance.

**Voting Rights:**    The holders of Series A Preferred Stock will vote together with the holders of Common Stock, and not as a separate class, except with respect to the election of directors and as specifically provided in "**Protective Provisions**" below or as otherwise required by applicable law or the terms of the Series A Preferred Stock and Existing Preferred Stock.

**Protective Provisions Preferred:**    The affirmative vote or consent of the holders of a majority of the outstanding shares of Series A Preferred Stock will be required for any action which: (i) amends the Certificate in a manner requiring a class vote of the Series A Preferred Stock pursuant to Section 242 of the General Corporation Law; (ii) otherwise alters or changes the powers, preferences or special rights of the Series A Preferred Stock so as to affect them adversely (including by amendment to the Company's Bylaws); (iii) increases the authorized number of shares of Series A Preferred Stock; (iv) creates any class or series of stock which is senior to or has preference over the Series A Preferred Stock; (v) effects a merger of the Company with another corporation in which the Company is not the surviving corporation or effects the sale of the Company or substantially all of its assets; (vi) effects a reclassification or recapitalization of the outstanding capital stock of the Company into shares of capital stock senior to or having preference over the Series A Preferred Stock; (vii) effects the repurchase of Series A Preferred Stock on terms not available to all holders of Series A Preferred Stock (viii) effects a transaction with "affiliates" (as such term is defined in Rule 405 of the Securities Act); (ix) effects the payment of cash dividends by the Corporation, (x) increases the number of shares of capital stock available for issuance under the Equity Incentive Plan, creates any other equity or equity-based incentive plan for management, employees, consultants or directors, or otherwise effects the issuance of any equity, instruments convertible to equity, or equity-based incentives to management, employees, consultants or directors other than through the Equity Incentive Plan; (xi) effects the incurrence of debt for borrowed money, other than trade debt in the ordinary course of the Company's business; or (xii) effects the grant of any security interest in the Company's assets.

**Series A Preferred Subscription Agreement:**    Purchasers of Series A Preferred Stock will enter into the Series A Preferred Stock Subscription Agreement, which will include fundamental representations and warranties and closing conditions, but otherwise will reference the Disclosure Statement.

3

**Registration Rights Agreement:**

In connection with the financing, purchasers of Series A Preferred Stock will enter into a Registration Rights Agreement (the "Registration Rights Agreement"), which will include the following provisions:

**Registration Rights:**

Demand Registration Rights: Subject to the conditions described below, the holders of Registrable Securities will be entitled to two demand registrations at any time on or after the earlier of (a) _____ ___, 2019 **[the 5th anniversary of the initial issuance of Series A Preferred Stock]** or (b) 180 days after consummation of the Company's initial public offering pursuant to an effective registration statement ("IPO"). These demand registration rights may only be exercised if one or more holders of Series A Preferred Stock holding more than 66⅔% of the outstanding shares of Series A Preferred Stock on an as-converted basis (including for this purpose any shares of Common Stock issued in connection with the conversion of such shares of Series A Preferred Stock (the "Conversion Shares")) request that the Company file a registration statement under the Securities Act. In the event of a request *after* an IPO, such demand registration must cover at least 40% of the then outstanding Registrable Securities (as defined below) held by the initiating holder(s) and having an aggregate offering price to the public of not less than $3,000,000. After _____ ___, 2019 and *prior* to an IPO, a demand for registration may only be made if (a) the anticipated aggregate price to the public would equal or exceed $20 million, (b) the proposed public offering would be underwritten by a nationally recognized investment banking firm and cover at least a majority of the then outstanding Registrable Securities, and (c) the shares offered would be listed on a nationally recognized securities exchange.

"Registrable Securities" means (a) any Conversion Shares, (b) any shares of Common Stock owned by any holder of Series A Preferred Stock, and (c) any shares of Common Stock subsequently issued to such holders on conversion of other securities, or in a merger, reorganization, as a stock dividend, or similar events.

The Company will use its commercially reasonable efforts to cause such shares to be registered, subject to the right of the Company and its underwriters to reduce the number of shares proposed to be registered pro rata in view of market conditions with preference in such cut-backs to be given to holders of Conversion Shares. The Company has the right to delay such registration under certain circumstances for a reasonable period in any 12 month period. The Company will not be obligated to effect a registration during the 180 day period commencing with the effective date of any registration statement filed in connection with any public offering of Common Stock or if it delivers written notice to the holders of the Registrable Securities, within 30 days of any registration demand, of its intent to file a registration statement with 120 days.

Other Registration Rights. The holders of Registrable Securities will be entitled to (a) unlimited piggyback registrations (as to offerings for the account of the Company or any other party), subject to the right of the Company and its underwriters to reduce the number of shares proposed to be registered in view of market conditions, with preference in such cut-backs being given to the Company and then to holders of Conversion Shares, and (b) unlimited S-3 registrations provided the aggregate price to the public would equal or exceed $1,000,000. The Company will bear registration expenses (exclusive

4

of underwriting discounts and commissions) of all such demand, piggyback, and S-3 registrations. Piggyback registration rights will not apply to an IPO with gross aggregate proceeds to the Company, before deducting underwriting commissions, of more than $25,000,000.

Lock-Up Provision.  Except as otherwise contemplated by the provisions of the Registration Rights Agreement, each holder of Registrable Securities will agree not to sell its shares for a specified period (but not to exceed 180 days) in connection with each registration statement.

**Stockholders' Agreement:**

In connection with the financing, Seegrid Holdings and the purchasers of Series A Preferred Stock will enter into a Stockholders Agreement (the "Stockholders' Agreement"), which will include the following provisions:

1.  Right of First Refusal.  If any stockholder who is party to the Stockholders' Agreement desires to sell, transfer, or hypothecate any or all of its shares to a third party (other than to a Permitted Transferee (as defined in the Stockholders' Agreement)), such holder must first offer such shares to the Company and then to each Major Holder.

"Major Holder" means Seegrid Holdings, for so long as Seegrid Holdings holds shares of Common Stock representing 5% or more of the issued and outstanding shares of Common Stock, and each holder of shares of Series A Preferred Stock (whenever purchased) representing 5% or more of the issued and outstanding shares of Series A Preferred Stock.

2.  Participation Rights.  The Major Holders will have the right to participate in any future sale of equity securities by the Company and will have the right to subscribe for and purchase such securities on a *pro rata* basis, subject to certain customary carve-outs.  Seegrid Holdings will have the right, but not the obligation, to assign the Seegrid Holdings participation right to its stockholders and note holders on such basis as the board of directors of Seegrid Holdings may reasonably determine.

3.  Right of Co-Sale.  Major Holders will have a right to participate *pro rata* (on the basis of outstanding shares of Series A Preferred Stock and Common Stock) in transfers of Common Stock by any holder of Common Stock for value, subject to certain customary carve-outs.

4.  Bring-Along Right.  If holders of at least 66⅔% of all of the then outstanding shares of Series A Preferred Stock and at least a majority of the then outstanding shares of the Company's Common Stock, voting as separate classes, propose to sell all shares of Preferred Stock and Common Stock then held by them to a third party, then at the request of such holders, all of the parties to the Stockholders' Agreement (including the holders of Series A Preferred Stock) will be obligated to sell their shares in the proposed transaction on the same terms and conditions.

5.   Agreement to Vote Shares.   If, at any time prior to the commencement of trading of the Company's Common Stock in the over-the-counter market or on any national securities exchange, holders of at least 66⅔% of the Series A Preferred Stock and at least

a majority of the Company's Common Stock, voting as separate classes, propose that the Company sell, convey, lease or exchange all or substantially all of its assets in an arm's length, bona fide transaction with a third party or engage in a merger, business combination or other transaction with substantially the same effect, then all of the parties to the Stockholders' Agreement (including the holders of Series A Preferred Stock) will be required to vote their shares in favor of the transaction. Each stockholder will also waive appraisal right available under Delaware law in connection with such a transaction to the extent permitted by law.

**Information Rights and Inspection Rights:**

Major Holders will have the following information and inspection rights:

Information Rights. The Company will deliver to each Major Holder copies of its annual financial plan for the upcoming fiscal year, in reasonable detail, and broken down on a monthly basis. Each Major Holder also will be entitled to receive (i) unaudited, and if requested by certain Major Holders, audited annual financial statements (audited by an accounting firm acceptable to the non-management directors) within 90 days after the end of each fiscal year, and (ii) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter.

Inspection Rights. Each Major Holder will also be entitled to standard inspection and visitation rights.

**Board of Directors:**

The Company's Board of Directors shall consist of up to 7 directors. These directors must be designated as follows:

- Up to four (4) directors designated by GE;

- Up to two (2) directors designated by Seegrid Holdings one of whom will be Dr. Hans Moravec for so long as he is employed by the Company; and

- The Company's Chief Executive Officer.

After a Qualified Public Offering, director nomination rights will be held by majority vote of the Board.

**Termination of Stockholders Agreement:**

Unless sooner terminated in accordance with their terms, the provisions of the Stockholders' Agreement will terminate upon the earlier of (a) the consummation of a Qualified Public Offering or (b) the consummation of any other initial public offering if upon or prior thereto all shares of Series A Preferred Stock have been converted into Common Stock.

EXHIBIT B TO<br>
SEEGRID PLAN OF REORGANIZATION

**PLAN SUPPORT AGREEMENT**



Giant Eagle, Inc.

October 2, 2014

*By Electronic Mail dheilman@seegrid.com*

Mr. David Heilman
Seegrid Corporation
216 Parkwest Drive
Pittsburgh PA 15257

**Re:    Seegrid Corporation / Plan Support**

Dear Dave:

Reference is made to the September 18, 2014 Term Sheet for the Restructuring and Financing of Seegrid Corporation (the "Term Sheet") between Seegrid Corporation ("Seegrid") and Giant Eagle, Inc. ("Giant Eagle"). Capitalized terms not defined herein shall have the meanings assigned to them in the Term Sheet.

Pursuant to the Term Sheet, Giant Eagle agreed to purchase up to $10 million Series A Preferred shares in Seegrid Sub, subject to certain terms and conditions set forth more fully therein. This purchase includes all sums advanced to Seegrid from and after June 27, 2014 until the filing of Seegrid's Chapter 11 Case as outlined in the Term Sheet (the "Prefiling Debt" as of the date hereof, $2,572,000), all financing to be provided under the Debtor-in-Possession arrangement contemplated by the Term Sheet (the "DIP Debt" estimated to be $3 million), and post-confirmation exit financing (the "Exit Financing" estimated to be $4 million).

This letter confirms, on behalf of Giant Eagle, the amount of the Exit Financing that will be made available to Seegrid under the Term Sheet, assuming the condition for its use has been met, will be the difference between $10 million and (a) the actual amount of the Prefiling Debt, and (b) the actual amount of the DIP Debt.

As noted, Giant Eagle's agreement is subject to the terms and conditions set forth in the September 18, 2014 Term Sheet, including Seegrid's compliance with its budget during the Chapter 11 Case and Seegrid Sub's compliance with its 2015 and later year projections..

Giant Eagle, Inc.

By:    *Andrew Drexler*

Andrew Drexler

# EXHIBIT B

# Seegrid Corporation

# Feasibility Analysis

*October 3, 2014*

# DISCLOSURE

The following pages contain material provided in the form of a feasibility analysis ("Analysis") in support of the Plan (as defined herein) of Seegrid Corporation ("Seegrid"). The following Analysis focuses on the feasibility and future profitability of Seegrid Sub, as Seegrid's feasibility ultimately relies on the financial viability of Seegrid Sub[1].

The information contained in this Analysis was obtained from Seegrid's management. The Analysis has not been audited or otherwise verified by outside third parties. Information supplied by Seegrid's management reflects Seegrid's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted. With respect to certain financial projections and forecasts, they have been reasonably prepared on a basis that reflects the best currently available estimates and judgments of senior management of Seegrid.

This Analysis was not prepared with regard to the guidelines for prospective financial statements of the American Institute of Certified Public Accounts or the rules and regulations of the United States Securities and Exchange Commission. The projections contained in this Analysis contain certain "forward looking statements" that are subject to a number of assumptions, risks and uncertainties that are beyond the control of Seegrid and Seegrid Sub.

Capitalized terms not defined in this Analysis shall have the same meanings as set forth in the Plan or the Disclosure Statement, as applicable.

---

[1] Under the Plan, Seegrid will have minimal administrative operating expenses post-confirmation. These expenses will be funded by Seegrid Sub pursuant to that certain Contribution, Assignment and Assumption Agreement (the "Contribution Agreement"), which is attached hereto as Addendum 1. As a result of this arrangement, the feasibility of Seegrid's Plan requires inquiry into the feasibility of Seegrid Sub, which is the focus of this Analysis.

# PURPOSE OF THE FEASIBILITY ANALYSIS

Seegrid intends to file a voluntary petition with the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on or before October 20, 2014, seeking relief under Chapter 11 of the United States Bankruptcy Code. Seegrid will file its Plan of Reorganization, as may be subsequently modified (the "Plan"), along with the Disclosure Statement to which this Analysis is an exhibit, with the Bankruptcy Court. The purpose of this Analysis is to inform holders of Claims and Interests about Seegrid's financial condition and future financial projections, as well as to assist these parties in making decisions related to the Plan.

This Analysis is also intended to assist the Bankruptcy Court in making certain determinations under section 1129(a)(11) of the Bankruptcy Code. Under this section of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor, or any successors to the Debtor, under the Plan, unless such liquidation or reorganization is proposed in the Plan. In addition, section 1129(a)(12) requires that all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or that the Plan provides for the payment of all such fees on the Effective Date of the Plan. These conditions are often referred to as the "feasibility" of the Plan. The Plan is a reorganization plan and is predicated upon the continuation of business by the Reorganized Debtor as a holding company. Seegrid believes this Analysis supports confirmation of the Plan.

1

# OVERVIEW

In determining the feasibility of Seegrid's Plan, Seegrid focused on the following:

➤ **Liquidity Analysis**: An equity infusion resulting from the sale of preferred shares in Seegrid Sub will provide an initial liquidity cushion, allowing Seegrid Sub to fund operating expenses while it grows revenues and diligently manages costs. This initial cash infusion will support Seegrid Sub's going-concern operation and will provide ample time for Seegrid Sub to reach a point of sustainable positive net income. Moreover, the Contribution Agreement will allow the Reorganized Debtor to pay its day-to-day administrative expenses until such time as the Reorganized Debtor realizes on the Seegrid Sub Common Stock.

# ASSUMPTIONS

- This Analysis is based on projected financial results for the fiscal years ending December 31, 2015, December 31, 2016 and December 31, 2017 (the "Projection Period"). These financial projections are detailed on the pages that follow.

- The financial projections assume that the effective date of the Plan is December 22, 2014 (the "Effective Date").

- The post-confirmation capital structure is assumed to be as follows:

  ▪ Upon the Effective Date, Seegrid Sub expects to have available funding of, at a minimum, $4.0 million as a result of selling preferred shares in Seegrid Sub, all in accordance with the terms of the Plan (the "Preferred Share Proceeds").

  ▪ On the Effective Date, and through the Projection Period, Seegrid Sub expects to have no long-term debt whatsoever.

2

# FINANCIAL SUMMARY

## (2015)

|  | 2015 | | | | 2015 |
|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | 2015 |
| **INCOME STATEMENT:** | | | | | |
| REVENUE | $1,278,762 | $1,903,632 | $2,465,502 | $2,874,372 | $ 8,522,268 |
| | | | | | |
| GROSS MARGIN | 432,027 | 788,950 | 1,112,802 | 1,346,458 | 3,680,238 |
| SG&A EXPENSES | 1,494,903 | 1,543,312 | 1,580,055 | 1,614,062 | 6,232,332 |
| PRETAX PROFIT (LOSS) | $(1,062,876) | $(754,362) | $(467,253) | $(267,604) | $ (2,552,094) |
| | | | | | |
| **BALANCE SHEET:** | | | | | |
| ASSETS | | | | | |
| CASH | $150,000 | $150,000 | $150,000 | $150,000 | $ 150,000 |
| STOCK SUBSCRIPTION RECEIVABLE | 4,123,469 | 2,989,862 | 2,237,961 | 1,222,126 | 1,222,126 |
| OTHER CURRENT ASSETS | 6,027,520 | 6,182,518 | 6,404,213 | 6,436,151 | 6,436,151 |
| Current Assets | 10,300,989 | 9,322,380 | 8,792,174 | 7,808,277 | 7,808,277 |
| FIXED ASSETS, net | 479,964 | 467,464 | 454,964 | 442,464 | 442,464 |
| OTHER ASSETS | 1,250 | 2,500 | 3,750 | 5,000 | 5,000 |
| TOTAL ASSETS | $10,782,203 | $9,792,344 | $9,250,888 | $8,255,741 | $ 8,255,741 |
| | | | | | |
| LIABILITIES & EQUITY | | | | | |
| ACCOUNTS PAYABLE | $58,441 | $76,540 | $ 89,814 | $ 95,148 | $        95,148 |
| ACCRUED EXPENSES | 455,887 | 415,220 | 541,441 | 514,836 | 514,836 |
| DEFERRED REVENUE | 565,000 | 349,000 | 133,000 | 75,000 | 75,000 |
| ACCOUNTS PAYABLE NOTES | 650,000 | 650,000 | 650,000 | - | - |
| Total Current Liabilities | 1,729,328 | 1,490,761 | 1,414,255 | 684,984 | 684,984 |
| OTHER LIABILITIES | 115,751 | 118,821 | 121,124 | 122,851 | 122,851 |
| PREFERRED STOCK | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |

3

# FINANCIAL SUMMARY

## (2015)

| | 2015 | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | 2015 |
| RETAINED EARNINGS-Beg | - | (1,062,876) | (1,817,238) | (2,284,490) | - |
| NET INCOME | (1,062,876) | (754,362) | (467,253) | (267,604) | (2,552,094) |
| RETAINED EARNINGS-End | (1,062,876) | (1,817,238) | (2,284,490) | (2,552,094) | (2,552,094) |
| Shareholders' Equity | 8,937,124 | 8,182,762 | 7,715,510 | 7,447,906 | 7,447,906 |
| TOTAL LIABILITIES & EQUITY | $10,782,203 | $9,792,344 | $9,250,888 | $8,255,741 | $ 8,255,741 |

### STATEMENT OF CASHFLOW:
CASH FLOWS FROM OPERATING ACTIVITIES:

| | Q1 | Q2 | Q3 | Q4 | 2015 |
|---|---|---|---|---|---|
| NET INCOME | $(1,062,876) | $(754,362) | $(467,253) | $(267,604) | $ (2,552,094) |
| NON-CASH CHARGES: | | | | | |
| DEPRECIATION AND AMORT | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| EBITDA | (1,037,876) | (729,362) | (442,253) | (242,604) | (2,452,094) |
| WORKING CAPITAL CHANGES | (242,906) | (390,495) | (295,898) | (759,481) | (1,688,780) |
| STOCK SUBSCRIPTION RECEIVABLE | 1,294,531 | 1,133,607 | 751,901 | 1,015,835 | 4,195,874 |
| Cash from Operating Activities | 13,750 | 13,750 | 13,750 | 13,750 | 55,000 |
| CASH FLOWS FROM INVESTING ACTIVITIES | (13,750) | (13,750) | (13,750) | (13,750) | (55,000) |
| CASH FLOWS FROM FINANCING ACTIVITIES | 0 | (0) | (0) | 0 | 0 |
| | | | | | |
| NET CHANGE IN CASH | 0 | (0) | (0) | 0 | 0 |
| BEGINNING CASH | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| ENDING CASH | $150,000 | $150,000 | $ 150,000 | $ 150,000 | $ 150,000 |

4

# FINANCIAL SUMMARY

## (2016)

| | | | 2016 | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | 2016 |
| **INCOME STATEMENT:** | | | | | |
| REVENUE | $ 3,033,244 | $ 3,186,244 | $ 3,357,514 | $ 3,510,514 | $ 13,087,517 |
| GROSS MARGIN | 1,416,466 | 1,503,903 | 1,599,101 | 1,688,402 | 6,207,872 |
| SG&A EXPENSES | 1,688,046 | 1,720,098 | 1,734,039 | 1,746,239 | 6,888,422 |
| PRETAX PROFIT (LOSS) | $ (271,580) | $ (216,195) | $ (134,938) | $ (57,837) | $ (680,550) |
| **BALANCE SHEET:** | | | | | |
| ASSETS | | | | | |
| CASH | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 |
| STOCK SUBSCRIPTION RECEIVABLE | 1,180,467 | 1,038,226 | 989,003 | 951,083 | 951,083 |
| OTHER CURRENT ASSETS | 6,377,154 | 6,311,004 | 6,395,706 | 6,380,538 | 6,380,538 |
| Current Assets | 7,707,620 | 7,499,230 | 7,534,710 | 7,481,620 | 7,481,620 |
| FIXED ASSETS, net | 424,964 | 407,464 | 389,964 | 372,464 | 372,464 |
| OTHER ASSETS | 6,250 | 7,500 | 8,750 | 10,000 | 10,000 |
| TOTAL ASSETS | $ 8,138,834 | $ 7,914,194 | $ 7,933,424 | $ 7,864,084 | $ 7,864,084 |
| LIABILITIES & EQUITY | | | | | |
| ACCOUNTS PAYABLE | $ 124,967 | $ 158,717 | $ 193,615 | $ 231,440 | $ 231,440 |
| ACCRUED EXPENSES | 635,195 | 589,628 | 706,368 | 655,144 | 655,144 |
| DEFERRED REVENUE | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| ACCOUNTS PAYABLE NOTES | - | - | - | - | - |
| Total Current Liabilities | 835,162 | 823,345 | 974,983 | 961,584 | 961,584 |
| OTHER LIABILITIES | 127,347 | 130,719 | 133,248 | 135,145 | 135,145 |

# FINANCIAL SUMMARY

## (2016)

| | Q1 | Q2 | Q3 | Q4 | 2016 |
|---|---|---|---|---|---|
| PREFERRED STOCK | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| RETAINED EARNINGS-Beg | (2,552,094) | (2,823,675) | (3,039,870) | (3,174,808) | (2,552,094) |
| NET INCOME | (271,580) | (216,195) | (134,938) | (57,837) | (680,550) |
| RETAINED EARNINGS-End | (2,823,675) | (3,039,870) | (3,174,808) | (3,232,644) | (3,232,644) |
| Shareholders' Equity | 7,176,325 | 6,960,130 | 6,825,192 | 6,767,356 | 6,767,356 |
| TOTAL LIABILITIES & EQUITY | $ 8,138,834 | $ 7,914,194 | $ 7,933,424 | $ 7,864,084 | $ 7,864,084 |
| **STATEMENT OF CASHFLOW:** | | | | | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | |
| NET INCOME | $ (271,580) | $ (216,195) | $ (134,938) | $ (57,837) | $ (680,550) |
| NON-CASH CHARGES: | | | | | |
| DEPRECIATION AND AMORT | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 |
| EBITDA | (241,580) | (186,195) | (104,938) | (27,837) | (560,550) |
| WORKING CAPITAL CHANGES | 213,671 | 57,705 | 69,465 | 3,666 | 344,507 |
| STOCK SUBSCRIPTION RECEIVABLE | 41,659 | 142,240 | 49,223 | 37,921 | 271,043 |
| Cash from Operating Activities | 13,750 | 13,750 | 13,750 | 13,750 | 55,000 |
| CASH FLOWS FROM INVESTING ACTIVITIES | (13,750) | (13,750) | (13,750) | (13,750) | (55,000) |
| CASH FLOWS FROM FINANCING ACTIVITIES | (0) | 0 | 0 | 0 | 0 |
| NET CHANGE IN CASH | (0) | 0 | 0 | 0 | 0 |
| BEGINNING CASH | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| ENDING CASH | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 |

# FINANCIAL SUMMARY

## (2017)

|  | Q1 | Q2 | 2017 Q3 | Q4 | 2017 |
|---|---|---|---|---|---|
| **INCOME STATEMENT:** | | | | | |
| REVENUE | $ 3,661,127 | $ 3,814,127 | $ 3,981,977 | $ 4,134,977 | $ 15,592,206 |
| GROSS MARGIN | 1,748,130 | 1,835,381 | 1,928,365 | 2,017,666 | 7,529,542 |
| SG&A EXPENSES | 1,820,869 | 1,854,044 | 1,868,234 | 1,880,560 | 7,423,707 |
| PRETAX PROFIT (LOSS) | $ (72,739) | $ (18,663) | $ 60,131 | $ 137,106 | $ 105,835 |
| **BALANCE SHEET:** | | | | | |
| **ASSETS** | | | | | |
| CASH | $ 244,317 | $ 286,413 | $ 419,739 | $ 557,301 | $ 557,301 |
| STOCK SUBSCRIPTION RECEIVABLE | 951,083 | 951,083 | 951,083 | 951,083 | 951,083 |
| OTHER CURRENT ASSETS | 6,361,480 | 6,277,995 | 6,354,558 | 6,323,193 | 6,323,193 |
| Current Assets | 7,556,879 | 7,515,491 | 7,725,379 | 7,831,577 | 7,831,577 |
| FIXED ASSETS, net | 349,964 | 327,464 | 304,964 | 282,464 | 282,464 |
| OTHER ASSETS | 11,250 | 12,500 | 13,750 | 15,000 | 15,000 |
| TOTAL ASSETS | $ 7,918,093 | $ 7,855,455 | $ 8,044,093 | $ 8,129,041 | $ 8,129,041 |
| **LIABILITIES & EQUITY** | | | | | |
| ACCOUNTS PAYABLE | $ 241,091 | $ 252,599 | $ 262,250 | $ 267,818 | $ 267,818 |
| ACCRUED EXPENSES | 767,297 | 708,106 | 824,182 | 764,370 | 764,370 |
| DEFERRED REVENUE | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| ACCOUNTS PAYABLE NOTES | - | - | - | - | - |
| Total Current Liabilities | 1,083,388 | 1,035,705 | 1,161,431 | 1,107,187 | 1,107,187 |
| OTHER LIABILITIES | 140,088 | 143,796 | 146,577 | 148,662 | 148,662 |
| PREFERRED STOCK | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |

# FINANCIAL SUMMARY

## (2017)

| | Q1 | Q2 | Q3 (2017) | Q4 | 2017 |
|---|---|---|---|---|---|
| RETAINED EARNINGS-Beg | (3,232,644) | (3,305,383) | (3,324,046) | (3,263,915) | (3,232,644) |
| NET INCOME | (72,739) | (18,663) | 60,131 | 137,106 | 105,835 |
| RETAINED EARNINGS-End | (3,305,383) | (3,324,046) | (3,263,915) | (3,126,809) | (3,126,809) |
| Shareholders' Equity | 6,694,617 | 6,675,954 | 6,736,085 | 6,873,191 | 6,873,191 |
| TOTAL LIABILITIES & EQUITY | $ 7,918,093 | $ 7,855,455 | $ 8,044,093 | $ 8,129,041 | $ 8,129,041 |
| | | | | | |
| **STATEMENT OF CASHFLOW:** | | | | | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | |
| NET INCOME | $ (72,739) | $ (18,663) | $ 60,131 | $ 137,106 | $ 105,835 |
| NON-CASH CHARGES: | | | | | |
| DEPRECIATION AND AMORT | 35,000 | 35,000 | 35,000 | 35,000 | 140,000 |
| EBITDA | (37,739) | **16,337** | 95,131 | 172,106 | 245,835 |
| WORKING CAPITAL CHANGES | 145,805 | 39,510 | 51,945 | (20,794) | 216,466 |
| STOCK SUBSCRIPTION RECEIVABLE | - | - | - | - | - |
| Cash from Operating Activities | 108,066 | 55,846 | 147,076 | 151,312 | 462,301 |
| CASH FLOWS FROM INVESTING ACTIVITIES | (13,750) | (13,750) | (13,750) | (13,750) | (55,000) |
| CASH FLOWS FROM FINANCING ACTIVITIES | (0) | 0 | 0 | (0) | (0) |
| | | | | | |
| NET CHANGE IN CASH | 94,316 | 42,096 | 133,326 | 137,562 | 407,301 |
| BEGINNING CASH | 150,000 | 244,317 | 286,413 | 419,739 | 150,000 |
| ENDING CASH | $ 244,316 | $ 286,413 | $ 419,739 | $ 557,301 | $ 557,301 |

8

## FEASIBILITY CONCLUSION

The test of feasibility herein determines whether Seegrid Sub will have sufficient financing going forward to fund its liabilities and operate as a going concern through the Projection Period. As detailed in the foregoing projections, for the majority of the Projection Period, Seegrid Sub maintains the ability to fund its ongoing operations and fund liabilities from the Preferred Share Proceeds and revenues. According to the above projections, the Preferred Share Proceeds do not become exhausted during the Projection Period. Net income sufficient to fund the cost of ongoing operations of Seegrid Sub becomes available and sustained in the third quarter of 2017 and positive EBITDA occurs in the second quarter of 2017. This means Seegrid Sub reaches profitability several months prior to the end of the Projection Period, at which point Seegrid Sub also maintains a liquidity cushion of more than one million dollars in the form of: (i) cash on hand, in excess of $400,000 and (ii) remaining Preferred Share Proceeds, in excess of $900,000 (see bolded items in the above projections).

*Utilizing the assumptions in Seegrid's projection model for Seegrid Sub, these analyses establish that Seegrid Sub will maintain sufficient liquidity to operate as a going concern through the Projection Period and that Seegrid's expenses will be funded until such time as Seegrid realizes on the Seegrid Sub Common Stock.*

9

# ADDENDUM 1

# TO SEEGRID CORPORATION

# **FEASIBILITY ANALYSIS**

### CONTRIBUTION, ASSIGNMENT AND ASSUMPTION AGREEMENT
### (from Seegrid Holdings to New Seegrid Corporation)

THIS CONTRIBUTION, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of the ____ day of _____, 2014, by and between Seegrid Corporation, a Delaware corporation ("Assignor"), and [New Seegrid Corporation], a Delaware corporation ("Assignee").

### WITNESSETH:

WHEREAS, Assignee has been formed by Assignor to act initially as a wholly owned subsidiary of Assignor; and

WHEREAS, Assignor is preparing to file a Prepackaged Plan of Reorganization of Assignor pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"); and

WHEREAS, Assignor desires to contribute and assign to Assignee all of the assets and operations of every nature and description owned by Assignor upon the terms and subject to the conditions set forth in the Plan (the "Assets"); and

WHEREAS, following the assignment contemplated hereby, Assignor will be a holding company and will have no employees, and no source of available cash, to manage and fund any administrative obligations of Assignor, except as provided by Assignee as required hereunder; and

WHEREAS, the contribution and assignment hereunder represents a capital contribution to Assignee and is being made in exchange for: (i) 11.25 million shares of Assignee's common stock; (ii) Assignee's assumption of the Assumed Liabilities, as defined herein; (iii) Assignee's agreement to fund the ongoing ordinary-course administrative costs of Assignor post-bankruptcy; and (iv) Assignee's agreement to provide administrative support services to Assignor as reasonably requested by Assignor; and

WHEREAS, Assignee has agreed to assume (i) all ongoing obligations under Assignor's executory contracts, which are assigned herein, provided that such executory contracts are not rejected as part of Assignor's Chapter 11 bankruptcy proceedings; (ii) all of Assignor's indemnification obligations to current and former directors and officers of Assignor (the "Assignor D&Os"), on a joint and several basis with Assignor, subject to the primary obligation of Assignor and behind any available coverage under Assignor's director and officer insurance policies; and (iii) all other obligations of Assignor to the extent provided in the Plan (the "Assumed Liabilities"); and

WHEREAS, the Assignee agrees that the Assignor D&Os shall be third party beneficiaries under this Agreement, with the right to enforce the indemnification obligations of Assignee hereunder; and

WHEREAS, the contribution and assignment hereunder represents a capital contribution to Assignee and is being made in exchange for receipt by Assignor of 100% of the issued capital stock of Assignee and other good and valuable consideration.

NOW, THEREFORE, for the consideration stated above and the mutual promises set forth herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Recitals.  The recitals to this Agreement are incorporated herein by reference and are made a substantive part of this Agreement.

2.    Contribution and Assignment.  Assignor hereby contributes, assigns and transfers, wholly, absolutely and unconditionally, to Assignee all of the Assets and Assignee hereby accepts the foregoing contribution and assignment from Assignor.   The contribution and assignment of the Assets as set forth in this Section 2 represents a capital contribution to Assignee (the "Capital Contribution").

3.    Exchange.   In exchange for the Capital Contribution, (i) Assignee has, concurrently herewith, issued to Assignor 11.25 million shares of Assignee's common stock, representing all of the issued and outstanding shares of capital stock of Assignee as of the date hereof; (ii) Assignee hereby agrees to fund the reasonable ordinary-course administrative costs of Assignor at all times following the date hereof; and (iii) Assignee agrees to make the services of its employees available to Assignor as reasonably requested by Assignor to provide administrative support services as required by Assignor.

4.    Assumption.  Assignee hereby assumes, and agrees to discharge as they become due, all of the Assumed Liabilities.  Any and all obligations of, or claims against, Assignor whether accrued or contingent, liquidated or unliquidated, asserted or unasserted, known or unknown or due or not due, which are not Assumed Liabilities shall be and remain the sole obligations and liabilities of Assignor and Assignee shall not be obligated in any respect therefor.

5.    Transfer Documents.  From and after the date hereof, Assignor and Assignee will execute and deliver to the other party hereto all documents, certificates, stock powers, endorsements and other items reasonably necessary in connection with the consummation of the transactions contemplated hereunder.

6.    Amendment.  This Agreement cannot be amended, modified or terminated orally. No waiver, extension or consent will be effective unless evidenced by an instrument in writing duly executed by the party which is sought to be charged with having granted the same.

7.    Headings.   The section headings of this Agreement are for convenience of reference only and do not form a part of this Agreement and do not in any way modify, interpret, or otherwise affect the intentions of the parties.

8.    Counterparts.  This Agreement may be signed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of executed signature pages by facsimile transmission will constitute effective and binding execution and delivery of this Agreement.

9.    <u>Third Party Beneficiaries</u>.    The Assignor D&Os shall be considered third party beneficiaries of this Agreement, with the right to enforce this Agreement against Assignee with respect to Assignee's assumption of the Assumed Liabilities.

10.    <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to its conflicts-of-laws principles.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have executed this Contribution, Assignment and Assumption Agreement on the day and year first above written.

**SEEGRID CORPORATION**, a Delaware corporation

By: _____

Name: _____

Title: _____

**[New Seegrid Corporation]**, a Delaware corporation

By: _____

Name: _____

Title: _____

**[SIGNATURE PAGE OF CONTRIBUTION, ASSIGNMENT AND ASSUMPTION AGREEMENT]**

# EXHIBIT C

# LIQUIDATION ANALYSIS

## PREPARED BY SSG CAPITAL ADVISORS, LLC

## LIQUIDATION ANALYSIS

### A. Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtor has prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying this Liquidation Analysis (the "Notes"). Capitalized terms shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims in a hypothetical Chapter 7 liquidation of the Debtor's Assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. SSG prepared the Liquidation Analysis with the assistance of and based on information provided to them by the Debtor.

### B. Scope, Intent and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtor's Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor, its management and its Professionals. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation. In addition, the Debtor's management cannot judge with any degree of certainty the impact of the forced liquidation asset sales on the recoverable value of the Debtor's Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor was liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NONE OF THE DEBTOR OR ITS PROFESSIONALS MAKES ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtor estimated Allowed Claims based upon the Debtor's books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Case, but which could be asserted and Allowed in a

Chapter 7 liquidation, including, without limitation, Administrative Expense Claims, wind down costs, trustee fees, and certain Rejection Damage Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The Debtor's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR AS TO THE ALLOWANCE OR DISALLOWANCE OF ANY CLAIM. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C. Global Notes to the Liquidation Analysis

### (1) Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes a hypothetical conversion of the Debtor's Chapter 11 Case to Chapter 7 liquidation case on August 31, 2014 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee (the Trustee) to oversee the liquidation of the Estate, which is assumed to take approximately 6 months.

### (2) Assets to be Liquidated

The Liquidation Analysis assumes a liquidation of all of the Debtor's Assets, which primarily consist of cash and cash equivalents, accounts receivable, inventory, machinery and equipment, information technology, and trademarks.

### (3) Methodologies

The estimated recovery percentages were used to determine the liquidation value of the Debtor's Assets based on the Debtor's balance sheet as of August 31, 2014. To value the domain names and trademarks, the relief from royalty method was utilized. The liquidation analysis assumes a liquidation of the Debtor's Assets occurs over a six month time frame which reflects an estimate of the time required to dispose of the material Assets.

### (4) Estimated Costs of Liquidation

Wind-down costs consist of the regularly occurring general and administrative costs required to operate the Debtor's Assets as well as the costs of any professionals the Trustee employs to assist with the liquidation process, including intellectual property brokers, attorneys, and other advisors.

## D. Estimated Recoveries

### (1) First Lien Noteholder Claims

First Lien Noteholder Claims are estimated to be $1.5 million. This liquidation scenario estimates that these claims would receive between 79.5% to 100.0% of their value in a Chapter 7 liquidation.

### (3) Second Lien Noteholder Claims

Second Lien Noteholder Claims approximate $11.5 million. This liquidation scenario estimates that these claims would receive between 0.0% to 12.1% of their value in a Chapter 7 liquidation.

### (4) Third Lien Noteholder Claims

Third Lien Noteholder Claims approximate $1.2 million. The liquidation scenario estimates that there would be insufficient liquidation proceeds for any recovery related to these Claims in a Chapter 7 liquidation.

### (5) Noteholder General Unsecured Claims

Noteholder General Unsecured Claims are estimated at $39.0 million based on the Debtor's books and records. The liquidation scenario estimates that there would be insufficient liquidation proceeds for any recovery related to these Claims in a Chapter 7 liquidation.

### (5) Other General Unsecured Claims

Other General Unsecured Claims are estimated at $3.1 million based on the Debtor's books and records. The liquidation scenario estimates that there would be insufficient liquidation proceeds for any recovery related to these Claims in a Chapter 7 liquidation.

### E. Conclusion

The following table summarizes the recovery estimates based on the estimated Liquidation Proceeds. The Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to Creditors in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims upon the Trustee's application of the Liquidation Proceeds. The high and low recovery ranges reflect high and low ranges of both estimated Liquidation Proceeds from the Trustee's sale of the assets and Allowed Claims. As illustrated by the Liquidation Analysis, the Debtor estimates that prepetition creditors will recover more value from confirmation of the proposed Plan than through an orderly Chapter 7 liquidation and sale process.

# Seegrid Corporation
## Liquidation Valuation as of August 31, 2014
*($ in thousands)*

| | Book Value | Realization Rate Low | Realization Rate High | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|
| Cash and Cash Equivalents[1] | $ 122 | 100.0% | 100.0% | $ 122 | $ 122 |
| Restricted Cash[2] | 100 | 50.0% | 70.0% | 50 | 70 |
| Accounts Receivable[3] | 459 | 58.6% | 78.2% | 269 | 359 |
| Inventory[4] | 4,311 | 11.8% | 21.4% | 509 | 924 |
| Fixed Assets[5] | 537 | 6.0% | 10.5% | 32 | 56 |
| Intangible Assets[6] | 3,490 | 10.0% | 50.0% | 349 | 1,745 |
| Other Current Assets[7] | 135 | 0.0% | 0.0% | 0 | 0 |
| Other Noncurrent Assets[8] | 21 | 0.0% | 0.0% | 0 | 0 |
| Gross Liquidation Proceeds | | | | $ 1,331 | $ 3,276 |
| | | | | | |
| Chapter 7 Trustee Fees | | | | (40) - | (98) |
| Professional Fees and Windown Costs | | | | (133) - | (328) |
| | | | | | |
| **Distributable Proceeds** | | | | **$ 1,158 -** | **$ 2,850** |

| Waterfall | Book Value | Recovery ($) Low | Recovery ($) High | Recovery (%) Low | Recovery (%) High |
|---|---|---|---|---|---|
| First Lien Noteholder Claims | $ 1,456 | $ 1,158 | $ 1,456 | 79.5% | 100.0% |
| Second Lien Notcholder Claims | 11,541 | 0 | 1,394 | 0.0% | 12.1% |
| Third Lien Noteholder Claims | 1,232 | 0 | 0 | 0.0% | 0.0% |
| Noteholder General Unsecured Claims | 39,042 | 0 | 0 | 0.0% | 0.0% |
| Other General Unsecured Claims | 3,099 | 0 | 0 | 0.0% | 0.0% |

**Notes:**
[1] Cash and cash equivalents include all cash balances located in checking and money market accounts.
[2] The Company maintains a corporate credit card with PNC that is secured by restricted cash.
[3] Accounts Receivable is net of the allowance for doubtful accounts.
[4] Inventory consists of raw materials, WIP and finished goods. Inventory figure is net of any reserve for slow moving inventory and any other applicable reserve.
[5] Fixed Assets conists of equipment, vehicles, furniture and fixtures, software and company owned robots.
[6] Intangible Assets valuation based on relief from royalty methodology.
[7] Other Current Assets primarily consists of prepaid expenses such as insurance.
[8] Other Noncurrent Assets consists of security deposits.