**<u>Exhibit B</u>**

LOAN AGREEMENT

**SEEGRID CORPORATION**

---

**DEBTOR-IN-POSSESSION LOAN AGREEMENT**

**October 21, 2014**

---

# TABLE OF CONTENTS

**Page**

### ARTICLE 1.
DEFINITIONS ....................................................................................................................2
   1.1    Definitions ...............................................................................................................2

### ARTICLE 2.
THE DIP FINANCING ........................................................................................................7
   2.1    The DIP Financing...................................................................................................7
   2.2    Procedures for Requesting Advances ......................................................................7
   2.3    Funding of Advances ..............................................................................................7
   2.4    Interest.....................................................................................................................7
   2.5    Security Interests; Collateral ...................................................................................8
   2.6    Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral................8

### ARTICLE 3.
REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...................................8
   3.1    Organization ............................................................................................................8
   3.2    Authorization...........................................................................................................9
   3.3    No Conflicts ............................................................................................................9
   3.4    No Consent or Approval Required ...........................................................................9
   3.5    Subsidiaries ............................................................................................................9
   3.6    Compliance with Laws; Permits..............................................................................9
   3.7    Title and Condition of Properties ............................................................................9
   3.8    Other Representations Regarding the Company's Assets and Liabilities. ..................10

### ARTICLE 4.
CONDITIONS PRECEDENT TO ADVANCES ..................................................................11
   4.1    Conditions to Lender's Obligation to Close............................................................11

### ARTICLE 5.
COVENANTS .....................................................................................................................12
   5.1    Conduct of Business ...............................................................................................12
   5.2    Use of Proceeds ......................................................................................................12
   5.3    Ongoing Obligations...............................................................................................12
   5.4    Events Requiring Prior Approval .............................................................................12
   5.5    Additional Reporting ..............................................................................................13
   5.6    Existence ................................................................................................................13
   5.7    Books and Records; Inspection Rights ....................................................................13

5.8     Compliance with Laws; Payment of Taxes ..................................................................14

5.9     Further Assurances .......................................................................................................14

5.10    No Liens .......................................................................................................................14

5.11    No Indebtedness ..........................................................................................................14

5.12    No Superpriority Claims ..............................................................................................14

5.13    Expenditures ................................................................................................................14

5.14    Rejection, Assumption of Executory Contracts ..........................................................14

5.15    Plan Support ................................................................................................................15

**ARTICLE 6.**

**EVENTS OF DEFAULT** .............................................................................................................15

6.1     Events of Default .........................................................................................................15

6.2     Remedies .....................................................................................................................18

**ARTICLE 7.**

**MISCELLANEOUS** ...................................................................................................................18

7.1     Survival .......................................................................................................................18

7.2     Release .........................................................................................................................18

7.3     Governing Law; Consent to Jurisdiction ....................................................................19

7.4     Notices .........................................................................................................................19

7.5     Entire Agreement ........................................................................................................20

7.6     Assignment; Successor and Assigns ...........................................................................20

7.7     No Third-Party Beneficiaries ......................................................................................20

7.8     Severability .................................................................................................................20

7.9     Time Periods ...............................................................................................................21

7.10    Headings ......................................................................................................................21

7.11    Gender .........................................................................................................................21

7.12    Counterparts ................................................................................................................21

7.13    Delivery by Facsimile or Electronic Mail ..................................................................21

7.14    Interpretation of Agreement ........................................................................................21

7.15    Waiver of Jury Trial ....................................................................................................21

7.16    Power of Attorney .......................................................................................................21

7.17    Parties Including Trustees; Bankruptcy Court Proceedings ........................................22

## SEEGRID CORPORATION
## DEBTOR-IN-POSSESSION LOAN AGREEMENT

THIS DEBTOR-IN-POSSESSION FINANCING AGREEMENT is made and entered this 21st day of October, 2014 (this "*Agreement*") by and between **SEEGRID CORPORATION**, a Delaware corporation (the "*Company*"), and **GIANT EAGLE, INC.**, a Pennsylvania corporation (the "*Lender*").

## <u>BACKGROUND</u>

A.      On October 21, 2014 (the "*Petition Date*"), the Company filed, with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), a voluntary petition for relief under Chapter 11 of the Bankruptcy Code at Case No. 14-[_____(___)] (the "*Chapter 11 Case*").

B.      The Company is engaged in the business of developing and selling vision-guided technology that can be used in various applications, including material handling equipment.

C.      For several years prior to the Petition Date, the Company sought an investor or purchaser to enable it to further exploit the technology that forms the basis of its vision-guided systems.  Unable to locate such an investor or purchaser, the Company instead relied, beginning in 2013, almost exclusively on loans and advances from the Lender and others to enable it to continue operations.

D.      As of the Petition Date, the Company was indebted to various investors, including the Lender, in an amount in excess of $45 million, of which, as of the Petition Date, approximately $17.8 million is secured by liens on all the Company's assets (the "*Pre-Petition Secured Debt*").

E.      The Lender holds approximately $15.2 million of the Company's Pre-Petition Secured Debt.  The next-largest holder of Pre-Petition Secured Debt is HERC Investment Services, LLC ("*HERC*"), which holds approximately $1.8 million of such Pre-Petition Secured Debt.  The balance of the Company's Pre-Petition Secured Debt is held by various individual investors (collectively with the Lender and HERC, the "*Pre-Petition Secured Lenders*").  A summary of the Company's Pre-Petition Secured Debt is attached hereto as **Exhibit A**.

F.      The Company, being unsuccessful in pre-petition efforts to attract a purchaser or investor, solicited votes on a prepackaged plan of reorganization.  The Company received the requisite acceptances in response to the solicitation and promptly commenced the Chapter 11 Case to confirm the prepackaged plan.

G.      In order to maintain the going-concern value of the Company's business and assets during the Chapter 11 Case, the Lender has agreed to provide debtor-in-possession financing to the Company in an amount not to exceed $3,000,000.00 on a secured, superpriority basis as more fully set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and undertakings of the parties set forth herein, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1    <u>Definitions</u>.  Unless the context otherwise requires, the following terms shall have the following meanings for purposes of this Agreement:

"***Advance***" shall have the meaning set forth in Section 2.1 of this Agreement.

"***Affiliate***" shall have the meaning ascribed thereto in section 101(2) of the Bankruptcy Code.

"***Availability Period***" shall mean the period from and including the Closing Date to, but excluding, the Termination Date.

"***Bankruptcy Code***" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

"***Board***" shall mean the Board of Directors of the Company.

"***Budget***" shall mean a weekly operating budget, including revenues and expenses, for the Company, as mutually agreed to by the Company and the Lender and in the form attached hereto as **Exhibit B**.

"***Business Day***" shall mean a day other than a Saturday, Sunday or other federal holiday on which commercial banks in the Commonwealth of Pennsylvania are authorized or required by law to be closed.

"***Bylaws***" shall mean the current Amended and Restated Bylaws of the Company.

"***Carve-Out***" shall have the meaning set forth in the Financing Orders.

"***Chapter 11 Case***" shall have the meaning set forth in the Background section.

"***Charter***" shall mean the Certificate of Incorporation of the Company.

"***Claim***" shall have the meaning ascribed thereto in Section 101(5) of the Bankruptcy Code.

"***Closing Date***" shall mean the date on which the conditions specified in Article 4 are satisfied or waived.

"***Collateral***" shall have the meaning set forth in the Financing Orders.

"***Company***" shall have the meaning set forth in the first paragraph of this Agreement and shall expressly include the Company as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

"***Company Claims***" shall mean, with respect to the Company, any and all claims, counterclaims, actions, causes of action (including, without limitation, any relating in any manner to any existing litigation or investigation), suits, obligations, controversies, defenses, debts, liens, contracts, agreements, covenants, promises, liabilities, damages, penalties, demands, threats, compensation, losses, costs, judgments, orders, interest, fee, or expense (including, without limitation, attorneys' fees and expenses) or other similar items of any kind, type, nature, character or description, whether in law, equity or otherwise, whether now known or unknown, whether in contract or in tort, whether choate or inchoate, whether contingent or vested, whether liquidated or unliquidated, whether fixed or unfixed, whether matured or unmatured, whether suspected or unsuspected, and whether or not concealed, sealed or hidden, of the Company and/or which may be asserted by the Company, through the Company or otherwise on the behalf of the Company (including, without limitation, those which may be asserted on any derivative basis), which have existed at any time on or prior to the date hereof.

"***Company Intellectual Property***" shall mean all Intellectual Property owned, licensed or used by the Company.

"***Company's Knowledge***" or "***Company Knowledge***" shall mean, as to a particular matter, the actual knowledge, after reasonable internal (within Seller) inquiry, of Seller's President, or any information clearly evidenced in a written record of the Company or a written notice received by the Company or its predecessors.

"***Contract***" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sale contract, mortgage, guarantee, license, franchise, insurance policy, commitment or other arrangement or agreement, whether written or oral, and all rights and remedies thereunder.

"***DIP Financing Commitment***" shall have the meaning set forth in Section 2.1 of this Agreement.

"***Effective Date***" shall have the meaning set forth in the Plan.

"***Final Financing Order***" shall mean an Order of the Bankruptcy Court, in substantially the form attached hereto as **Exhibit D**, entered on a final basis, in form and substance satisfactory to the Lender, which (a) contains substantially the same provisions as the Interim Financing Order (including reaffirming (x) that the Lender is extending credit to the Company in good faith (within the meaning of Section 364(e) of the Bankruptcy Code) under this Agreement and (y) the granting of Liens and priority position provided in connection with the Interim Financing Order), (b) contains the provisions set forth in the Interim Financing Order to be included in the Final Financing Order and (c) is not subject to appeal, vacatur, amendment, modification, reversal or stay.

"***Financing Orders***" means, collectively, the Interim Financing Order and the Final Financing Order.

- 3 -

"***Governmental Authority***" shall mean any nation or government, any state or other political subdivision thereof, and any entity, department, commission, bureau, agency, authority, board, court, official or officer, domestic or foreign, exercising executive, judicial, regulatory or administrative functions of or pertaining to government.

"***Indebtedness***" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.

"***Intellectual Property***" shall mean (i) all patents, patent applications and patent disclosures; (ii) trade names, trademarks, service marks, trade dress, logos, domain names, names (registered and unregistered) and applications and registrations therefor; together with all of the goodwill associated therewith; (iii) copyrights (registered and unregistered), copyrightable works and registrations and applications therefor; (iv) mask works and registrations and applications for registration thereof; (v) all rights in confidential information, such as research, development and commercially practiced processes, trade secrets, know-how, inventions, manufacturing and production processes and techniques, engineering and other technical information, drawings, specifications, designs, plans, financial, marketing and business data and plans, in whatever form or medium; and (vi) all computer programs, software and data bases and trade manuals, in each case, owned by or licensed to the Company other than such "shrink-wrap," "click-through" or "off-the-shelf" computer programs, software, data and data bases and trade manuals thereof.

"***Interim Financing Order***" shall mean an Order of the Bankruptcy Court, in the form attached hereto as **Exhibit C**, entered on an emergency and/or interim basis and after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c) no later than four (4) days after the Petition Date, authorizing and approving the transactions contemplated in this Agreement and finding, among other things, that the Lender is extending credit to the Company in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which Order shall, on an interim basis, (i) grant and approve the superpriority liens and security interests and administrative expense claims contemplated herein, (ii) grant adequate protection in favor of the Pre-Petition Secured Lenders, (iii) authorize the use by the Company of proceeds of pre-petition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code), (iv) otherwise be in form and substance satisfactory to the Lender and (v) prior to the entry of the Final Financing Order, be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified without the prior written consent of the Lender.

"***Law***" shall mean any applicable federal, state, local or foreign law (including, without limitation, common law), statute, code, ordinance, rule, regulation or other requirement or guideline promulgated by any Governmental Authority to the extent such Person is subject thereto.

"***Legal Proceeding***" shall mean any judicial, administrative or arbitral action, suit, proceeding (public or private), arbitration or other dispute resolution proceeding, investigation, claim or governmental proceeding with respect to which the Company has received written notice.

"***Liabilities***" shall mean all Indebtedness, obligations and other liabilities, whether direct or indirect, and any loss, damage (including, without limitation, direct, incidental, consequential and special damages), cost, deficiency, Lien, penalty, fine, cost or expense (including, without limitation, any litigation expenses), contingent liability, loss contingency, unpaid expense, claim, guaranty or endorsement (other than endorsements for deposits or collection of checks in the ordinary course of business).

"***Licenses***" shall mean all licenses, permits, authorizations, approvals, franchises, rights, Orders, variances (including, without limitation, zoning variances), easements, rights of way and similar consents or certificates granted or issued by any Person, other than a Governmental Authority, relating to the business of the Company or any Subsidiary.

"***Lien***" shall have the meaning as set forth in Section 101(37) of the Bankruptcy Code.

"***Material Adverse Effect***" shall mean a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Company, (b) the ability of the Company to perform any of its obligations under this Agreement, the Notes or any related agreement or (c) the rights of or benefits available to the Lender under this Agreement or the Notes; provided that the filing of the Chapter 11 Case by itself shall not be deemed to have a Material Adverse Effect.

"***Material Contract***" shall mean a Contract to which the Company is a party or by which it is bound which may relate to or is reasonably likely to result in (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (ii) provisions adversely affecting or restricting the development, presentation or delivery of the products or services of the Company and (iii) indemnification of and by the Company.

"***Note***" shall have the meaning set forth in Section 2.1 of this Agreement.

"***Order***" shall mean any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award issued, granted, imposed or promulgated by a Governmental Authority.

"***Permit***" shall mean any written approval, authorization, consent, franchise, license, permit, variance, registration or certificate issued or granted by any Governmental Authority, including, without limitation, all permits necessary to comply with all applicable Laws, including, without limitation, Environmental Laws.

"***Permitted Encumbrances***" means:  (i) Liens imposed by Law for Taxes that are not yet due or are being contested; (ii) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by Law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested; (iii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, (iv) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and (v) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by Law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Company; provided that the term "***Permitted Encumbrances***" shall not include any Lien securing Indebtedness.

"***Person***" shall mean any individual, partnership, limited partnership, limited liability partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization and any Governmental Authority or other legal or business entity of any kind.

"***Petition Date***" shall have the meaning set forth in the Background section.

"***Plan***" shall mean the Prepackaged Plan of Reorganization of Seegrid Corporation Under Chapter 11 of the Bankruptcy Code filed on the Petition Date in the Chapter 11 Case for which the Company and the Lender are co-proponents.

"***Potential Default***" shall mean an event that would constitute an Event of Default with the giving of notice or lapse of time.

"***Pre-Petition Secured Debt***" shall have the meaning set forth in the Background section.

"***Purchase Money Security Interest***" means the pre-petition purchase money security interest and lien granted by the Company in favor of U.S. Bank National Association.

"***Subsidiary***" shall mean any Person in which 50% or more of the outstanding voting securities or of the total equity interests are directly or indirectly owned by the Company.

"***Taxes***" shall mean all federal, state, local and foreign net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, withholding, payroll, employment, social security, unemployment, FICA, FUTA, excise, occupation, property, value added, deed, stamp, alternative or add-on minimum, environmental, license, lease, service, workers' compensation or other taxes, customs, duties, fees, assessments, levies or charges of any kind whatsoever, whether disputed or not, including, without limitation, all interest and penalties thereon and additions to tax or additional amounts with respect thereto.

"***Termination Date***" means the earliest to occur of (a) the Effective Date, (b) January 15, 2015, and (c) the date on which the DIP Financing Commitment (as defined herein) terminates pursuant to Article 6 hereof.

# ARTICLE 2.
# THE DIP FINANCING

2.1    <u>The DIP Financing</u>.  The Lender agrees, subject to the terms and conditions of this Agreement and the Financing Orders, to make advances (each, an "***Advance***") to the Company from time to time during the Availability Period in an aggregate amount not to exceed $3,000,000.00 (the "***DIP Financing Commitment***").  The Lender shall have no obligation to make Advances to the extent that a requested Advance, plus the aggregate amount of the outstanding Advances, exceeds the DIP Financing Commitment.  The Company's obligations to repay, and the principal repayment terms of, each Advance will be evidenced by a note or notes (each, a "***Note***" and, collectively, the "***Notes***") and shall be secured by the Collateral.

2.2    <u>Procedures for Requesting Advances</u>.  The Company shall request an Advance on a Business Day not less than two (2) days prior to the date on which the Advance is to be made.  Such request shall be sent by e-mail to Andy Drexler at andy.drexler@gianteagle.com with a copy to Paul M. Singer at psinger@reedsmith.com.  Only one Advance may be requested in any week, and the amount of such Advance shall not exceed the amount set forth in the Budget, plus the amount necessary to cover any Permitted Variance, with respect to the applicable week.  All Advances, together with interest, are due and payable on the Termination Date.

2.3    <u>Funding of Advances</u>.  Funding of an Advance shall occur only if and when the conditions set forth below have been satisfied, in Lender's reasonable judgment:

      (a)    With respect to the first Advance, the Closing Date shall have occurred and the Company shall be in compliance with the terms and conditions hereof.

      (b)    With respect to the second (and each subsequent) Advance under the DIP Financing Commitment:

            (i)    No Event of Default or Potential Default shall have occurred and be continuing; and

            (ii)    The Final Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

2.4    <u>Interest</u>.

      (a)    The unpaid balance of each Advance hereunder, from the date of the Advance until paid in full, shall bear interest at a per-annum rate of eight (8%) percent.  Interest shall be payable monthly, in arrears, on the first calendar day in each month upon all Advances outstanding during the previous month, and on the Termination Date.

      (b)    After the occurrence and during the continuation of any Event of Default hereunder, the per-annum effective rate of interest on all outstanding Advances shall increase by three (3%) percent to eleven (11%) percent.

2.5     Security Interests; Collateral.  Pursuant to the Financing Orders, as security for the full and timely payment and performance of all obligations of the Company under this Agreement and the Notes, now existing or hereafter arising, the Company has granted to the Lender a valid, binding, enforceable, duly perfected security interest in the Collateral described in the Financing Orders, including, as set forth in the Final Financing Order, avoidance, preference, fraudulent transfer recoveries and Company Claims (but only pursuant to the Final Financing Order), subject only to Liens specified in the Financing Orders and the Carve-Out. Without limiting the generality of the foregoing, the repayment of all obligations of the Company arising under this Agreement and the Notes shall be granted, as set forth in more detail in the Financing Orders, a first administrative priority status and a first priority security interest in and Lien on the Collateral by the Bankruptcy Court pursuant to Section 364(d) of the Bankruptcy Code, with priority and superiority over (i) any and all other Liens and claims against the property of the Company or the Collateral existing on the Petition Date (except the Purchase Money Security Interest) and (ii) priority claims (including administrative expenses) alleging priority pursuant to Section 503, Section 506(c) or Section 507 of the Bankruptcy Code, heretofore or hereafter arising or incurred in the Chapter 11 Case or in any superseding case or cases under any chapter of the Bankruptcy Code, other than the Carve-Out.

2.6     Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any obligations of the Company under this Agreement and the Notes shall be outstanding, the Company hereby irrevocably waives (i) any right, pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the obligations of the Company under this Agreement and the Notes or to approve a claim of equal or greater priority than the obligations of the Company under this Agreement and the Notes, except as permitted under the Financing Orders and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any manner not permitted by this Agreement and/or the Financing Orders.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Lender as follows, as of the date hereof, as of the Closing Date and as of each date on which an Advance is extended.

3.1     Organization.  The Company is a corporation duly organized, validly existing and in good standing under, and by virtue of, the General Corporation Law of the State of Delaware, has all requisite corporate power and authority to own and lease its properties and assets, and to carry on its business as presently conducted and as presently proposed to be conducted.  The Company is duly qualified as a foreign corporation in each other jurisdiction, if any, in which the conduct of its business as presently conducted or as presently proposed to be conducted or its present ownership, leasing or operation of property requires such qualification and where the failure so to have qualified would not, individually or in the aggregate, have a Material Adverse Effect on the Company.

3.2    <u>Authorization</u>.

(a)    Subject to the entry of the Financing Orders, all corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of and performance of all obligations under this Agreement and the Notes has been taken.

(b)    Upon the entry of the pertinent Financing Order, the Notes shall have been duly authorized.

3.3    <u>No Conflicts</u>.    The execution, delivery and performance by the Company of this Agreement and the Notes, and the consummation by the Company of the transactions contemplated by this Agreement and the Notes, will not violate any provision of Law or any Order applicable to the Company or its properties or assets.

3.4    <u>No Consent or Approval Required</u>.    Except for the entry of the pertinent Financing Order, no consent, approval or authorization of, or declaration to or of, or filing with, any Governmental Authority is required to be obtained by the Company for the authorization, execution and delivery by the Company of this Agreement and the Notes or the issuance and performance of the Notes or the consummation of any other transaction contemplated on the part of the Company by this Agreement and the Notes.

3.5    <u>Subsidiaries</u>.    The Company (i) does not have any Subsidiaries, (ii) does not own any ownership interest or profits interest in any other Person and (iii) is not a participant in any joint venture, partnership or similar arrangement.

3.6    <u>Compliance with Laws; Permits</u>.    The Company has complied in all material respects, and is in compliance in all material respects, with all federal, state, local and foreign Laws and Orders applicable to it, its business or the ownership of its assets.    The Company possesses all Permits that are necessary for the conduct of its business as currently conducted, all such Permits are in full force and effect and the Company has not received any notice that any such Permit may be revoked or canceled.

3.7    <u>Title and Condition of Properties</u>.    The Company has good and marketable title to all of its properties (both real and personal) and assets and, except as set forth below with respect to the Park West Drive Lease, has good title to all its leasehold interests, and such assets are not and will not be subject to any Lien except (i) Liens securing the Company's Pre-Petition Secured Debt, (ii) the Purchase Money Security Interest, (iii) Liens for current Taxes and assessments not yet due and payable, (iv) encumbrances and easements of record, (v) rights of way, building or use restrictions, exceptions, variances and reservations of record and (vi) other Liens and limitations of any kind which do not materially detract from the value of or materially interfere with the present or contemplated use of any of the assets subject thereto or affected thereby or otherwise materially impair the business operations conducted by the Company and which have arisen or been incurred only in the ordinary course of business and as to which the aggregate amount of the obligations secured thereby does not exceed $50,000.00.    All facilities, machinery, equipment, fixtures, vehicles and other properties owned or leased by the Company have been maintained in the ordinary course of business in a reasonably prudent manner and are in good

operating condition and repair, ordinary wear and tear excepted.  With respect to the property and assets subject to leases, with the exception of that certain lease dated September 21, 2009, with Regional Development Corporation of Southwestern Pennsylvania, for the premises located at 216 Park West Drive (the "Park West Drive Lease"), the Company is in material compliance with such leases and has obtained all certificates of occupancy or use necessary from the proper Governmental Authorities for the use of property by the Company.  Except for the Park West Drive Lease, no event has occurred and is continuing which, with due notice or lapse of time or both, would constitute a default by the Company under any such lease or agreement or, to the Company's Knowledge, by any other party.

3.8     Other Representations Regarding the Company's Assets and Liabilities.

(a)     Accounts Receivable.    As of the Closing Date, all of the accounts receivable and other receivables of the Company are valid and enforceable claims for goods or services actually delivered or rendered, are subject to no material setoff or material counterclaim, are to the Company's Knowledge collectable in the normal course of business (subject to any reserve set forth on the Financial Statements, which reserves are adequate) and are free and clear of all Liens except for Liens securing the Company's Pre-Petition Secured Debt.

(b)     Accounts and Notes Payable.  All accounts payable and notes payable of the Company arose in bona fide arm's-length transactions in the ordinary course of business.

(c)     Cash Accounts.  Set forth below is a true and complete list as of the Closing Date of (i) the name and address of every bank or other financial institution in which the Company maintains an account (whether checking, savings, investment or otherwise), lock box or safe deposit box, (ii) the account number of each account and (iii) the identity of each natural person who is a signatory on each such account.

| Bank | Account Type | Account Number | Signatory |
|------|-------------|----------------|-----------|
| PNC Bank | Checking | 11-3607-0248 | Jim Rock/David Heilman/Phil Oliveri |
| PNC Bank | Money Market | 11-3658-3131 | Jim Rock/David Heilman/Phil Oliveri |

(d)     Deposits.    Except for $20,100.00 paid as a deposit to the Regional Industrial Development Corporation of Southwestern Pennsylvania and $500.00 paid as a deposit to Equity Real Estate, there are no security deposits paid by the Company under any lease.

(e)     Licenses.  All Licenses, sublicenses or other Contracts granted or assigned by any third party to the Company, excluding "shrink-wrap," "click-through" or other standard licenses arising from the purchase of "off-the-shelf" products are in full force and effect, and there is no breach by the Company or, to the Company's Knowledge, any other party thereto nor any Claim or information to the contrary.  There are no outstanding or threatened disputes or disagreements with respect to any such Licenses, sublicenses or other Contracts.

(f)     Patents.  To the Company's Knowledge, all issued patents, registered trademarks and registered copyrights in the Company Intellectual Property are valid and enforceable.

- 10 -

## ARTICLE 4.
## CONDITIONS PRECEDENT TO ADVANCES

4.1    <u>Conditions to Lender's Obligation to Close</u>.  The obligation of the Lender to consummate the transactions contemplated herein shall become effective on the date on which each of the conditions set forth below are satisfied:

(a)    The Plan shall have been filed with the Bankruptcy Court on the Petition Date.

(b)    The Company shall have received the votes necessary to confirm the Plan prior to the Petition Date.

(c)    The Interim Financing Order shall have been entered by the Bankruptcy Court which such entry shall be within four (4) Business Days of the Petition Date and the Interim Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(d)    The Lender shall be satisfied that it shall have the protection of Section 364(e) of the Bankruptcy Code.

(e)    Each of the representations and warranties of the Company contained herein that are not qualified by a "materiality," "Material Adverse Effect" or similar qualifier shall be true and correct in all material respects on and as of the Closing Date.  Each of the representations and warranties of the Company contained herein that are qualified by a "materiality," "Material Adverse Effect" or similar qualifier shall be true and correct in all respects on and as of the Closing Date.  No Event of Default or Potential Default shall have occurred and be continuing.

(f)    All corporate and other proceedings in connection with the transactions contemplated hereunder and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to Lender and its counsel, and the Lender and its counsel shall have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

(g)    No Legal Proceeding shall be pending against the Company related to this Agreement.

(h)    There shall have occurred no event or condition, other than arising as a result of the commencement of the Chapter 11 Case, that has resulted in, or is reasonably likely to result in, a Material Adverse Effect.

(i)    If requested in writing by the Lender, delivery to the Lender of evidence reasonably satisfactory to the Lender that all financing statements (Form UCC-1) and other filings and similar actions (including the recordation of intellectual property security agreements with the United States Patent and Trademark Office and/or the United States Copyright Office), as applicable, have been filed and all other steps required to be taken by the Company to perfect in favor of the Lender security interests in the Collateral have been taken.

## ARTICLE 5.
## COVENANTS

The Company covenants and agrees that, from and after the Closing Date:

5.1     <u>Conduct of Business</u>.  Except as contemplated by the Plan, the Company shall not engage in any line of business other than the development, production and sale of vision-guided technology to be incorporated into material handling equipment and all businesses related thereto.

5.2     <u>Use of Proceeds</u>.  The Company shall use the proceeds of the Advances solely to (i) pay operating expenses arising from and after the Petition Date and certain expenses arising prior to the Petition Date approved by the Bankruptcy Court, solely at the times and in the amounts set forth in the Budget attached to the Interim Financing Order (together with the Permitted Variance) and (ii) make any and all payments required to be made under the Plan (including payments to be made as a condition to the Effective Date of the Plan), <u>provided</u> that no proceeds shall be used by the Company (i) to pay interest accruing from and after the Petition Date on any Pre-Petition Secured Debt or (ii) to conduct an investigation of, commence or prosecute any action or objection with respect to the Claims, Liens or security interests that relate to the Pre-Petition Secured Debt.  Notwithstanding anything to the contrary set forth in this Agreement or the Budget, the Company shall not request an Advance for the purpose of making, or use the proceeds of any Advances to make, any payments required to be made to Holders of Class 2-B Claims under the Plan without notifying the Lender in writing of the Debtor's intent to do so (a "***Plan Payment Notice***") and obtaining the prior written consent of the Lender.  Upon receipt of a Plan Payment Notice, the Lender shall notify the Debtor within three (3) Business Days as to whether it intends to fund the borrowing request through an Advance or through a post-confirmation exit facility.  If the Lender fails to respond to the Plan Payment Notice within three (3) Business Days, the Lender shall fund the payments required to be made to Holders of Class 2-B Claims under the Plan through a post-confirmation exit facility.   If the Lender elects to fund the borrowing request through a post-confirmation exit facility, the Lender shall fund the advance no later than one (1) Business Day prior to the Effective Date.  For the avoidance of doubt, the Lender shall have no obligation to fund a post-confirmation exit facility if the DIP Financing Commitment has been terminated in accordance with the terms of this Agreement.

5.3     <u>Ongoing Obligations</u>.  Except as contemplated by the Plan, the Company shall (i) operate its business in accordance with the Budget (with such variances as permitted in the Financing Orders and with such changes as mutually agreed to by the Company and Lender) and (ii) otherwise comply with the terms of the Financing Orders.

5.4     <u>Events Requiring Prior Approval</u>.  Without first obtaining the written approval of the Lender and except as contemplated by the Plan, the Company will not, directly or indirectly, take or otherwise agree to become obligated to take, any action to:  (i) sell, transfer, assign, pledge, encumber or grant any License or sublicense of any rights under or with respect to any of the Company Intellectual Property or technology except in the ordinary course of business; (ii) sell, transfer, lease or assign any of its assets, tangible or intangible, having a value greater than $50,000 in the aggregate outside of the ordinary course of business; (iii) exit any of its current lines of business; (iv) enter into any Contract (or series of Contracts) relating to the sale,

marketing or distribution of any of its products or services that provides exclusive rights to another party; (v) incur or suffer to exist any Indebtedness, other than Indebtedness outstanding as of the Closing Date, in excess of $50,000 in the aggregate at any time except for Indebtedness incurred in the ordinary course of business; or (vi) materially increase the compensation of, or enter into a new material agreement, Contract or transaction, with any of its officers, employees or directors, or grant other options pursuant to an existing stock award plan or option plan of the Company.

5.5    <u>Additional Reporting</u>.  The Company shall furnish to the Lender:

(a)    Within three (3) Business Days following the end of each weekly period covered by the Budget, a reconciliation of projected versus actual revenues and expenses for the period covered by such Budget;

(b)    As soon as possible and in any event within three (3) Business Days after the Company obtains Company Knowledge of any event that could result in a Material Adverse Effect, written notice describing the same and the steps being taken by the Company with respect thereto;

(c)    As soon as possible and in any event within three (3) Business Days after the Company obtains Company Knowledge of the occurrence of any Event of Default or Potential Default, written notice describing the same and the steps being taken by the Company with respect thereto;

(d)    As promptly as possible after the end of each month, copies of its monthly management reports; and

(e)    Promptly upon and in any event within three (3) Business Days after the commencement of, or any material development with respect to, any Legal Proceeding or Order that could have a Material Adverse Effect, written notice describing the same and the steps being taken by the Company with respect thereto.

5.6    <u>Existence</u>.  The Company shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, Licenses, Permits, privileges and franchises necessary or desirable in the conduct of its business.

5.7    <u>Books and Records; Inspection Rights</u>.  The Company shall keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.   The Company shall permit any representatives designated by the Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; <u>provided</u> that when an Event of Default or Potential Default exists which is continuing, the Lender (or any of its representatives) may do any of the foregoing at any time during normal business hours and without advance notice.

5.8    <u>Compliance with Laws; Payment of Taxes</u>.  The Company shall (a) comply in all material respects with all applicable Laws, decrees and Orders (including the Financing Orders and other requirements imposed in connection with the Chapter 11 Case) and (b) pay, prior to delinquency, all Taxes and other governmental charges against it or any of its property, as well as claims of any kind which, if unpaid, might become a Lien on any of its property; <u>provided</u> that the foregoing shall not require the Company to pay any such Tax, claim or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto.

5.9    <u>Further Assurances</u>.  The Company shall take such actions as are reasonably necessary or as the Lender may reasonably request from time to time (including the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, financing statements and other documents and the filing or recording of any of the foregoing) to ensure that the obligations of the Company hereunder and under the Notes are secured by substantially all of the assets of the Company.  The Company agrees that, upon entry of the Interim Financing Order (and, if entered, the Final Financing Order), no further actions or filings are required to create or perfect the Liens of the Lender.

5.10    <u>No Liens</u>.  The Company shall not incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except Liens granted pursuant to the Financing Orders, including in connection with the Carve-Out and Permitted Encumbrances.

5.11    <u>No Indebtedness</u>.  The Company shall not incur or assume any Indebtedness other than that assumed hereunder or trade debt incurred in the ordinary course of the Company's business.

5.12    <u>No Superpriority Claims</u>.  The Company shall not permit to exist any claims entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code, other than those of the Lender and the Carve-Out.

5.13    <u>Expenditures</u>.  In no event shall the Company's actual weekly expenditures exceed:  (i) with respect to any specific line item relating to the payment of professional fees and expenses, the amount budgeted therefore in the Budget; (ii) with respect to any specific line item not relating to the payment of professional fees and expenses, the amount budgeted therefore in the Budget by more than fifteen percent (15%) of such specific line item; and (iii) with respect to the aggregate amount of weekly expenditures, the aggregate amount of all expenditure line items set forth in the Budget for such period by more than ten percent (10%) (collectively, the "***Permitted Variance***").  In the event that the actual expenditures for a weekly period are less than the budgeted amount for such period under the Budget, such unused expenditures may be carried over for use in the next weekly period (and, to the extent not entirely used in that next weekly period, further may be carried over to any and all weekly periods until fully used).

5.14    <u>Rejection, Assumption of Executory Contracts</u>.    The Company shall not (a) assume any operating lease entered into prior to the Petition Date (b) without first obtaining the written consent of the Lender; or (i) reject any material unexpired lease or executory Contract

- 14 -

or (ii) assume or apply to the Bankruptcy Court to assume any material executory Contract or unexpired lease (other than an operating lease) entered into prior to the Petition Date, unless, in the case of any unexpired lease, the Order (which shall be in a form acceptable to Lender in its sole discretion) authorizing such assumption specifically provides that, notwithstanding such assumption, the Company may later assign the relevant lease under Section 365(f) of the Bankruptcy Code without, among other things, obtaining the consent of the relevant lessor (but after complying with the other requirements of Section 365 of the Bankruptcy Code).

5.15    Plan Support.  The Company shall not, without the prior written consent of the Lender, (a) directly or indirectly solicit, support, prosecute, encourage, or respond in the affirmative to any proposal or offer of refinancing, reorganization, or restructuring that could reasonably be expected to hinder, block, prevent, delay, or impede the confirmation of the Plan, (b) object to, challenge, withdraw support, or otherwise commence or support any proceeding opposing confirmation of the Plan, (c) seek or support the appointment of a trustee for the Company or dismissal of the Chapter 11 Case, and (d) take any other action inconsistent with seeking confirmation of the Plan.

## ARTICLE 6.
## EVENTS OF DEFAULT

6.1    Events of Default.  An "*Event of Default*" shall mean the occurrence (whatever the reason therefor and whether voluntary, involuntary or effected by operation of Law) of any one or more of the following events or conditions:

(a)    The Company shall fail to pay when due the principal of an Advance which it is required to pay under this Agreement or any Note;

(b)    The Company shall fail to pay when due the interest or any other amount (other than principal) which it is required to pay under this Agreement or any Note, which failure shall continue for a period of three (3) Business Days;

(c)    Any representation or warranty made or deemed made by or on behalf of the Company in or in connection with this Agreement or any Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect or misleading in any material respect when made or deemed made;

(d)    The Company shall default in the observance or performance of any covenant or condition set forth in the Financing Orders, the effect of which is to cause the Lender to lose its first-priority security interest in the Company's property as contemplated therein; or any Lien securing any obligation under this Agreement or any Note shall, in whole or in part, fail to be a perfected Lien having first priority over all other Liens (except the Purchase Money Security Interest);

(e)    The Company shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any Note, which failure shall continue for a period of five (5) days after the Lender gives the Company notice of such failure;

(f)    The Company shall contest in any manner the validity or enforceability of any provision of this Agreement or any Note; or the Company shall deny that it has any or further liability or obligation under this Agreement or any Note or shall purport to revoke, terminate or rescind any provision of this Agreement or any Note; or any provision of this Agreement or any Note, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all obligations of the Company hereunder or thereunder, shall cease to be in full force and effect; or any Lien securing any obligation of the Company under this Agreement or the Notes shall, in whole or in part, fail to be a perfected Lien having the priority purported to be created by the Financing Orders;

(g)    The Bankruptcy Court shall enter an Order to which the Lender does not consent with respect to the Company dismissing its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in its Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Company's business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and the Order appointing such trustee, responsible officer or examiner shall not be stayed, reversed or vacated within three (3) days after the entry thereof;

(h)    The Bankruptcy Court shall enter an Order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any claim against the Company having an aggregate value (for all such claims) in excess of $50,000, which Order enables the holder of such claim to exercise any right or remedy against any property of the Company;

(i)    An Order of the Bankruptcy Court shall be entered in the Chapter 11 Case amending, supplementing, staying for a period in excess of five (5) days, vacating or otherwise modifying any of the Financing Orders (including entry of an Order terminating the use of cash collateral (as more fully described in the definition of the term "Interim Financing Order")), or the Company shall apply for authority to do so;

(j)    The Company shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Company) any other Person's opposition of any motion made in the Bankruptcy Court by the Lender seeking confirmation of the amount of the Lender's Claim or the validity and enforceability of the Liens in favor of the Lender (including the Liens securing Pre-Petition Secured Debt owed to the Lender);

(k)    From and after the date of entry thereof, the Interim Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Lender, and the Final Financing Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment);

(l)      The Final Financing Order shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the Petition Date; or from and after the date of entry thereof, the Final Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Lender;

(m)     The Company shall make any payment on any Indebtedness of the Company incurred before the Petition Date, other than as permitted under the Financing Orders or as permitted hereunder and other than any payment approved by the Bankruptcy Court of any Indebtedness;

(n)     The Company shall fail to comply with the terms of the Financing Orders in any material respect;

(o)     The commencement of any action against the Lender by or on behalf of the Company except for any action commenced by an unsecured creditors committee or any other individual or entity following authorization and approval by the Bankruptcy Court or any actions pending against the Lender as of the Petition Date;

(p)     The Company, without the prior written consent of the Lender, withdraws the Plan or withdraws its support of confirmation of the Plan;

(q)     The Company modifies or amends the Plan without the prior written consent of the Lender, which consent shall not be unreasonably withheld with respect to any immaterial modification or amendment;

(r)     The Bankruptcy Court denies confirmation of the Plan;

(s)     The Plan is not confirmed by the Bankruptcy Court on or before the date that is sixty (60) days after the Petition Date;

(t)     The Effective Date does not occur on or before the date that is seventy-five (75) days after the Petition Date;

(u)     The Company, without the prior written consent of the Lender, (i) files, supports, or seeks confirmation of a plan of reorganization or liquidation other than the Plan (which for purposes of this subsection (u) shall be deemed to include any modifications or amendments to the Plan to which the Lender consented in accordance with subsection (q)) or (ii) moves to sell all or any portion of the Company's assets pursuant to section 363 of the Bankruptcy Code that is not otherwise expressly authorized under this Agreement;

(v)     The entry of an Order granting any other claim superpriority status or a Lien equal or superior to that granted to the Lender other than with respect to the Carve-Out; or

(w)     Except as set forth in section 6.1(o) of this Agreement, the filing by the Company of any motion or proceeding which could reasonably be expected to result in material impairment of the Lender's rights under this Agreement or the Notes; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion

or proceeding brought by any other party which results in any material impairment of the Lender's rights under this Agreement or the Notes.

6.2     Remedies.  If any Event of Default shall occur and be continuing, in addition to the right of the Lender to refuse to make further Advances pursuant to the provisions hereof, the automatic stay under Section 362 of the Bankruptcy Code shall be deemed lifted, without further Order of or application to the Bankruptcy Court, to permit the Lender to do one or more of the following:  (a) terminate the Company's use of cash collateral and cease to make any Advances to the Company; (b) declare all obligations of the Company under this Agreement and the Notes to be immediately due and payable; (c) terminate the DIP Financing Commitment (if it has not theretofore terminated); (d) enforce rights against the Collateral in the possession of the Lender for application towards the obligations of the Company under this Agreement and the Notes; and (e) take any other action or exercise any other right or remedy permitted under the Financing Orders, this Agreement and the Notes, or applicable Law to effect the repayment and satisfaction of the obligations of the Company under this Agreement and the Notes; provided that the Lender shall provide five (5) Business Days written notice (by facsimile, telecopy, electronic mail, or otherwise) to the U.S. Trustee, counsel to the Company and counsel to any committee appointed in the Bankruptcy Case prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses (a), (b), and (c) above to the extent they might be deemed remedies in respect of the Collateral); provided further that the Debtor shall have the right to seek a continuation of the automatic stay during such five (5) Business Day period.  The foregoing shall not be construed to limit the Lender's discretion (to the extent provided in this Agreement) to take any action described above at any other time.

# ARTICLE 7.
## MISCELLANEOUS

7.1     Survival.  All covenants, agreements, representations and warranties made by the Company herein and in the certificates and other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the parties hereto and shall survive the execution and delivery of this Agreement and the funding of any advances, regardless of any investigation made by any such party or on its behalf and notwithstanding the Lender may have had notice or knowledge of any Event of Default or Potential Default or incorrect representation or warranty at the time any advance is funded hereunder, and shall continue in full force and effect until the repayment of the Notes, the expiration or termination of the DIP Financing Commitment or the termination of this Agreement or any provision hereof.

7.2     Release.  In consideration of providing the DIP Financing Commitment, the Company hereby remises, releases, forever discharges, and acquits the Lender, its successors and assigns, subsidiaries, affiliates, officers, directors, shareholders, and members (collectively, the "Releasees") of and from all manner of claims, demands, actions, and causes of action, whether known or unknown, arising out of any matter, event, occurrence, cause or thing on or prior to the date hereof with respect to the DIP Financing Commitment, this Agreement, any other association of the Lender with the Company, and the actions of any of the Releasees in their capacities as directors, members of any committee of the Board, or as officers of the Company; provided, however, that the foregoing shall not release the Lender from its obligations under this Agreement, or from any breach of its representations, warranties, or covenants set forth herein.

      7.3     <u>Governing Law; Consent to Jurisdiction</u>. This Agreement shall be governed in all respects by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice- or conflict-of-law provision or rule that would cause the application of the Laws of any other jurisdiction, except to the extent governed by the Bankruptcy Code. No suit, action or proceeding with respect to this Agreement or any of the Notes may be brought in any court or before any similar authority other than in the Bankruptcy Court, and the Company hereby submits to the exclusive jurisdiction of such court for the purpose of such suit, proceeding or judgment. The Company hereby irrevocably and unconditionally (i) consents to submit to the jurisdiction of such court for any litigation arising out of or relating to this Agreement or any of the Notes (and agrees not to commence any litigation relating thereto except in such court), (ii) waives any objection to the laying of venue of any such litigation in such court and (iii) agrees not to plead or claim that such litigation brought therein has been brought in any inconvenient forum.

      7.4     <u>Notices</u>. All notices and other communications given to any party hereto pursuant to this Agreement shall be in writing and shall be hand delivered or sent either by (i) certified mail, postage prepaid, return receipt requested; (ii) electronic mail (<u>provided</u> that a confirming copy is sent by overnight express courier service that provides written confirmation of delivery); or (iii) an overnight express courier service that provides written confirmation of delivery;, addressed as follows:

|  |  |
|---|---|
| Company: | Seegrid Corporation<br>216 Parkwest Drive<br>Pittsburgh, PA 15275<br>Attn: David Heilman<br>E-mail: dheilman@seegrid.com |
| with a copy to: | Buchanan Ingersoll & Rooney<br>One Oxford Centre, 20th Floor<br>301 Grant Street<br>Pittsburgh, PA 15219<br>Attn: Thomas Buchanan, Esq.<br>E-mail: thomas.buchanan@bipc.com |
|  | and |
|  | Morris, Nichols, Arsht & Tunnell LLP<br>1201 N. Market Street, 16th Floor<br>Wilmington, DE 19801<br>Attn: Robert J. Dehney, Esq. and Curtis S. Miller, Esq.<br>Email: rdehney@mnat.com; cmiller@mnat.com |

Lender:                          Giant Eagle, Inc.
                                 101 Kappa Drive
                                 RIDC Park
                                 Pittsburgh, PA 15238
                                 Attn:  Richard A. Russell
                                 E-mail:  rick.russell@gianteagle.com

with a copy to:                  Reed Smith LLP
                                 225 Fifth Avenue, Suite 1200
                                 Pittsburgh, PA 15217
                                 Attn:  Paul M. Singer, Esq.
                                 E-mail:  psinger@reedsmith.com

Any communication given in conformity with this Section 7.3 shall be effective upon the earlier of actual receipt or deemed delivery.  Delivery shall be deemed to have occurred as follows:  if hand-delivered, on the day so delivered; if mailed, three (3) Business Days after the same is deposited in the United States mail; if telecopied or sent by electronic mail, upon written confirmation by the sending machine of effective transmission or upon telephone confirmation of receipt; and if sent by overnight express courier service, on the next Business Day.  Any party may at any time change its address for receiving communications pursuant to this Section 7.3 by giving notice of a new address in the manner prescribed herein.

    7.5    <u>Entire Agreement</u>.    This Agreement, together with all Notes, exhibits and schedules, constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect thereto are hereby superseded in their entirety except as otherwise specifically provided herein.  To the extent any that term or other provision of any other indenture, agreement or instrument by which any party hereto is bound conflicts with this Agreement, this Agreement shall have precedence over such conflicting term or provision.

    7.6    <u>Assignment; Successor and Assigns</u>.    Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto and shall inure to the benefit of and be enforceable by each Person who shall be a holder of any Note from time to time.  This Agreement may not be assigned by the Company without the prior written consent of the Lender.

    7.7    <u>No Third-Party Beneficiaries</u>.    Nothing in this Agreement, express or implied, is intended, except as expressly set forth herein, to confer upon any third party (other than any indemnities) any rights, remedies, obligations or liabilities.

    7.8    <u>Severability</u>.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other

jurisdiction, and this Agreement will be performed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

7.9    Time Periods.   In computing the number of days for any purpose of this Agreement, all days shall be counted including Saturdays, Sundays and holidays, except that if the last day of any period occurs on a Saturday, Sunday or holiday, the period will be deemed extended to the end of the next Business Day.

7.10    Headings.   The Table of Contents and the Article, Section and Subsection headings are included solely for convenient reference and shall not be deemed to provide an accurate description of the content of any Article, Section or Subsection hereof or otherwise affect the meaning or interpretation of any of the provisions hereof.

7.11    Gender.   All pronouns used herein shall include all genders and the singular and plural as the context requires.

7.12    Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

7.13    Delivery by Facsimile or Electronic Mail.   This Agreement, the agreements referred to herein and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic mail, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a Contract and each such party forever waives any such defense.

7.14    Interpretation of Agreement.   The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's-length and among parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement.   Accordingly, any rule of Law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is otherwise waived.   The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties as set forth in this Agreement.

7.15    Waiver of Jury Trial.   THE COMPANY AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.16    Power of Attorney.   The Company appoints the Lender, and each other Person whom the Lender may from time to time designate, as the Company's attorney- and agent-in-fact with power (which appointment and power, being coupled with an interest, is irrevocable until

all other obligations hereunder are paid and performed in full and this Agreement is terminated), without notice to the Company, to:

(a)    At such time or times while an Event of Default exists and shall be continuing (but only after the expiration of the notice period described in Article 6 and to the extent the Bankruptcy Court determines that an Event of Default exists, if such a request is made to the Bankruptcy Court by any of the noticed parties), as the Lender or said agent, in its discretion, may determine in the name of the Company (i) endorse the Company's name on any checks, notes, drafts or any other items of payment relating to and/or proceeds of the Collateral which come into the possession of the Lender or under the Lender's control and apply such payment or proceeds to the obligations hereunder; (ii) endorse the Company's name on any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement in Lender's possession relating to accounts, inventory or any other Collateral; (iii) use the information recorded on or contained in any data-processing equipment and computer hardware and software to which the Company has access relating to accounts, inventory or other Collateral, (iv) use the Company's stationery and sign the name of the Company to verifications of accounts and notices thereof to account debtors and (v) if not done by the Company, do all acts and things determined by the Lender to be necessary to fulfill the Company's obligations under this Agreement; and

(b)    At such time or times while an Event of Default exists and shall be continuing (but only after the expiration of the notice period described in Article 6 and to the extent the Bankruptcy Court determines that an Event of Default exists and is continuing, if such a request is made to the Bankruptcy Court by any of the noticed parties), as the Lender or said agent, in its discretion, may determine, in the name of the name of the Company or the Lender (i) demand payment of any accounts, (ii) enforce payment of any accounts, by legal proceedings or otherwise; (iii) exercise all of the Company's rights and remedies with respect to the collection of any accounts and other Collateral; (iv) settle, adjust, compromise, extend or renew any accounts; (v) settle, adjust or compromise any legal proceedings brought to collect any accounts; (vi) if permitted by applicable Law, sell or assign any accounts or other Collateral upon such terms for such amounts and at such time or times as the Lender may deem advisable; (vii) discharge and release any accounts or other Collateral; (viii) prepare, file and sign the Company's name on any proof of claim in bankruptcy or similar document against any account debtor; (ix) prepare, file and sign the Company's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with any accounts or other Collateral and (x) do all acts and things necessary, in Lender's discretion, to obtain repayment of the obligations hereunder.

7.17    <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.    This Agreement and the Notes shall be binding upon, and inure to the benefit of, the successors of the Lender and its assigns, transferees and endorsees.    The Company may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties under this Agreement and the Notes without the prior express written consent of the Lender.    Any such purported assignment, transfer, hypothecation or other conveyance by the Company without the prior express written consent of the Lender shall be void.    The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Company and the Lender with

respect to the transactions contemplated hereby, and no Person shall be a third-party beneficiary of any of the terms and provisions of this Agreement and the Notes.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SEEGRID CORPORATION

By: _____
Name:  David Heilman
Title:  Interim CEO

GIANT EAGLE, INC.

By: _____
Name:
Title:

*[Signature Page to Debtor-In-Possession Loan Agreement*
*of Seegrid Corporation and Giant Eagle, Inc.]*

**EXHIBIT A**

<u>Summary of Pre-Petition Secured Debt</u>

(Attached)

**EXHIBIT B**

<u>Budget</u>

(Attached)

**EXHIBIT C**

Form of Interim Financing Order

(Attached)

**EXHIBIT D**

<u>Form of Final Financing Order</u>

(Attached)