IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SEEGRID CORPORATION,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 14-12391 (BLS)<br><br>**Requested Hearing Date: November 18, 2014 at 11:00 a.m.**<br>**Requested Objection Deadline: Prior to or at the Hearing** |

## DEBTOR'S MOTION FOR ENTRY OF ORDER TO COMPEL HORBAL GROUP TO SEARCH FOR DOCUMENTS RESPONSIVE TO SEARCH TERMS

Seegrid Corporation ("Seegrid"), as debtor and debtor in possession (the "Debtor") hereby moves this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to section 105(a) of the United States Code (the "Bankruptcy Code"), Rule 7026 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 7026-3(e) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) compelling the Horbal Group to search for documents using the search terms attached hereto as Exhibit B and to produce responsive documents identified by such terms and (b) granting Seegrid such other and further relief as the Court deems just and proper. In support of this Motion, the Debtor respectfully represents as follows:

PRELIMINARY STATEMENT

1.     As the Court is aware, this is an expedited matter. The deposition period ends in less than two weeks and the hearing at which the Court will consider Seegrid's financing, plan of reorganization, disclosure statement and plan solicitation (the "Confirmation Hearing") will be held in just four weeks. Despite the Horbal Group's initial agreement to an expedited schedule

---

[1]   The last four digits of the Debtor's tax payer identification number are: 1133. The Debtor's address is 216 Park West Drive, Pittsburgh, PA 15275.

(the "Agreed Schedule") attached hereto as Exhibit C, it has become apparent that the Horbal Group now desires only to postpone the Confirmation Hearing, including by making deficient responses to Seegrid's discovery requests that materially prejudice Seegrid in preparing for the Confirmation Hearing.

2. This Motion is precipitated by the Horbal Group's refusal to search for documents using eighteen narrowly-tailored search terms targeted at specific, unopposed production requests (the "Contested Terms"). (*See* Ex. B.) As the Horbal Group concedes, half of the terms return only a few hundred hits, and the collective yield of the Contested Terms – many of which the Horbal Group requested that Seegrid use in searching its documents – is only 12,000 unique documents. For the three sophisticated law firms representing Mr. Horbal, a review of only 12,000 documents is a pedestrian undertaking. Moreover, each of the Contested Terms is targeted at specific production requests that are not opposed by the Horbal Group.

3. For its part, the Horbal Group delayed more than a week in providing any justification for objecting to the Contested Terms, then failed to identify the specific contested terms for days thereafter, resulting in a ten-day delay. It should not be permitted to justify its deficient request for delaying these proceedings in its *Emergency Motion of the Horbal Group to Continue December 10, 2014 Hearing* [D.I. 84] (the "Emergency Motion") by refusing to run search terms targeting vital documents necessary for Seegrid to take and defend the depositions that commence in just four days.

## JURISDICTION

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

6. The predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rules 7026 and 7037, and Local Rule 7026.

PROCEDURAL BACKGROUND

7. On October 21, 2014 (the "Petition Date"), the Debtor commenced its bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. At a hearing on October 22, 2014 (the "First Day Hearing") the Court scheduled the Confirmation Hearing for December 10, 2014.

8. No trustee, examiner, or official committee has been appointed in this case.

9. A description of the Debtor's business and the events leading up to the Petition Date is set forth in the *Declaration of David Heilman in Support of Debtor's Voluntary Chapter 11 Petition and First Day Motions* [D.I. 3] filed on the Petition Date, which is incorporated herein by reference as if fully set forth herein.

BACKGROUND OF MOTION

10. Pursuant to the expedited Agreed Schedule, the parties exchanged requests for the production of documents on October 24 (*Debtor's First Request for Production of Documents* [D.I. 45] is attached hereto as Exhibit D; *Horbal Group's Responses and Objections to the Debtor's First Request for Production of Documents* [D.I. 65] is attached hereto as Exhibit E), and were set to substantially complete the production of documents responsive to those requests just over two weeks later on November 10. (Ex. C.)

11. On October 30, Seegrid proposed search terms for the Horbal Group to run in response to Seegrid's requests for production. (Ex. F.) Five days later, on November 4, the Horbal Group provided Seegrid with a revised set of search terms that eliminated several terms

and modified several others, but failed to provide Seegrid with even the barest justification or explanation for those revisions. (Ex. G.)

13. It was not until two days later – after Seegrid had significantly revised its search terms (Ex. H) – that the Horbal Group asserted any basis for its proposed revisions. In an email dated Friday, November 7, 2014, less than an hour after filing the Emergency Motion, the Horbal Group stated *for the first time* that certain of Seegrid's revised terms were overbroad. (Ex. I.) The Horbal Group stated that it had performed a "preliminary analysis," but did not disclose what that analysis was or why it led it to believe that the terms Seegrid proposed were overbroad. Critically, the Horbal Group failed to even identify the terms it believed were overbroad, other than to say that they were terms it previously "had eliminated." (*Id.*)

13. In several communications the following morning, the Horbal Group continued to refuse to identify the specific search terms it believed were overbroad. (Ex. J; Ex. K.) Although the Horbal Group claims that Seegrid was aware of the Contested Terms by November 4, that misconstrues the parties' communications on the issue. As is clear from a comparison of the terms proposed by the Horbal Group on November 4 and the terms proposed by Seegrid on November 6, Seegrid accepted some but not all of the Horbal Group's November 4 revisions. (*Compare* Ex. G *with* Ex. H.) The Horbal Group continued to obfuscate the actual terms at issue in its email on November 7, when it vaguely stated that it was objecting only to the two terms it "had eliminated" ("Series A" and "(Seegrid OR SG)"), leading Seegrid to assume that the Horbal Group was *not* objecting to the terms that it had only modified or assigned to a different date range. (Ex. I; Ex. J.) It was not until the next morning that the Horbal Group explained that it was *actually* objecting to a broader set of terms. (Ex. K.) However, the actual set of terms to

4

which the Horbal Group was objecting as "overbroad" and "not tailored to locate relevant, responsive information," remained a mystery for another day and a half.

14. Finally, on the evening of Sunday, November 9 – the night before the substantial completion date set forth in the Agreed Schedule – the Horbal Group provided a report identifying the Contested Terms and the corresponding hits that the Horbal Group claimed supported its position that the Contested Terms were overbroad (the "Hit Report"). (Ex. L.)

15. In reality, however, the Hit Report, showed just the opposite. Rather than overbroad terms, the Hit Report confirmed that the terms were narrowly-tailored to focus on the issues raised by the parties. In total, the Horbal Group represented to Seegrid that the Contested Terms yielded only approximately 12,000 unique documents. (Ex. L.)

| | |
|---|---:|
| Company and (buy or purchase* or acqui* or sell or sale or merger or invest*) | 8,157 |
| Company and (capital or funding or financing) | 4,304 |
| Company and budget* | 1,064 |
| Company and (sales or revenue* or EBIDA or profitability) | 5,593 |
| Company and (valuation or apprais*) | 1,568 |
| (Company and minutes) and (board or committee) | 473 |
| (Company and director*) or (special committee*) | 3,136 |
| Company and refinan* | 219 |
| Company and restruct* | 522 |
| Company and reorg* | 563 |
| Company w/10 (value* or worth) | 858 |
| management w/10 agreement | 732 |
| marketing | 7,060 |
| "Series A" | 1,006 |
| bankrupt* | 987 |
| chapter w/5 (11 or 7) | 330 |
| Seegrid | 3,098 |
| SG | 152 |

16. Seegrid pressed the Horbal Group on (a) how the need to review 12,000 unique documents imposed a significant burden on the three sophisticated law firms representing the

Horbal Group in this matter,[2] (b) why, if it would take its law firms "several days" to review that volume, the Horbal Group had not commenced its review in a timely manner such that it could be completed before the substantial completion deadline, and (c) the basis upon which the Horbal Group objected to terms as not reasonably calculated to lead to the discovery of responsive documents when it had asked Seegrid to run many of the same terms (Ex. M.). The Horbal Group responded by delving into meaningless details of the parties' communications on the issue and focusing on irrelevant distinctions regarding the theoretical usage of the term "company." (Ex. N.) Seegrid declined to restrict any of the Contested Terms in response to the Horbal Group's unsubstantiated objections because those terms are designed to identify documents responsive to requests to which the Horbal Group had not objected (Ex. O.). On Wednesday, November 12 – two days after the agreed-upon deadline for substantial completion – the Horbal Group declared its production substantially complete and confirmed that it had not run the Contested Terms or reviewed documents that related to them. Upon review, however, the Horbal Group's production failed to include any documents responsive to requests targeted by the Contested Terms, such as the Horbal Group's wherewithal to continue financing Seegrid.

BASIS FOR RELIEF REQUESTED

I.    SEEGRID IS ENTITLED TO HAVE ACCESS TO RESPONSIVE DOCUMENTS IDENTIFIED BY THE CONTESTED TERMS.

17.    It is well-settled that Seegrid "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). For discovery purposes, relevance is broadly and liberally construed. *See, e.g.*, *In re NewStarcom Hldgs, Inc.*, 514 B.R. 394, 399-400 (Bankr. D. Del. 2014) ("Construed as a broad standard, discovery is

---

[2]    By way of contrast, in response to the Horbal Group's expansive document requests, Seegrid reviewed nearly 72,000 documents during the review period.

ordinarily allowed under the concept of relevancy 'unless it is clear that the information sought can have no possible bearing upon the subject matter of the action'") (quoting *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993)); *In re Reading Tube Corp.*, 73 B.R. 99, 100–101 (E.D. Pa. 1987) (citing 4 J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice*, ¶ 26.56 [1] (2d ed. 1984)). Information can be relevant and thus discoverable so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *See NewStarcom Hldgs*, 514 B.R. at 399.

18. Parties are expected to work cooperatively to negotiate an agreement on how to conduct electronic discovery. Local Rule 7026-3(e). The Horbal Group has failed to do so. Although Seegrid proposed search terms for the Horbal Group to run on October 30, 2014 – well in advance of the agreed-upon substantial completion date of November 10 – the Horbal Group did not respond to that proposal for five days, did not articulate a basis for its revisions for eight days, and did not identify the specific terms it objected to for ten days. Aside from trickling out the information necessary to conduct an actual negotiation on search terms, the Horbal Group failed to disclose that it was refusing to run the Contested Terms until the night evening before the substantial completion deadline – essentially ensuring that those documents would not be available for the depositions beginning the week of November 17.

19. More basically, however, in light of the well-settled and broad approach to discovery, the Horbal Group has no basis for refusing to run the Contested Terms, which are targeted at specific, unopposed production requests and which will return, at most, only 12,000 unique documents for review.

20. The list of Contested Terms illustrates that the terms are narrowly-tailored to seek relevant documents. For example, despite the fact that this matter is focused on the Chapter 11

7

bankruptcy filing of a company that Anthony Horbal – the principal of the Horbal Group – helmed for more than four years, the Horbal Group has objected to searching its files for documents containing the terms "bankrupt*" and "chapter /5 (11 or 7),"[3] claiming that they are "overbroad" and "not tailored to locate relevant, responsive information." Perhaps unsurprisingly, given the obvious relevance of those terms to this contested matter – pointedly demonstrated by the fact that the Horbal Group requested that Seegrid use those terms in searching for responsive documents[4] – the basis for those boilerplate objections has never been supported by any argument. It is well-settled, therefore, that the Horbal Group cannot rely on those objections to avoid discovery. *In re Nat'l Sun Indus., Inc.*, 1985 WL 660523, at *1 (Bankr. D.N.D. June 17, 1985) (citing *Tele–Radio Sys., Ltd. v. DeForest Elec., Inc.,* 92 F.R.D. 371 (D.C.N.J. 1981)) ("It is not enough under Rule 26(c) for the debtor to merely allege that matters inquired of are not relevant. The party resisting discovery has the burden of explaining its objections and providing support therefor.").

21. The Horbal Group similarly relies on its deficient boilerplate objections to several other terms, including "Seegrid" and "SG" – terms which are limited to the period from June 1, 2014 to October 21, 2014 only – "management w/10 agreement," "marketing," and "Series A." Each of these terms appropriately targets relevant internal Horbal Group documents and communications that are responsive to specific requests for production.

22. For example, the time-limited terms "Seegrid" and "SG" target the highly contested period in which (a) Giant Eagle proposed the financing that serves as the basis for Mr.

---

[3] "!" and "*" are wildcard characters that represent zero or more non-space characters. For example, a search for "bankrupt!" would return "bankrupt" or "bankruptcy." "/5" signifies that the term will return instances where the first term appears within 5 terms of the second.

[4] The Horbal Group requested that Seegrid run the terms "bankrupt!", "chapter 11," "ch 11," "ch. 11," chapter 7," "ch 7," and "ch. 7."

8

Horbal's derivative action against the Seegrid board of directors and Giant Eagle in the Delaware Court of Chancery, (b) Mr. Horbal was terminated as CEO of Seegrid (July 14) and resigned as a director (August 6), and (c) Seegrid considered, approved, solicited, and filed its plan of reorganization. It is highly likely that there are relevant internal Horbal Group documents and communications during this less than five month time period that go beyond the bankruptcy-, financial-, and valuation-focused search terms that Seegrid has proposed.[5] At the very least, those terms are reasonably calculated to lead to the discovery of admissible evidence during that critical period that is responsive to numerous requests for production, including Nos. 9 to 19, 25, and 28 to 33. Furthermore, the Hit Report demonstrates that the terms were well-targeted. The term "Seegrid" returned only three thousand hits, and the term "SG" returned just 152 hits. Those numbers do not represent unique documents, merely search term hits.

23. The Horbal Group's unsubstantiated objection to the term "Series A" is particularly indicative of its gamesmanship. That term refers to the "Series A" preferred stock Giant Eagle would receive under the "term sheets" it proposed in July and August 2014. Although the Horbal Group claims that this term is "overbroad and not tailored to locate relevant, responsive information," their discovery responses in this case demonstrate that, by attempting to exclude this term, the Horbal Group is simply attempting to hide the ball. In their responses to Seegrid's interrogatories, the Horbal Group alleged that the term sheets were the main vehicle by which Giant Eagle "drastically dilut[ed the Horbal Group's] stake in the Company and remov[ed] Mr. Horbal from the Board." *The Horbal Group's Responses and Objections to the Debtor's First Set of Interrogatories and Requests for Admission* [D.I. 101] at

---

[5] Because Mr. Horbal does not possess his Seegrid email or other documents, the search terms will be applied only to the Horbal Group's internal emails and files or the personal email and files of its members.

Interrog. No. 21 (attached hereto as Exhibit P). While the Horbal Group's responses to Seegrid's interrogatories remained silent as to the components of the term sheets, in complaints filed in Delaware and Pennsylvania, the Horbal Group alleges that the issuance of Series A stock to Giant Eagle was a major component of the term sheets, diluted other stockholders, and gave Giant Eagle effective control over Seegrid at a discount price. The Horbal Group has not yet filed its objections to Seegrid's plan of reorganization, but Seegrid expects that it will largely track the virtually identical complaints Mr. Horbal filed in Delaware and Pennsylvania. Accordingly, the Horbal Group's contention now that this term is not reasonably calculated to lead to admissible evidence should be rejected for the smokescreen that it is.

24. The Horbal Group is also relying solely on its deficient boilerplate objections to withhold documents that contain the terms "management w/10 agreement," and "marketing." Like the other terms proposed by Seegrid, these terms are focused on narrow issues and are responsive to specific requests, to which the Horbal Group agreed that it would "produce non-privileged documents in its possession, if any…." (Ex. E at Resp. 25, 26, 28, 29.) The term "management w/10 agreement" refers to the consulting/management services agreement pursuant to which Mr. Horbal served as president and CEO of Seegrid, and is focused on Requests for Production Nos. 28 and 29, which seek documents related to [No. 28] Mr. Horbal's "resignation from the Company's board of directors;" and [No. 29] and "the termination of [Mr. Horbal's] employment by the Company." (Ex. D at Req. 28, 29.) The term "marketing" refers to the Horbal Group's dual claims that Seegrid refused to hire his hand-selected marketing candidate and also improperly marketed the Company to investors, and is focused on Requests for Production Nos. 25 and 26, which seek documents related to Mr. Horbal's assertions in Delaware state court that [No. 25] "the Board failed to begin a 'fair and impartial process to

engage an investment banking firm to identify, examine, and pursue Seegrid's strategic alternatives;'" and [No. 26] Seegrid's board of directors and Giant Eagle "deliberately left the Company in an undercapitalized condition" (Ex. D at Req. 25, 26.)

25. The only search terms for which the Horbal Group made any attempt to support its boilerplate objections are those terms tied to the additional term "company." ("Company-Paired Terms") (*See* Ex. N.) The substance of that argument, however, is easily addressed. First, the Horbal Group's objection to the Company-Paired Terms is based entirely on the impropriety of the term "company." The Horbal Group makes no objection based on the breadth or lack of relevance of the separate paired terms and has, in fact, agreed to run them in connection with other terms such as "Seegrid" and "SG." Second, the Horbal Group claims that a search using the term "company" would include information not related to Seegrid. While perhaps true, that does not mean that the search would *not also include* unique information related to Seegrid. Indeed, when pressed on this issue, the Horbal Group was unwilling to certify that Mr. Horbal had never used the term "company" in reference to Seegrid.

26. The Horbal Group's argument with respect to the Company-Paired Terms fails for the additional reason that it incorrectly assumes that Seegrid is the only "company" for which financial information is relevant. In the state court actions, Mr. Horbal claimed that by late 2013, he lacked sufficient funds to continue investing in Seegrid, an allegation he confirmed was at issue in this contested matter in responding to Seegrid's interrogatories. *See* Interrog. No. 16. Furthermore, Seegrid specifically requested "[a]ny and all documents or communications relating to [the Horbal Group's] financial ability to provide financing to the Company." These documents are directly relevant to the current dispute—as Horbal has been given the opportunity to participate *pro rata* with Giant Eagle in every investment to date. If Horbal actually has

money to invest but is choosing not to, then such fact would inform the parties as to Horbal's own views as to the value of the Debtor. Despite the fact that no such documents have been produced, the Horbal Group has declared its production "substantially complete." Without these relevant documents, the production cannot be complete.

27. In light of the upcoming depositions, the Horbal Group should be ordered to immediately search for documents responsive to the Contested Terms and complete their production. If the Horbal Group cannot, or will not, comply with such an order, its unjustified failure to even search for existing, relevant documents warrants an adverse inference. *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) (An adverse inference is appropriate when a party, without explanation, fails "to produce evidence that would tend to throw light on the issues."); *Coca-Cola Bottling Co. v. Coca-Cola, Co.*, 110 F.R.D. 363, 369 (D. Del. 1986) (A party is "entitled to the advantage of every possible inference that fairly could be drawn from the … evidence sought" where the opposing party refuses to disclose information despite an obligation to do so). In addition, the Horbal Group's failure to comply with its discovery obligations under the Agreed Schedule merits an award of "reasonable expenses, including attorney's fees, caused by the failure" under Fed. R. Civ. P. 37(b)(2) and (c)(1).

## LOCAL BANKRUPTCY RULE 7026-1(C) CERTIFICATION

28. As described above, counsel for the Debtor has made reasonable efforts to resolve these discovery issues with the Objecting Parties and have been unable to reach agreement.

## NOTICE

29. Notice of the Motion has been given via electronic transmission, first class mail, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) the Objecting Parties; and (iii) the general service list established in these chapter 11 cases. Accordingly, the Debtors submit that under the circumstances no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, (a) compelling the Horbal Group to search for documents using the search terms identified herein and to produce responsive documents identified by such terms and (b) granting them such other and further relief as the Court deems just and proper.

Dated: November 14, 2014
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Matthew B. Harvey*
Robert J. Dehney (Bar No. 3578)
Curtis S. Miller (Bar No. 4583)
Daniel B. Butz (Bar No. 4227)
Matthew B. Harvey (Bar No. 5186)
1201 North Market Street
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@mnat.com
      cmiller@mnat.com
      dbutz@mnat.com
      mharvey@mnat.com

*Proposed Counsel for Debtor
and Debtor in Possession*

8664928