## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEEGRID CORPORATION,[1] | Case No. 14-12391 (BLS) |
| Debtor. | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS REQUEST FOR AN ORDER (I) APPROVING THE (A) DISCLOSURE STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (B) SOLICITATION OF VOTES AND VOTING PROCEDURES AND (C) FORMS OF BALLOTS AND (II) CONFIRMING THE PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney
Curtis S. Miller
Daniel B. Butz
Matthew B. Harvey
1201 N. Market Street
Wilmington, Delaware 19801
(302) 658-9200

*Counsel for Seegrid Corporation,*
*Debtor and Debtor in Possession*

Dated: December 17, 2014

---

[1]    The last four digits of the Debtor's tax payer identification number are: 1133.  The Debtor's address is 216 Park West Drive, Pittsburgh, PA 15275.

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ v

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ........................................................................................... 3

I.       SEEGRID'S CORPORATE AND FINANCIAL HISTORY. ............................. 3

         A.       Seegrid's Capital Structure. ..................................................................... 3

         B.       The Debtor's Historical Operations And Recent
                  Developments. .......................................................................................... 6

         C.       Seegrid's Revenues. ................................................................................. 8

         D.       Events Leading To The Commencement Of This
                  Chapter 11 Case. ...................................................................................... 9

                  1.       Seegrid Fails To Attract Outside Financing. .................................. 9

                  2.       Seegrid Exhausts Willingness Of Existing Investors
                           Other Than Giant Eagle To Fund Operating Loans. ..................... 10

                  3.       Horbal Blocks Seegrid's Ability To Obtain
                           Financing From Willing Sources. ................................................. 12

II.      THE PREPACKAGED PLAN. ....................................................................... 15

III.     THE SOLICITATION PROCESS. ................................................................. 16

IV.      BANKRUPTCY. ........................................................................................... 17

ARGUMENT ............................................................................................................ 19

I.       THE SOLICITATION AND VOTING PROCEDURES COMPLY
         WITH THE BANKRUPTCY CODE AND THE BANKRUPTCY
         RULES, AND THEREFORE SHOULD BE APPROVED. ............................... 19

         A.       The Debtor's Prepetition Solicitation Complies With The
                  Requirements Of Sections 1125(g) And 1126(b) Of The
                  Bankruptcy Code. ................................................................................... 19

                  1.       The Solicitation Is Exempt From Federal And State
                           Securities Registration Requirements And Proxy
                           Rules. ........................................................................................... 19

TABLE OF CONTENTS (Continued)

2.  The Disclosure Statement Contains Adequate Information Within The Meaning Of Section 1125(a)(l) And As Required By Section 1126(b) Of The Bankruptcy Code. ................................................................22

3.  It Is Not Necessary To Solicit Votes From Classes Presumed To Accept Or Deemed To Reject The Plan..........................................................................................25

B.  The Solicitation Materials, Ballots, And Solicitation Procedures Comply With The Requirements Of Bankruptcy Rules 3017(d) And 3018(c). ....................................................25

1.  Solicitation Packages. ..................................................27

2.  Confirmation Hearing Notice. .....................................27

3.  Ballots. ........................................................................28

C.  The Solicitation Period Complied With Applicable Nonbankruptcy Law And Was Reasonable Under Bankruptcy Rule 3018(b)..........................................................28

D.  The Solicitation Procedures Should Be Approved Under Bankruptcy Rule 3017(e)..........................................................29

II.  THE PLAN SHOULD BE CONFIRMED. ........................................................30

A.  Section 1129(a)(1): The Plan Complies With Applicable Provisions Of The Bankruptcy Code........................................30

1.  The Plan Complies With Section 1122 Of The Bankruptcy Code. ......................................................31

2.  Section 1122(b) – Convenience Classes. .....................33

3.  Section 1123(a): The Plan Complies With All Of The Requirements Of Section 1123(a) Of The Bankruptcy Code. ......................................................34

a.  Section 1123(a)(l): Designation of Classes of Claims and Equity Interests. .........................34

b.  Section 1123(a)(2): Classes that Are Not Impaired by the Plan........................................34

TABLE OF CONTENTS (Continued)

c.      Section 1123(a)(3): Treatment of Classes that Are Impaired By the Plan................................34

d.      Section 1123(a)(4): Equal Treatment Within Each Class...................................................35

e.      Section 1123(a)(5): Adequate Means for Implementation. ................................................35

f.      Section 1123(a)(6): Amendment of the Reorganized Debtor's Charter. ...............................36

g.      Section 1123(a)(7): Provisions Regarding Directors and Officers. .....................................36

4.     Section 1123(b): The Plan Incorporates Certain Permissible Provisions. ................................37

B.     Section 1129(a)(2): The Debtor, As Proponent Of The Plan, Has Complied With All Applicable Provisions Of The Bankruptcy Code.......................................................40

C.     Section 1129(a)(3): The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law. ...............................41

D.     Section 1129(a)(4): The Plan Provides For Court Approval Of Payment For Services And Expenses. .................................42

E.     Section 1129(a)(5): All Information Required To Be Disclosed Regarding The Officers And Directors Of Reorganized Seegrid Has Been Provided. ................................43

F.     Bankruptcy Code Section 1129(a)(6) Is Not Applicable.........................44

G.     Section 1129(a)(7): The Plan Is In The Best Interests Of Creditors And Equity Interest Holders. ...................................44

H.     Section 1129(a)(8): Acceptance By All Impaired Classes. ......................47

I.     Section 1129(a)(9): The Plan Provides For Payment In Full Of Allowed Priority Claims. ...................................................47

J.     Section 1129(a)(10): The Plan Has Been Accepted By At Least One Impaired Class That Is Entitled To Vote................................48

K.     Section 1129(a)(11): The Plan Is Feasible................................49

<u>TABLE OF CONTENTS</u> (Continued)

L.     Section 1129(a)(12): The Plan Provides For Full Payment Of Statutory Fees. ................................................................................. 52

M.    Section 1129(a)(13): The Plan Provides For The Continuance Of Retiree Obligations. ....................................................... 52

N.     Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply. ..................... 52

CONCLUSION ............................................................................................................ 53

v.

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                   <u>Page(s)</u>

*In re Am. Consol. Transp. Cos., Inc.*,
   470 B.R. 478 (Bankr N.D. Ill. 2012) ....................................................................50

*In re ANC Rental Corp., Inc.*,
   278 B.R. 714 (Bankr. D. Del. 2002) ....................................................................38

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006) ................................................................................30

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (D. Del. 2006) ..........................................................................31, 49

*In re Bally Total Fitness a/Greater NY, Inc.*,
   Case No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ..........21

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship*,
   526 U.S. 434 (1999) ............................................................................................45

*Bank of Am. v. 203 N. LaSalle St. P'ship*,
   195 B.R. 692 (N.D. Ill. 1996), *rev'd on other grounds*, 526 U.S. 434 (1999) ......50

*Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden
   Motel and Apts.)*,
   195 B.R. 294 (D.N.J. 1996) ................................................................................50

*Brady v. Andrew (In re Commercial W. Fin. Corp.)*,
   761 F.2d 1329 (9th Cir. 1985) ............................................................................32

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................................23

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................50, 51

*In re Eddington Thread Mfg. Co.*,
   181 B.R. 826 (Bankr. E.D. Pa. 1995) ..................................................................50

*In re Elsinore Shore Assoc.*,
   91 B.R. 238 (Bankr. D.N.J. 1988) ......................................................................43

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ................................................................22, 23

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) ..................................................................43

TABLE OF AUTHORITIES (Continued)

Page(s)

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*
994 F.2d 1160 (5th Cir. 1993) ..........................................................................30

*In re Jersey City Med. Ctr.,*
817 F.2d 1055 (3d Cir. 1987)............................................................................31

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
987 F.2d 154 (3d Cir. 1993) .............................................................................31

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988*)*
.............................................................................................. 31, 40, 41, 49

*In re Kaiser Aluminum Corp.,*
2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ................................................32

*Krystal Cadillac-Oldsmobile GMC Truck. Inc. v. Gen. Motors Corp.,*
337 F.3d 314 (3d Cir. 2003) .............................................................................22

*In re The Leslie Fay Cos.,*
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..........................................................49, 51

*Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.,*
756 F.2d 1043 (4th Cir. 1985) ..........................................................................38

*N.L.R.B. v. Bildisco & Bildisco (In re Bildisco),*
682 F.2d 72 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984)................................38, 42

*In re Nil Holdings, Inc.,*
288 B.R. 356 (Bankr. D. Del. 2002) ..................................................................49

*In re NTK Holdings, Inc.,*
Case No. 09-13611 (KJC) (Bankr. D. Del. Dec. 4, 2009)....................................21

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.),*
913 F.2d 873 (11th Cir. 1990) ..........................................................................33

*In re One Times Square Assocs. Ltd. P'ship*,
159 B.R. 695 (Bankr. S.D.N.Y. 1993) ...............................................................49

*In re Oxford Homes,*
204 B.R. 264 (Bankr. D. Me. 1997)...................................................................23

TABLE OF AUTHORITIES (Continued)

Page(s)

*Pereira v. Foong (In re Ngan Gung Rest.)*,
 254 B.R. 566 (Bankr. S.D.N.Y. 2000) ..............................................................42

*In re Phoenix Petroleum Co.*,
 278 B.R. 385 (Bankr. E.D. Pa. 2001) ..............................................................23

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
 761 F.2d 1374 (9th Cir. 1985) ........................................................................50

*In re Prudential Energy Co.*,
 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ........................................................50, 51

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000) ...........................................................................40

*In re Recycled Paper Greetings, Inc.*,
 Case No. 09-10002 (KG) (Bankr. D. Del. Feb. 16, 2009)...................................21

*In re S & W Enters.*,
 37 B.R. 153 (Bankr. N.D. Ill. 1984)................................................................31

*In re Sagamore Ps., Ltd.*,
 512 B.R. 296 (S.D. Fla. 2014) ........................................................................50

*In re Scioto Valley Mort. Co.*,
 88 B.R. 168 (Bankr. S.D. Ohio 1988) .............................................................23

*In re SGL Carbon Corp.*,
 200 F.3d 154 (3d Cir. 1999) ...........................................................................41

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
 872 F.2d 36 (3d Cir. 1989) .............................................................................38

*In re Sun Country Dev., Inc.*,
 764 F.2d 406 (5th Cir. 1985) ..........................................................................41

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
 844 F.2d 1142 (5th Cir. 1988) ........................................................................23

*In re Texaco Inc.*,
 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ........................................................49, 51

*In re Toy & Sports Warehouse, Inc.*,
 37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..............................................................40

<u>TABLE OF AUTHORITIES</u> (Continued)

*In re Trans World Airlines, Inc.*,
    261 B.R. 103 (Bankr. D. Del. 2001) ...................................................................38

*In re U.S. Truck Co., Inc.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ....................................49

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
    518 U.S. 213 (1996) .....................................................................45

*In re Vertis Holdings. Inc.*,
    Case No. 08-11460 (CSS) (Bankr. D. Del. Aug. 26, 2008) .................................................21

*In re Woodmere Investors Ltd. P'ship*,
    178 B.R. 346 (Bankr. S.D.N.Y. 1995) ........................................................ 16, 49

<u>Statues and Other Authorities</u>

11 U.S. C. § 363.............................................................14

11 U.S.C. § 365.............................................................37

11 U.S.C. § 507.............................................................47, 52

11 U.S.C. § 1122.............................................................*passim*

11 U.S.C. § 1123.............................................................*passim*

11 U.S.C. § 1125.............................................................*passim*

11 U.S.C. § 1126.............................................................*passim*

11 U.S.C. § 1129.............................................................*passim*

11 U.S.C. § 1146.............................................................39, 40

15 U.S.C. § 77.............................................................20

28 U.S.C. § 1930.............................................................52

Fed. R. Bankr. P. 2002 .............................................................26, 27

Fed. R. Bankr. P. 3017 .............................................................*passim*

Fed. R. Bankr. P. 3018 .............................................................*passim*

H.R. Rep. No. 95-595 (1977) .............................................................23, 31, 40

ix.

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Page(s)</u>

S. Rep. No. 95-989 (1978)..................................................................................................31, 40

## PRELIMINARY STATEMENT

The Prepackaged Plan of Reorganization of Seegrid Corporation Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") is the result of extensive, arm's-length negotiations and represents the highest and best restructuring proposal—indeed, the only proposal—received by Seegrid after years of actively marketing the company for a sale or outside investment. The parties to these negotiations each recognize that Seegrid remains a viable business, but that it requires a revised capital structure to pursue the product development and business growth necessary to continue as a going concern. The Plan accomplishes this much-needed financial restructuring, while at the same time maximizing returns for Seegrid's existing stakeholders by providing for a 100% percent return over time to "impaired" classes, allowing existing equity to retain their interests, and preserving jobs and agreements with trade partners. In short, the Plan represents Seegrid's best, and perhaps only, opportunity to successfully reorganize and remain viable as a going concern.

In light of the favorable treatment and outcomes the Plan achieves for all of Seegrid's stakeholders, the Plan has achieved universal acceptance among the classes entitled to vote, and, with one exception, there have been no objections to the Plan or the disclosures and solicitation process related to the Plan. That one exception is a group led by Seegrid's disgruntled former CEO, Anthony Horbal ("Horbal"). After he was terminated as CEO, Horbal embarked on a scorched-earth campaign against Seegrid, its lender, and its directors and officers, including resigning from Seegrid's Board and refusing to nominate a replacement, filing two hundred-plus page state court complaints as well as a complaint in this Court, interfering with Seegrid's business relationships with customers, and refusing to even respond to a request to extend the maturity dates of his notes, which led directly to Seegrid's bankruptcy filing.

2.

Although Horbal has been successful in causing the estate to incur significant expense, he will ultimately be unsuccessful in opposing the Plan.  Seegrid will show at the confirmation hearing that the Plan complies with all applicable provisions of the Bankruptcy Code.  In light of such compliance, the universal support of impaired classes, and the exceptional value delivered to all holders of claims and interests, Seegrid respectfully submits that the Court should confirm the Plan.

## STATEMENT OF FACTS

I.    **SEEGRID'S CORPORATE AND FINANCIAL HISTORY.**

    A.    **Seegrid's Capital Structure.**

Seegrid Corporation ("Seegrid" or the "Debtor") was founded in 2003 by Dr. Hans Moravec and Dr. Scott Friedman to bring automation to high-volume commercial vehicles. Seegrid is a pioneer of automation solutions for high-volume commercial vehicles, including pallet trucks and tow trucks.

Since its inception, Seegrid has raised approximately $61.4 million in funding from investors including its founders and financial investors. The company currently has two classes of shares authorized, comprising Common Stock and Preferred Stock. There are six series of Preferred Stock authorized: Series A Preferred Share Interests, Series A-1 Preferred Share Interests, Series B Preferred Share Interests, Series C Preferred Share Interests, Series C-1 Preferred Share Interests, and Series D Preferred Share Interests. Seegrid's last equity financing was completed in 2009 and raised $7.0 million in proceeds from the sale of Series C-1 Preferred Share Interests. No shares of Series D Preferred have been issued and such shares are being reserved for issuance upon optional conversion of the loans described below.

Seegrid has approximately $45 million in loans outstanding as of September 24, 2014, primarily borrowed from its primary investors, Giant Eagle, Inc. and Giant Eagle of Delaware, Inc. (collectively, "Giant Eagle") and Horbal, HERC Management Services, LLC ("HERC"), Michael Horbal, Apryle Anne Horbal, Donna Anderson Horbal, Screaming Eagle Air, Inc. and Great American Health Plans, Inc. (collectively with Horbal and HERC, the "Horbal Group") in a highly complex secured debt structure that has developed over the last several years out of necessity, rather than design. Over those years, Seegrid continuously believed that it was on the threshold of launching with certain original equipment manufacturers ("OEMs") and gaining

traction in the sales of its own branded trucks (referred to as "<u>Blue Trucks</u>"), which would put Seegrid on the path to profitability. In addition, Seegrid continuously sought to attract outside investors or purchasers. Many of the loans received during this period of flux were intended to be short-term advances against a longer term financing alternative or sale that, unfortunately, never materialized.

Historically, Seegrid was able to raise funds through convertible, unsecured loans from its investors. In October of 2012, however, it became clear that Seegrid would likely need to offer enhanced terms to attract financing in the future. At the time, Seegrid was pursuing up to $4 million in unsecured financing to close in November and December 2012 (the "<u>December 2012 Round</u>"), with Giant Eagle committed to funding $2.18 million. Given that Seegrid would be seeking additional financing a few months later, Seegrid determined that it needed to assure lenders in the December 2012 Round that they would receive the benefit of any future enhancements. Accordingly, the loan documents related to the December 2012 Round provided that participants would receive any enhancements provided to lenders in the next round of financing once the next round reached a threshold of $1 million in funded loans.

Thereafter, in January 2013, Giant Eagle and HERC presented Seegrid with a term sheet proposing a $3 million secured debt offering (the "<u>First Secured Debt Offering</u>"). The First Secured Debt Offering provided that the lenders would receive a security interest in substantially all of Seegrid's assets. The maximum amount of financing under the First Secured Debt Offering was increased by Seegrid from $3 million to $6 million in June 2013.

Later the same year, in December 2013, Giant Eagle presented Seegrid with a term sheet for additional secured funding at the same priority level as the First Secured Debt Offering (the "<u>Second Secured Debt Offering</u>") and, after substantial negotiations led by a special committee

of disinterested members of Seegrid's board, Seegrid and Giant Eagle agreed to terms on the Second Secured Debt Offering.  The loan documents for the Second Secured Debt Offering implemented the loan in two increments of $2 million each, with the first being funded on January 21, 2014, and the second to be funded on March 15, 2014, provided that Seegrid remained reasonably on track with its 2014 business plan.

Giant Eagle funded all $4 million contemplated under the Second Secured Debt Offering notwithstanding Seegrid's failure to make the sales targets outlined in the 2014 business plan. For the two months ending on February 28, 2014, prior to the funding of the second increment of $2,000,000, Seegrid's revenue was $301,615 against projected revenue of $1,498,360.  Through May 2014, shortfalls continued, with revenue of $1,845,255 against projected revenue of $5,388,815.

Due to Seegrid's inability to meet projections, there was an acute need for additional capital to fund continuing operations.  As a result, Giant Eagle provided additional funding under the Second Secured Debt Offering terms in the amount of $600,000 on May 23, 2014 for continuing operations.  Subsequently, on June 11, 2014, Giant Eagle and HERC funded $400,000 and $100,000, respectively, on a senior basis to cover operational losses, followed by Giant Eagle alone funding $928,000 on a senior basis in July 2014.

From August 5, 2014, through October 1, 2014, after the Horbal Group blocked Seegrid's efforts to obtain a longer term financing solution, Giant Eagle funded an additional $1,644,000 in subordinated debt to prevent Seegrid from shutting down and to fund Seegrid's operations and efforts to resolve its debt crisis.

B.    **The Debtor's Historical Operations And Recent Developments.**

Seegrid's corporate headquarters is located in Pittsburgh, Pennsylvania where the company leases 40,200 square feet, housing its research and development, engineering, technical support, global sales and marketing, and corporate functions. Seegrid also maintains an engineering facility in Lowell, Massachusetts.

Over the last decade, Seegrid has developed the first automation system focused on seamlessly converting commercial industrial vehicles (pallet trucks and tow tractors) into low-cost robotic industrial vehicles that do not require additional infrastructure. Robotic industrial vehicles dramatically improve the economics and operations of an existing industry through reduced labor costs and improved efficiency and safety. Unlike previous attempts at vehicle automation, Seegrid's robotic industrial vehicles completely leverage the existing manufacturing, sales and field service operations of original equipment manufacturers.

Seegrid's automation system integrates a proprietary and patented software technology to "see" its environment, map it in a virtual "grid" and guide the vehicle; hence the name "Seegrid." The technology is state of the art yet simple to use, as it does not require additional infrastructure or a specialized team of engineers to install, support, or operate the robotic industrial vehicles. Seegrid's software technology was designed by its team of engineers, including holders of five PhDs, and features sophisticated, state-of-the-art "evidence grid" software technology, stereo camera technology, user interface/sliding autonomy interaction architecture, motion control technology and enterprise and fleet information software technology. Seegrid currently has 31 issued or allowed patents and over 40 patents in process on over 20 matters. These patents and patent applications generally cover the automation of materials handling processes and the underlying robot perception technology. Seegrid has invested over $15.1 million in research and

development since its inception in 2003. These expenses served to develop the technology, commercialize the product and refine the core software and probabilistic volumetric sensing approaches.

For the first commercial application of this technology, Seegrid is using its automation systems to automate pallet trucks, tow tractors, and other industrial vehicles for the materials handling industry. The materials handling industry—specifically, manufacturing and warehousing applications—provides an attractive initial target market for Seegrid's automation solutions because labor costs are high and rising, the market is large, and qualified labor is becoming scarce. Indeed, the biggest challenge facing the material handling industry has historically been managing labor and controlling the associated labor costs. As a result, Seegrid believes that the market is ripe for automated, labor-cost reducing solutions.

Seegrid's founders understood early on that no single company would have the reach and resources to ship robotic vehicles worldwide and developed a two-phase market strategy to address the scale of the opportunity. The first phase of this strategy required Seegrid to develop its own line of Seegrid-branded robotic industrial vehicles, the Blue Trucks, which it marketed directly to end-users. Seegrid believes that this strategy helped Seegrid to better understand the needs of the industry, and establish basic product functionality and a price point in the range of approximately $75,000 to $95,000 in the United States.

The second phase of Seegrid's market strategy was to partner with the top OEMs. These OEMs, as a group, have the end-user relationships, the installed base, and the sales, distribution and service capabilities to ship and support robotic industrial vehicles worldwide. OEMs have been initially receptive as they are looking to capitalize on end-user demand for automation solutions and to deploy higher margin and higher value products into their sales, distribution, and

service channels, also allowing them to generate larger maintenance streams. Through this strategy, Seegrid has reached agreements with a number of the top OEMs and sold a number of automation systems to them. Seegrid continues to work with the OEMs to test and develop Seegrid's automation systems for use with the OEMs' industrial vehicles.

### C.   Seegrid's Revenues.

Seegrid generates revenue from the sale of Seegrid-branded robotic industrial vehicles, the Blue Trucks, to dealers and end-users, the sale of "Guided by Seegrid®" automation systems (sometimes referred to by Seegrid as "S-Kits") used by OEMs to convert their product into robotic industrial vehicles, and the sale of parts and services to support its other products. Prior to 2010, Seegrid also generated revenue from development agreements with third parties.

Seegrid's total revenue for 2011 was $2.4 million, with 57% of revenue derived from the sale of automation systems to OEMs, 34% of revenue from the sale of Seegrid-branded robotic industrial vehicles and the remainder from other services. Total revenue for 2012 was $1.6 million from the sale of Seegrid-branded robotic industrial vehicles (16 units) and services and the sale of 11 S-Kits to OEMs. For 2013, total revenue was $6.2 million from the sale of 73 Seegrid-brand trucks and services. Approximately 56% of those sales were to a single end-user and Seegrid's largest customer. For 2014, Seegrid's sales figure forecast projected $11.3 million in sales as of August 31, 2014, but Seegrid was only able to achieve $3.3 million by that date in part because sales to OEMs, sales in Europe and sales of Blue Trucks have been slower than previously projected.

D.      **Events Leading To The Commencement Of This Chapter 11 Case.**

1.      **Seegrid Fails To Attract Outside Financing.**

For the past several years, Seegrid has sought an outside investor or purchaser to enable it to exploit and perfect the technology that forms the basis of its vision guided systems. Specifically, on February 9, 2010, Seegrid engaged Merrill Lynch to advise Seegrid and seek out a potential sale of greater than $5 million in voting securities. Although Merrill Lynch was not successful, Seegrid continued to seek out investors.

In September 2011, Seegrid engaged Needham & Company ("Needham") to locate and secure new investors or potential buyers under a nine-month engagement. During Needham's engagement, Seegrid and Needham actively marketed the company for a capital raise. In connection with this effort, Needham contacted at least 76 potential investors. Of those investors, at least 26 potential investors actively reviewed the investment opportunity, at least 5 parties expressed further interest, and at least 3 reviewed Seegrid's Confidential Information Memorandum. Needham also helped the company market itself for a potential sale, contacting at least 62 potential purchasers. Of these 62 potential purchasers, approximately 39 actively reviewed the opportunity, and 4 expressed further interest. Despite much effort by Needham and Seegrid, however, Needham was not successful in raising new investments or locating a buyer.

At the same time that Needham was marketing the company, Seegrid also engaged Gulf Capital Group, Inc. ("Gulf Capital") to provide consulting and financing services seeking investors from the countries belonging to the Gulf Cooperation Council, the greater Middle East and North Africa. Gulf Capital contacted at least 22 potential investors under its arrangement with Seegrid. In support of Gulf Capital's efforts, Seegrid's senior management participated in a

series of trips to Qatar to meet with interested parties.  Ultimately, Gulf Capital was unsuccessful in landing investors.

During these engagements, and in between active engagements, Seegrid's investors and senior management undertook efforts of their own to attract investors and strategic buyers through their networks and contacts.  In addition, several investors and companies reached out to Seegrid directly to explore opportunities.  These inquiries resulted in a number of meetings and visits both to Seegrid and to potential investors and acquirers, but none of these opportunities matured into an investment or acquisition offer.

In April 2013, Seegrid engaged OEM Capital as financial advisor to explore potential new sources of financing and potential acquisitions of Seegrid.  OEM Capital was selected after a search process that included considering several other investment banking advisors.  OEM Capital raised interest from potential investors and purchasers, but no potential transaction progressed beyond the initial stage, and Seegrid ended its engagement with OEM Capital in March 2014 due to the lack of results.  Prior to ending the engagement, OEM Capital considered or contacted over 115 parties, some of whom spent significant resources and efforts evaluating Seegrid before declining the opportunity.

After March 2014, Seegrid's management, Board members, and investors continued to seek outside investors and/or a strategic acquirer and were in active discussions and due diligence with four potential investors, the last of which ended in July 2014 with no viable offers.

> 2.    **Seegrid Exhausts Willingness Of Existing Investors Other Than Giant Eagle To Fund Operating Loans.**

Until 2012, Seegrid's early research and development and operating shortfalls were funded by equity investments and, later, by unsecured loans from existing shareholders.  By late 2012, however, investors' willingness to fund through equity or unsecured loans had evaporated.

In early 2013, when the First Secured Debt Offering was implemented, Giant Eagle and HERC had invested at a level above which they were comfortable, and the First Secured Debt Offering was intended to fund Seegrid's operating losses while Seegrid engaged OEM Capital as investment banker to attempt to sell Seegrid.

In addition to its efforts to seek long-term outside investments and its continued efforts to seek short-term funding from its current investors as a last resort, Seegrid took a series of steps in late 2012 and early 2013 to reduce its expenses through workforce reductions, wage reductions, reduced healthcare benefits, renegotiation of its headquarters lease and other changes. These steps by Seegrid management reduced the monthly operating expense by approximately 25%, or $300,000 (from a monthly burn rate of approximately $1.15 million down to $850,000). Notwithstanding these efforts and an increase in Seegrid-brand product sales, commencing in 2013, Seegrid had to rely almost exclusively on loans and advances from Giant Eagle and HERC to continue operations.

In September 2013, Giant Eagle requested a presentation from Seegrid's management regarding long-term cash needs and a forecast for 2014. This presentation was made in November 2013 and resulted in the Second Secured Debt Offering.

The tenor of Seegrid's relationship with Giant Eagle and HERC briefly improved when Seegrid passed reliability testing with the largest OEM, and Seegrid moved closer to a launch after many delays. In late 2013, it was expected that the launch would occur in April of 2014. Ultimately, due to further delays, this launch did not occur until June of 2014.

In addition, Seegrid's prospects were also temporarily lifted by the increased levels of Seegrid-brand product sales and the success Seegrid experienced with its largest customer in 2013, lending support to Seegrid's prediction that other customers would see the utility of

Seegrid's products in their operations and would want to expand use to many different applications throughout their facilities.

Nonetheless, by 2014, only Giant Eagle was willing to lend to Seegrid, with the exception of HERC funding $100,000, as compared to approximately $6.2 million in funding from Giant Eagle in 2014. Giant Eagle informed Seegrid that it had grown wary of providing additional funding, and the funding provided by Giant Eagle in 2014 became milestone-based or tied to specific sales progress based on the budget presented in November 2013. Despite Giant Eagle's growing reluctance to fund Seegrid's operating losses, however, Giant Eagle (along with HERC and other lenders from time to time) made convertible loans to Seegrid from April 2012 through June 2014.

By late June 2014, Giant Eagle was not willing to make further loans based on what Giant Eagle perceived to be an inflated valuation of Seegrid. Indeed, when Giant Eagle proposed a new financing structure by term sheet dated July 2, 2014, that called for $10 million in long term financing, Giant Eagle's proposal valued Seegrid at $12.5 million on a pre-funding basis (the "July 2, 2014 Term Sheet"). Unlike prior debt financing transactions, the July 2, 2014 Term Sheet contemplated the creation of an operating subsidiary with new equity funding to flow into the subsidiary.

3.      **Horbal Blocks Seegrid's Ability To Obtain Financing From Willing Sources.**

Unlike prior debt financing transactions, the July 2, 2014 Term Sheet was intended not only to allow Seegrid to become current on its obligations through the end of 2014, but also to provide sufficient funding to carry Seegrid through to cash flow positive operations. As with prior offerings, the opportunity was also to be offered to the other accredited investor shareholders. Absent participation, existing shareholders interests would have been diluted, but

the offering proposed to preserve 10% of the post-closing value of Seegrid for employees, an amount that was subsequently negotiated up to 15% by Seegrid.  Seegrid viewed the employee component as particularly important because employee options were substantially diluted over time, and the proposal would have restored material value to the employees, who are the most critical component for continued value enhancement for Seegrid's stakeholders.

Due to the dilutive nature of the July 2, 2014 Term Sheet, Giant Eagle conditioned the proposal upon the unanimous approval of Seegrid's Board of Directors and majority approval of the disinterested stockholders.  Horbal, who was a member of Seegrid's Board of Directors at the time of the vote on July 11, 2014, voted against the July 2, 2014 Term Sheet as amended and reissued on July 10, 2014.  The Horbal Group also refused to extend the September 30, 2014, maturity date of the debt held by the Horbal Group.

Seeking alternatives, Seegrid's Board directed management and counsel on July 21, 2014, to discuss three different financing alternatives with Giant Eagle and the Horbal Group:  (i) provide four to five months of interim financing to allow Seegrid to engage in a thorough marketing process for a sale of Seegrid, (ii) provide ongoing funding for Seegrid to continue executing its business plan, including a proposal to Giant Eagle that the July 2, 2014 Term Sheet (as modified on July 10, 2014) be put back on the table, or (iii) provide sufficient funding to allow Seegrid to wind up its operations in an orderly liquidation.

In response, Giant Eagle presented a Term Sheet to Seegrid on July 22, 2014 (the "July 22, 2014 Term Sheet"), with terms similar to the July 2, 2014 Term Sheet (as modified on July 10, 2014), but with the addition of warrant coverage.  The July 22, 2014 Term Sheet was conditioned on the approval of the Horbal Group, along with certain waivers from the Horbal Group.  Seegrid's Board met on July 22, 2014, and July 23, 2014, to discuss the July 22, 2014

Term Sheet, and Giant Eagle's request to Seegrid that Seegrid respond with a specific counter-proposal if the terms of the July 22, 2014 Term Sheet were not acceptable.

At the Board meeting, Seegrid's Board directed management and counsel to counter the terms of the July 22, 2014 Term Sheet with specific revisions, including a pre-funded 60-day marketing period for a sale of Seegrid, an increased valuation, and a reduced warrant exercise period. In subsequent discussions, Giant Eagle expressed a willingness to be flexible on terms, provided that Seegrid would be able to obtain the required consent and waivers from the Horbal Group.

The Seegrid Board met again on July 24, 2014, to discuss the July 22, 2014 Term Sheet and Giant Eagle's response to Seegrid's counter-proposal. By the end of this lengthy Board meeting, it was clear that the Horbal Group would not provide the necessary consent and waivers. Counsel for Seegrid therefore was directed to advise Giant Eagle that the July 22, 2014 Term Sheet was not approved.

With no feasible alternative source of capital acceptable to the Horbal Group, Seegrid's Board considered all options available to Seegrid, including a new proposal by Giant Eagle to fund Seegrid's operations in chapter 11 pending a thorough but prompt section 363 sale process, with Giant Eagle serving as a stalking horse. Giant Eagle, however, subsequently withdrew its proposal for a sale process and, instead, proposed a loan that would have avoided the risk, expense and negative impact of a bankruptcy filing. Specifically, on August 20, 2014, Giant Eagle proposed funding up to an additional $8 million under a convertible note and warrant transaction, which would be opened up to all investors who wished to participate with Giant Eagle, on the same terms and at the same valuation as the January 2014 note purchase transaction, including a provision to market the company, with the sole exception that the

maturity date for all existing and new notes be extended from September 30, 2014 to September 30, 2019.  Given the urgency of Seegrid's financial condition, the August 20, 2014 proposal required a preliminary (nonbinding) approval from both Seegrid and the Horbal Group on or before August 26, 2014.

Seegrid immediately communicated the terms of the proposal to the Horbal Group, and offered to provide any information required in order to allow the Horbal Group to consider the request for the Horbal Groups' preliminary approval of the proposal.  Seegrid explained to the Horbal Group that the proposal was the only alternative to bankruptcy available to Seegrid, and that the funding proposal was on the same terms as previously approved by the Seegrid Board and by the Horal Group, except for the 5 year extension of the notes.  The Horbal Group requested extensive information to allow it to review the proposal, which Seegrid promptly provided.  However, the Horbal Group never responded to the August 20, 2014, proposal.

Horbal and the Horbal Group refused to consent to this final effort to avoid a bankruptcy filing and refused to extend the maturity of the Seegrid notes they held, instead issuing a demand for full payment of their notes—in excess of $9 million.  Because of the Horbal Group's refusal to extend the maturity of their notes and demand for immediate payment, Seegrid had no option but to seek bankruptcy protection.

II.    **THE PREPACKAGED PLAN.**

The Plan is the product of extensive, arm's-length negotiations, with the goal of maximizing value for all stakeholders with minimal disruption to Seegrid's operations, employees, customers and vendors.  Seegrid believes that the Plan accomplishes these goals.  In summary, the Plan provides that:

- The Debtor shall form a wholly-owned subsidiary ("Seegrid Sub") that will receive all of the Debtor's operating assets, including without limitation, its intellectual property and the name "Seegrid."

- Certain secured debt of Giant Eagle will be converted dollar for dollar into Seegrid Sub Series A Preferred Shares. To the extent that the debt converted is less than $10 million, and subject to the terms of the Plan Support Agreement, within one year after the Effective Date, Giant Eagle shall have the rights to purchase such additional Seegrid Sub Series A Preferred Shares to enable it to have a total of $10 million in Seegrid Sub Series A Preferred Shares.

- All of the Debtor's other direct and indirect stockholders and convertible debt holders (the "Investors") shall also have the right to participate in the issuance of the Seegrid Sub Series A Preferred Shares in an amount that allows such Investors to maintain their direct and indirect *pro rata* share of the Seegrid Sub on a fully diluted, as converted basis, or such larger amount as the board of the Debtor may determine.

- The Debtor's remaining secured and unsecured noteholders will have the maturity dates on their notes extended by five years.

- The Debtor's trade creditors and other general unsecured creditors will have the option of receiving 75 cents on the dollar on their claims upon the effectiveness of the Plan or 50 cents on the dollar on their claims upon Plan effectiveness and the other 50 cents on their claim one year later.

- The Debtor's stockholders will retain their interests in Seegrid.

III.    **THE SOLICITATION PROCESS.**

Prior to the date Seegrid filed its voluntary bankruptcy petition, October 21, 2014 (the "Petition Date"), and to effectuate the terms of the proposed consensual restructuring, Seegrid caused its balloting agent (the "Balloting Agent") to distribute packages (the "Solicitation Packages") containing: (a) the Plan and the disclosure statement thereto (the "Disclosure Statement"), (b) the ballot (each, a "Ballot" and collectively, the "Ballots") for each holder of a claim in Classes 1-A, 1-B, 1-C, 1-D, 2-A and 2-B, the only impaired classes of creditors entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"), and (c) directions for voting on the Plan and otherwise making any necessary elections (such as manner and timing of distributions or whether the holder wished to participate in the equity issuances, as appropriate) under the Plan. The Balloting Agent transmitted the Solicitation Packages to the Voting Classes

by overnight mail on October 3, 2014.  Holders of claims in Classes 3-A, 3-B, 3-C, 3-D, 3-E and 4 (the "Non-Voting Classes") were not provided a Solicitation Package, but were provided with various information concerning the proposed restructuring and an election form to participate in the issuance of the Seegrid Sub Series A Preferred Shares (the "Offer Notice").

Seegrid established October 17, 2014, at 5:00 p.m. (prevailing Eastern Time) as the deadline for the Voting Classes to vote to accept or reject the Plan (the "Voting Deadline"). Each Voting Class was explicitly informed in the applicable Ballot that such Holder needed to submit its Ballot such that it is actually received by the Balloting Agent on or before the Voting Deadline to be counted.  Pursuant to the instructions contained in the Ballot, claimants in the Voting Classes were required to return the completed Ballots and other necessary forms by either electronic mail, first class mail, or overnight mail.

On October 21, 2014, the Balloting Agent filed the *Declaration of Kathleen M. Logan Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting Plan of Reorganization for Seegrid Corporation* (D.I. 12) (the "Voting Report").  As detailed in the Voting Report, all classes of claims and interests entitled to vote on the Plan accepted the Plan.  Additionally, on December 16, 2014, the Balloting Agent filed a series of declarations (D.I. 231, 232, and 233) (the "Solicitation Declarations") detailing the information transmitted to both the Voting Classes and Non-Voting Classes in connection with the solicitation of the Plan.

IV.     **BANKRUPTCY.**

On October 21, 2014, Seegrid filed its voluntary petition for bankruptcy protection.  On October 22, 2014, at the request of Seegrid, the Court entered the *Order (A) Scheduling A Combined Hearing On Debtor's Disclosure Statement And Plan Confirmation, (B) Establishing An Objection Deadline And Procedures For Objecting To The Disclosure Statement, Plan And Assumption Of Executory Contracts And Unexpired Leases, (C) Approving Solicitation*

*Procedures, (D) Approving The Form And Notice Of The Combined Hearing, (E) Waiving The Requirement For A Meeting Of Creditors And (F) Granting Related Relief* (D.I. 26) (the "Scheduling Order").  The Scheduling Order set a number of deadlines in connection with this case.  Most importantly, it set the deadline by which all parties in interest (except the Horbal Group and the Office of the United States Trustee) were to object to confirmation of the Plan and the approval of the disclosure and solicitation requirements thereto (the "Solicitation Procedures"), including approval of the Disclosure Statement as November 21, 2014 (the "General Objection Deadline").

Since the Petition Date, Seegrid has amended its Plan to streamline the confirmation hearing.  The amendments, detailed in the *First Amendment to Plan of Reorganization of Seegrid Corporation under Chapter 11 of the Bankruptcy Code* dated November 14, 2014 (D.I. 131), provide for payment in full in cash with interest to HERC on its First Priority Secured June 11 Noteholder Claim (Class 1-A).  The amendment effectively resolves any question of whether HERC's first priority secured claim is unimpaired and narrows significantly the remaining confirmation issues, including by obviating the need for the Court to evaluate whether the Plan is fair and equitable or discriminates unfairly under section 1129(b) of the Bankruptcy Code because all classes are either unimpaired or have voted to accept the Plan.[2]

The amendments also revised the treatment of Giant Eagle's Third Priority Secured Bridge Notes to extend their maturity to the fifth anniversary of the Effective Date, release the

---

[2]     At the hearing on December 16, 2014, the Horbal Group conceded, as it must, that the Plan was not a "cramdown" chapter 11 plan proceeding under section 1129(b) but was proceeding as a consensual chapter 11 plan under section 1129(a).  *Dec. 16, 2014 Mot. in Limine Hr'g Tr.* at 52:18-21.

related liens, and replace the liens with a third priority replacement lien on the Seegrid Sub Common Stock issued to Reorganized Seegrid pursuant to Article IX of the Plan.

On November 21, 2014, the General Objection Deadline passed with no objections filed by any party in interest in these cases.  Only the Horbal Group currently actively contests the relief sought by Seegrid.

## ARGUMENT

I.    **THE SOLICITATION AND VOTING PROCEDURES COMPLY WITH THE BANKRUPTCY CODE AND THE BANKRUPTCY RULES, AND THEREFORE SHOULD BE APPROVED.**

To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, this Court must determine whether the Solicitation Procedures complied with sections 1125(g) and 1126(b), (f) and (g) of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  As set forth below, the Solicitation Procedures complied with each of these requirements and therefore should be approved.

A.    **The Debtor's Prepetition Solicitation Complies With The Requirements Of Sections 1125(g) And 1126(b) Of The Bankruptcy Code.**

1.    **The Solicitation Is Exempt From Federal And State Securities Registration Requirements And Proxy Rules.**

Sections 1125(g) and 1126(b) of the Bankruptcy Code govern the acceptance of a plan of reorganization by a holder of a claim or interest prior to the commencement of a chapter 11 case. Section 1125(g) provides:

> Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

11 U.S.C. § 1125(g).

Section 1126(b) of the Bankruptcy Code provides that "a holder of a claim or interest that has accepted or rejected the plan before the commencement of [the chapter 11 case] is deemed to have accepted or rejected such plan" if:

> (1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or
>
> (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b).

The Debtor has complied with these requirements.  To the extent that the Debtor's solicitation under the Plan is deemed to constitute an offer of new securities, the Debtor is exempt from the registration requirements of the Securities Act (and of any equivalent state securities or "blue sky" laws) with respect to such offering under section 4(a)(2) of the Securities Act (formerly section 4(2), but re-designated 4(a)(2) under the JOBS Act of 2012) and Regulation D promulgated thereunder.  Regulation D exempts from registration under the Securities Act all "transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(a)(2) (formerly § 77d(2)).  As the transaction contemplated by the Plan constitutes a private placement of securities, the Debtor has complied with the requirements of section 4(a)(2) of the Securities Act and Regulation D.  The offer to purchase new equity in Seegrid Sub was made only to those creditors who are "accredited investors" as defined in Regulation D under the Securities Act, as investors were required to certify on their Election Forms that they were accredited investors.  *See* Solicitation Declarations.  Prepetition solicitations relying on the

exemption in section 4(a)(2) of the Securities Act have been approved in other prepackaged chapter 11 cases.  *See, e.g.*, *In re NTK Holdings, Inc.,* Case No. 09-13611 (KJC) (Bankr. D. Del. Dec. 4, 2009); *In re Recycled Paper Greetings, Inc.,* Case No. 09-10002 (KG) (Bankr. D. Del. Feb. 16, 2009); *In re Vertis Holdings. Inc.,* Case No. 08-11460 (CSS) (Bankr. D. Del. Aug. 26, 2008); *In re Bally Total Fitness a/Greater NY, Inc.,* Case No. 07-12395, 2007 WL 2779438, at *11 (Bankr. S.D.N.Y. Sept. 17, 2007).

Even though the solicitation was exempt from the securities registration and proxy solicitation requirements of nonbankruptcy law, rules, and regulations, to the extent that the solicitation constituted an offer of securities, such solicitation nevertheless is subject to the antifraud provisions of section 17 of the Securities Act, and to the extent that such solicitation involves the sale of securities, it is subject to the anti-fraud and anti-manipulation provisions of section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  The Debtor believes that the Disclosure Statement and the solicitation comply with the requirements of section 10(b) and Rule 10b-5. The Debtor endeavored to disclose all material facts and is not aware of any untrue statement of material fact in the Disclosure Statement or any related documents or communications.  The Debtor does not believe that the Disclosure Statement omits any material fact.  Moreover, the Debtor had no intention of making any untrue statement or omitting any material fact.

Because the Solicitation Procedures complied with applicable nonbankruptcy law, votes were solicited in a manner that complied with applicable nonbankruptcy law, and the solicitation was in compliance with all applicable nonbankruptcy laws, rules and regulations governing the adequacy of disclosure, the Debtor has satisfied sections 1125(g) and 1126(b) of the Bankruptcy Code.

2. **The Disclosure Statement Contains Adequate Information Within The Meaning Of Section 1125(a)(l) And As Required By Section 1126(b) Of The Bankruptcy Code.**

To the extent that the solicitation did not constitute an offer or sale of securities, there is no applicable nonbankruptcy law governing such solicitation. In the absence of applicable nonbankruptcy law, section 1126(b) of the Bankruptcy Code requires that the Disclosure Statement and solicitation disclose "adequate information" as defined in section 1125 of the Bankruptcy Code. 11 U.S.C. § 1126(b). Section 1125(a)(l) of the Bankruptcy Code defines "adequate information" as follows:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1). Thus, a debtor's disclosure statement must, as a whole, provide information that is reasonably practicable to permit an informed judgment by impaired creditors entitled to vote on the plan. *See Krystal Cadillac-Oldsmobile GMC Truck. Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003). A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

The bankruptcy court has broad discretion to determine the adequacy of the information contained in a disclosure statement. *See Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1156–57 (5th Cir. 1988); *In re Oxford Homes*, 204 B.R. 264, 269 (Bankr. D. Me. 1997). Congress granted bankruptcy courts discretion in order to facilitate the effective reorganization of debtors in the broad range of businesses in which chapter 11 debtors engage and the array of circumstances that accompany chapter 11 cases. *See* H.R. Rep. No. 95-595, at 408–09 (1977); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (adequacy of disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties"). Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

In that regard, courts generally examine a number of factors to determine whether the disclosure statement contains adequate information. *See*, *e.g.*, *In re Scioto Valley Mort. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing factors); *see also In re Ferretti*, 128 B.R. at 18-19 (listing similar factors). The factors are not meant to be comprehensive, nor must a debtor provide information on all factors. *Id.* Rather, the bankruptcy court must decide what is appropriate in each case. *Id.* (noting that not every debtor needs to provide information on each factor); *see also In re Phoenix Petroleum Co.*, 278 B.R. at 393 (making use of a list of factors but cautioning that "no one list of categories will apply in every case").

Here, the Disclosure Statement contains adequate information with respect to the factors considered by courts, including, but not limited to, a discussion of:

a.     an overview of the Plan, including a chart describing the treatment of each class in the introduction to the Disclosure Statement (Disclosure Statement Arts. III & VI);

b.     the operation of the Debtor's business (Disclosure Statement Art. IV);

c.     the indebtedness and corporate structure of the Debtor and information regarding claims and administrative expenses (Disclosure Statement Arts. IV & VI);

d.     key events leading to the commencement of the Debtor's chapter 11 case (Disclosure Statement Art. IV);

e.     events anticipated to occur during the chapter 11 case (Disclosure Statement Art. V);

f.     the proposed capital and debt structure of the Reorganized Debtor (Disclosure Statement Art. VI);

g.     information regarding the future management of the Debtor (Disclosure Statement Art. VI);

h.     financial projections and valuation analysis (Disclosure Statement Ex. B);

i.     a liquidation analysis (Disclosure Statement Ex. C);

j.     information regarding securities issued under the Plan (Disclosure Statement Art. VI and Ex. A);

k.     risk factors affecting the Debtor (Disclosure Statement Art. XIII);

l.     requirements for confirmation of the Plan (Disclosure Statement Arts. IX and XII); and

m.     tax consequences of the Plan (Disclosure Statement Art. XIV).

In addition to the types of information that bankruptcy courts typically examine, the Disclosure Statement also provides an analysis of the alternatives to confirmation and consummation of the Plan and a description of the voting process. Disclosure Statement Arts. XII (voting process) and XV (alternatives to the Plan).

Accordingly, the Debtor submits that the Disclosure Statement contains the information typically considered by bankruptcy courts and found to be adequate and respectfully requests that the Court approve the Disclosure Statement as containing "adequate information" as defined by section 1125(a) and required by of section 1126(b) of the Bankruptcy Code.

3.    **It Is Not Necessary To Solicit Votes From Classes Presumed To Accept Or Deemed To Reject The Plan.**

The holders of Claims or Equity Interests in each of the Unimpaired Classes[3] are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  The Bankruptcy Code does not require the solicitation of votes from such holders. Specifically, section 1126(f) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

11 U.S.C. § 1126(f).  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims or Equity Interests in each of the Unimpaired Classes are conclusively presumed to accept the Plan and have not been solicited.

B.    **The Solicitation Materials, Ballots, And Solicitation Procedures Comply With The Requirements Of Bankruptcy Rules 3017(d) And 3018(c).**

Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan of reorganization:

---

[3]    Classes 1-A, 1-D, 3-A, 3-B, 3-C, 3-D, 3-E, and 4 are unimpaired (the "Unimpaired Classes").

Upon approval of a disclosure statement,—except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders—the debtor in possession, trustee, proponent of the plan, or clerk as the court orders shall mail to all creditors and equity security holders, and in a chapter 11 reorganization case shall transmit to the United States trustee,

    (1) the plan or a court-approved summary of the plan;

    (2) the disclosure statement approved by the court;

    (3) notice of the time within which acceptances and rejections of the plan may be filed; and

    (4) any other information as the court may direct, including any court opinion approving the disclosure statement or a court-approved summary of the opinion.

In addition, notice of the time fixed for filing objections and the hearing on confirmation shall be mailed to all creditors and equity security holders in accordance with Rule 2002(b), and a form of ballot conforming to the appropriate Official Form shall be mailed to creditors and equity security holders entitled to vote on the plan.

Fed. R. Bankr. P. 3017(d).  Bankruptcy Rule 3017(d) also provides, in relevant part, as follows:

If the court orders that the disclosure statement and the plan or a summary of the plan shall not be mailed to any unimpaired class, notice that the class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan or summary of the plan and disclosure statement may be obtained upon request and at the plan proponent's expense, shall be mailed to members of the unimpaired class together with the notice of the time fixed for filing objections to and the hearing on confirmation.

*Id.*

Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."  Fed. R. Bankr. P. 3018(c).  In addition, Bankruptcy Rule 2002(l) permits a court to "order notice by publication if

it finds that notice by mail is impracticable or that it is desirable to supplement the notice." Fed. R. Bankr. P. 2002(l).

The Debtor submits that its solicitation of the Plan complied with all applicable provisions of the Bankruptcy Code and Bankruptcy Rules, as described below.

### 1.    **Solicitation Packages.**

As required by Bankruptcy Rule 3017(d), the Solicitation Materials included the Disclosure Statement, the Plan, and notice of the deadline to submit Ballots to accept or reject the Plan. The Solicitation Materials were mailed to creditors in the Voting Classes as described in the Voting Report.

### 2.    **Confirmation Hearing Notice.**

In addition, the Debtor distributed a notice of the combined hearing on the Solicitation Procedures, Disclosure Statement and Plan (the "Confirmation Hearing Notice") to creditors and equity holders in compliance with the Scheduling Order and published the Confirmation Hearing Notice in The Pittsburgh Post-Gazette. The Confirmation Hearing Notice provided that copies of the Plan and the Disclosure Statement could be obtained upon request to Debtor's counsel, are on file with the Clerk of the Bankruptcy Court during normal Court business hours, and are available for inspection on the Bankruptcy Court's website at http://www.deb.uscourts.gov or by emailing the Debtor's claims and balloting agent at SeeGrid@loganandco.com. The Confirmation Hearing Notice also described the procedures and deadline for submitting an objection to confirmation of the Plan.

The Solicitation Procedures, including publication of the Confirmation Hearing Notice, afforded parties in interest ample notice of these proceedings. As such, the Debtor requests that the Solicitation Procedures be approved and that the Court find that the Debtor was not required to distribute copies of the Plan or the Disclosure Statement to any holder of a Claim against or

Equity Interest in the Debtor within a class under the Plan that is deemed to accept the Plan. As noted above, pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, solicitation of creditors in such classes is not required. As such, the Debtor submits that its service of the Confirmation Hearing Notice satisfies the requirements of Bankruptcy Rule 3017(d).

3.    **Ballots.**

Bankruptcy Rules 3017(d) and 3018(c) require a form of ballot substantially conforming to Official Form No. 14. The Ballots are based on Official Form No. 14, but were modified to address the particular aspects of this chapter 11 case and to be relevant and appropriate for each class of impaired Claims entitled to vote on the Plan. To be counted as votes to accept or reject the Plan, the Ballots stated that all Ballots must be properly executed, completed and delivered to the Voting Agent so that they are received no later than the Voting Deadline. In addition, each of the Ballots was specifically designed to conform to the Plan.

> **C.    The Solicitation Period Complied With Applicable Nonbankruptcy Law And Was Reasonable Under Bankruptcy Rule 3018(b).**

Bankruptcy Rule 3018(b) provides, in relevant part, that (i) the plan must have been transmitted to substantially all creditors and equity security holders of the same class, (ii) the time prescribed for such creditors and equity security holders to accept or reject the plan must not have been unreasonably short and (iii) the solicitation must have been in compliance with section 1126(b) of the Bankruptcy Code. Fed. R. Bankr. P. 3018(b).

As noted above, the Solicitation Package was distributed to holders of Claims in the Voting Classes by Federal Express overnight mail on October 3, 2014, with the Voting Deadline of October 17, 2014. The Debtor's solicitation period ran approximately two (2) weeks (the "Solicitation Period"). Importantly, the Debtor's voting creditor base is sophisticated. Therefore, the Solicitation Period was adequate and not unreasonably short under the particular

circumstances of the Debtor's case as evidenced by, among other things, the amount of voter participation.  The solicitation elicited significant voter participation from the relatively small number of claimants in the Voting Classes.  For example, 77 of the Debtor's trade creditors and other general unsecured creditors submitted ballots casting a timely vote on the Plan (and all but two voted to accept the Plan, one of which is a member of the Horbal Group).

Solicitation periods of approximately two weeks for prepackaged bankruptcy plans such as this one are "presumptively reasonable."  *See, e.g.*, *General Order M-454 of the United States Bankruptcy Court for the Southern District of New York, Dated June 27, 2013, Approving Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York* (providing that a 14-day solicitation for non-publicly traded securities is presumptively reasonable for a prepackaged plan).

In light of the foregoing, the Debtor submits that the Solicitation Period in this case complied with applicable nonbankruptcy law and, given the responses received within the Solicitation Period, was not unreasonably short, thereby complying with section 1125(g) of the Bankruptcy Code and Bankruptcy Rule 3018(b), respectively.

### D.    The Solicitation Procedures Should Be Approved Under Bankruptcy Rule 3017(e).

Bankruptcy Rule 3017(e) requires that this Court "consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to the beneficial holders of stock, bonds, debentures, notes and other securities, determine the adequacy of the procedures, and enter any orders the court deems appropriate."  Fed. R. Bankr. P. 3017(e). Here, the Debtor caused the Solicitation Materials, including the Disclosure Statement, to be distributed to the Voting Classes to solicit votes to accept or reject the Plan as described in the

Voting Report.  The Debtor submits that the Solicitation Procedures were appropriate and that the Court should enter the Confirmation Order approving such procedures.

Accordingly, based on the foregoing and the record on the Scheduling Motion, the Debtor submits that the Solicitation Materials and Solicitation Procedures should be approved by this Court, as they satisfy the requirements of sections 1125(g) and 1126(b), (f) and (g) of the Bankruptcy Code and Bankruptcy Rules 3017(d) and (e) and 3018(b) and (c).

## II.    **THE PLAN SHOULD BE CONFIRMED.**

To obtain confirmation of the Plan, the Debtor must demonstrate by a preponderance of the evidence that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code.  *See*, *e.g.*, *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)* 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").  *See also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).

Through the record in this bankruptcy case, the Voting Report and testimonial evidence that may be adduced at or before the Confirmation Hearing, the Debtor will demonstrate, by a preponderance of the evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

### A.    **Section 1129(a)(1): The Plan Complies With Applicable Provisions Of The Bankruptcy Code.**

Section 1129(a)(l) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(l).  The legislative history of section 1129(a)(1) informs that this provision encompasses the requirements of sections 1122

and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively.  H.R. Rep. No. 95-595,  at 412 (1977);  S. Rep. No. 95-989,  at 126 (1978); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988*); In re S & W Enters.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was more directly aimed at were Sections 1122 and 1123.").

As demonstrated below, the Plan fully complies with the requirements of sections 1122 and 1123 and all of the other applicable provisions  of the Bankruptcy Code.

1.    **The Plan Complies With Section 1122 Of The Bankruptcy Code.**

Section 1122(a) of the Bankruptcy Code provides in pertinent part as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  To satisfy section 1122, it is not necessary that all substantially similar claims or interests be included in the same class, but only that all claims or interests classified together be substantially similar to each other.  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (D. Del. 2006).  The Third Circuit, among others, has recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that the classification is proper as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Jersey City Med. Ctr.*,

817 F.2d 1055, 1061 (3d Cir. 1987) (allowing a plan proponent to group similar claims in different classes, but recognizing that separate classes of claims must be reasonable).

Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights; and (b) where there are good business reasons for separate classification. *See*, *e.g.*, *In re Kaiser Aluminum Corp.*, 2006 WL 616243, at \*5 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights).

The Plan provides for the separate classification of Claims against, and Equity Interests in, the Debtor based upon differences in the legal nature or priority of such Claims and Equity Interests. The Plan designates the following twelve (12) Classes of Claims and Equity Interests: (1) Class 1-A, First Priority Secured June 11 Noteholder Claims; (2) Class 1-B, First Priority Secured Bridge Noteholder Claims; (3) Class 1-C, Second Priority Secured Noteholder Claims; (4) Class 1-D, Third Priority Secured Noteholder Claims; (5) Class 2-A, Noteholder General Unsecured Claims; (6) Class 2-B, Other General Unsecured Claims; (7) Class 3-A, Series A Preferred Share Interests; (8) Class 3-B, Series A-1 Preferred Share Interests; (9) Class 3-C, Series B Preferred Share Interests; (10) Class 3-D, Series C Preferred Share Interests; (11) Class 3-E, Series C-1 Preferred Share Interests; and (12) Class 4, Common Stock.

In general, the Plan's classification scheme follows the Debtor's prepetition capital structure. The Plan classifies the Debtor's prepetition secured debt separately from its unsecured debt. The Plan divides the Debtor's issuances of prepetition secured debt into four (4) separate classes based on priority and the relevant agreements giving rise to such Claims. *See Brady v. Andrew (In re Commercial W. Fin. Corp.)*, 761 F.2d 1329, 1338 (9th Cir. 1985) (holding that separate classification of secured claims is appropriate).

Likewise, the Plan classifies unsecured Claims against the Debtor according to their legal nature.  Noteholder General Unsecured Claims in Class 2-A are classified separately from Other General Unsecured Claims in Class 2-B because of the differences in the legal nature of claims and the treatment of the claims under the Plan.  Specifically, Class 2-A comprises Noteholder claims that represent long-term debt of the Debtor, and the terms of the underlying Unsecured Notes are left unaltered under the Plan except for extending the maturity date to five years from the Effective Date of the Plan.  By comparison, Class 2-B comprises other general unsecured claims, most of which are short-term, trade debt.  Claims in that class are being paid 50% of their Allowed Claim upfront in Cash, with the remainder in a non-interest bearing note, subject to the ability to elect to receive 75% in Cash but no note.  Similarly, the Debtor's various classes of Preferred Stock and its Common Stock are separately classified on account of the distinct legal rights afforded to each class of stock.

Accordingly, the Debtor's classification of Claims and Equity Interests does not prejudice the rights of holders of such Claims and Equity Interests, is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.  *See Olympia & York Fla. Equity Corp. v. Bank of N.Y.  (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed "considerable discretion to classify claims  and interests  according to the facts and circumstances of the case" so long as the classification scheme does not violate basic priority rights or manipulate voting).

### 2.    __Section 1122(b) – Convenience Classes.__

Section 1122(b) is an elective, not mandatory, provision relating to the designation of a class of de minimis claims for administrative convenience.  The Plan does not include a convenience class.  Therefore, section 1122(b) is inapplicable.

3.      **Section 1123(a): The Plan Complies With All Of The Requirements Of Section 1123(a) Of The Bankruptcy Code.**

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply.  *See* 11 U.S.C. § 1123(a).  As demonstrated herein, the Plan fully complies with each enumerated requirement.

a.      **Section 1123(a)(l): Designation of Classes of Claims and Equity Interests.**

Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests subject to section 1122 of the Bankruptcy Code.  11 U.S.C. § 1123(a)(1).  As discussed above, the Plan designates twelve (12) classes of Claims and Equity Interests under section 1122.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

b.      **Section 1123(a)(2): Classes that Are Not Impaired by the Plan.**

Section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan.  11 U.S.C. § 1123(a)(2).  In compliance with this provision, the Plan specifies that Non-Priority Tax Claims and Classes 1-A, 1-D, 3-A, 3-B, 3-C, 3-D, 3-E, and 4 are Unimpaired.

c.      **Section 1123(a)(3): Treatment of Classes that Are Impaired  By the Plan.**

Section 1123(a)(3) requires a plan to specify how classes of claims or interests that are impaired by the plan will be treated.  11 U.S.C. § 1123(a)(3).  The Plan sets forth the treatment of all classes that were impaired or may be impaired under the Plan—Classes 1-B, 1-C, 2-A and 2-B.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

d.    **Section 1123(a)(4): Equal Treatment Within Each Class.**

Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless the holder agrees to receive less favorable treatment than other class members.  11 U.S.C. § 1123(a)(4).  Pursuant to the Plan, the treatment of each Claim against or Equity Interest in the Debtor, in each respective class, is the same as the treatment of each other Claim or Equity Interest in such class, except at the election of a particular Claim or Interest holder, such as in Class 2-B where Claim holders have the option to elect less total payment in exchange for more Cash on the Effective Date and in Class 1-A, where Claim holders have the option to have their notes reinstated instead of paid in full.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code because each Claim or Interest within each class will receive the same treatment unless the Claim or Interest holder elects or agrees otherwise.

e.    **Section 1123(a)(5): Adequate Means for Implementation.**

Section 1123(a)(5) requires that a plan provide "adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Articles VII and IX of the Plan and the various documents and agreements set forth in, and contemplated by, the Plan Supplements provide adequate and proper means for the implementation of the Plan, including: (i) adoption or assumption, as applicable, of the agreements with existing management; (ii) selection of the directors and officers for Seegrid and Seegrid Sub; (iii) the issuance and distribution of the Series A Preferred Shares and warrants; (iv) the formation of Seegrid Sub; (v) the amendment of the certificate of incorporation; (vi) the transfer of assets to Seegrid Sub; and (vii) all other actions contemplated by the Plan (whether to occur before or on the Effective Date).

In addition, the Debtor has filed with the Plan and Plan Supplements many of the documents necessary to implement the Plan, including: (i) the Amended Certificate of Incorporation; (ii) formation documents for Seegrid Sub; (iii) a list of preserved causes of actions and assumed leases and executory contracts; and (iv) a list of individuals proposed to serve as members of the board of directors and as officers of Reorganized Seegrid.

The transactions contemplated by the Plan are designed to preserve the value of the Debtor's businesses and assets.   The Plan, together with the documents and agreements contemplated thereby, provide the means for implementation of the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

f.        **Section 1123(a)(6): Amendment of the Reorganized Debtor's Charter.**

Section 1123(a)(6) prohibits the issuance of nonvoting equity securities, and requires amendment of the debtor's charter to so provide.  11 U.S.C. § 1123(a)(6).  It also requires that the reorganized debtor's corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power.  *Id*.  Section 9.4 of the Plan provides that, on the Effective Date, Seegrid shall amend its certificate of incorporation to prohibit the issuance of non-voting securities.  The Amended Certificate of Incorporation included as part of the Plan Supplement will reflect the foregoing.   Additionally, the Amended Certificate of Incorporation will not alter the pre-petition distribution of voting power among the classes of securities possessing voting power.   Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

g.        **Section 1123(a)(7): Provisions Regarding Directors and Officers.**

Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the

manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). The identities of the individuals proposed to serve as members of the board of directors, identified as of the Confirmation Date, and of the officers of Reorganized Seegrid are included in the Plan Supplement. It provides for the selection of directors consistent with the interests of creditors and equity security holders and public policy in accordance with section 1123(a)(7). Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

**4.      Section 1123(b): The Plan Incorporates Certain Permissible Provisions.**

Section 1123(b) sets forth certain provisions that may be incorporated into a chapter 11 plan, although they are not required. *See* 11 U.S.C. § 1123(b). Each provision of the Plan is consistent with section 1123(b) of the Bankruptcy Code.

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired  any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). Claims and Equity Interests in Classes 1-B, 1-C, 2-A, and 2-B are impaired. Claims in Classes 1-A, 1-D, 3-A, 3-B, 3-C, 3-D, 3-E, and 4 are not impaired by the Plan. *See* Plan Arts. III & IV. Accordingly, the Plan is consistent with section 1123(b)(l) of the Bankruptcy Code.

Section 1123(b)(2) allows a plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. The Plan provides that, as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) is the subject of a motion or is specifically addressed in the plan or (ii) is set forth in a schedule, as an executory contract or unexpired  lease to be rejected, if any, filed by the

Debtor as part of the Plan Supplements.  *See* Plan § 7.1.  The Debtor has not yet moved to reject any contract or unexpired lease.

Courts routinely approve a debtor's assumption, assumption and assignment, or rejection of executory contracts or unexpired leases where such decision is made in the exercise of such debtor's sound business judgment and benefits its estate.  *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *see also N.L.R.B. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984); *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 723 (Bankr. D. Del. 2002).  The business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim, or caprice.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *see also Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).  The Debtor's decision regarding executory contracts is the result of the exercise of the Debtor's sound business judgment, is permitted by section 1123(b)(2) of the Bankruptcy Code, and should therefore be approved.

Section 1123(b)(3)(B) provides that a plan may "provide for the retention and enforcement by the debtor" of claims or interests belonging to the Debtor.  11 U.S.C. § 1123(b)(3)(B).  The Plan preserves for the Reorganized Debtor the right to enforce any Causes of Action accruing to the Debtor, except as otherwise provided by the Plan.  *See* Plan § 14.14.

Section 1123(b)(5) of the Bankruptcy Code provides that a plan may "modify the rights of holders of secured claims."  11 U.S.C. § 1123(b)(5)  The Plan modifies the rights of the holders of certain secured notes by: (i) issuing Seegrid Sub Series A Preferred Shares in exchange for the notes of holders in Class 1-B; (ii) extending the maturity date of the notes of

holders in Class 1-C; and (iii) extending the maturity date of the notes of holders in Class 1-D. These modifications comply with section 1123(b)(5) of the Bankruptcy Code.

Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." The Plan contains two types of provisions permitted by section 1123(b)(6): (1) exculpation provisions in section 11.3 of the Plan; (2) a release of avoidance actions in section 11.5 of the Plan; and (3) a provision in section 14.7 of the Plan to exempt the issuance of any securities under the Plan from transfer taxes pursuant to section 1146(a) of the Bankruptcy Code. All of these section 1123(b)(6)-type provisions in the Plan are consistent with applicable provisions of the Bankruptcy Code and case law in the Third Circuit as described in more detail herein.

The exculpation provisions in section 11.3 of the Plan are the product of extensive negotiations and are necessary to secure support for the Plan. Without such support, the Debtor could not have obtained the funding necessary to propose the Plan, which addresses the Debtor's debt and delevers its balance sheet. For these reasons and the reasons discussed below, the exculpations in the Plan should be approved.

The exculpation in section 11.3 of the Plan should also be approved under the standards established by the Third Circuit. Section 11.3 limits liability arising out of the restructuring negotiations, the negotiation, solicitation and pursuit of approval of the Disclosure Statement and the Plan, and the further confirmation, funding, consummation and administration of the Plan and the property distributed thereunder for the Debtor and the plan funder. The exculpation contains an express carve-out for willful misconduct or gross negligence as determined by a Final Order. This type of provision is standard and has been approved by the Third Circuit where, as here, creditors in all of the voting classes overwhelmingly support the Plan, and the

exculpation is being granted only to the Debtor and the party responsible for funding the distributions under the Plan, on these facts, exculpation is appropriate.  *See In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000).

In addition, section 14.7 provides that securities issued under the Plan are exempt from transfer taxes pursuant to section 1146(a).  Section 1146(a) of the Bankruptcy Code provides: "The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. §1146(a).  The Debtor believes that the Seegrid Sub Series A Preferred Shares and Seegrid Sub Common Stock will be exempt from any transfer or similar taxes under this exemption.

Based upon the foregoing, the Plan fully complies with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and therefore satisfies section 1129(a)(1) of the Bankruptcy Code.

> **B.**     **Section 1129(a)(2): The Debtor, As Proponent Of The Plan, Has Complied With All Applicable Provisions Of The Bankruptcy Code.**

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions  of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2).  The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).  As

discussed above, the Debtor's disclosure and solicitation satisfy section 1129(a)(2) of the Bankruptcy Code.

### C.    Section 1129(a)(3): The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Third Circuit has found that good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11. *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *see also In re Johns-Manville Corp.*, 843 F.2d at 649 (citing *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)) (interpreting the standard as requiring a showing that "the plan was proposed with honesty and good intentions." (internal quotation marks omitted)).

Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *Id*.

The Debtor, as plan proponent, has met its good faith obligation under the Bankruptcy Code. Although the Plan provides for a $10 million investment in Seegrid Sub by Giant Eagle, this was not the only investor who could have participated under the Plan. As described in the Plan, Disclosure Statement, and Solicitation Motion, and similar to every previous secured financing round approved by the Debtor, *every* convertible debt holder or direct or indirect shareholder of the Debtor was invited to participate via an offer notice (the "Offer Notice"), which was sent to all eligible investors. As described in the Offer Notice:

> Additional Series A Shares in New Seegrid Corporation beyond the $10 million of Series A Shares available to Giant Eagle are being offered to the Investors *in at least an amount that allows the Investors to maintain their direct and indirect pro rata share of New Seegrid Corporation on a fully diluted, as converted basis* (the "<u>Minimum Investment Amount</u>"), or such larger amount as the Board of Seegrid Holdings may determine. Investors interested in participating in the Offering are encouraged to indicate the maximum amount they wish to invest on the accompanying Election Form.

Offer Notice, at 2 (emphasis added).  This provision is also repeated in Exhibit A to the Plan.

The Plan implements a substantial reorganization designed to enhance the value of the Debtor's estate and maximize the value of the Debtor's assets for all stakeholders in accordance with the priorities and provisions of the Bankruptcy Code.  Thus, the prepackaged Plan achieves the primary objectives underlying a chapter 11 bankruptcy: the reorganization and continuation of the Debtor as a viable business and the distribution of value to creditors for amounts owing.  *See NLRB. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose  of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse  of economic  resources."); *Pereira v. Foong (In re Ngan Gung Rest.)*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (stressing the paramount importance of paying creditors in chapter 11 cases).  Inasmuch as the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code and has garnered the overwhelming support of the parties voting on the Plan, the Plan and the related documents have been proposed in good faith and the Debtor has satisfied its obligations under section 1129(a)(3).

D.     **Section 1129(a)(4): The Plan Provides For Court Approval Of Payment For Services And Expenses.**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  11 U.S.C.

§ 1129(a)(4).   No such payments have been made to the Debtor's retained professionals for services rendered after the Petition Date, and all payments to such professionals are subject to the approval of this Court pursuant to the terms of the orders authorizing the retention of the Debtor's professionals.   *See* Plan § 2.2.   Furthermore, the Plan provides that the Bankruptcy Court shall retain jurisdiction to "hear and determine any timely objections to Administrative Expense Claims of Professionals asserted . . . both before and after the Confirmation Date…" Plan § 13.1(k).

Section 1129(a)(4) is further satisfied because the Plan provides for the payment of only Allowed Claims (including the Allowed Claims of prepetition professionals).   *See In re Elsinore Shore Assoc.,* 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions—e.g., §§ 328, 329, 330, 331 and 503(b)—and need not be explicitly provided for in a Chapter 11 plan.").   Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4).

> E.      **Section 1129(a)(5): All Information Required To Be Disclosed Regarding The Officers And Directors Of Reorganized Seegrid Has Been Provided.**

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtor. *See* 11 U.S.C. § 1129(a)(5).

The Debtor has satisfied the foregoing requirements.  In accordance with the provisions of the Plan, from and after the Effective Date, the individuals listed in the Plan Supplement are proposed to serve as members of the Board of Directors of Reorganized Seegrid.  The Plan Supplement includes information about such proposed directors' affiliations.  Except as set forth in the Plan, provisions regarding members of the Board of Directors of Reorganized Seegrid and Seegrid Sub shall be as set forth in the Amended Certificate of Incorporation and related corporate documents.

The proposed officers for Reorganized Seegrid, whose names are also disclosed in the Plan Supplement, are current officers of the Debtor.  The proposed officers' knowledge of the operations, businesses, accounts, finances, and business relationships of the Debtor is critical to achieving a successful transition out of chapter 11, and is thus critical to maximizing the value of the Debtor in this case.  *See id.*  Their particular knowledge of the business will also facilitate prompt distribution to creditors pursuant to the Plan.  *Id.*  As such, the appointment of these individuals is consistent with the interests of the Debtor's creditors and with public policy.  *Id.*

F.    **Bankruptcy Code Section 1129(a)(6) Is Not Applicable.**

Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) is  not applicable because the Plan does not provide for rate changes requiring regulatory approval.

G.    **Section 1129(a)(7): The Plan Is In The Best Interests Of Creditors And Equity Interest Holders.**

Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test" or the "liquidation test," and provides, in relevant part:

> With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class-
>
> (i)      has accepted the plan; or
>
> (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

11 U.S.C. § 1129(a)(7). The best interests test focuses on individual dissenting creditors rather than on classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship*, 526 U.S. 434, 441 (1999). Under the best interests test, the court must find that each non-accepting creditor will receive or retain value that is not less than the amount it would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. *Id.* at 441; *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996) ("11 U.S.C. § 1129(a)(7) authorizes creditors with impaired claims . . . to reject a plan that would give them less than they would get from a Chapter 7 liquidation . . . ."). As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.

In the instant case, the best interests test is satisfied because the liquidation analysis, attached to the Disclosure Statement as Exhibit C (as subsequently amended, the "Liquidation Analysis"), demonstrates that the values that could be realized by the non-accepting holders of Claims and Interests upon disposition of the Debtor's assets pursuant to a chapter 7 liquidation would be less than, or equal to, the value of the recoveries available to such holders under the Plan. *See* Disclosure Statement Art. XV & Ex. C.

In this case, as described in more detail in the Disclosure Statement, under chapter 7, the cash available for distribution to creditors would consist of the proceeds of (i) the sale of the Debtor's intellectual property, (ii) the orderly collection of existing accounts receivable during

the wind-down, and (iii) the orderly sale of inventory/equipment and other fixed assets. Disclosure Statement Art. XV & Ex. C.  Additionally, the Liquidation Analysis assumes a liquidation of all of the Debtor's assets, which include accounts receivable, inventory, equipment, furniture and fixtures, and intellectual property.  *Id.*  The cash available would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtor's businesses and the use of chapter 7 for purposes of liquidation.  *Id.*  Additionally, the Liquidation Analysis assumes an orderly and expedited wind down of the Debtor's business and assumes that the wind-down could be completed in several months.  *Id.*

The Liquidation Analysis shows that creditors will recover substantially more value from confirmation of the proposed Plan than through an orderly liquidation and sale process.  *Id.* Subject to the qualifications specified, the Liquidation Analysis estimates a range of gross proceeds, net of wind down costs, trustee fees, and professional fees, under which the First Lien Noteholder Claims would recover 100% of their Claims on the high end and 79.5% on the low end of the range; with Second Lien Noteholder Claim recovering 12.5% on the high end of the range and all other holders of claims or interests receiving nothing in a liquidation (under either a high or low scenario).  Thus, liquidation proceeds would not be adequate to make full payment on the Second Lien Noteholder Claims or any unsecured Claims even at the high end of the valuation range.  *Id.*  However, under the Plan, all secured claims will be allowed in full, holders of unsecured claims will receive at least 75% on account of their Claims, and equity holders will retain their interests, and therefore the Plan is in the best interest of each member of each Class of Claims or Interests.

In sum, if this case were converted to a case under chapter 7 of the Bankruptcy Code, there could be a substantial delay in returns to creditors as compared with the distributions under the Plan, and the value that creditors would recover would drop precipitously. *Id.* Due to the value destruction, delay and uncertainties inherent in a conversion to chapter 7, the Debtor submits that the best interests test established pursuant to section 1129(a)(7) of the Bankruptcy Code is satisfied.

### H. **Section 1129(a)(8): Acceptance By All Impaired Classes.**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or not be impaired  by the plan.  11 U.S.C. § 1129(a)(8).  As set forth above and in the Voting Report, each class of impaired claims has accepted the Plan.  *See* Voting Report.  The Plan, therefore, satisfies section 1129(a)(8) of the Bankruptcy Code as all impaired classes have accepted the Plan.

### I. **Section 1129(a)(9): The Plan Provides For Payment In Full Of Allowed Priority Claims.**

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under the Plan.  11 U.S.C. § 1129(a)(9).  In accordance with section 1129(a)(9)(B) of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expense Claims to be paid in full by the later of (i) the Effective Date (or as soon thereafter as is reasonably practicable), and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed, except with regard to Administrative Expense Claims incurred in the ordinary course of business, which may be paid by Seegrid in accordance with its past practice and the terms of the agreements governing such obligations. *See* Plan § 2.1.  Thus, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code.

With respect to the payment of Non-Tax Priority Claims, in accordance with section 1129(a)(9)(B) of the Bankruptcy Code, the Plan provides that holders of Allowed Non-Tax Priority Claims shall receive on the Effective Date or as soon thereafter as is reasonably practical payment in Cash equal to the Allowed amount of such Claim.  *See* Plan § 2.4.

With respect to the payment of Priority Tax Claims, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, the Plan provides that, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the latest of:  (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable; (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; and (ii) over a period ending not later than five (5) years after the Effective Date.  *See* Plan § 2.3

Based upon the foregoing, the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

### J.    Section 1129(a)(10): The Plan Has Been Accepted By At Least One Impaired Class That Is Entitled To Vote.

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  The Debtor has met this standard, as Class 2-B has affirmatively accepted the Plan, without including the acceptance of the Plan by insiders, in such classes.  *See* Voting Report.  Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

K.    **Section 1129(a)(11): The Plan Is Feasible.**

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the Bankruptcy Court determine that a plan is feasible. Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). As described below, the Plan is feasible within the meaning of this provision.

The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether a plan is workable and has a reasonable likelihood of success. *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 167 (D. Del. 2006); *In re Nil Holdings, Inc.*, 288 B.R. 356, 364 (Bankr. D. Del. 2002); *In re The Leslie Fay Cos.*, 207 B.R. 764, 788–89 (Bankr. S.D.N.Y. 1997); *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995).

Moreover, "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d at 649; *see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.") (*quoting* 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-54 (15th ed. 1992)); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is

that there be reasonable assurance of commercial viability."); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11)."); *see also Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden Motel and Apts.)*, 195 B.R. 294, 307 (D.N.J. 1996) (the plan proponent "need not guarantee success, but merely demonstrate a reasonable assurance of success").

The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed, so as to protect against a visionary or speculative plan. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (*quoting* 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-34 (15th ed. 1984)). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.") (*citing In re U.S. Truck*, 47 B.R. at 944).  Having to refinance years into the future cannot defeat feasibility.  *In re Sagamore Ps., Ltd.*, 512 B.R. 296, 320–321 (S.D. Fla. 2014); *Bank of Am. v. 203 N. LaSalle St. P'ship*, 195 B.R. 692, 711 (N.D. Ill. 1996), *rev'd on other grounds*, 526 U.S. 434 (1999); *In re Am. Consol. Transp. Cos., Inc.*, 470 B.R. 478 (Bankr N.D. Ill. 2012); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995).

Applying the foregoing standards of feasibility, courts have identified the following factors, as probative:

(a)     the adequacy of the capital structure;

(b)     the earning power of the business;

(c)     economic conditions;

(d)     the ability of management;

(e)     the probability of the continuation of the same management;

(f)      the availability of prospective credit, both capital and trade;

(g)     the adequacy of funds for equipment replacements;

(h)     the provisions for adequate working capital; and

(i)      any other matter bearing on the successful operation of the business to enable performance of the provisions of the plan.

*Leslie Fay*, 207 B.R. at 789; *see also Texaco Inc.*, 84 B.R. at 910; *Prudential Energy*, 58 B.R. at 862–63.  The foregoing list is neither exhaustive nor exclusive.  *In re Drexel Burnham*, 138 B.R. at 763.

Applying the foregoing legal standards, the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  For purposes of determining whether the Plan satisfies the feasibility standards, the Debtor has analyzed its ability to fulfill its obligations under the Plan.  *See* Disclosure Statement Art. XII & Ex. B.  As part of this analysis, the Debtor has prepared projections of its financial performance for the fiscal years 2015 through 2018 (the "Projections"), including a projected income statement and projected balance sheets.  *Id*.  As set forth in the Disclosure Statement, the Projections are premised upon, among other things, that the Debtor will conduct operations substantially similar to those businesses currently in operation, the anticipated future performance of the Debtor's business, industry performance, general business and economic conditions.  *Id*.  These Projections indicate that the Debtor will have sufficient resources to meet its obligations under the Plan.  Based upon the foregoing, the

Plan has more than a reasonable likelihood of success and satisfies the feasibility standard of section 1129(a)(11).

> ### L.    Section 1129(a)(12): The Plan Provides For Full Payment Of Statutory Fees.

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing  on continuation of the plan." 11 U.S.C. § 1129(a)(12).   Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provide that all such fees payable, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  *See* Plan § 14.10.

> ### M.    Section 1129(a)(13): The Plan Provides For The Continuance Of Retiree Obligations.

Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(13). The Debtor does not pay any retiree benefits.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

> ### N.    Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply.

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  *See* 11 U.S.C. 1129(a)(14).  The Debtor is not subject to any domestic support obligations, and, as such, this section of the Bankruptcy Code does not apply.   Section 1129(a)(15) applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).   The Debtor is not an "individual," and, accordingly, section

1129(a)(15) is inapplicable.   Finally, the Debtor is a moneyed, business, or commercial corporation, and accordingly, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is inapplicable in this chapter 11 case.

## CONCLUSION

For the reasons set forth in this Memorandum, the Debtor requests that the Court enter an order, in a form substantially similar to the proposed Confirmation Order, (i) confirming the Plan; (ii) waiving the 14-day stay of the Confirmation Order; and (iii) granting such other and further relief as it deems appropriate.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Daniel B. Butz*
_____
Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 658-9200
Fax: (302) 658-3989
E-mail: rdehney@mnat.com
        cmiller@mnat.com
        dbutz@mnat.com
        mharvey@mnat.com

Dated: December 17, 2014
8677361.6