## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEEGRID CORPORATION,[1] | ) Case No. 14-12391 (BLS) |
| | ) |
| Debtor. | ) Re: D.I. 11, 235 |
| | ) |

### THE HORBAL GROUP'S OBJECTION TO THE DISCLOSURE STATEMENT FOR PREPACKAGED PLAN OF REORGANIZATION OF SEEGRID CORPORATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Anthony Horbal ("Horbal"), Michael Horbal, Apryle Anne Horbal, Donna Anderson Horbal, Screaming Eagle Air, Inc. ("Screaming Eagle"), Great American Health Plans, Inc. ("Great American"), and HERC Management Services, LLC ( "HERC" and, together with the other Horbal parties, the "Horbal Group"), creditors and parties in interest in the above-captioned bankruptcy case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"),[2] of Seegrid Corporation (the "Debtor"), hereby object (the "Objection") to the *Debtor's Disclosure Statement* (the "Disclosure Statement") for *Prepackaged Plan of Reorganization of Seegrid Corporation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). In further support of their Objection, the Horbal Group respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Debtor was founded in 2003 to capitalize on the experience of its founders in the field of robotic perception and navigation. The Debtor's goal has been to revolutionize the material-handling industry by developing vision-guided automated vehicles

---

[1] The last four digits of the Debtor's tax payer identification number are 1133. The Debtor's address is 216 Park West Drive, Pittsburgh, PA 15275.

[2] Section references in this Objection will be to the Bankruptcy Code unless otherwise indicated.

("AGVs") that operate without wires, tapes, lasers, or other guidance systems while dramatically reducing labor costs, increasing efficiency, and improving workplace safety.  However, as described by the Debtor in its Disclosure Statement, the Debtor's business has never been profitable and the Debtor has faced numerous challenges, including the failure to meet sales projections, the incurrence of significant debt to fund its operations and an inability to secure third-party financing for its capital and other needs.  According to the Disclosure Statement, prior to the petition date, the Debtor obtained the majority of its capital from two main sources: (i) Giant Eagle, Inc. and Giant Eagle of Delaware, Inc. (collectively, "Giant Eagle"); and (ii) one or more of the Horbal Group.  Ultimately, according to the Debtor, its poor financial performance, complicated capital structure and inability to obtain third-party capital forced the Debtor to file for protection under the Bankruptcy Code.

2.    After deciding to file for bankruptcy protection, the Debtor and Giant Eagle chose to solicit a prepackaged plan (the "Plan") and proceed in bankruptcy solely on that Plan.  In connection with its out-of-court solicitation, the Debtor provided those it solicited with the Disclosure Statement, which contained the principal explanation (indeed, the only explanation) to such persons of information alleged by the Debtor to be relevant to their review and/or approval (or not) of the Debtor's proposed Plan.

3.    As the Debtor did not seek the Court's approval prior to disseminating the Disclosure Statement and the related solicitation materials, the Debtor now needs Court approval after the fact in order to confirm its Plan.  As discussed herein, however, the Debtor will not be able to demonstrate that the Disclosure Statement provides adequate information as required under the Bankruptcy Code.  Accordingly, the Court should not approve the Debtor's Disclosure

Statement and instead should require the Debtor to re-solicit its Plan on the basis of full, fair and adequate disclosures as required by the Bankruptcy Code.

## PROCEDURAL BACKGROUND

4.       On October 21, 2014 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Simultaneously, the Debtor also filed its Disclosure Statement and the Plan.

5.       Under the Plan, the Debtor will form Seegrid Sub as a wholly-owned subsidiary and contribute all of its operating assets (the "Transferred Assets") to Seegrid Sub in exchange for 45% of Seegrid Sub's equity, to be held by the Reorganized Debtor.[3]  The Debtor proposes to give Giant Eagle 40% of Seegrid Sub's equity, in the form of preferred shares plus warrants to purchase additional shares at an exercise price of $1 per share over the next two years, in exchange for approximately $10 million (consisting primarily of debt forgiveness).[4]  The remaining 15% of Seegrid Sub will be given to Seegrid Sub's management and employees.[5]

6.       The Horbal Group, the Debtor's second largest shareholder and creditor, will receive no interest in Seegrid Sub.[6]  Instead, the Horbal Group will retain its debt and equity positions in the Debtor (now diluted), with no right to any control over Seegrid Sub and no claim against Seegrid Sub or the Transferred Assets.[7]  The Horbal Group's unsecured notes will be extended by five years and will remain liabilities of the Reorganized Debtor, which will become a non-operating entity with no revenue and no assets other than its 45% ownership interest in Seegrid Sub.[8]

---

[3] Plan §§ 9.2(a), (e).
[4] Id. §§ 9.2(b), (e).
[5] Id. §§ 9.2(c), (e).
[6] Id. § 9.2(e).
[7] Id. §§ 4.1, 4.3, 4.7-4.12.
[8] Id. §§ 4.5, 9.2.

7.      Under the Plan, Giant Eagle is entitled to select four of Seegrid Sub's seven directors, giving Giant Eagle an absolute right to control Seegrid Sub (and Seegrid's assets) regardless of Seegrid Sub's ownership structure.[9]  Unlike now, Giant Eagle's control will be carved in stone, as its right to elect a majority of Seegrid Sub's directors will be incorporated in Seegrid Sub's organizational documents.   As further discussed below, Giant Eagle is a controlling shareholder standing on both sides of the transaction and, here, Giant Eagle (not the Debtor) also set the price for its 40% interest in Seegrid Sub and the Transferred Assets (*i.e.*, all of the Debtor's operating assets).  Giant Eagle's board designees also approved the Plan and the Disclosure Statement on *Seegrid's* behalf.

## SUMMARY OF THE ARGUMENT

8.      The Court should not approve the Debtor's Disclosure Statement or solicitation process for the following nine reasons.  First, the Disclosure Statement does not provide adequate information regarding the feasibility of the Debtor's Plan.  Second, the Disclosure Statement does not provide adequate information supporting the Debtor's estimated 100% recovery to creditors.  Third, the Disclosure Statement does not provide adequate information supporting the Debtor's view of Seegrid Sub's value.  Fourth, the Disclosure Statement does not fairly disclose the Debtor's discussions with Giant Eagle regarding the Plan.  Fifth, the Debtor's Disclosure Statement does not contain an accurate description of the events which led to the filing of the Debtor's bankruptcy case.  Sixth, the Disclosure Statement does not contain information relevant to the risks posed to creditors under the Plan.  Seventh, the Disclosure Statement's Liquidation Analysis is incomplete.  Eighth, the Disclosure Statement omits material information about the proposed the Debtor's debtor-in-possession financing.  Finally, the Debtor did not properly solicit its Plan.

[9] *Id.*, Annex A, p. 6.

## ARGUMENT

### I.    Applicable Law

#### A.    The Prepackaged Plan

9.    The Debtor solicited its Plan before it filed its bankruptcy case.  While prepackaged plans can benefit the debtor and stakeholders, including through time and cost-savings associated with a consensual and organized bankruptcy process, the proponent still bears the burden to demonstrate that its solicitation of the plan complied with applicable law.[10]

10.    Moreover, while in a typical chapter 11 bankruptcy case interested parties have the opportunity to review information proposed to be disclosed and, if necessary, request further or different disclosure by the proponent,[11] with a prepackaged plan, interested parties (and the Court) are deprived of the right to provide input into the adequacy of the information in the proposed disclosure statement and the solicitation process.[12]  Instead, the proponent only seeks the Court's approval after the proponent already has provided its self-determined disclosure to the holders of claims and interests, and obtained votes based on that disclosure.[13]

11.    Accordingly, a prepetition solicitation process must be carefully scrutinized.  The bankruptcy court acts as a "Monday morning quarterback" because it reviews, after the fact, the disclosure statement and solicitation process to determine *for itself* whether the

---

[10] *In re Pioneer Fin. Corp.*, 246 B.R. 626, 630 (Bankr. D. Nev. 2000) (citing *City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 691 (Bankr. D. Colo. 1995) (court must scrutinize prepetition solicitation process to assure "all creditors affected by the plan were accorded the basic elements of due process.").

[11] *See Colorado Springs*, 177 B.R. at 691.

[12] *Id.*

[13] *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 461-62 (Bankr. S.D.N.Y. 2014); *Republic Health Corp. v. Coral Gables, Ltd. (In re REPH Acquisition Co.)*, 134 B.R. 194, 196 n.1 (N.D. Tex. 1991); *Pioneer*, 246 B.R. at 630.

disclosure made by the proponent and associated procedures were adequate (or not) or whether there were other deficiencies in the notice or solicitation process.[14]

12.    Not surprisingly, then, the proponent of a prepackaged plan accepts the risk that the court may determine that the disclosure statement was inadequate in some way.  As aptly noted by one court, the risk accepted by the proponent of the prepackaged plan resembles "Russian Roulette" because "any shortcoming . . . would require going back to the drawing board for a bankruptcy regulated disclosure statement hearing with notice, and the usual bankruptcy process toward a hearing on confirmation."[15]

**B.    Section 1126(b)**

13.    Section 1126(b) requires that the debtor's solicitation of a prepackaged bankruptcy plan must comply with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.[16]  To the extent that there is no applicable nonbankruptcy law, the prepetition solicitation by the debtor may be approved and accepted by the Court only if the debtor made such solicitation after the disclosure of adequate information as defined in section 1125(a) of the Bankruptcy Code.[17]

14.    Here, the Debtor argues that its solicitation of the Plan does not constitute an offer of new securities and therefore is not subject to any disclosure provision under the Securities Act or Regulation D thereunder.[18]  Even if the solicitation was deemed to include an

---

[14] *See Pioneer*, 246 B.R. at 633-36 (denying confirmation of prepackaged plan due to inadequate notice of prepetition solicitation); *Colorado Springs*, 177 B.R. at 690-91 (same).

[15] *Colorado Springs*, 177 B.R. at 691, *citing In re Southland Corp.*, 124 B.R. 211, 225 (Bankr. N.D. Tex. 1991).

[16] *See* 11 U.S.C. § 1126(b)(1).

[17] *See* 11 U.S.C. § 1126(b)(2).

[18] *See Debtor's Memorandum of Law in Support of Its Request for an Order (I) Approving the (A) Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures and (C) Forms of Ballots and (II) Confirming the Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 235] (the "Debtor Mem.") p. 20.

offer of new securities, the Debtor argues that it is exempt from registration under the Securities

Act and Regulation D as its offering (if any) does not involve a public offering and any offer to

purchase new equity in Seegrid Sub only has been made to "accredited investors."[19]  The Debtor

also disclaims the applicability of section 10(b) and Rule 10b-5, although it freely represents that

its disclosure was adequate because the Debtor: (i) "endeavored to disclose all material facts";

(ii) "is not aware of any untrue statement of material fact" in the Disclosure Statement; (iii) does

not "believe that the Disclosure Statement omits any material fact"; and (iv) "had no intention of

making any untrue statement or omitting any material fact" in the Disclosure Statement.[20]

15.    The Debtor thus submits that the provisions of its Plan that (arguably

could) relate to securities are not subject to any disclosure requirement under nonbankruptcy law,

and the Debtor does not identify any nonbankruptcy law otherwise applicable to its Plan and the

non-security related provisions therein.  Accordingly, as required under section 1126(b), the

Debtor argues that its solicitation was appropriate because it provided "adequate information" to

holders of claims or interests under 11 U.S.C. § 1125.[21]

C.     **Section 1125(a)**

16.    "Disclosure is the 'pivotal' concept in Chapter 11 reorganization."[22]

The plan proponent bears the burden of demonstrating that the disclosure statement contains

"adequate information."[23]  Section 1125(a) defines adequate information as "information of a

---

[19] Debtor Mem. p. 20.

[20] *See* Debtor Mem. p. 21.

[21] *See* Debtor Mem. pp. 21-22.

[22] *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (citing 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 1125.03 (15th ed. 1992)); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 2013) (citation omitted); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) ("One of the fundamental policies underlying the Chapter 11 reorganization process is disclosure.").

[23] *See Official Comm. of Unsecured Creditors v. H.B. Michelson (In re Michelson)*, 141 B.R. 715, 719-20 (Bankr. E.D. Cal. 1992).

RLF1 11320772v.4

kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history

of the debtor and the condition of the debtor's books and records . . . that would enable such a

hypothetical investor of the relevant class to make an informed judgment about the plan."[24]

17.    The proponent has a heavy burden under section 1125:

> The importance of full disclosure is underlaid by the reliance placed upon the
> disclosure statement by the creditors and the court.  Given this reliance, we cannot
> overemphasize the debtor's obligation to provide sufficient data to satisfy the
> Code standard of adequate information.[25]

The provision of adequate information is a prerequisite to approval of a disclosure statement and

adequate disclosure is fundamental to the proper functioning of the bankruptcy process.[26]

Accordingly, the information disclosed by the plan proponent must not only be sufficient but

also accurate because the disclosure statement is the primary source of information provided to

interested parties in connection with the solicitation of the proposed plan.[27]

18.    The disclosure statement itself must describe all factors known to the plan

proponent that may impact the success or failure of the plan: "[A] disclosure statement must

contain all pertinent information bearing on the success or failure of the proposals in the plan of

reorganization [and] . . . should likewise contain all material information relating to the risks

posed to creditors and equity interest holders under the proposed plan of reorganization."[28]  Mere

---

[24] 11 U.S.C. § 1125(a).

[25] *Oneida*, 848 F.2d at 417 (internal quotations omitted).

[26] *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[T]he importance of full and honest disclosure cannot be overstated."); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) (disclosure statement may be approved only if "it includes adequate information."); *In re Forrest Hills Assocs., Ltd.*, 18 B.R. 104 (Bankr. D. Del. 1982) (debtor must file disclosure statement approved with adequate information even where all creditors were classified as unimpaired).

[27] *See In re Jeppson*, 66 B.R. 269, 291 (Bankr. D. Utah 1986); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985).

[28] *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (citation omitted); *see also In re Radco Properties, Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) ("When providing creditors with information in connection with a disclosure statement, more is better."); *Colo. Mountain Express, Inc. v. Aspen Limousine Serv., Inc., (In re Aspen Limousine Serv., Inc.)*, 193 B.R. 325, 334 (D. Colo.

statements of opinion or belief, without accompanying factual support, are inadequate.[29]

Moreover, a debtor may not solicit a plan based on misleading disclosures.[30]

19.    There are a number of factors that a court may consider to determine whether the proponent met the statutory requirement to provide "adequate information" in connection with its solicitation.  These factors include (among other things):

(a)    the events which led to the filing of the bankruptcy petition;

(b)    a description of the available assets and their value;

(c)    the anticipated future of the debtor;

(d)    the source of the information provided in the disclosure statement;

(e)    the estimated return to creditors under a chapter 7 liquidation;

(f)    the chapter 11 plan or a summary thereof;

(g)    the estimated administrative expenses, including attorneys' and accountants' fees;

(h)    financial information, data, valuations or projections relevant to creditors' determinations of whether to accept or reject the chapter 11 plan;

(i)    information relevant to the risks posed to creditors under the plan; and

(j)    the relationship of the debtor with affiliates.[31]

While the determination of whether a disclosure statement contains "adequate information" is left to the court's sound discretion, the court has an independent obligation to determine whether a disclosure statement includes adequate information.[32]  If the proponent did not disclose adequate information, then the plan is not eligible for confirmation and the disclosure statement

---

1996) (disclosure statement must "inform equity holders and claimants about the probable financial results of the acceptance or rejection of that particular plan.") (citation omitted).

[29] *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) ("Conclusory allegations or opinions without supporting facts are generally not acceptable.") (citations omitted).

[30] *See Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 184 (B.A.P. 9th Cir. 2003) ("[T]he use of misleading or false information in a disclosure statement may be so serious as to invalidate the voting by creditors as to a plan, requiring a new round of voting after necessary corrections to the disclosure statement are made.").

[31] *See In re United States Brass Corp.*, 194 B.R. 420, 425-26 (Bankr. E.D. Tex. 1996); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Tex. 1984); *In re Joseph A. Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142-143 (Bankr. D. Minn. 1989).

[32] *See* 11 U.S.C. § 1125(b).

should not be approved.[33]   Moreover, a disclosure statement that omits material facts cannot be

approved.[34]

## II.    The Disclosure Statement Should Not Be Approved Because It Lacks Adequate Information.

### A.    The Disclosure Statement Does Not Provide Adequate Information Regarding The Feasibility Of The Debtor's Plan.

20.    In order to confirm its Plan, the Debtor is required to demonstrate that its

plan is feasible.[35]  "The key element of feasibility is whether there exists a reasonable probability

that the provisions of the plan can be performed."[36]  The Court may consider a variety of factors,

including: (a) adequacy of the capital structure; (b) the earning power of the business; (c)

economic conditions; (d) the ability of the debtor's management; (e) the probability of the

continuation of the same management; and (f) any other related matters which will determine the

prospects of a sufficiently successful operation to enable performance of the provisions of the

plan.[37]

21.    One of the purposes of the "feasibility test is to protect against visionary

or speculative plans."[38]   Thus, the proposed plan must include "'a realistic and workable

framework.' . . . . [that is] 'reasonably likely to succeed on its own terms without a need for

---

[33] *See* 11 U.S.C. § 1129(a)(2).
[34] *See In re Unichem Corp.*, 72 B.R. 95, 98-100 (Bankr. N.D. Ill. 1987), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987).
[35] *See* 11 U.S.C. § 1129(a)(11); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("A plan is confirmable only if it is feasible, that is, if '[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganized is proposed in the plan.'") (*citing* 11 U.S.C. § 1129(a)(11)) (other citations omitted); *see also* Debtor Mem. p. 49 ("as a condition to confirmation, the Bankruptcy Court [must] determine that a plan is feasible").
[36] *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010).
[37] *See id.* at *28.
[38] *Id.* at *27.

RLF1 11320772v.4

further reorganization on the debtor's part.'"[39]   In other words, the proponent must demonstrate

that "the reorganized debtor has a reasonable assurance of commercial viability."[40]   Accordingly,

the feasibility of a proposed plan is one of the key issues for disclosure to those voting on the

plan and one of the most important considerations for the Court when considering the propriety

of the plan proponent's self-determined disclosure.

          22.   Here, the Debtor assured its stakeholders (as well as the Court) that its

proposed Plan is feasible.[41]   According to the Debtor, its Plan "satisfies the feasibility test"

because the "projections prepared by the Debtor" included in its feasibility analysis "are

reasonable and achievable" and the "financing committed to by Giant Eagle is sufficient to fund

Seegrid Sub's operating losses until the cost cutting measures, refined business plan and increase

in sales result in a net profit to sustain Seegrid Sub."[42]   As further described below, however, the

Debtor's representations regarding the feasibility of its Plan and the 100% recoveries to creditors

estimated by the Debtor thereunder were replete with multiple material omissions and otherwise

were inaccurate and misleading, thereby rendering the Disclosure Statement and the Debtor's

solicitation process unreliable, deficient and incapable of being approved by the Court.

          23.   First, the Debtor's Disclosure Statement and feasibility analysis are

deficient because the Debtor failed to make adequate disclosures regarding the Debtor's proposal

to defer significant distributions under the proposed Plan until several years after the Debtor's

emergence (if any) from bankruptcy.   The Debtor's feasibility analysis (and its Disclosure

---

[39] *Am. Capital Equip.,* 688 F.3d at 156 (citations omitted) (internal quotations omitted).

[40] *Aleris Int'l,* 2010 WL 3492664, at *27; *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) ("The proper standard is whether the plan offers a 'reasonable assurance' of success.") (citations omitted).

[41] *See* Disclosure Statement, pp. 45-46.

[42] Disclosure Statement, p. 45.

Statement in general) not only fails to *adequately* discuss this issue, the Debtor barely mentions this critical aspect of its proposed Plan at all.

   24. Under the Plan, certain classes of creditors will not receive their projected distribution until up to several years after the Plan's Effective Date.[43]  Creditors in Classes 1-C (second priority secured noteholder claims) and 2-A (noteholder general unsecured claims), each of whom the Debtor represents will receive 100% on account of their claims, are not entitled to receive such payment until five years after the Effective Date.[44]  The Debtor identifies approximately $50.7 million of claims in these categories.[45]  Similarly, creditors in Class 2-B (general unsecured creditors), each of whom (according to the Debtor) should receive 100% recovery on their claims (*see id.*), are not entitled to receive their full distribution until one year after the Effective Date.[46]  The Debtor identifies approximately $2.6 million of claims in this category.  Accordingly, the overwhelming majority (in dollar value) of claims against the Debtor have to wait (for up to several years) for the 100% distribution promised by the Debtor (or for any distribution whatsoever).  Moreover, the overwhelming majority of these claimants are not given any recourse against the assets of Seegrid Sub, but instead are left with unsecured claims against the proposed Reorganized Debtor, the entity devoid (post-emergence) of any assets other than a 45% stake in Seegrid Sub's common stock.[47]

---

[43] *See* Disclosure Statement, pp. 17-19.
[44] *See id.*
[45] *See* Disclosure Statement, pp. 23-24.
[46] *See id.*
[47] *See* Plan §§ 4.5-4.6, 9.2.  The Debtor concurrently contends that ██████ ████ *See* SSG Advisors, LLC's Enterprise Valuation as of December 22, 2014, p. 15; *see also infra*, Section II(C). ████████████████████ the Debtor had no reasonable basis to represent that unsecured note creditors (who claims alone total almost $40 million (prior to PIK interest due under the Plan)) will receive payment of 100% of their claims, and the Debtor solicited its proposed Plan by making misleading estimates of distributions under the Plan and other inaccurate disclosures and/or omissions.

25.    The Debtor's Disclosure Statement and feasibility analysis do not discuss these significant, deferred obligations, or otherwise provide adequate information regarding how these obligations might be satisfied.[48]  Indeed, the Debtor's feasibility analysis expressly only extends to the alleged feasibility of Seegrid Sub, and not the Reorganized Debtor, even though the Reorganized Debtor is the entity from which the Debtor represents unsecured note holders (and other claimants) will receive 100% recovery on their claims.[49]  The Debtor's decision to ignore any discussion of the Reorganized Debtor and its ability or inability to pay the estimated 100% distribution to the $50+ million in claims the Debtor identified as payable by that entity, is inexcusable.  Far from providing an adequate disclosure, the Debtor provides none whatsoever.

26.    The Debtor's failure to discuss how the Reorganized Debtor will fund the distributions to claimants left with claims against that entity dooms the Disclosure Statement and related solicitation process as the Debtor failed to make any adequate disclosures regarding this key factual, feasibility and confirmation related issue.  Indeed, the law is clear: when a debtor proposes a plan that incorporates significant, deferred payment to creditors, "the debtor is required to present credible evidence to the Court demonstrating that the balloon payment will likely be made by the Plan's maturity date."[50]  As noted by one court confronting a similar circumstance:

---

[48] *See* Disclosure Statement.

[49] *See* Plan, Ex. B, Feasibility Analysis.

[50] *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 757 (Bankr. N.D. Ill. 2013); *see also In re Geijsel*, 480 B.R. 238, 260 (Bankr. N.D. Tex. 2012) (when considering a plan that incorporates a balloon payment, the court should "consider the most important question:  whether the creditor's security, in some form, will outweigh its owed, proposed debt at the time of the balloon payment.  Specifically, the court should consider whether the debtor will have sufficient equity to attract a refinancier or, if not, whether the debtor can sell the property and fully pay-off the secured creditor."); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 540-41 (Bankr. E.D. Tenn. 1997) ("Establishing feasibility of a plan with a balloon payment scheme depends on the debtor demonstrating that the funds will be available at the time payment is due."); *In re Sound Radio, Inc.*, 103 B.R. 521, 522-24 (D.N.J. 1989) ("In effect, the bankruptcy judge is required to find that the debtor will be able to make all of its payments under the plan

Debtor has not made any showing of how it will be able to make the balloon
payment to Heartland at the end of fifteen years.  Because the plan calls for debtor
to be operating on a shoestring budget and there has been no showing of the
source of funds for the balloon payment, it is difficult to see how the plan could
be feasible under the Code.…  A plan that has a 'marginal prospect of success'
because the debtor's 'prospects of meeting the debt service under the plan or
reorganization are marginal is not, as a matter of law, a feasible plan.'[51]

Here, the Debtor's failure to discuss the Reorganized Debtor's ability to fund the distributions

due under the Plan or include any feasibility analysis of the Reorganized Debtor leaves the Court

with no alternative but to conclude that the Debtor failed to provide adequate information to

recipients of its Disclosure Statement regarding material aspects of its proposed Plan.

        27.    Second, the Debtor's omission of adequate discussion of the deferred

obligations owed by the Reorganized Debtor and its ability or inability to fund payment thereof

is compounded by the Debtor's material misrepresentation of the amount of claims pending

against the Reorganized Debtor.  As noted above, the Debtor identified approximately $50

million in claims payable by the Reorganized Debtor five years after the Effective Date.[52]  The

actual amount of such claims payable by the Reorganized Debtor as proposed under the Plan,

however, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

and to comply with the plan  . . . .  [A] bankruptcy judge is required to look beyond the initial funding of a
reorganization plan and predict with reasonable assurance the commercial vitality of the plan.").

    [51] *In re Briscoe Enters., Ltd., II*, 138 B.R. 795, 805-06 (N.D. Tex. 1992) (citation omitted);
*Compare id., and Geijsel*, 480 B.R. at 256-61, 272-74 (Bankr. D. Del. 2012) (plan contemplating 7-year
balloon payment not feasible due to lack of evidence of plan to pay debt); *In re Batankhah*, No. 10-40058,
2012 WL 170901, at *2-3 (Bankr. S.D. Tex. Jan. 18, 2012) (five-year balloon payment feasible because
debtors had equity and proposed to pay down debt on monthly basis over five years); *and Crosscreek
Apartments*, 213 B.R. at 540-41 (Bankr. E.D. Tenn. 1997) (plan contemplating ten year balloon payment
feasible where debtor demonstrated availability of funds to make payment at time due); *and In re Am.
Trailer & Storage, Inc.*, 419 B.R. 412, 430-32 (Bankr. W.D. Mo. 2009) (plan with five year balloon
payment feasible because debtor's loan to value ratio, debt service coverage ratio, and other metrics used
by lenders to refinance would lead to reasonable prospect of refinancing).

    [52] *See supra*, ¶ 24; Disclosure Statement, pp. 23-24.

███████████████.[53]   Accordingly, while hiding the ball on how the Reorganized Debtor supposedly will satisfy (or, more likely, cannot satisfy) $50+ million of unfunded obligations is sufficient to render the Debtor's Disclosure Statement and solicitation process materially deficient, it is equally true that the Debtor's actual disclosure of the amount of the deferred claims payable by the Reorganized Debtor ████████████████████████. Disclosure of the actual amount of deferred claims would have made even more clear the fact that the Debtor has no plan or proposal for satisfaction of these claims.   Under these circumstances, the Disclosure Statement cannot be approved.[54]

        28.   Third, the feasibility analysis prepared by the Debtor's management also fails to account for significant amounts to be owed by Seegrid Sub to Giant Eagle on account of the preferred stock Giant Eagle is slated to receive under the terms of the Debtor's Plan.  The feasibility analysis was drafted in accordance with generally accepted accounting principles ("GAAP") and under GAAP preferred stock does not reflect dividends, which accumulate annually, if not paid.  Here, pursuant to the Summary of the Series A Convertible Preferred Stock Rights and Preferences of New Seegrid Corporation (the "Preferred Stock Term Sheet") dated October 2, 2014 (Exhibit A to Plan), Giant Eagle's $10 million of preferred stock in Seegrid Sub is required to pay dividends at a rate of 8%, thus generating $800,000 per year in dividends.  This significant obligation owed to Giant Eagle as the holder of preferred stock, which must be satisfied prior to any payments to the Reorganized Debtor on its common stock in Seegrid Sub, is not incorporated into the Debtor's feasibility analysis or disclosed by the Debtor as additional, preferred amounts that must be paid before the Reorganized Debtor's creditors will

---

[53] See, e.g., Conly Report; Debtor's Rebuttal Report p. 17.
[54] See, e.g., supra, ¶¶ 23-26; Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. B.A.P. 2003) (debtor may not solicit a plan based on misleading disclosures); In re Unichem Corp., 72 B.R. 95, 98-100 (Bankr. N.D. Ill. 1987) aff'd 80 B.R. 448 (N.D. Ill. 1987) (a disclosure statement that omits material facts cannot be approved).

receive any recovery under the Plan. This is material information that should have been clearly disclosed and discussed by the Debtor, but was not.

29.  Fourth, as noted above,[55] ███████████████████████████████

████████████████████████, and the Reorganized Debtor's only asset will be its 45% interest in the common stock of Seegrid Sub. However, the Debtor failed to disclose its view of Seegrid Sub's value in the solicitation process; and therefore it obviously also failed to adequately discuss ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ Indeed, ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████. Under this circumstance as well, the Debtor's disclosure of its Plan's alleged feasibility and related solicitation process is materially deficient and should not be approved by the Court.[56]

30.  Fifth, the limited disclosures actually made by the Debtor hardly fill the void left by these material omissions and misstatements. While the Debtor proposes to defer payments from the Reorganized Debtor for up to five years after the Effective Date, the Debtor chose only to include three years of financial projections for Seegrid Sub.[57] Accordingly, on its face, the feasibility analysis proffered by the Debtor is deficient because it fails to include

---

[55] *Supra*, n. 47.

[56] *See*, *e.g.*, *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46-47 (Bankr. D. Del. 2000) (plan not feasible because debtor's valuation demonstrated that debtor would be in immediate default of its facility due to lack of collateral).

[57] *See* Plan, Ex. B.

adequate information regarding the projected performance of Seegrid Sub for the time period

chosen by the Debtor for distributions under the Plan.[58]

31.    There can be no reasonable dispute that the Debtor's discussion of the

Plan's feasibility, including the feasibility analysis the Debtor used in the solicitation process,

did not provide adequate information to holders of claims or interests regarding the Reorganized

Debtor's ability or inability to fund the deferred obligations under the Plan.  As noted by the

Debtor's own expert witness, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████



Instead of acknowledging the real possibility that creditors slated for repayment by the

Reorganized Debtor will not receive anything (and certainly not the 100% distribution estimated

---

[58] *See, e.g., F.H. P'trs, L.P. v. Inv. Co. of the Southwest, Inc. (In re Inv. Co. of the Southwest, Inc.)*, 341 B.R. 298, 315-16 (B.A.P. 10th Cir. 2006) (debtor must demonstrate ability to fund balloon payments and did not do so when financial projections did not extend through date of such payments; court requires "some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be *reasonably funded*.") (emphasis added); *see also In re GAC Storage El Monte, LLC*, 489 B.R. 747, 757-58 (Bankr. N.D. Ill. 2013) (debtor required to present credible evidence that balloon payment will likely be made by the plan's maturity date); *In re Geijsel*, 480 B.R. 238, 261 (Bankr. N.D. Tex. 2012) ("Courts should not shift the real risk of an asset's value volatility onto a creditor who will be left holding the keys in the event of liquidation"); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479, 493 (S.D. Ohio 2011) (debtor required to provide evidence to support contention of ability to pay deferred obligation).

[59] Victor Tr. 194:6-18, 195:6-10.59.

by the Debtor), the Debtor stayed silent in its disclosures, content to solicit on the basis of its representation to creditors of their full recovery, and ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[60]   This is not adequate disclosure.  It is a failure to disclose a known risk relevant (indeed critical) to the holder of a claim or interest's evaluation of the Debtor's feasibility and the Debtor's representation that creditors will receive a 100% recovery on their claims.

32.    Sixth, while the Debtor touted its feasibility analysis as demonstrating that the Debtor's projections (and therefore its Plan) were reasonable and achievable,[61] the reality is that the Debtor's management – who prepared the underlying projections – also prepared the feasibility analysis included by the Debtor in its disclosure.[62]  This fact was not clearly disclosed by the Debtor.[63]  Accordingly, a reasonable reader might not have realized that the Debtor's feasibility analysis did not independently validate the projections[64] on which the feasibility analysis was based.[65]

---

[60] See, e.g., Oliveri Tr. 201:18-202:1 (████████████████████████████████████████████
████████████████████████.").
[61] See Disclosure Statement, p. 45.
[62] See Plan, Ex. B.
[63] See id.; Disclosure Statement, p. 45.
[64] Even in these contested proceedings, the Debtor has not caused its financial projections to be independently evaluated by any third-party.  Indeed, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.  See SSG Advisors, LLC's Enterprise Valuation as of December 22, 2014, p. 35 (████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████).
[65] As further discussed below, the Debtor's Plan depends on the Debtor's projections, and the reliability of the projections prepared by the Debtor's management itself is an important issue on which the Debtor did not disclose adequate information.

33.   <u>Finally</u>, as the Court knows, the Debtor has stated numerous times that whether its Plan should be confirmed ultimately depends on the reliability, and integrity, of the projections prepared by the Debtor's management.[66]   Given the Debtor's admissions regarding the importance of its self-generated financial projections, the Court and interested parties reasonably should expect a fulsome discussion of those projections by the Debtor in the Disclosure Statement.   Remarkably, however, the Debtor hardly even mentions the projections in the disclosures that the Debtor used to solicit its Plan.   Instead, the Debtor only states, in conclusory fashion, that the projections are "reasonable and achievable."[67]   There is no discussion by the Debtor of how it created the projections, the analysis the Debtor undertook in putting the projections together or the assumptions made by the Debtor in formulating the projections.[68]   The Debtor also did not include any objective information regarding its projections, including a discussion of why the Debtor believed that its projected sales levels were achievable, or how the Debtor arrived at that conclusion in light of the Debtor's prior or historical financial results.[69]

34.   The Debtor's failure to discuss its projections and the bases for its assertion that the projections (on which its Plan depends) are reasonable and achievable is a remarkable failure by the Debtor to provide adequate information to the recipients of its Disclosure Statement.   Indeed, based on the information provided by the Debtor, the recipients of the Debtor's Disclosure Statement were given no basis on which to agree, or disagree, with the

---

[66] *See, e.g.*, Tr. of Dec. 16, 2014 Hr'g at 6:22-23 (Debtor's counsel: "And we've always said this was all about the projections"), 25:6-8 (Debtor's counsel: "what we're talking about at confirmation . . . is the feasibility and the projections."), 75:24-25 (Debtor's counsel: "it will all come up in the projections, and how we put them there") and 76:2-4 (Debtor's counsel: "they will have their opportunity to go through how the company built up the projections . . . we're not hiding from it").

[67] *See* Disclosure Statement, p. 45.

[68] *See id.*

[69] *See id.*

Debtor's conclusory assertion that its projections were reasonable and achievable. This fact alone renders the Disclosure Statement inadequate.[70]

35. Moreover, the Debtor's failure to include such information in its Disclosure Statement should lead the Court to conclude that the Disclosure Statement is not adequate because the Debtor is actually aware of, but did not adequately disclose, its historical inability to prepare reliable projections. Indeed, in these proceedings, the Debtor effectively has conceded that: (i) it has no objective basis on which to assert that it has the capacity to prepare reliable projections of its future financial performance; and (ii) ████████████████████

████████████████████████████████████████████████████

████████████████████████████ .

36. The first point is easily established. The Debtor's counsel on numerous occasions has represented to the Court that the Debtor consistently has failed over long periods of time to create reliable projections for its financial performance.[71] These admissions accurately reflect the Debtor's subjective understanding of its own inability to effectively forecast its sales and financial results. Indeed, as noted by the Debtor's Chief Financial Officer, ████████████

████████████████████████████████████████████████████

████████████████████ ."[72] The Debtor utterly fails to disclose these facts in its Disclosure Statement.[73] Recipients of the Disclosure Statement thereby were deprived of

---

[70] *See In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) (in a disclosure statement, "[c]onclusory allegations or opinions without supporting facts are generally not acceptable."); *In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ("opinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information.").

[71] *See, e.g.*, Tr. of Nov. 18, 2014 Hr'g at 55:8-10 (Debtor's counsel: "the company has never been able to meet projections . . . they would create projections and they would blow them."); Tr. of Dec. 16, 2014 Hr'g at 6:23-24 (Debtor's counsel: "the company has never met any projections").

[72] Oliveri Tr. 251:20-22.

[73] *See* Disclosure Statement.

information known to the Debtor and relevant to the Debtor's representation that its financial projections were reasonable and achievable.

37.     The second point (the Debtor's failure to disclose or discuss its subjective doubts about the projections on which it based its Plan) is as easily established. Hans Moravec, a founder and Seegrid's director, was questioned at deposition ██████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

██████████████████ :

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Dr. Moravec continued this theme ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████. According to Dr. Moravec, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[74] Moravec Tr. p. 44:5-19 (emphasis added).
[75] Moravec Tr. 45:1-5.

Indeed, Dr. Moravec testified that █████████████████████████████

████████████████████████████████████████████████████

Ultimately, Dr. Moravec ███████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████

Indeed, ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

38.    Dr. Moravec was not the only Debtor representative who ███████████

█████████████████████████████████████████████. Mr. Oliveri (the Debtor's

---

[76] Moravec Tr. 45:22-46:2 (emphasis added).
[77] Moravec Tr. 46:15-22 (emphasis added).
[78] Moravec Tr. 47:11-18 (emphasis added).
[79] Moravec Tr. 47:18-21.

CFO), who (as noted above) 

.

39.     The Debtor's Disclosure Statement is utterly devoid of any information that relates to these

. Thus, the Debtor did not disclose "adequate information" regarding its sales and financial forecasts in connection with the solicitation of the Plan on which those forecasts are based.[82]

40.     Accordingly, for all of the reasons demonstrated above, the Debtor did not include a full, fair and frank discussion of the facts related to its Plan's feasibility (or lack thereof) in its Disclosure Statement or other solicitation materials, and the Debtor's actual disclosures were replete with material omissions and misstatements, or flat out mistakes. Under either scenario, the Debtor's disclosures cannot be approved. Instead, the Debtor should be

---

[80] *Supra*, ¶ 36.
[81] Oliveri Tr. 70:16-71:4 (emphasis added).
[82] *See In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985) ("It is clear . . . that in all cases, facts which inform claimants about the financial results of acceptance or rejection of a plan, must be included."); *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981) ("the information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.").

required to re-solicit its Plan after providing holders of claims and interests with a full, fair and accurate disclosure regarding these many issues relevant both to the feasibility of the Debtor's Plan and the narrative used by the Debtor throughout its disclosures in discussion of the Plan and estimated recoveries thereunder.

B.      **The Disclosure Statement Does Not Provide Adequate Information Supporting The Debtor's Estimated 100% Recovery To Creditors.**

41.      Pursuant to well-settled law, the debtor must provide adequate information to stakeholders regarding the estimated distributions identified by the debtor in its solicitation materials.[83]  A debtor also must formulate its estimated recovery to creditors in good faith and may not use the estimated distribution for the purpose of improperly influencing those voting on the proposed plan.[84]

42.      Here, the Debtor solicited its Plan based on its representation that creditors will receive an estimated 100% recovery on their claims.[85]  For the reasons discussed above,[86] the Debtor failed to provide adequate disclosure regarding its estimated recoveries to those voting on the Plan.[87]  Indeed, voters were deprived of information necessary to make an informed decision regarding the Debtor's estimated 100% recovery and for the seemingly

---

[83] *See In re Radco Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (disclosure statement should provide adequate information to creditor about "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."), citing *In re Joseph A. Ferretti*, 128 B.R. at 19.

[84] *See* 11 U.S.C. § 1129(a)(3); *In re American Capital Equipment*, 688 F.3d 145, 158-161 (3d Cir. 2012) (bankruptcy court may find at disclosure statement hearing that plan not proposed in good faith is not confirmable).

[85] *See* Disclosure Statement, pp. 17-19.

[86] *See supra*, ¶¶ 20-40.

[87] *See also In re Forest Grove, LLC*, 448 B.R. 729, 735 (Bankr. D.S.C. 2011) (disclosure statement does not contain "adequate information" where sources of estimated distributions are uncertain or speculative; where distributions are contingent in part on future sources of income, disclosure statement must identify those sources in order to contain "adequate information").

obvious reason of influencing their vote. This does not meet the proponent's burden to support approval of a disclosure statement and solicitation process.[88]

### C.    The Disclosure Statement Does Not Provide Adequate Information Supporting The Debtor's View Of Seegrid's Sub's Value.

43.    As discussed above, the Debtor's feasibility analysis and related disclosures are materially deficient because the Debtor failed to disclose or discuss the Reorganized Debtor's ███████████████████████████████████████████[89] Moreover, while the Debtor's Plan leaves creditors left with claims against the Reorganized Debtor dependent on Seegrid Sub's future value (as the Reorganized Debtor's only asset will be its minority 45% interest in Seegrid Sub's common stock), the Debtor failed to disclose its view of ███████████████████████████████████. Indeed, it is now clear that the Debtor actually believes that ███████████████████████████████ ██████████████████████████████[90]

44.    The Debtor's failure to include its view of Seegrid Sub's post-emergence value in its solicitation materials deprived those solicited by the Debtor of information that could have aided their independent consideration of the Plan, and provided context for their consideration of the other information and disclosures made by the Debtor in support of its Plan. As such, the Debtor's Disclosure Statement and solicitation materials did not include adequate information as required under the Bankruptcy Code.

---

[88] *See Westland Oil Development Corp. v. MCorp Management Solutions, Inc. v. Federal Deposit Insurance Corp.*, 157 B.R. 100, 103 (S.D. Tex. 1993) ("[t]he code requires adequate disclosure, not selective disclosure."); *supra*, ¶¶ 20-40.

[89] *Supra*, ¶ 29.

[90] *See supra*, n. 47 (███████████████████████████████████████).

RLF1 11320772v.4

**D.      The Disclosure Statement Does Not Fairly Disclose the Debtor's Discussions With Giant Eagle Regarding The Plan.**

45.      One of the key disclosures made by the Debtor in its Disclosure Statement is that the Debtor engaged in "extensive, good-faith and arm's-length negotiations" with Giant Eagle regarding the terms of the Debtor's Plan.[91]  It is not difficult to understand why the Debtor would want those it solicited to believe that the Debtor acted in an appropriate, arm's length and fiduciary capacity vis-à-vis Giant Eagle with regards to the Plan and the provisions thereof. After all, Giant Eagle is the Debtor's largest shareholder, it appointed two of the Debtor's three Board Members and it is designated to receive significant distributions under the Plan, including in the form of preferred stock and solidified rights of control over Seegrid Sub and its post-emergence governance and financing decisions.[92]  Presumably, then, the Debtor's representation that it engaged in extensive, good-faith and arm's-length negotiations with Giant Eagle regarding the Plan was intended by the Debtor to reassure those solicited by the Debtor and influence their willingness to vote in favor of the Plan.

46.      The deposition testimony elicited from the Debtor, however, demonstrates



. Instead,

.[93]

---

[91] *See* Disclosure Statement, p. 2.
[92] *See* Plan Art. 9; Plan, Annex A.
[93] Moravec Tr. 130:12-130:21 (                                                        ").

47.    For example, Mr. Oliveri testified that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[95]    David Heilman, the Debtor's

President, 30(b)(6) witness and First Day Affiant, testified that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████[96]    Mr. Heilman also

████████████████████████████████████████████████████████████████

██████████████████████████████.[97]    Mr. Rock, the Debtor's CEO, similarly testified that ████████

████████████████████████████████████████████████████████████████

████████████████████████████████.[98]

48.    The Debtor's Disclosure Statement is devoid of any discussion of these

facts, each of which is relevant to the Debtor's express representation to those solicited regarding

the Debtor's negotiations with Giant Eagle.  Accordingly, the Debtor failed to provide adequate

disclosure and its Disclosure Statement and solicitation process should not be approved.

**E.    The Disclosure Statement Does Not Contain An Accurate Description Of The Events Which Led To The Filing Of The Bankruptcy Case.**

49.    The Debtor's Disclosure Statement includes an extensive one-sided

diatribe that blames Mr. Horbal and HERC for the Debtor's ills, including but not limited to the

---

[94] *See* Oliveri Tr. 168:18-169:10 ("████████████████████████████████████

████████████.

[95] *See* Oliveri Tr. 169:1-8.
[96] *See* Heilman Tr. pp. 81:9-82:7.
[97] *See* Heilman Tr. pp. 75:20-77:17, 81:9-82:7.
[98] *See* Rock Tr. pp. 105:14-106:10 (████████████████████████████████

████████████████████████████████████████████████████).

Debtor's need to file its bankruptcy case.[99]   As with the Debtor's representation of extensive, good faith and arm's length negotiations with Giant Eagle, the Debtor presumably intended for that unfair narrative to reassure those solicited that the deal dictated by Giant Eagle (*i.e.*, the Debtor's Plan) is a fair deal that should be approved, and to demonize Mr. Horbal and hold out Giant Eagle as Seegrid's savior.

50.   There is, however, an extensive set of facts known to the Debtor that contradicts the narrative included by the Debtor in its Disclosure Statement.  These facts can be found in two lawsuits that members of the Horbal Group filed against Giant Eagle and members of the Debtor's Board of Directors that are controlled by Giant Eagle:  (a) *Anthony Horbal and HERC Management Services, LLC, derivatively on behalf of Seegrid Corporation v. Daniel Shapira, Phillip Oliveri, Hans Moravec, Giant Eagle, Inc. and Giant Eagle of Delaware, Inc.*, Case No. 10023-VCL, in the Court of Chancery of the State of Delaware (the "Delaware Action"); and (b) *Anthony Horbal and HERC Management Services, LLC v. Giant Eagle, Inc. and Giant Eagle of Delaware, Inc.*, Case No. GD-14-013654, in the Court of Common Pleas of Allegheny County, Pennsylvania (the "Pittsburgh Action").

51.   The Disclosure Statement does not mention the Delaware Action or the Pittsburgh Action.  Having chosen to blame the Horbal Group for the Debtor's ills, the Debtor cannot simultaneously fail to include a description of the facts known to it that contradict its narrative or fail to provide additional facts that fairly should be considered by those solicited with that narrative.[100]   Moreover, the Delaware Action is a derivative action.[101]   Accordingly,

---

[99] *See* Disclosure Statement, pp. 1-2, 11-15.

[100] *See Westland Oil Development Corp. v. MCorp Management Solutions, Inc. v. Federal Deposit Insurance Corp.*, 157 B.R. 100, 103 (S.D. Tex. 1993) ("[t]he code requires adequate disclosure, not selective disclosure.").

[101] *See, e.g.*, Verified Derivative Complaint, p. 1 (plaintiff files complaint "derivatively on behalf of Seegrid Corporation").

that complaint includes claims for relief as against Giant Eagle and certain of the Debtor's officers and/or directors that could lead to a recovery that benefits those solicited under the Plan. Again, the Debtor fails to even mention these claims and potential sources of recovery in its Disclosure Statement.[102]   Nor does the Debtor disclose whether Giant Eagle is receiving a release from the Debtor that extends to the derivative claims currently pending against Giant Eagle.[103] For these reasons as well, then, the Debtor's disclosures include material omissions that preclude approval of its Disclosure Statement and solicitation process.

F.   **The Disclosure Statement Does Not Contain Information Relevant To The Risks Posed To Creditors Under The Plan.**

52.   The Debtor discloses certain risk factors related to its Plan, but almost all of them are bankruptcy related.[104]   Given the Debtor's prior business history and the risks associated with the limited financing to be provided by Giant Eagle under the Plan, there are a number of risk factors that the Debtor's stakeholders should have been informed about, including but not limited to:

(a)   The risk that the Debtor will emerge from bankruptcy with less liquidity than disclosed in the Disclosure Statement due to more expenses or Giant Eagle's unwillingness to fund the Debtor due to the Debtor's failure to meet bankruptcy-related or operational milestones;

(b)   The risk associated with having an additional secured claim if the DIP Facility is insufficient and the Debtor needs to obtain additional debtor in possession financing;

(c)   The risk of conflicts of interest between the Boards of Directors of the Reorganized Debtor, Seegrid Sub and/or Giant Eagle;

---

[102] *See* Disclosure Statement.

[103] *See id.*

[104] *Id.*, pp. 48-52 ((a) Classification of claims and interests, (b) non-occurrence of the Effective Date, (c) failure to receive requisite accepting votes, (d) nonconsensual confirmation, (e) failure to confirm the Plan, (f) risk of additional or larger claims, (g) alternative chapter 11 plan, (h) variances from projections based on unanticipated events occuring subsequent to preparation of such projections, (i) certain tax implications of the chapter 11 case, (j) the Debtor's emergence from chapter 11 is not assured, (k) the Debtor may fail to satisfy solicitation requirements, and (l) confirmation and consummation may be delayed if the Debtor has to resolicit).

(d)     The risk that the Debtor's feasibility analysis is incorrect and the ramifications thereof;

(e)     The risk that Giant Eagle and/or Seegrid Sub will need additional financing or take other action post-emergence that reduces the value potentially realized from Seegrid Sub's common stock;

(f)     The risk that funds available to pay the Reorganized Debtor's debt are significantly reduced due to substantial tax obligations created by the subsidiary structure, including profits being taxed at Seegrid Sub and then taxed again as proceeds are distributed from Seegrid Sub to the Reorganized Debtor;

(g)     The risk to stakeholders from the majority and discretionary control to be afforded to Giant Eagle over Seegrid Sub and its governance and financing decisions;

(h)     The risk that the Debtor will not be able to grow its business through either increased sales to existing customers and/or attracting new customers;

(i)     The risk that the Debtor will not be able to adequately protect or enforce its intellectual property;

(j)     The risk that the Debtor will not be able to innovate and keep pace with changing technology;

(k)     The risk from other robotic manufacturers and the concomitant reduction in the Debtor's market share and growth prospects; and

(l)     The risk posed by the Debtor being unable to retain key management and technical personnel.

Each of these risk factors should have been included in the Debtor's discussion of the risks associated with the Debtor's Plan but were not.  Instead, the Debtor avoided any adequate discussion of the business risks associated with its Plan.

53.     Moreover, with regards to the Debtor's reliance on projections of its future financial performance,[105] the Debtor only identified unanticipated events occurring subsequent to the preparation of those projections as a risk factor for consideration by those solicited.[106]  As demonstrated above,[107] ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Accordingly,

---

[105] *See* Disclosure Statement, p. 50.
[106] *See id.*
[107] *See supra*, ¶¶ 33-39.

RLF1 11320772v.4

the Debtor's representation that only unanticipated, subsequent events constituted a risk factor in connection with the Debtor's financial projections was materially misleading.

###### G.   The Disclosure Statement's Liquidation Analysis Is Incomplete.

54.   The Debtor's disclosures regarding its liquidation value are deficient for at least two reasons.  First, the Debtor fails to fairly account for or value (for liquidation purposes) the Debtor's intellectual property.  As more fully discussed in the Expert Report of Ellen I. Larson, dated December 15, 2014 (the "Larson Report"), the Debtor's liquidation analysis (among other things): ███████████████████████████████████████████████

█████████████████████████████████████████ (ii) ███████████████████████

██████████████████████████ ; and (iii) ████████████████████████████

██████████████████████████████████████████████ [108]

55.   If the Debtor's intellectual property is more valuable than currently identified by the Debtor, it is conceivable that one or more classes of the Debtor's creditors could anticipate a full recovery, in cash, from the liquidation of the Debtor's assets.  This information, then, is relevant and necessary to a fair and adequate solicitation process.

56.   Second, the Debtor apparently disagrees with the expert testimony to be proffered by the Horbal Group on the potential value of the Debtor's intellectual property.  But its response, by way of an expert disclosure of Hans Moravec, raises more questions regarding the Debtor's discussion of its business and Plan-related risk factors in its Disclosure Statement than it answers with regards to the value of the Debtor's intellectual property.

57.   Indeed, according to the Debtor, Dr. Moravec is expected to testify that

████████████████████████████████████████████████████████████ .  For example, the Debtor disclosed that Dr. Moravec is expected to testify that ████████████

---

[108] *See* Larson Report, pp. 4-5, 20-24.

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████ ,"[109]  According to the Debtor, Dr. Moravec also will testify that ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ,"[110]  And, rather remarkably,

the Debtor intends to have Dr. Moravec testify that the ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ [111]

58.     The Debtor did not adequately disclose or discuss these ████████

████████████████████████████████████████████████████████ or explain

how Seegrid Sub (Debtor's proposed successor) will handle these ██████████████

████████████ .  Nor did the Debtor identify any of these topics, ████████████████

████████████████████████████████████████ , in the risk factors

that the Debtor included in its Disclosure Statement.[112]  But the Debtor cannot have it both ways.

It cannot fail to disclose known risk factors in its Disclosure Statement and solicitation of its

Plan, and then come before the Court and present those known risk factors in support of its

Disclosure Statement and Plan.

---

[109] Debtor Disclosure, p. 2.
[110] *Id.*
[111] *Id.*
[112] *See* Disclosure Statement, pp. 48-52.

RLF1 11320772v.4

59. Accordingly, the Debtor's failure to adequately discuss and value its intellectual property, and the Debtor's own admissions regarding risk factors not disclosed by the Debtor in its Disclosure Statement, each demonstrates that the Debtor failed to include adequate information in its Disclosure Statement and the Court should require re-solicitation by the Debtor of its proposed Plan.

**H.     The Disclosure Statement Omits Material Information About the Proposed Debtor In Possession Financing**

60. As set forth more fully in the *Objection to the Debtor's Motion for entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code (IV) Granting Liens and Superpriority Claims (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing* (the "DIP Objection") filed concurrently herewith, the Horbal Group objects to the Debtor's proposed debtor-in-possession financing on various grounds. The Horbal Group's incorporates by reference its discussion as set forth in the DIP Objection. These issues were not discussed by the Debtor in its Disclosure Statement. For these reasons, then, the Debtor failed to provide adequate information to those solicited in connection with the Debtor's Plan.

**I.     The Debtor Inadequately Solicited its Plan**

61. As described more fully in the Horbal Group's *Motion for Order Authorizing HERC Management Services, LLC and Great American Health Plans, Inc. to Submit Late Ballots in Connection with the Debtor's Prepackaged Plan of Reorganization* [D.I. 253] (the "Motion to Allow"), the Debtor's solicitation of its proposed Plan was materially deficient. For the reasons more fully detailed therein, the Court should not approve the Debtor's

solicitation process, should require the Debtor to re-solicit its Plan and/or permit the Horbal Group to vote as requested under its Motion to Allow.

## **CONCLUSION**

For all of the foregoing reasons, the Horbal Group respectfully requests that the Court: (i) not approve the Debtor's Disclosure Statement or solicitation process; (ii) require the Debtor to deliver a complete and accurate disclosure in connection with the re-solicitation of its proposed Plan; and (iii) award the Horbal Group such other and further relief as the Court deems just and appropriate.

[Remainder of Page Intentionally Blank]

Dated:  December 30, 2014
        Wilmington, Delaware

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Marcos A. Ramos (No. 4450)
Robert C. Maddox (No. 5356)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Patrick J. Neligan, Jr.
Seymour Roberts, Jr.
NELIGAN FOLEY LLP
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:  (214) 840-5300
Facsimile:  (214) 840-5301

-and-

William A. Brewer III
Catherine Pastrikos
BICKEL & BREWER
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 489-1400
Facsimile:  (212) 489-2384

**COUNSEL FOR THE HORBAL GROUP**