## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEEGRID CORPORATION, | Case No. 14-12391 (BLS) |
| Debtor. | Docket Reference Nos. 398, 399 |

Curtis S. Miller, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE  19899

and

Jonathan D. Marcus, Esquire
Scott Livingston, Esquire
Marcus & Shapira LLP
302 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, PA  15219-6401

*Counsel for the Reorganized Debtor*

Duane D. Werb, Esquire
Werb & Sullivan
300 Delaware Avenue, 13th Fl.
Wilmington, DE  19801

and

William A. Brewer, Esquire
Michael J. Collins, Esquire
Brewer, Attorneys and Counselors
750 Lexington Avenue, 14th Floor
New York, NY  10022

*Counsel for Anthony Horbal,*
*Screaming Eagle Air, Inc.*
*and Great American Health Plans, Inc.*

## OPINION[1]

Before the Court are Seegrid Corporation's ("Seegrid" or the "Company")

objections to Claims 19, 20 and 21 (the "Claims").  The Claims were filed by Seegrid's

former CEO, Mr. Anthony Horbal (or entities controlled by Mr. Horbal) and seek (i)

payment for amounts alleged to be due under Mr. Horbal's employment agreement and

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

(ii) reimbursement of costs relating to Mr. Horbal's use of Seegrid's aircraft on company business.  The matter was well and fully briefed, and a two-day evidentiary hearing was held.  At trial, the Court admitted into evidence over 60 exhibits and heard the testimony of several witnesses, including Mr. Horbal, Mr. David Heilman (Seegrid's Chief Administrative Officer) and Mr. Daniel Shapira (Seegrid's Chairman of the Board of Directors).  For the reasons that follow, the Court will overrule each of Seegrid's objections and allow Claims 19, 20 and 21 in their entirety.

## I. <u>BACKGROUND</u>

Seegrid is a fascinating company.  It is a high-tech startup based outside Pittsburgh, Pennsylvania, and since its inception in 2003 it has been dedicated to the development of self-driving vehicles for use in industrial applications.  As described to the Court, these vehicles (primarily forklifts and pallet trucks) are outfitted with Seegrid's guidance units.  In a nutshell, the guidance units take thousands of images of a route while the vehicle is being driving by a human operator.  Based on these images, the goal is then for the vehicle to be able to retrace the route autonomously and repeatedly.[2]  Seegrid foresees substantial demand for its products in industries that utilize very large manufacturing facilities, such as an automotive plant, a steel mill, or a factory.

---

[2] During the bankruptcy case, Dr. Hans Moravec (a co-founder and a director of the Company) educated the Court on the profound challenges associated with developing a product that will repeatedly drive itself from Point A to Point B.  To a layman, this would seem a relatively simple task in comparison to the complex and massive tasks already carried out by computers today.  However, Dr. Moravec testified that what we would regard as simple tasks any 5-year-old could accomplish – such as recognizing a face, walking across a room to pick up a designated item, or holding a conversation – are the product of millions of years of evolutionary refinement.  What we might regard as more complex or challenging tasks, such as playing chess or Go, or performing higher mathematics, are actually much less challenging to program and accomplish.  Dr. Moravec testified that this principle is known in the field of robotics as the "Moravec Paradox."

Seegrid filed this prepackaged Chapter 11 case on October 21, 2014 (the "Petition Date"). Also on the Petition Date, Seegrid filed its Plan of Reorganization and an accompanying Disclosure Statement. By Order dated January 20, 2015, this Court confirmed the Plan, and the Plan went effective on January 23, 2015. Seegrid is a reorganized debtor and under the terms of the Plan is entitled to file and prosecute objections to claims.

## II.     JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## III.     THE PARTIES' POSITIONS

### A. The Employment Claim

Claim 20[3] was filed by HERC Management Services, LLC ("HERC"), an entity created and controlled by Mr. Horbal. HERC seeks allowance of an unsecured prepetition claim in the aggregate amount of $282,537.66. The lion's share of Claim 20 consists of a $200,000 fee payable upon Mr. Horbal's termination without cause and a $50,000 "quarterly fee" alleged to be due under the Contract. The balance of Claim 20 relates to unpaid health insurance obligations and travel reimbursements.

Seegrid objects to Claim 20 on several grounds. First, Seegrid contends that there was no written contract in effect between the parties at the time of Mr. Horbal's termination. Specifically, Seegrid observes that Mr. Horbal entered into a contract with

---

[3] Joint Exhibit 2.

Seegrid to serve as its "President" on June 16, 2010.  In January 2012, however, Mr. Horbal agreed to become Seegrid's "Chief Executive Officer" upon the resignation of the prior CEO.  Since no new agreement was entered into to cover the new position, Seegrid contends that the agreement terminated and did not continue to govern Mr. Horbal's relationship with the Company.  Alternatively, Seegrid contends that Claim 20 should be disallowed because it believes that Mr. Horbal breached his fiduciary duties and was terminated "for cause".

Mr. Horbal characterizes the Debtor's position regarding termination of the employment agreement as hyper-technical, and an unfair penalty upon him in a situation where he agreed to assume the role of CEO at the request of the Board.  Separately, Mr. Horbal contends that he was not fired "for cause," that no one at the Company ever suggested that he was being terminated for cause, and that there is no Board resolution that would evidence such a termination.  Finally, Mr. Horbal vigorously disputes that he breached his fiduciary duties to Seegrid.

## B.  The Aircraft Claims

Claims 19[4] and 21[5] relate to requests for reimbursement of expenses incurred in connection with Mr. Horbal's travel on two private aircraft leased by Seegrid. [6]  Mr. Horbal owns or controls Screaming Eagle, Inc. and Great American Health Plans, Inc., which lease two aircraft to Seegrid and provide for pilot services for these aircraft,

---

[4] Joint Ex. 1.

[5] Joint Ex. 3.

[6] It is important to note that Seegrid's objections to Claims 19 and 21 are not based on any allegation of non-business personal or family use of the aircraft.  Seegrid acknowledges that Mr. Horbal indeed used the aircraft on Company business, but contends that his use of the aircraft violated corporate policy that, under the circumstances of the trips at issue, would have required use of commercial travel rather than a private jet.

respectively.  Seegrid contends that Mr. Horbal used the aircraft – and particularly a Gulfstream jet capable of international travel – without necessary authorization and in violation of a policy adopted by the Company's Board of Directors.

Mr. Horbal asserts that his use of the aircraft was consistent with all applicable policies, was known at the time to other senior managers of Seegrid, and was necessary for the advancement of the interests of the Company.  He seeks payment for use of the aircraft during each of the flights in question, as well as payment for the services of the pilots.

## IV.    LEGAL STANDARD

When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity of the claim "rests on different parties at different times."  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure, i.e., includes the facts and documents necessary to support the claim, constitutes *prima facie* evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  Pursuant to Bankruptcy Code § 502(a), a claim that is properly filed under Rule 3001 and Code § 501 is "deemed allowed" unless a party in interest objects.  11 U.S.C. §502(a).  "The objecting party carries the burden of going forward with the evidence in support of its objection which much be of a probative force equal to that of the allegations of the creditor's proof of claim."  *In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008) (*citing Allegheny*, 954 F.2d at 173-74).  If the objecting party succeeds in overcoming the prima facie effect of the

proof of claim, the ultimate burden of persuasion then rests upon the claimant to prove the validity of the claim by a preponderance of the evidence.  *Id.*

In this case, Mr. Horbal of course has the benefit of the presumption embodied in Rule 3001 and Code § 502, and each of the Claims was deemed allowed upon filing. Seegrid has responded with competent evidence and arguments in opposition to the Claims.  At trial, therefore, the burden lay with Mr. Horbal to prove the validity of the Claims by a preponderance of the evidence.

## V.    DISCUSSION

As noted above, the Claims fall into two broad categories:  (i) requests for reimbursement for charges and costs associated with travel on company aircraft and (ii) claims arising from the termination of Mr. Horbal as the Chief Executive Officer of Seegrid.  The Court addresses each category in turn.

### A.  The Aircraft Claims

On December 6, 2011, Seegrid entered into a Non-Exclusive Aircraft Lease Agreement (the "G200 Lease")[7] with Screaming Eagle Air, Inc. ("Screaming Eagle"). Screaming Eagle is a privately-held company owned or controlled by Mr. Horbal. Under the G200 Lease, Seegrid arranged for use of a Gulfstream G200 jet aircraft at a rental rate of $4,770 per hour.  Separately, Seegrid leased another aircraft called a Pilatus PC-12 (the "Pilatus")[8], which was a propeller plane and substantially less expensive to use than the G200.

---

[7] Joint Ex. 8.
[8] Joint Ex. 7.

Screaming Eagle filed Claim 19 in the amount of $274,408.59 on account of prepetition invoices for flights on the G200.  As a result of negotiations and discussions between the parties prior to trial, the amount of Claim 19 that remains unpaid and disputed by the Seegrid is $241,924.86.

A separate but related Claim was filed by Great American Health Plans, Inc. ("Great American").  Claim 21 was filed by Great American, which is another entity owned or controlled by Mr. Horbal.  Great American was engaged by contract with Seegrid to provide the pilots and related support services for Seegrid's use of company aircraft.[9]  By Claim 21, Great American seeks $28,800 for pilot services relating to the flights identified in Claim 19.  All in, Mr. Horbal (through his corporate entities Screaming Eagle and Great American) presently seeks the sum of $270,724.86 for Claims 19 and 21 on account of the use of Company aircraft.

Seegrid does not really dispute that Mr. Horbal took the trips described in Claims 19 and 21 for business purposes.  Seegrid does, however, contend that his use of the G200 was in violation of a formal corporate policy which encouraged use of commercial air travel or the Pilatus before using the more expensive G200.  Seegrid reasons that Mr. Horbal should not be reimbursed for trips taken in violation of corporate policy established by the Board of Directors.

Seegrid's Board of Directors adopted a "Non-Commercial Aircraft Travel Policy" (the "Aircraft Policy") on January 31, 2012.[10]  It recites that its purpose is to:

---

[9] Joint Ex. 9.
[10] Joint Ex. 10

- Establish guidelines for employees with respect to what should be considered in determining whether to fly via commercial or non-commercial aircraft;

- Establish policies for the transportation of Seegrid passengers and cargo when non-commercial aircraft is selected; and

- Establish the basis for payment of the costs of approved non-commercial air travel.[11]

The Aircraft Policy lays out how use of the Pilatus and the G200 are to be authorized in advance of travel by company personnel:

- Each request for non-commercial air travel must first be approved by the appropriate department head and then submitted to the appropriate executive officer of Seegrid for final approval.  The Chief Administrative Officer will have the authority to make final approval in the case of travel on the Pilatus PC-12 Aircraft (the Pilatus"), **and the Chief Executive Officer will have the authority to make final approval, in the case of travel on the Gulfstream G200 Aircraft (the "G200").**

- The G200 shall be used as infrequently as possible. Consideration must always be given to using the Pilatus as the preferred non-commercial aircraft.  In any event, but subject to the foregoing criteria, the G200 shall only be used for international travel and travel to the States of California, Oregon and Washington, and in situations where the Pilatus cannot accommodate the number of passengers and/or cargo to be transported.[12]

Finally, the Aircraft Policy provides for payment by the Company to Screaming Eagle and to Great American for use of the G200 and the Pilatus and related pilot services:

**Payment.**  When authorized in accordance with this policy, the Company will pay for use of the Pilatus and the G200 based on the rental charge per block hour as set forth in the Non-Exclusive Aircraft Lease Agreements for

---

[11] Joint Ex. 10 at § 1.
[12] Joint Ex. 10 at § 4 (emphasis added).

each of such aircrafts entered into between Seegrid and Screaming Eagle Air, Inc. dated as of December 6, 2011, or any successor agreements approved by Seegrid Board of Directors.  In addition, Seegrid will pay for fuel, and will pay for pilot services in accordance with the terms of that certain Pilot Services Agreement entered into between Seegrid and GAHP dated as of November 28, 2011, or any successor agreement approved by the Seegrid Board of Directors.  In any event, the Company's total payments for the use of the Pilatus and the Company's total payments for the of the G200 must be less than the amounts the Company would pay an unrelated non-commercial aircraft service for use of the same model Pilatus and the same model G200, respectively.[13]

Seegrid contends that the Aircraft Policy was subsequently modified in late 2012 to impose significant restrictions upon use of the G200.  The new policy, according to Seegrid, was occasioned by increasing liquidity constraints and would have required Board approval prior to use of the G200 by anyone, including Mr. Horbal.

Mr. Horbal disputes that there was any such new policy, and he correctly points out that there is no document or resolution that would indicate a revision to or replacement of the Aircraft Policy approved by the Board in January of 2012.  In this case, the Aircraft Policy is the governing document and Seegrid has not demonstrated that it was replaced or formally amended:  at most, the testimony supports a finding that the Board wished to limit use of the G200 as part of a broader effort to manage expenses in a time of financial strain.[14]

Construing the Aircraft Policy, the Court concludes that Mr. Horbal had authority to approve use of the G200:  "[T]he Chief Executive Officer will have the authority to make final approval, in the case of travel on the Gulfstream G200."[15]  The

---

[13] Joint Ex. 10 at § 5.
[14] Feb. 1 Tr. at 173-176 (testimony of David Heilman); at 96-97 (testimony of Anthony Horbal).
[15] Joint Ex. 10 at § 4.

record adduced at trial reflects that each of the challenged trips was in fact for a legitimate business purpose, and Mr. Horbal testified as to each flight and why he believed use of the G200 was necessary or appropriate in each circumstance.  It is true that several of the domestic flights identified in Claims 19 and 21 did not involve the west coast destinations contemplated in the Aircraft Policy, but the record supports Mr. Horbal's testimony that the flights were necessary and that Mr. Heilman was made aware of the use of the G200.[16]

The Court will focus special attention on the flights reflected in Invoices 8006 and 9006.  These invoices are detailed in Claims 19 and 21, respectively, and relate to a multi-stop European trip taken by Mr. Horbal in early 2013.  The aggregate charges from this four-day trip total $116,202.68, or nearly half of the total value sought through Claims 19 and 21.  Mr. Horbal testified to a series of client or customer meetings, and further testified to the time sensitivity that required use of the G200.[17]

The Aircraft Policy rested discretion and authority over the use of the G200 squarely with Mr. Horbal.  The Court carefully considered Mr. Heilman's and Mr. Shapira's testimony regarding an alleged modification or new policy, but in the absence of a writing and considering Mr. Horbal's contrary testimony, it cannot be

---

[16] Feb. 1 Tr. at p. 94-95.

[17] Indeed, Mr. Horbal testified with arresting candor regarding his personal assessment of the value of his time.  In response to cross-examination regarding the significant expense of this trip as compared to a trip with similar stops on commercial airlines, Mr. Horbal provided the following testimony:

> QUESTION:  Did you look into the cost of what it would have been to get the best first-class ticket you wanted to go to these locations?
> ANSWER:  You know,  . . . I couldn't have done it in 96 hours or less and my time mattered.  I was running 80 people and we were on a challenge a competitive challenge to deliver a product to the market, including Toyota, NACCO, Lindy, that worked – Nilfisk.
> I didn't have the time or the luxury, ***that's why us guys, us one-percenters fly around in jets***.

Feb. 1 Tr. at 106 (emphasis added, but hardly required).

demonstrated that the Board-approved policy was indeed changed or that prior Board approval was required for Mr. Horbal's use of the G200.  At most, the record reflects that Mr. Horbal was encouraged or admonished to limit expenses in a later time of tight finances.  Based upon the authority granted Mr. Horbal under the Aircraft Policy and the testimony reflecting the business purpose of the various flights, the Court finds that Mr. Horbal has carried his burden regarding Claims 19 and 21.[18]  These Claims are allowed.

### B. The Employment Claims

In June 2010, Mr. Horbal (acting through HERC, an entity owned and controlled by Mr. Horbal) entered into a Consulting/Management Services Agreement (the "Agreement")[19] whereby Mr. Horbal was engaged to serve as President of Seegrid. Nearly two years later, in January 2012, Mr. Horbal was asked by Seegrid to serve as the Company's Chief Executive Officer.  No new or amended agreement was ever executed to formalize Mr. Horbal's new role and responsibilities.

On April 16, 2014, Mr. Horbal tendered his resignation effective December 31, 2014.[20]  Shortly thereafter, on July 14, 2014, Seegrid's Board terminated Mr. Horbal effective immediately.[21]

Mr. Horbal (again, acting through HERC) filed Claim 20 in the amount of $282,537.66 for amounts alleged to be due under the Agreement.  The majority of Claim

---

[18] Seegrid also contends that Mr. Horbal affirmatively waived his right to reimbursement, or acknowledged that the flights were not reimbursable.  Feb. 1 Tr. at 98-102.  However, the record reflects at most that Mr. Horbal deferred getting paid or reimbursed for flights during a period where Seegrid was in a cash crunch.  Such deferral is not remarkable in a start-up company or a distressed enterprise.

[19] Joint Ex. 6.

[20] Joint Ex. 49.

[21] Joint Ex. 28 and 35 (Board resolutions and minutes regarding Mr. Horbal's resignation and termination).

20 consists of a $200,000 termination fee under the Agreement and a $50,000 consulting fee. The remainder of Claim 20 relates primarily to unpaid health insurance reimbursements and business travel expenses.

Seegrid objects to Claim 20 in its entirety. The objections fall into three separate categories: first, Seegrid contends that the Agreement was effectively terminated when Mr. Horbal shifted in 2012 from President to Chief Executive Officer. Since the Agreement expressly contemplated only Mr. Horbal's role as President, Seegrid reasons that it cannot cover him in a different position, and so Mr. Horbal cannot assert any claims under the Agreement. Second, even if the Agreement remained valid and enforceable, Seegrid claims it terminated Mr. Horbal for cause because Mr. Horbal breached his fiduciary duties to the Company. Finally, Seegrid objects to Claim 20 on the ground that Mr. Horbal failed to disclose a prior felony conviction. As noted above, Mr. Horbal disputes that his termination was for cause. If it was not, and assuming the Agreement was still in effect, Mr. Horbal contends that the Agreement affords him the recoveries identified in Claim 20. The Court will address each of these arguments in turn.

### i. <u>Was the Agreement Terminated in January 2012?</u>

Seegrid correctly notes that the Agreement is quite specific regarding the office Mr. Horbal was to hold:

> WHEREAS, the Company has sought out the services of
> Anthony Horbal for the role as the Company's President (or,
> if the Company requests and Herc agrees, Vice Chairman)
> and Horbal is willing to serve in such capacity provided that
> such services can be rendered as an employee of Herc; and

> WHEREAS, the Company desires to engage Herc to provide
> the Services (as defined in Section 3), including the services
> of Horbal as the Company's President (or, if the Company
> requests and Herc agrees, Vice Chairman) and Herc desires
> to accept such engagement, in accordance with the terms
> and conditions of this Agreement ("Services").[22]

The record reflects that Mr. Horbal continued in his capacity as President until early

2012, when Dr. Scott Friedman, the Company's CEO, resigned.  At that point, the Board

requested that Mr. Horbal take over as CEO.

As noted, no new agreement or amendment to the existing Agreement was

entered into.  The Agreement expressly provides that it "may not be amended or

modified except by a written agreement executed by the parties."[23]  The record reflects

that Mr. Horbal's attorney subsequently contacted counsel for Seegrid by email in April

2012 to suggest an amendment to the Agreement to reflect the new position.[24]  The

proposed amendment was limited to (i) changing the title from President to CEO, and

(ii) providing for a termination bonus on terms similar to that provided to Seegrid's

former CEO.[25]  The record does not indicate that Seegrid responded to this

correspondence.  In any event, no new or amended Agreement was entered into.

Seegrid's argument here has an appealing simplicity:  if the Agreement was

limited to services as President, then it must have ceased to be operative when Mr.

Horbal became CEO.  In the absence of an agreement, Mr. Horbal was an at-will

employee as CEO and therefore is not entitled to recover anything under the

---

[22] Joint Ex. 6 at 1.
[23] Joint Ex. 6 at § 16(b).
[24] Joint Ex. 37.
[25] *Id.*

Agreement upon his termination.  And Seegrid cites to Pennsylvania law[26] for the

proposition that the proposed-but-unaccepted amendment mentioned above proves

that the old Agreement ended and that no new agreement was reached.  *Auerbach v.*

*Kantor-Curley Pediatric Assocs., P.C.*, 2004 WL 870702 (E.D. PA. 2004).

 Mr. Horbal responds that both he and Seegrid continued to abide by and operate

under the terms of the agreement following his ascension to the CEO position.

Specifically, Seegrid provided Mr. Horbal with precisely the same compensation and

benefits he enjoyed as President under the Agreement.

 Mr. Horbal acknowledges that the Agreement was never formally amended, and

that the amendment proposed by his counsel was not acted upon.  However, he takes

issue with the Company's contention that Pennsylvania law estops him from proving

that the Agreement remained in effect.  Mr. Horbal correctly notes that Pennsylvania

contract law recognizes that a contractual arrangement may be modified by subsequent

conduct, and contends that this is what happened here.  *See, Somerset Cmty. Hosp. v.*

*Allen B. Mitchell & Assoc., Inc.*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996) ("An agreement

that prohibits non-written modification may be modified by subsequent oral agreement

if the parties' conduct clearly shows the intent to waive the requirement that the

amendments be made in writing.").

 In considering the competing constructions of Pennsylvania law offered by the

parties, the Court concludes that Mr. Horbal has the better argument on several

grounds.  First, Seegrid's heavy reliance on the *Auerbach* decision is misplaced.  In that

---

[26] Joint Ex. 6 at § 16(a) (providing that the Agreement is governed by Pennsylvania law).

case, a physician's employment agreement contained a provision that it could not be modified or amended, except in writing. *Auerbach*, 2004 WL 870702 at *1. The parties formally amended that agreement in writing eight separate times, and then the employer declined to further amend (and renew) the agreement just two months before the physician was terminated. *Id.* at *2 ("[Employers] made their decision not to present Plaintiff with another contract amendment."). *Id.* at *2-3. The court in *Auerbach* concluded that the parties had not renewed the agreement, and therefore the physician was an at-will employee. In so ruling, the Court placed heavy emphasis on the long and substantial course of conduct of the parties, who had scrupulously adhered to the written amendment requirement, and then terminated the plaintiff promptly after the expiration of the final extension of the agreement. *Id.*

Here, by contrast, Mr. Horbal continued to work for several years after switching positions. The only new proposal was intended to memorialize a new title, and to suggest a larger termination bonus. Seegrid and Mr. Horbal continued in all respects to operate in a business-as-usual fashion, and the Pennsylvania decisional law cited by Mr. Horbal clearly covers the "modification by subsequent conduct" doctrine described in *Somerset,* notwithstanding the Agreement's requirement of written amendment.

Second, there is nothing in the record to suggest or support that either side believed in 2012 that the Agreement had ceased to be operative. Thus, to raise this contention years later, after Mr. Horbal changed positions at the request of the Board and in the CEO position for several years, smacks of a bait-and-switch argument that will not defeat a Claim asserted under the Agreement. The Agreement did not lapse

upon Mr. Horbal's transition from President to CEO, and Mr. Horbal is entitled to seek to recovery under the Agreement on account of his termination.[27]

### ii.    Did Mr. Horbal breach his fiduciary duties, warranting his termination "for cause"?

In its objection to Claim 20, Seegrid offers alternative theories.  First, as discussed above, Seegrid contended that the Agreement had lapsed and that it could therefore treat Mr. Horbal as an at-will employee and terminate him for any (or no) reason.  The Court has rejected that theory.  Separately, Seegrid contends that even if the Agreement survived, Mr. Horbal was terminated "for cause."   The cause identified by Seegrid relates to two areas:  (i) Mr. Horbal's alleged disruptive and threatening conduct toward other Company Board members; and (ii) his refusal to allow a representative of Giant Eagle, Seegrid's largest stakeholder (and ultimately the Plan sponsor in this bankruptcy case), to review the Company's books and records.  Seegrid contends that Mr. Horbal's conduct constituted a breach of his fiduciary duty, which is defined as "cause" in the Agreement.[28]  Termination for cause would prevent any recovery by Mr. Horbal under the Agreement beyond the pro rata portion of any monthly fee then due and owing.[29]

As a threshold matter, however, the Court notes that there is no contemporaneous writing – not a termination letter, not a board resolution, not even an

---

[27] Seegrid also contends that any claim under the Agreement should be cut off as of December 31, 2014, since Mr. Horbal had committed to resign effective that date.  However, the Court finds the Company's termination of Mr. Horbal in July 2014 triggers the full contractual obligation.

[28] Joint Ex. 6 at § 6(a)(ii)(defining "cause" as, *inter alia,* "any act or omission by Herc or Horbal which in the good faith judgment of the Board, constitutes breach of Horbal's fiduciary duty to the Company.")

[29] Joint Ex. 6 at § 6(a)(1).

email – to support the proposition that Seegrid fired its CEO for cause.[30]  As the Court

observed at trial,[31] this presents a significant initial proof challenge for Seegrid:  in the

Court's experience, when a company (and especially a company as actively represented

by counsel as Seegrid) fires a senior executive for cause, somebody usually writes it

down.  That didn't happen here, and the Court is deeply skeptical that Seegrid actually

fired Mr. Horbal for cause in July 2014.[32]  It is abundantly clear that the Board was

thoroughly sick and tired of dealing with Mr. Horbal, but that hardly rises to the level

of "cause" under the Agreement.

Seegrid offered the testimony of David Heilman and Daniel Shapira, the

Company's Chief Administrative Officer and its Chairman, respectively, to demonstrate

that Mr. Horbal's conduct warranted his termination for cause.  The record reflects that

Seegrid was in a liquidity crisis in mid-2014 and was desperate for funding to ensure its

survival.  Messrs. Heilman and Shapira each testified that, at Board meetings

throughout this period, Mr. Horbal was at times verbally abusive and threatened the

other Board members with litigation.[33]  Mr. Horbal did not really deny these

allegations, but observed that he is "a passionate guy" and that he sought to remind the

other Board members of their fiduciary duties.[34]

---

[30] *See* Joint Tr. Ex. 35 (Board minutes from July 11, 2014 meeting adopting resolution: "RESOLVED, that the Board hereby terminates Anthony Horbal as the Company's Chief Executive Offices, effective immediately.").

[31] Feb. 1 Tr. at 84-86.

[32] In its post-trial submission, Seegrid correctly notes that it was not legally required to effect Mr. Horbal's termination in writing, and the Court does not suggest otherwise.  The lack of a writing or other credible evidence, however, presents an evidentiary challenge for Seegrid, particularly where the only affirmative evidence proffered by Seegrid is the hedged testimony of Mr. Shapira stating that he told Mr. Horbal that he was "going to seek to fire you for cause." Feb. 2 Tr. at 48.

[33] Feb. 1 Tr. at 189-190; Feb. 2 Tr. at 50.

[34] Feb. 1 Tr. at 47.

Mr. Horbal testified that he was aware of the cash crunch the Company was in, but that he saw it as his duty to press for alternatives and to warn against the risk that Giant Eagle, the Company's largest stakeholder, might seize control of Seegrid as a result of this crisis.[35]  Mr. Horbal may have been right or wrong in this, but the record does not support any finding that he breached his fiduciary duty in this context.

The other incident Seegrid relies upon occurred on July 9, 2014.  In the throes of the liquidity crisis, Giant Eagle sent Mr. James Rock to the Company to review its books and records in connection with a potential investment by Giant Eagle.  The testimony reflects that Mr. Rock's visit had been approved by Mr. Heilman, but that Mr. Horbal was only informed of the visit "about 20 minutes before" Mr. Rock was to arrive.  Mr. Horbal testified that he met Mr. Rock in the lobby and refused to provide him access to the Company's books and records.  Mr. Rock then left the building.  The testimony of Mr. Heilman and Mr. Rock both reflect that Mr. Rock was provided with the relevant Company information by Mr. Heilman within a few hours of his abortive visit to Seegrid.[36]

Seegrid contends that Mr. Horbal's conduct jeopardized the potential Giant Eagle funding, which represented the Company's only possible lifeline at that critical time.  And perhaps so.  But again, while it was clearly annoying to the Board members, it is hardly a breach of his fiduciary duty or conduct sufficient to warrant termination for cause.  Mr. Horbal was the CEO of the Company and declined to permit a third party to review confidential business information where he had not been advised about

---

[35] Feb. 1 Tr. at 51-52.
[36] Feb. 1 Tr. at 206.

the visit in advance.  And again, the record is undisputed that Mr. Rock ended up

getting all of the information he sought within an hour or two.

The bottom line is this:  there is no doubt that Mr. Horbal became difficult to deal

with as the Company's crisis deepened.  Seegrid complains of a variety of Mr. Horbal's

other actions (not mentioned in its objections, but brought out at trial) that it believes

jeopardized or harmed valuable customer and investor relationships.[37]  Mr. Horbal

testified that he was acting in an effort to save the Company that he and others had

spent years and millions of dollars building, and he was simultaneously attempting to

stave off what he saw as the effective seizure of the Company by its largest

stakeholder.[38]  Again, he may have been wrong in his assessment of the situation and

Seegrid's options, and in how he went about attempting to remedy the crisis.  Seegrid is

on record as blaming Mr. Horbal for the entire Chapter 11 filing, as it contends that his

refusal to consent to the Giant Eagle funding compelled the Company to file a

bankruptcy proceeding to implement that transaction.[39]  Seegrid's Board was, on this

record, entirely within its right to conclude that Mr. Horbal did not share the Board's

vision for where the Company should go.  And the Board had every right to terminate

him (and ultimately – and perhaps predictably – to install Mr. Rock as the new CEO, at

---

[37] *See, e.g.*, Feb. 1 Tr. at 184-186 (Mr. Heilman's testimony regarding an unauthorized trip by Mr. Horbal to Raymond Corp., one of the Company's largest customers).

[38] Joint Ex. 34 (minutes from July 11, 2014, reflecting the Board's consideration of the Giant Eagle investment and Mr. Horbal's position that "the Company should not accept the term sheet from Giant Eagle, relying instead on receivables and, if necessary, a temporary furlough of employees to manage the Company's cash position.  Mr. Shapira stated his view that a furlough of employees, even for a short time, would effectively put the Company out of business."  The Board then voted to approve the Giant Eagle term sheet over Mr. Horbal's opposition.

[39] See Declaration of David Heilman in Support of Debtor's Voluntary Chapter 11 Petition and First Day Motions, at paragraph 14 ("[T]he Horbal Group's refusal to consent to Seegrid's proposals has forced Seegrid to reorganize under the protection of the Bankruptcy Code.").

the direction of Giant Eagle).  But the termination was not for cause, Mr. Horbal did not

breach his fiduciary duties,[40] and Seegrid must honor its obligations to him under the

Agreement.

### iii.    Did Mr. Horbal's Prior Felony Conviction Warrant His Termination For Cause?

Seegrid's final basis for objection to Claim 20 is that Mr. Horbal failed to disclose

a prior felony conviction.  The record reflects that, in the 1980s, Mr. Horbal operated a

retail fur business when he was in his twenties.  He testified at trial without

contradiction that in 1987, one of his trucks was stopped by a customs agent at the U.S.

– Canada border.  The necessary paperwork was not in order, and Mr. Horbal was

apparently charged with making a false statement to a federal official.  The record

reflects that Mr. Horbal was not in the truck or traveling with the shipment.  Mr. Horbal

testified that, on the advice of counsel at the time, he pled guilty and paid a small fine.[41]

He also testified credibly that he "was not well represented" in connection with this

incident.[42]

Mr. Horbal testified in his deposition that he disclosed the existence of the

conviction to Mr. Heilman and to Mr. Shapira when he joined the Company in 2009.[43]

Seegrid contests this, and contends that it only learned of the conviction after

terminating Mr. Horbal.  Seegrid further notes that Pennsylvania law permits it to rely

upon subsequently-discovered information to justify Mr. Horbal's termination for

---

[40] Seegrid does not appear to specify which of Mr. Horbal's fiduciary duties was breached.  On this record, the Court does not find a breach of either his duty of care or his duty of loyalty.

[41] Feb. 1 Tr. at 138-139.

[42] Feb. 1 Tr. at 139.

[43] Horbal Deposition Designation at 19.

cause.  *Dobinsky v. Crompton & Knowles Colors, Inc.*, 2004 WL 2302 686 at *3-6 (M.D. Pa. 2004).

The Court finds that the record supports that Mr. Horbal timely disclosed the conviction.  Further, the Court observes that the decades-old conviction is a relatively minor consideration in the context of Mr. Horbal's relationship with Seegrid, and that it appears that attention to this event is little more than a post-hoc attempt by the Company to justify the termination.[44]

### IV.    CONCLUSION

For the reasons stated above, the Court will overrule Seegrid's objections and allow Claims 19, 20 and 21 in their entirety.  Counsel shall promptly confer and submit a proposed form of order memorializing the Court's ruling within fourteen (14) days of the date hereof.

**BY THE COURT**:

Dated: October 27, 2016
Wilmington, Delaware

_____
Brendan Linehan Shannon
Chief United States Bankruptcy Judge

---

[44] A restaurant patron asked the waiter, "What's the soup of the day?"  The waiter said, "Ox-tail soup."  The diner responded, "That's a long way back to go for soup."